**25**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Kurt F. Vote #160496
Steven K. Vote #309152
Danielle J. Bethel #315945
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail:  rwalter@wjhattorneys.com
         dbethel@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 23-10457 |
| MADERA COMMUNITY HOSPITAL, | DC No.:  WJH-1 |
| Debtor in Possession. | Chapter 11 |
| Tax ID#: 23-7429117<br>Address: 1250 E Almond Avenue<br>Madera, CA 93637 | Date:  N/A<br>Time:  N/A<br>Place:  2500 Tulare Street<br>Courtroom 11<br>Fresno, CA 93721<br>Judge:  Honorable Jennifer Niemann |

## DECLARATION IN SUPPORT OF APPLICATION FOR ORDER SHORTENING TIME OF EMERGENCY MOTIONS

I, Karen Paolinelli, hereby declare and represent as follows:

1.     I am the Chief Executive Officer of Madera Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor").  I am primarily responsible for the overall management of the Debtor.  I am generally familiar with the day-to-day continuing operations, assets, and financial affairs of the Debtor.

Declaration in Support of Application for Order    1    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                 Docs re Multiple Emergency
                                                     Motions\Declaration.031023.docx

2.    Unless as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (my own or information gathered from others who report to me), my review of relevant documents, or my opinion based upon my experience.

3.    I submit this Declaration in support of the "first-day" relief that the Debtor has requested by the emergency motions (the "Emergency Motions") discussed below, and to assist the Court and other interested parties to understand this Case. The relief sought in the Emergency Motions is intended to enable the Debtor to continue to function. I have reviewed the Emergency Motions and believe that the relief sought in each of them is essential to the continued functioning of the Debtor's business.

4.    After filing of the Petition, the Debtor filed the following Emergency Motions:

    a.    Emergency Motion for an Entry of an Order: (i) Authorizing Debtor to (a) Pay certain Pre-Petition Wages, Salaries, Employee Benefits, and other Compensation and (b) Pay Pre-Petition Reimbursable Employee Pre-Petition Expenses; and (ii) Authorizing and Directing the Banks to Pay all Checks and Electronic Payments Requests Made by the Debtor Relating to the Foregoing [WJH-2];

    b.    Emergency Motion for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral, (b) Granting Adequate Protection for Use of Petition Collateral and (c) Granting Relief Requested [WJH-3];

    c.    Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms [WJH-4];

    d.    Emergency Motion for Order (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (b) Determining Adequate Assurance of Payment for Future Utility Services [WJH-5];

    e.    Emergency Motion to Sell Personal Property (Excess Medical Supplies) [WJH-6];

    f.    Emergency Motion for Order Limiting Scope of Notice [WJH-7]; and

Declaration in Support of Application for Order          2          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                    Docs re Multiple Emergency
Motions\Declaration.031023.docx

g.   Emergency Motion for authority to Maintain Insurance Coverage and Pay Insurance Premiums [WJH-8].

5.   This Declaration is divided into parts: Part I of this Declaration provides an overview of the Debtor's business; Part II provides a discussion of the Debtor's financial history, assets and the events leading up to commencement of this Case, and the Debtor's goals for the Chapter 11; and Part III sets forth the relevant facts in support of the Emergency Motions.

## I.

## BACKGROUND

Madera Community Hospital is a non-profit California Corporation ("MCH" or "Hospital"). It owns a general acute care hospital in Madera, California. The hospital is licensed (in suspense) for 106 beds and currently has 31 full time employees and 4 per diem employees, most of whom are administrative personnel and physical plant maintenance persons. Since December 26, 2022, the Debtor has laid off over 700 employees. It is the only adult hospital in the county and served a population of about 160,000 people, some of whom are uninsured and many of whom are of lower income. The closest hospitals with emergency rooms are 23.5 miles away in Fresno or 35 miles away in Merced, both of which are long distances in an emergency situation.

As discussed below, in December 2022, Saint Agnes Medical Center ("SAMC"), after receiving conditions imposed by the California Attorney General, terminated negotiation of an affiliation agreement with MCH which resulted in MCH shutting down all medical services. Since January 10, 2023 no medical services have been provided at the hospital. There are no patients. All patient care has ceased. Operations, however, continue as the Debtor is pursuing collections and recoveries, preserving its facilities, and pursuing suitors.

MCH also had a Rural Health Clinic in Chowchilla, a Rural Health Clinic in Madera, a Rural Health Clinic in Mendota, all of which were closed on January 10, 2023.

MCH previously provided the following services: Clinics, Diagnostic Imaging, Inpatient Care, Dialysis, Emergency Department, Intensive Care Unit, Telemedicine, and

Declaration in Support of Application for Order     3     R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                      Docs re Multiple Emergency
                                                          Motions\Declaration.031023.docx

Gastroenterology, Labor & Delivery, Telemetry, Medical Surgical Inpatient Services, Medical Guard Unit and Maternity.

Although MCH is not currently treating patients, it has extensive ongoing operations relating to preserving its assets, seeking "suitors" and exploring resumption of operating its clinics.

MCH is governed by a volunteer Board of Trustees consisting of community leaders: Diedre da Silva, Chair, Stell Manfredi, Vice Chair, Robert Poythress, Finance Committee Chair, Monte Pistoresi, Secretary, Mohammad Arain, M.D., Past Chief of Staff, Don Warnock, Executive Member, Aftab Naz, M.D., Chief of Staff, Jon Basila, Anita Eden, Bruce Norton, Jan Zitek, Mike Diebert, Jay Mahil and Wally Nishimoto.

The leadership of the hospital consists of myself, Karen Paolinelli, MSN, RN, FNP-C, PA-C, Chief Executive Officer. The CFO is Shondale Seymour on a contract basis. The Controller is Aaron Chambers, also on a contract basis.

As with many other rural hospitals serving a largely uninsured population, MCH has sustained many financial setbacks in recent years and the COVID pandemic accelerated the financial problems. The governmental reimbursement fees and health plan fees paid to MCH were wholly insufficient and did not cover the costs of care we are required to provide.

For the past two and a half years, MCH and the courageous nurses, physicians and caregivers that treat patients, went far above and beyond battling COVID. This response took a significant toll on the financial health of MCH. While there have been "lifelines" tossed out, the lifeline has dried up and without help MCH has withered and will soon die without immediate care.

A recent 2022 American Hospital Association report highlights that there has been a significant increase in costs of labor, drugs, equipment and supplies, including food and energy costs, all of which are being exacerbated by extremely high inflation especially for 2022. Some of the key findings of the AHA report show:

Declaration in Support of Application for Order          4          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                Docs re Multiple Emergency
                                                                   Motions\Declaration.031023.docx

A.    Labor expenses, which account for more than 50% of MCH's total expenses, on a nationwide basis, increased 19% per patient in 2021 compared to 2019. Even more in 2022.

B.    Average hospital drug expenses in 2021 were 37% higher per patient compared to 2019. Even more in 2022.

C.    Medical supply expenses have jumped by 21% per patient through the end of 2021 compared to 2019. Even more in 2022.

D.    At the same time, Medi-Care and Medi-Cal, which is relied upon by 84% of the patients seen by MCH, reimburse less than the cost of providing the care and their rate increases have not been enough to sustain the Hospital. The rates paid to MCH are among the very lowest in California. Pleas to the State government have fallen on deaf ears.

E.    The bottom line is that MCH has done everything it can to increase its revenues, but the increasing expenses caused MCH to sustain a loss of $2.0 - $2.5 million per month during 2022. This plus the failure of the affiliation led to the closure.

Beginning in 2021 and continuing to this day, MCH embarked on evaluating and identifying potential relationships with other healthcare systems. In 2021 MCH identified a possible afflation with Saint Agnes Medical Center ("SAMC") and its parent, Trinity Health Care System ("Trinity"). Protracted negotiations ensued. SAMC made significant loans to MCH. When the proposed affiliation was presented to the Attorney General of the State of California, the Attorney General, after many months of delay, sought to impose conditions that were unacceptable to SAMC. As a result SAMC terminated the affiliation agreement. This, thus, forced MCH to file Chapter 11 as it ran out of money and was unable to pay employees.

MCH has the following major assets: Cash $5,000,000, Hospital campus $16,000,000-$60,000,000, incoming provider fees receivable/government transfers $24,000,000, $1,500,000 in receivables, $00.00 to $20,000,000 million of FEMA reimbursements, miscellaneous personal property assets $3,000,000 (est.) and a 35-acre farm property valued at $535,000, and a long term note valued at $485,000 which is secured by real property.

Declaration in Support of Application for Order    5    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                    Docs re Multiple Emergency
                                                        Motions\Declaration.031023.docx

The major secured creditor of MCH is SAMC, to whom $15,400,000 is owed. New England Sheet Metal and one of its subcontractors, Patterson Drywall, together assert four mechanic's liens for about $1,100,000.

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims. MCH is a very sick hospital.

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manages its affairs as a debtor in possession. No trustee, examiner, ombudsman or committee has been appointed. There are no patients being treated by the Debtor. The Debtor is aggressively soliciting new suitors and evaluating ways to restart and resume operations, including reopening its medical clinics.

## II.

## FINANCES

### A.     The Debtor's Campus

The Hospital is located at 1250 E Almond Avenue, Madera, California 93637. The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves. The Debtor owns the entire 39.5 acre campus with the hospital and medical buildings. Two buildings on the campus are owned by physicians on land leased from the Debtor. The Debtor formerly leased three other facilities: the Chowchilla Medical Center Rural Health Clinic in Chowchilla, the Family Health Service Rural Health Clinic in Mendota, and the IT facility in Madera. All three facilities have been relinquished to the landlords. The Debtor has three suspended construction

Declaration in Support of Application for Order     6     R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                        Docs re Multiple Emergency
                                                            Motions\Declaration.031023.docx

projects on the main campus. The estimated value of the hospital campus is $16 million to $60 million.

### B. The Debtor's Staff

The Hospital is licensed ("Suspended") to operate 106 beds. The license is suspended. Approximately 160 doctors have privileges at the Hospital. As of the Petition Date, the Debtor employed approximately 30-35 people. The current personnel include, but are not limited to, administrative and office staff, technicians, maintenance staff, IT staff, human resources staff, medical records personnel, engineering and housekeeping services. The staff are needed to collect on money owed and to mothball the facility and preserve it for future use. Over 700 employees were laid off since late-December 2022 following issuance of a WARN Act notice.

### C. The Debtor's Services

MCH previously provided the following services: Clinics, Diagnostic Imaging, Inpatient Care, Nephrology, Emergency Department, Orthopedics, Telemedicine, Endocrinology & Gastroenterology, Medical Imaging, Primary Care, and Women's Health. All Patient services ceased January 10, 2023. The Debtor has historically treated approximately 3,000 patients per month in the Emergency Room, of which approximately 200 were eventually admitted to the Hospital. Annually, the Debtor had approximately 2,500 patients admitted to the Hospital, not including newborns. Doctors working in the Hospital performed approximately 3,000 outpatient surgeries and approximately 1,500 inpatient surgeries, and delivered approximately 725 babies, and 200 C-sections annually. The Debtor also operated three medical clinics.

### D. The Debtor's Management

As noted above, I am the Debtor's Chief Executive Officer. I have served in this position since November 2017. Prior to that, I was the Chief Operating Officer. I have a Nursing Degree and a Master of Science Degree and have worked at MCH for over 35 years.

The Chief Financial Officer, Shondale Seymour, joined MCH January 2023. The Controller is Aaron Chambers who joined December 2022. The Debtor's long time CFO retired in December 2022.

Declaration in Support of Application for Order    7    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions            Docs re Multiple Emergency
Motions\Declaration.031023.docx

### E.　　The Debtor's Revenues

The Debtor will receive revenues for payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal.

The Debtor has been informed by State of California agencies that it should receive about $24,000,000+ over the period of about 24 months from January 2023 consisting of provider fees and disproportionate share money. It has about $5,000,000 cash, $1,500,000 in collectible accounts and large claim for funds from FEMA in an unknown amount ($00.00 to $20,000,000). MCH has considerable assets in addition to these expected cash revenues, including a 35 acre farm and a large 39.5 acre hospital campus having a significant value. SAMC asserts a security interest in these assets, junior only to mechanic's liens.

### F.　　The Chapter 11 Filing

The fiscal crisis for the Debtor is the result of the collision of several factors. First, the Debtor provided millions of dollars per year in care to low income, uninsured people, for which it was inadequately compensated. The percentage of the Debtor's resources expended on this care increased because the Debtor serves a depressed community and the economic condition of this community has worsened due to inflation and other factors. The COVID pandemic has devastated MCH. According to a May 2022 article in the American Journal of Nursing, the COVID pandemic "transformed a long-simmering nursing shortage into a full-blown crisis," leading hospitals to turn to traveling nurses to fill the shortage. MCH was not immune to this crisis and was forced to hire traveling nurses of its own at very high costs in order to meet state mandated nurse-to-patient ratios.

Second, the Hospital's campus is approximately 51 years old and the maintenance costs for this campus are substantial and increasing every year.

Third, the fracture of the proposed affiliation agreement took MCH by surprise and occurred as MCH was at a critically low cash point, leaving it with no cash to pay for continued medical services.

Fourth, being a standalone, small rural area hospital in California is simply not an advantageous financial situation. Such hospitals, including MCH, suffered from a lack of

economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower revenue base.

Fifth, the costs resulting from COVID and the resulting costs of traveling nurses was considerable, as have the high inflationary pressures and considerable legal expense in connection with the affiliation process.

During the period of time that I have managed the Hospital, I have made extensive efforts to deal with the financial crisis, including, but not limited to, begging the State of California and elected representatives for more money while operating as efficiently as possible on a shoestring budget. However, MCH lacked leverage and was not able to increase the governmental or health plan contract rates. Pleas for more money fell (and continue to fall) on deaf ears. The combination of low Medi-Cal rates plus lower than market contract rates with health plans meant MCH could not cover the costs of operations.

Prior to closing, the Debtor needed to generate approximately $300,000 per day in revenue to cover its operating costs to stay in full operation. The Hospital was generating only approximately $225,000 per day in revenue when it closed. Thus, the Debtor lost money, $2 to $2.5 million, every month it operated in 2022.

Over a year ago, because the Debtor's CEO and Board concluded that the Debtor cannot survive at its then cash flow levels and would have to close absent drastic measures, representatives of the Board approached SAMC (and others), which had previously expressed an interest in acquiring or operating the Hospital, and negotiated an affiliation agreement subject to California Attorney General approval. After a long delay and review of over 13 months, on account of conditions imposed by the California Attorney General, SAMC withdrew from proceeding with the affiliation agreement. As a result of the withdrawn affiliation agreement and lack of money to pay employees, MCH concluded that it must shut down hospital operations, cease treating patients, shut down clinics, close its doors and find a suitor or liquidate its assets.

The emergency room closed on December 30, 2022. The WARN Act notice was sent to all employees on December 23, 2022.

Every effort to obtain a new suitor was, and is, being made as are efforts to reopen the clinics.

### G.    The Debtor's Secured Debt

#### 1.    Saint Agnes Medical Center

In April 2021, SAMC, entered into an agreement to provide financing to MCH.

As of the Petition Date, the Debtor owed SAMC a total of approximately $15,400,000 which is secured by a deed of trust against all real property and a security interest in almost all assets. The loan is in default. The Debtor believes SAMC is the only creditor with a security interest in cash collateral.

#### 2.    New England Sheet Metal

The Debtor owes New England Sheet Metal and one of its subcontractors, Patterson Drywall, about $1,100,000 on account of works of improvement and four mechanic's liens against the hospital campus have been filed.

#### 3.    Equipment Leases

The Debtor has numerous leases with numerous lessors of real and personal property, all of which are still being evaluated. An estimated $2,800,000 is owed on these equipment leases.

As of the Petition Date, the monthly payments called for on the leases total about $100,000 per month. The actual amounts are being investigated. No payments on the executory contracts have been made recently.

### H.    The Debtor's Unsecured Debt

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims.

Declaration in Support of Application for Order        10        R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                             Docs re Multiple Emergency
                                                                Motions\Declaration.031023.docx

### III.

### EMERGENCY MOTIONS

As I stated above, I believe that the Emergency Motions will facilitate the Debtor's orderly transition to being an operating debtor in possession and will assist MCH in maximizing the return to creditors. The Emergency Motions are discussed below.

**A.      Emergency Motion for Entry of an Order: (i) Authorizing the Debtor to (a) Pay Prepetition Wages and (b) Pay Reimbursable Employee Expenses; and (ii) Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payments Requests Made by the Debtor Relating to the Foregoing (WJH-2)**

By the *Emergency Motion of the Debtor for Entry of an Order: (i) Authorizing the Debtor to (a) Pay Certain Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (b) Pay Pre-Petition Reimbursable Employee Expenses; and (ii) Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payments Requests Made by the Debtor Relating to the Foregoing* (the "Employee Motion"), the Debtor requests entry of an order (i) authorizing, but not directing, the Debtor to pay or honor in its discretion certain limited Pre-Petition employee related obligations (as described below) and (ii) authorizing and directing the applicable bank to pay all checks and electronic payment requests made by the Debtor relating to the foregoing.

The Debtor's objective in this Case is to pursue a timely sale of its assets as a going concern, facilitate an orderly administration of the Estate, and maximize the value of its assets for the benefit of all stakeholders. Accordingly, it is imperative to the accomplishment of the Debtor's goals in this Case that the Debtor minimize any adverse impact of the Chapter 11 filing on the Debtor's remaining workforce and on the orderly administration of this Case. Any disruption in the payment of its payroll or the continued implementation of employee programs in the ordinary course of the Debtor's operations would adversely affect the Debtor's goals in this Case because it would adversely impact employee morale at a particularly sensitive time. Accordingly, the Debtor respectfully requests that the Court grant the Employee Motion.

Because the Debtor's Employees are vital to the Debtor's ability to continue to operate the hospital through a disposition or liquidation, the uninterrupted payment of wages and the

Declaration in Support of Application for Order        11        R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                 Docs re Multiple Emergency
                                                                    Motions\Declaration.031023.docx

honoring of Employee benefits is vital to maintaining its Employees. The Debtor therefore requests that this Motion be heard on an emergency basis.

As noted above, all wages and salaries and related benefits have been paid through March 10, 2023. However, there was about $100.00 in wages for employees who were paid but the checks were not cashed prior to the Petition Date. All checks were drawn on MCH's payroll account at Bank of America.

By this Motion, the Debtor seeks authority to pay these limited pre-petition wages and benefits. No single payment exceeds the cap of Section 507.

The Debtor does not seek authority to pay any pre-petition accrued PTO. A separate motion addressing PTO will be filed.

**B. Emergency Motion for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral and (b) Granting Adequate Protection for Use of Cash Collateral (WJH-3)**

By the Emergency Motion of the Debtor for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral and (b) Granting Adequate Protection for Use of Cash Collateral (the "Cash Collateral Motion") the Debtor seeks an order authorizing it to use cash collateral on an emergency basis for the period of March 11, 2023 to June 10, 2023. The Debtor requests that there be an initial emergency hearing on March 16, 2023 to authorize uses for the period of March 16, 2023 through March 31, 2023, pending a further hearing on March 30, 2023 for uses between April 1, 2023 and June 10, 2023, to be followed by a continued interim hearing on May 31, 2023 for uses after June 10, 2023. By the Motion, the Debtor also seeks an order granting adequate protection to the Secured Creditor on an interim basis in the form of replacement liens to the extent necessary to protect the Secured Creditor from diminution in value of its collateral. A budget showing the Debtor's cash flow projections for the period of March 11, 2023 to June 10, 2023 is attached to my declaration in support of the Cash Collateral Motion ("Budget").

The Debtor has an immediate and ongoing need for use of cash collateral in which SAMC asserts an interest ("Cash Collateral"). The Debtor must have access to Cash Collateral to make payments to vendors for post-petition goods, maintenance of the facilities, employees, insurances,

Declaration in Support of Application for Order     12     R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                          Docs re Multiple Emergency
                                                             Motions\Declaration.031023.docx

taxes and other pertinent, ordinary expenses of its operations. Should the Debtor suffer an inability to use Cash Collateral, such inability would cause a serious interruption to the operations of the Debtor. As a result, the value of the Debtor's assets will be significantly impaired, to the serious harm and detriment of the Debtor and its creditors, employees, and SAMC.

Pursuant to the Cash Collateral Motion, the Debtor seeks authorization to use the Cash Collateral in accordance with the Budget. The use of Cash Collateral will provide the Debtor with the necessary capital with which to operate, maintain its assets, pay its employees, maximize value, including the value of the Secured Creditor's existing collateral (the "Existing Collateral"), and pursue timely sales of the Hospital.

In anticipation of this Case, the Debtor has developed cash flow projections reflecting anticipated revenue and expenditures through the first thirteen (13) weeks of the case, contained in the proposed Budget provided that Debtor seeks authority to exceed 15% of the aggregate of the weekly expenditures reflected on the Budget (the "Allowed Variance"), measured on a four-week rolling basis. The Budget, which was reviewed and approved by myself, the CFO, and the Controller, sets forth the amount of cash necessary for the Debtor to operate post-petition. The Budget takes into account the effect this bankruptcy filing may have on the Debtor's operations and the expenses of the administration of this Case, especially maintenance of the Hospital facility.

Because the Secured Creditor asserts a lien on the Cash Collateral, as adequate protection for the use of such Cash Collateral, the Debtor proposes to grant the Secured Creditor effective immediately and without the necessity of the execution by the Debtor of any financing statements or other documentation, in accordance with Section 361, a valid, perfected, enforceable and non-avoidable replacement lien on its existing collateral and the proceeds thereof, and cash flow generated from operations ("Post-Petition Collateral"), but only if and to the extent that (i) the Secured Creditor's prepetition security interests are valid, enforceable, properly perfected, and unavoidable, and (ii) the Debtor's use of Cash Collateral results in a diminution of value of the Secured Creditor's collateral. Any replacement lien excludes causes of action arising under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553. While the

Declaration in Support of Application for Order    13    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions    Docs re Multiple Emergency
Motions\Declaration.031023.docx

Debtor's use of Cash Collateral will reduce the prepetition Cash Collateral, collections will continue to generate cash. Granting the Secured Creditor a replacement lien in the Post-Petition Collateral to the extent of any diminution in value of the Secured Creditor's Existing Collateral adequately protects the Secured Creditor's position by giving it an ongoing interest in post-petition cash generated from its Existing Collateral.

The Debtor requests that the Court enter an order authorizing it to use cash collateral on an emergency basis for the period of March 11, 2023 to June 10, 2023, pursuant to the Budget. The Debtor requests that there be an initial emergency hearing on March 16, 2023 to authorize uses for the period of March 16, 2023 through March 31, 2023, pending a further hearing on March 30, 2023 for uses between April 1, 2023 and June 10, 2023, to be followed by a continued interim hearing on May 31, 2023 for uses after June 10, 2023. The Debtor also seeks an order granting adequate protection to the Secured Creditor on an interim basis in the form of replacement liens to the extent necessary to protect the Secured Creditor from diminution in value of its collateral.

**C. Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms (WJH-4)**

By the *Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms* (the "Cash Management Motion"), the Debtor is seeking an order of this Court: (a) authorizing the Debtor to maintain and to continue using its existing bank accounts, (b) authorizing the Debtor to continue using its electronically generated business forms without "Debtor in Possession" appearing on them for a period of seventy five (75) days until the Debtor can alter its software to include that designation and the Case number on the forms, to utilize its preprinted forms without the "Debtor in Possession" stamp until the supply is depleted, and to approve the use of a "Debtor in Possession" stamp on all checks issued until the current stock of checks is depleted and checks are reordered, (c) authorizing and directing the Banks to honor post-petition checks drawn on and transfers made from the Accounts in the ordinary course of business, (d) requiring that in the event that if any Bank refuses to honor checks drawn on the Accounts (provided there are sufficient good funds in the account to honor the checks and the

Declaration in Support of Application for Order    14    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions    Docs re Multiple Emergency
Motions\Declaration.031023.docx

Accounts (provided there are sufficient good funds in the account to honor the checks and the checks are otherwise property payable) order the Bank to immediately turn over the deposits held in the applicable Account upon the Debtor's request, (e) granting such other and further relief as is just and proper under the circumstances.

The Debtor requests that the relief sought in the Cash Management Motion be granted on an emergency basis because the uninterrupted use of its Accounts and cash management system and the continued use of its current business forms and checks as described in the Cash Management Motion and in this Declaration are essential to the Debtor's ability to maximize its post-petition operations and to adjust smoothly to being an operating debtor in possession.

As with most hospitals, MCH has a long-maintained, complicated cash management system. The Debtor currently has accounts with Bank of America ("BofA") and Edward Jones ("EJ") which it requests remain open (collectively, BofA and EJ are the "Banks").

### 1. **The Accounts**

The primary bank is Bank of America, an authorized depository. All operating revenues, including provider fees, are electronically transferred to a depository account (2081) ("Depository Account"). From the depository account, funds go to the master account (8391) ("Master Account"). From the master account, funds are transferred to sub accounts:

        a) Payroll (2082) - used to pay employees, pay payroll taxes and 401k deposits ("Payroll Account").

        b) Accounts Payable - (2549) used to pay vendor claims, utilities, etc. ("Accounts Payable Account").

        c) Employee Benefits - (2083) used to pay self-insured claims ("Employee Benefits Account").

        d) Section 125 - (7730) used to pay Section 125 claims. The Section 125 plan was terminated as of December 31, 2022, but claims prior to that date can be submitted up until March 31, 2023 ("Section 125 Plan Account").

Declaration in Support of Application for Order    15    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions    Docs re Multiple Emergency
Motions\Declaration.031023.docx

e) Worker's Comp Collateral Account (-8627) ("Worker's Comp Collateral Account").

The Depository Account, Master Account, Payroll Account, Accounts Payable Account, Employee Benefits Account, Section 125 Plan Account, and Worker's Comp Collateral Account are collectively referred to hereafter as the "General Business Accounts" or the "BofA Accounts."

Last, MCH has an account at Edward Jones, which holds segregated funds on account of about 30 unknown persons who hold Bearer Bonds from a 1978 bond sale ("the Bearer Bond Account"). This is discussed more fully below.

The above accounts are hereinafter collectively referred to as the "Accounts" and the banks as "Banks." A comprehensive list of the Accounts is attached to my declaration filed in support of the Cash Management Motion as Exhibit A.

### 2. Postpetition Cash Management System

#### a. The General Business Accounts

The Debtor requests that it be authorized to maintain the Accounts described above and to utilize them post-petition in the same manner that it utilized them pre-petition. The Debtor receives payment for its services from five primary sources: (1) direct payments from patients ("Patient Payments"), (2) payments from its patients made by credit card ("Credit Card Payments"), (3) payments from private insurance companies on behalf of patients ("Commercial Insurance Payments"), (4) payment from the State of California under the Medi-Cal program ("Medi-Cal Payments") and (5) payments form the Federal Government under the Medicare or Medi-Cal programs (together with the Medi-Cal Payments, the "Government Payments"). These payments are deposited into the Depository Account. Each night, funds are swept from the Depository Account into the Master account. The Debtor transfers the funds from the Master Account to the other above listed accounts on an as needed basis.

Historically, the Debtor has transferred all of the funds from the Master Account to the various other accounts on a daily basis. This account is not interest bearing.

The Debtor transfers funds as available to the Payroll account so that it would contain approximately $100,000 for each pay run every other Friday. Payroll is calculated in the Debtor's

Declaration in Support of Application for Order          16          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                    Docs re Multiple Emergency
Motions\Declaration.031023.docx

Meditech accounting system, and the majority of the remaining employees are paid via direct deposit (which is processed by BofA).

Payroll taxes are remitted directly through the IRS's EFTPS system and the CA EDD system.

BofA is approved as a depository for funds of debtors in possession by the U.S. Trustee's Office so the funds in the BofA Accounts are protected as required by section 345 of the Bankruptcy Code.

### b.    The Bearer Bond Account

The Debtor issued certain Bearer Bonds in 1978, 30 of which are still held by unknown persons. Public notice will be given regarding these bonds, and after paying out all legitimate claims, which will take some time, the Debtor will take the steps necessary to close this account and transfer the balance of the funds to the General Business Accounts. However, until the Debtor is able to accomplish the resolution of all 1978 Bearer Bond issues, it requests authority to keep this account open and to utilize it as necessary and, to the extent necessary, as otherwise approved by the Court to satisfy its Bearer Bond obligations.

Far and away, the preponderance of revenues are received electronically and mostly from governmental payors. Any disruption of the system would be extremely detrimental to MCH. When checks are written by MCH, they are electronically prepared and it will take at least seventy-five (75) days before the software can be reprogrammed to say "Debtor in Possession."

The Debtor is requesting that it be authorized to leave its accounts open and to utilize them as described above.

### D.    Emergency Motion for Order (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (b) Determining Adequate Assurance of Payment for Future Utility Services (WJH-5)

By the *Emergency Motion for Order Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and Determining Adequate Assurance of Payment for Future Utility Services* (the "Utilities Motion") the Debtor is requesting an order (a) prohibiting each of the utilities (collectively, the "Utility Companies" and individually, a "Utility Company") from altering, refusing, or discontinuing services to the Debtor without further order of this Court; (b)

Declaration in Support of Application for Order    17    R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions    Docs re Multiple Emergency
Motions\Declaration.031023.docx

finding that the following constitutes adequate assurance of payment for future utility services as contemplated by §§ 366(b) and (c)(3)(A):  (i) a Deposit made by the Debtor to each of the Utility Companies in an amount equal to the average monthly invoice for prepetition services;  and (ii) the ability of the Utility Companies to obtain an expedited hearing twenty (20) days after the Debtor receives notice of a default and does not cure that default; and (c) requiring any Utility Company whose services are terminated by the Debtor to immediately refund any deposit in connection with this Motion (with no offset for prepetition claims) (provided that all postpetition invoices have been paid).

The relief sought in the Utilities Motion is needed on an emergency basis because uninterrupted utilities are essential.  In addition, certainty as to the amount of the deposits, if any, will provide the Debtor with much needed stability at this critical time.  Furthermore, I am advised that the Bankruptcy Code sets forth a short time frame for resolving disputes with utility companies.

The Debtor receives essential utility services from several utility providers. A list of the utility providers together with the corresponding average monthly pre-petition invoice is attached as Exhibit A to my declaration filed in support of the Utilities Motion ("List of Utility Companies"). The Debtor's facilities receive one or more of the essential water, sewer, gas, electric, telephone, cell, and garbage services from the Utility Companies.

The Debtor still operates a hospital facility that must be maintained twenty four/seven (24 hours a day, 7 days a week). While any interruption in utility services would certainly be detrimental to the Debtor's operations, the more important consideration in this case is that any utility interruption, no matter how brief, could be extremely harmful to the hospital facility.  At this critical time and given the nature of the Debtor's operations, uninterrupted electricity, gas, water, sewer, garbage service, telephone and cell services, and internet services are essential to the ongoing operations of the Debtor and to the preservation of the value thereof.

///

///

///

The Debtor routinely pays its regular monthly utility obligations when due. In addition, the Debtor's chapter 11 filing occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, there are likely limited outstanding prepetition amounts owed to the Utility Companies.

The Debtor believes it will have adequate cash to meet all of its necessary post-petition operating expenses on a current basis for the initial 13-week period, including payments to the Utility Companies. The Debtor has specifically included in its budget amounts for payments to Utility Companies, including the payment of potential Utility Deposits (as defined below).

The Debtor proposes to give each of the Utility Companies adequate assurance of payment for its future services in the form of cash deposits (the "Utility Deposits" and each, a "Utility Deposit") in amounts that are equal to the average monthly invoice for one month of prepetition services provided to the Debtor by each Utility Company. These amounts (as so calculated) are included in the List of Utility Companies. The Debtor proposes to pay the Utility Deposits within forty-five (45) days after the Court's entry of an order granting the Utilities Motion.

Additionally, the Debtor proposes that if the Debtor defaults on an obligation to pay a Utility Company for post-petition services and such default is not cured within twenty (20) days of such Debtor's receipt of written notice of default, then the applicable Utility Company may file a motion requesting that the Debtor furnish further adequate assurance of future payment, and such motion shall be heard on an expedited basis.

Last, the Debtor is requesting that Utility Companies must immediately refund any Utility Deposit (without offset for prepetition claims) in the event that the Debtor terminates the services of any Utility Company and after all post-petition invoices to that Utility Company have been paid.

Under the circumstances of this case in which the Debtor believes it has no significant outstanding prepetition utility obligations and has already arranged to maintain current payment for post-petition services, the Debtor believes that the proposed Utility Deposits combined with expedited access to a court hearing in the event of a default, together, constitute adequate assurance of payment under Section 366(c) of the Bankruptcy Code.

Declaration in Support of Application for Order          19          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                      Docs re Multiple Emergency
                                                                         Motions\Declaration.031023.docx

**E.      Motion for Authority to Sell Personal Property of the Estate (Excess Medical Supplies) (WJH-6)**

By the *Emergency Motion for Order Authorizing the Sale of Personal Property of the Estate Pursuant to § 363* (the "Sale Motion") the Debtor seeks an order authorizing it to sell excess medical supplies on a case-by-case basis for fair market value as determined by the Debtor and deposit all proceeds into the Debtor's cash collateral account with the proceeds to be used pursuant to further order of this Court and waiving the fourteen-day stay provision of B.R. 6004.

The Debtor seeks authority to sell personal property consisting of excess medical supplies. The supplies are no longer needed in the operation of the Hospital due to the discontinuance of lines of service.  The Debtor seeks authority to sell the excess supplies described on Exhibit A to my declaration in support of the Sale Motion for market value on a case-by-case basis.  The proceeds of sale may be the cash collateral of SAMC.  The prices to be paid are market prices based on the experience of the Debtor.  Emergency relief is needed to maximize the benefit to the estate as many of these supplies are subject to expiration dates which greatly affects their value.

**F.      Emergency Motion of Debtor for Order Limiting Notice (WJH-7)**

By the *Emergency Motion to Limiting the Scope of Notice for Chapter 11 Case* (the "Limited Notice Motion") the Debtor seeks an order authorizing the Debtor to limit notice of the Limited Notice Matters (defined below) in this chapter 11 case to the following parties: (1) the U.S. Trustee's Office, (2) the creditors appearing on the list filed by the Debtor in accordance with Bankruptcy Rule 1007(d) unless and until a committee of unsecured creditors (the "Committee") is appointed, then in that event, to counsel to the Committee and the Committee, (3) parties that file with the Court and serve upon the Debtor requests for notice in accordance with Bankruptcy Rule 2002(i), (4) any secured creditors, (5) various attorneys for the California Attorney General and (6) any party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its counsel.

The Debtor's creditor matrix exceeds 1000+ parties.  Requiring notice to and service upon all parties would significantly increase the cost of administering this estate.  The limited scope of notice proposed herein is necessary to avoid the administrative burdens and costs that serving

Declaration in Support of Application for Order          20          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                            Docs re Multiple Emergency
                                                                               Motions\Declaration.031023.docx

notice of all pleadings on these parties would impose upon the Debtor while assuring that the interested parties receive notice of all matters.

I am informed and believe that, by this Limited Notice Motion, the Debtor seeks, pursuant to Bankruptcy Rules 2002(i), 2002(m), 4001, 6004, 6006, 6007, 9006, 9007, 9013, 9014, and 9019, an order authorizing the Debtor to limit notice of the Limited Notice Matters (as defined below) in this Case to the following parties: (1) the U.S. Trustee's Office, (2) the twenty largest creditors appearing on the list filed by the Debtor unless and until a committee of unsecured creditors (the "Committee") is appointed, then in that event, also to counsel of the Committee, (3) any party asserting secured claims, (4) parties that file with the Court and serve upon the Debtor requests for notice, (5) various attorneys for the California Attorney General and (6) any party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its counsel. If the relief requested in the Limited Notice Motion is granted, the cost that is associated with administering this case would be dramatically reduced. Any party not on the list has the option of requesting special notice.

The Debtor requests that the Court limit the scope of service of all notices, motions, or applications (the "Limited Notice Matters"), including, but not limited to, the following:

- any proposed use, sale, or lease of property of the estate pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 4001(b), and 6004;

- any proposed debtor in possession financing or use of cash collateral;

- any proposed extension of the Debtor's exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to section 1121 of the Bankruptcy Code and Bankruptcy Rule 3016;

- any proposed approval of a compromise or settlement of a controversy pursuant to Bankruptcy Rules 2002(a)(3) and 9019 and/or section 363 of the Bankruptcy Code;

- any proposed abandonment or disposition of property of the estate pursuant to section 554 of the Bankruptcy Code and Bankruptcy Rules 6007(a) or (c);

Declaration in Support of Application for Order          21          R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                    Docs re Multiple Emergency
                                                                        Motions\Declaration.031023.docx

- any proposed assumption, assumption and assignment or rejection of contracts or leases under section 365 of the Bankruptcy Code and Bankruptcy Rule 6006(a) or (c);
- any proposal to prohibit or condition the use, sale or lease of property pursuant to section 363 of the Bankruptcy Code or Bankruptcy Rule 4001(a);
- any proposed objections to claims pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rules 3002, 3003 or 3007;
- any verified statement filed by any entity or committee (other than those appointed pursuant to section 1102 or 1104 of the Bankruptcy Code) representing more than one creditor pursuant to Bankruptcy Rule 2019(a) and any motion filed in respect thereof pursuant to Bankruptcy Rule 2019(b);
- any proposed application for employment of professionals pursuant to sections 327, 1103 or 1104 of the Bankruptcy Code or Bankruptcy Rule 2014;
- any proposed application for compensation or reimbursement of expenses of professionals, pursuant to sections 328, 329, 330, or 331 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(6), 2016, 2017, and 6005; except as provided by other orders of this Court;
- a hearing on any other contested matter in this case that requires notice to all creditors or equity holders pursuant to the Bankruptcy Code, Bankruptcy Rule 9014, or the Local Bankruptcy Rules; and
- all other pleadings, papers, and requests for relief or other order of the Court, except as limited below.

Notwithstanding the foregoing, I am informed and believe the relief requested in the Limited Notice Motion does not affect the rights of all creditors and parties in interest in this Case to receive notice of the following matters or proceedings: (i) a hearing on the dismissal or conversion of this Case; (ii) the time fixed for filing objections to any disclosure statement and any hearing to consider approval of any disclosure statement; (iii) the time fixed for accepting, rejecting, or objecting to confirmation of a plan or any modification thereof and the hearing

Declaration in Support of Application for Order　　22　　R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions　　　　　　Docs re Multiple Emergency
Motions\Declaration.031023.docx

1 thereon; (iv) the entry of an order confirming a plan; and (v) the date fixed for filing proofs of

2 claim.

3      Further, because the Debtor is concurrently with this Motion filing other motions seeking

4 relief, the Debtor requests that this Motion be heard on an emergency basis as set forth above.

5 **G.     Motion For Entry of an Order (I) Authorizing the Debtor to (a) Maintain Insurance**
         **Program, (b) Pay Insurance Premiums and Brokerage Commissions in the Ordinary**
6        **Course, and (c) Pay All Obligations Associated Therewith [WJH-8].**

7      By the *Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (a) Maintain*

8 *Insurance Program, (b) Pay Insurance Premiums and Brokerage Commissions in the Ordinary*

9 *Course, and (c) Pay All Obligations Associated Therewith* (the "Insurance Motion"), the Debtor

10 seeks an order allowing it to (1) maintain its current insurance coverage levels as set forth in the

11 Insurance Motion, including the authority to revise, extend, supplement, renew or change

12 insurance coverage as needed; (2) pay insurance premiums, self-insured retentions, broker fees

13 and deductibles in the ordinary course of business; and (3) pay certain administrative obligations

14 associated therewith.

15      The Debtor maintains various insurance policies issued by several insurance carriers

16 (collectively, the "Insurance Carriers"). Collectively, these policies provide for coverage for,

17 among other things: workers' compensation and employee liability, general liability, and

18 professional liability, commercial property, commercial automobile, D&O liability, employee

19 benefits and other coverage (collectively, the "Insurance Policies"). A list of the Insurance

20 Policies is attached to my declaration filed in support of the Insurance Motion ("Summary of

21 Insurance Policies, Coverage, and Obligations").

22      Most of the Debtor's Insurance Policies will expire beginning on April 1, 2023, or later.

23 It is critical that the Debtor continues to carry the necessary insurance coverage to operate. The

24 Debtor seeks the authority to renew, modify, extend or enter into new Insurance Policies

25 (collectively, the "New Insurance Policies") on a postpetition basis in the ordinary course of

26 business.

27      In certain instances, the Debtor pays premiums for its Insurance Policies in full at the

28 beginning of the policy and in other instances in monthly installments as reflected in the Summary

Declaration in Support of Application for Order     23     R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                          Docs re Multiple Emergency
                                                             Motions\Declaration.031023.docx

of Insurance Policies, Coverage, and Obligations.   To ensure continued insurance coverage in the ordinary course of the Debtor's operations, the Debtor seeks the authority to pay all premium payments that may come due on current Insurance Policies during the course of this Case. *See* the Summary of Insurance Policies.  The Debtor also seeks authority to pay all premiums associated with the New Insurance Policies on a postpetition basis in the ordinary course of business.

The Debtor also seeks authority to pay its deductibles and self-insured retention amounts such amounts come due on a postpetition basis, including any amounts accrued and not due as of the Petition Date, in the ordinary course of business.  Debtor also seeks to pay brokerage commission and other amounts due to its brokers in the ordinary course of business.

The premiums, deductibles, self-insured retention amounts, brokerage commissions and other amounts due to the Debtor's brokers, are collectively referred to hereafter as the "Insurance Obligations."

Payment of the Insurance Obligations represents a sound exercise of the Debtor's business judgment, because is necessary to avoid immediate and irreparable harm to the Debtor's estate, and is therefore justified under §§ 105(a) and 363(b) of the Bankruptcy Code.  Paying insurance premiums, self-insured retentions, deductibles, and other Insurance Obligations will benefit the Debtor's estate and its creditors by allowing the Debtor's operations to continue without interruption.  Indeed, the Debtor believes that without the relief requested herein, it will be unable maintain its current insurance coverage or find suitable replacement or renewal insurance coverage.

For the reasons discussed herein, payment of the Insurance Obligations is necessary to ensure that the Debtor is able to maintain operations post-petition.  This Court should exercise its equitable powers to grant the relief requested in this Motion.

///

///

///

///

Declaration in Support of Application for Order      24      R:\Client\10538-002\PLEADINGS\WJH-1 OST
Shortening Time of Emergency Motions                                 Docs re Multiple Emergency
Motions\Declaration.031023.docx

I declare under penalty of perjury that the foregoing facts are true and correct under the laws of the United States of America and I would so testify if called as a witness.

Executed this __10__ day of March, 2023, at Madera, California.

Karen Paolinelli

R:\Client\10538-002\PLEADINGS\WJH-1 OST
Docs re Multiple Emergency
Motions\Declaration.031023.docx