**12**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Kurt F. Vote #160496
Steven K. Vote #309152
Danielle J. Bethel #315945
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail:  rwalter@wjhattorneys.com
　　　　dbethel@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re:<br><br>MADERA COMMUNITY HOSPITAL,<br><br>　　　Debtor in Possession.<br><br>Tax ID#:　23-7429117<br>Address:　1250 E. Almond Avenue<br>　　　　　Madera, CA 93637 | Case No. 23-10457<br><br>Chapter 11<br><br>DC No.:　WJH-4<br><br>Date:　　March 16, 2023<br>Time:　　11:00 a.m.<br>Place:　　2500 Tulare Street<br>　　　　　Courtroom 13<br>　　　　　Fresno, CA 93721<br>Judge:　　Honorable René Lastreto II |

**DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF EMERGENCY MOTION FOR ORDER AUTHORIZING (1) MAINTENANCE OF EXISTING BANK ACCOUNTS, (2) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND (3) CONTINUED USE OF BUSINESS FORMS**

I, Karen Paolinelli, hereby declare and represent as follows:

1.　I am the Chief Executive Officer of Madera Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor"). I am primarily responsible for the overall management of the Debtor. I am generally familiar with the day-to-day continuing operations, assets, and financial affairs of the Debtor.

Declaration of Karen Paolinelli in Support of　　　1　　　R:\Client\10538-002\PLEADINGS\WJH-4
Motion to Maintain Existing Bank Accounts and　　　　　　Motion re Maintenance of Bank
Use Existing Cash Management System　　　　　　　　　　Accounts\Dec.031023.docx

2.      Unless as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (my own or information gathered from others who report to me), my review of relevant documents, or my opinion based upon my experience.

3.      I submit this Declaration in support of the "first-day" relief that the Debtor has requested by the emergency motion (the "Emergency Motion") to maintain existing bank accounts and continue using the existing cash management system and to assist the Court and other interested parties to understand this Case. The relief sought in this Emergency Motion is intended to enable the Debtor to continue to function. I have reviewed the Emergency Motion and believe that the relief sought in it is essential to the continued functioning of the Debtor's operations.

## I.

## BACKGROUND

Madera Community Hospital is a non-profit California Corporation ("MCH" or "Hospital"). It owns a general acute care hospital in Madera, California. The hospital is licensed (in suspense) for 106 beds and currently has 31 full time employees and 4 per diem employees, most of whom are administrative personnel and physical plant maintenance persons. Since December 26, 2022, the Debtor has laid off over 700 employees. It is the only adult hospital in the county and served a population of about 160,000 people, some of whom are uninsured and many of whom are of lower income. The closest hospitals with emergency rooms are 23.5 miles away in Fresno or 35 miles away in Merced, both of which are long distances in an emergency situation.

As discussed below, in December 2022, Saint Agnes Medical Center ("SAMC"), after receiving conditions imposed by the California Attorney General, terminated negotiation of an affiliation agreement with MCH which resulted in MCH shutting down all medical services. Since January 10, 2023 no medical services have been provided at the hospital. There are no patients. All patient care has ceased. Operations, however, continue as the Debtor is pursuing collections and recoveries, preserving its facilities, and pursuing suitors.

The leadership of the hospital consists of myself, Karen Paolinelli, MSN, RN, FNP-C, PA-C, Chief Executive Officer. The CFO is Shondale Seymour on a contract basis. The Controller is Aaron Chambers, also on a contract basis.

As with many other rural hospitals serving a largely uninsured population, MCH has sustained many financial setbacks in recent years and the COVID pandemic accelerated the financial problems. The governmental reimbursement fees and health plan fees paid to MCH were wholly insufficient and did not cover the costs of care we are required to provide.

For the past two and a half years, MCH and the courageous nurses, physicians and caregivers that treat patients, went far above and beyond battling COVID. This response took a significant toll on the financial health of MCH. While there have been "lifelines" tossed out, the lifeline has dried up and without help MCH has withered and will soon die without immediate care.

Beginning in 2021 and continuing to this day, MCH embarked on evaluating and identifying potential relationships with other healthcare systems. In 2021 MCH identified a possible afflation with Saint Agnes Medical Center ("SAMC") and its parent, Trinity Health Care System ("Trinity"). Protracted negotiations ensued. SAMC made significant loans to MCH. When the proposed affiliation was presented to the Attorney General of the State of California, the Attorney General, after many months of delay, sought to impose conditions that were unacceptable to SAMC. As a result SAMC terminated the affiliation agreement. This, thus, forced MCH to file Chapter 11 as it ran out of money and was unable to pay employees.

MCH has the following major assets: Cash $5,000,000, Hospital campus $16,000,000-$60,000,000, incoming provider fees receivable/government transfers $24,000,000, $1,500,000 in receivables, $00.00 to $20,000,000 million of FEMA reimbursements, miscellaneous personal property assets $3,000,000 (est.) and a 35-acre farm property valued at $535,000, and a long term note valued at $485,000 which is secured by real property.

The major secured creditor of MCH is SAMC, to whom $15,400,000 is owed. New England Sheet Metal and one of its subcontractors, Patterson Drywall, together assert four mechanic's liens for about $1,100,000.

| Declaration of Karen Paolinelli in Support of Motion to Maintain Existing Bank Accounts and Use Existing Cash Management System | 3 | R:\Client\10538-002\PLEADINGS\WJH-4 Motion re Maintenance of Bank Accounts\Dec.031023.docx |

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims. MCH is a very sick hospital.

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manages its affairs as a debtor in possession. No trustee, examiner, ombudsman or committee has been appointed. There are no patients being treated by the Debtor. The Debtor is aggressively soliciting new suitors and evaluating ways to restart and resume operations, including reopening its medical clinics.

## II.

## FINANCES

### A. The Debtor's Campus

The Hospital is located at 1250 E Almond Avenue, Madera, California 93637. The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves. The Debtor owns the entire 39.5 acre campus with the hospital and medical buildings. Two buildings on the campus are owned by physicians on land leased from the Debtor. The Debtor formerly leased three other facilities: the Chowchilla Medical Center Rural Health Clinic in Chowchilla, the Family Health Service Rural Health Clinic in Mendota, and the IT facility in Madera. All three facilities have been relinquished to the landlords. The Debtor has three suspended construction projects on the main campus. The estimated value of the hospital campus is $16 million to $60 million.

///

///

B. **The Debtor's Staff**

The Hospital is licensed ("in suspense") to operate 106 beds. The license is in suspense. Approximately 160 doctors have privileges at the Hospital. As of the Petition Date, the Debtor employed approximately 30-35 people. The current personnel include, but are not limited to, administrative and office staff, technicians, maintenance staff, IT staff, human resources staff, medical records personnel, engineering and housekeeping services. The staff are needed to collect on money owed and to mothball the facility and preserve it for future use. Over 700 employees were laid off since late-December 2022 following issuance of a WARN Act notice.

C. **The Debtor's Management**

As noted above, I am the Debtor's Chief Executive Officer. I have served in this position since November 2017. Prior to that, I was the Chief Operating Officer. I have a Nursing Degree and a Master of Science Degree and have worked at MCH for over 35 years.

The Chief Financial Officer, Shondale Seymour, joined MCH January 2023. The Controller is Aaron Chambers who joined December 2022. The Debtor's long time CFO retired in December 2022.

D. **The Debtor's Revenues**

The Debtor will receive revenues for payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal.

The Debtor has been informed by State of California agencies that it should receive about $24,000,000+ over the period of about 24 months from January 2023 consisting of provider fees and disproportionate share money. It has about $5,000,000 cash, $1,500,000 in collectible accounts and large claim for funds from FEMA in an unknown amount ($00.00 to $20,000,000). MCH has considerable assets in addition to these expected cash revenues, including a 35 acre farm and a large 39.5 acre hospital campus having a significant value. SAMC asserts a security interest in these assets, junior only to mechanic's liens.

E. **The Chapter 11 Filing**

The fiscal crisis for the Debtor is the result of the collision of several factors. First, the Debtor provided millions of dollars per year in care to low income, uninsured people, for which

Declaration of Karen Paolinelli in Support of    5    R:\Client\10538-002\PLEADINGS\WJH-4
Motion to Maintain Existing Bank Accounts and         Motion re Maintenance of Bank
Use Existing Cash Management System               Accounts\Dec.031023.docx

it was inadequately compensated. The percentage of the Debtor's resources expended on this care increased because the Debtor serves a depressed community and the economic condition of this community has worsened due to inflation and other factors. The COVID pandemic has devastated MCH. According to a May 2022 article in the American Journal of Nursing, the COVID pandemic "transformed a long-simmering nursing shortage into a full-blown crisis," leading hospitals to turn to traveling nurses to fill the shortage. MCH was not immune to this crisis and was forced to hire traveling nurses of its own at very high costs in order to meet state mandated nurse-to-patient ratios.

Second, the Hospital's campus is approximately 51 years old and the maintenance costs for this campus are substantial and increasing every year.

Third, the fracture of the proposed affiliation agreement took MCH by surprise and occurred as MCH was at a critically low cash point, leaving it with no cash to pay for continued medical services.

Fourth, being a standalone, small rural area hospital in California is simply not an advantageous financial situation. Such hospitals, including MCH, suffered from a lack of economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower revenue base.

Fifth, the costs resulting from COVID and the resulting costs of traveling nurses was considerable, as have the high inflationary pressures and considerable legal expense in connection with the affiliation process.

During the period of time that I have managed the Hospital, I have made extensive efforts to deal with the financial crisis, including, but not limited to, begging the State of California and elected representatives for more money while operating as efficiently as possible on a shoestring budget. However, MCH lacked leverage and was not able to increase the governmental or health plan contract rates. Pleas for more money fell (and continue to fall) on deaf ears. The combination of low Medi-Cal rates plus lower than market contract rates with health plans meant MCH could not cover the costs of operations.

Prior to closing, the Debtor needed to generate approximately $300,000 per day in revenue to cover its operating costs to stay in full operation. The Hospital was generating only approximately $225,000 per day in revenue when it closed. Thus, the Debtor lost money, $2 to $2.5 million, every month it operated in 2022.

Over a year ago, because the Debtor's CEO and Board concluded that the Debtor cannot survive at its then cash flow levels and would have to close absent drastic measures, representatives of the Board approached SAMC (and others), which had previously expressed an interest in acquiring or operating the Hospital, and negotiated an affiliation agreement subject to California Attorney General approval. After a long delay and review of over 13 months, on account of conditions imposed by the California Attorney General, SAMC withdrew from proceeding with the affiliation agreement. As a result of the withdrawn affiliation agreement and lack of money to pay employees, MCH concluded that it must shut down hospital operations, cease treating patients, shut down clinics, close its doors and find a suitor or liquidate its assets.

The emergency room closed on December 30, 2022. The WARN Act notice was sent to all employees on December 23, 2022.

Every effort to obtain a new suitor was, and is, being made as are efforts to reopen the clinics.

### F. The Debtor's Secured Debt

#### 1. Saint Agnes Medical Center

In April 2021, SAMC, entered into an agreement to provide financing to MCH.

As of the Petition Date, the Debtor owed SAMC a total of approximately $15,400,000 which is secured by a deed of trust against all real property and a security interest in almost all assets. The loan is in default. The Debtor believes SAMC is the only creditor with a security interest in cash collateral.

#### 2. New England Sheet Metal

The Debtor owes New England Sheet Metal and one of its subcontractors, Patterson Drywall, about $1,100,000 on account of works of improvement and four mechanic's liens against the hospital campus have been filed.

3.  **Equipment Leases**

The Debtor has numerous leases with numerous lessors of real and personal property, all of which are still being evaluated. An estimated $2,800,000 is owed on these equipment leases.

As of the Petition Date, the monthly payments called for on the leases total about $100,000 per month. The actual amounts are being investigated. No payments on the executory contracts have been made recently.

G.  **The Debtor's Unsecured Debt**

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims.

### III.

### EMERGENCY MOTION

A.  **Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms (WJH-4)**

By the *Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System, and (3) Continued Use of Business Forms* (the "Cash Management Motion"), the Debtor is seeking an order of this Court: (a) authorizing the Debtor to maintain and to continue using its existing bank accounts, (b) authorizing the Debtor to continue using its electronically generated business forms without "Debtor in Possession" appearing on them for a period of seventy five (75) days until the Debtor can alter its software to include that designation and the Case number on the forms, to utilize its preprinted forms without the "Debtor in Possession" stamp until the supply is depleted, and to

Declaration of Karen Paolinelli in Support of Motion to Maintain Existing Bank Accounts and Use Existing Cash Management System

8

R:\Client\10538-002\PLEADINGS\WJH-4 Motion re Maintenance of Bank Accounts\Dec.031023.docx

approve the use of a "Debtor in Possession" stamp on all checks issued until the current stock of checks is depleted and checks are reordered, (c) authorizing and directing the Banks to honor post-petition checks drawn on and transfers made from the Accounts in the ordinary course of business, (d) requiring that in the event that if any Bank refuses to honor checks drawn on the Accounts (provided there are sufficient good funds in the account to honor the checks and the checks are otherwise property payable) order the Bank to immediately turn over the deposits held in the applicable Account upon the Debtor's request, (e) granting such other and further relief as is just and proper under the circumstances.

The Debtor requests that the relief sought in the Cash Management Motion be granted on an emergency basis because the uninterrupted use of its Accounts and cash management system and the continued use of its current business forms and checks as described in the Cash Management Motion and in this Declaration are essential to the Debtor's ability to maximize its post-petition operations and to adjust smoothly to being an operating debtor in possession.

As with most hospitals, MCH has a long-maintained, complicated cash management system. The Debtor currently has accounts with Bank of America ("BofA") and Edward Jones ("EJ") which it requests remain open (collectively, BofA and EJ are the "Banks").

**1. The Accounts**

The primary bank is Bank of America, an authorized depository. All operating revenues, including provider fees, are electronically transferred to a depository account (2081) ("Depository Account'). From the depository account, funds go to the master account (8391) ("Master Account"). From the master account, funds are transferred to sub accounts:

  a) Payroll (2082) - used to pay employees, pay payroll taxes and 401k deposits ("Payroll Account").

  b) Accounts Payable - (2549) used to pay vendor claims, utilities, etc. ("Accounts Payable Account").

  c) Employee Benefits - (2083) used to pay self-insured claims ("Employee Benefits Account").

Declaration of Karen Paolinelli in Support of　　9　　R:\Client\10538-002\PLEADINGS\WJH-4
Motion to Maintain Existing Bank Accounts and　　　　Motion re Maintenance of Bank
Use Existing Cash Management System　　　　Accounts\Dec.031023.docx

      d) Section 125 - (7730) used to pay Section 125 claims. The Section 125 plan was terminated as of December 31, 2022, but claims prior to that date can be submitted up until March 31, 2023 ("Section 125 Plan Account").

      e) Worker's Comp Collateral Account (-8627) ("Worker's Comp Collateral Account").

The Depository Account, Master Account, Payroll Account, Accounts Payable Account, Employee Benefits Account, Section 125 Plan Account, and Worker's Comp Collateral Account are collectively referred to hereafter as the "General Business Accounts" or the "BofA Accounts."

Last, MCH has an account at Edward Jones, which holds segregated funds on account of about 30 unknown persons who hold Bearer Bonds from a 1978 bond sale ("the Bearer Bond Account"). This is discussed more fully below.

The above accounts are hereinafter collectively referred to as the "Accounts" and the banks as "Banks." A comprehensive list of the Accounts is attached hereto Exhibit A.

    **2.    Postpetition Cash Management System**

        **a.    The General Business Accounts**

The Debtor requests that it be authorized to maintain the Accounts described above and to utilize them post-petition in the same manner that it utilized them pre-petition. The Debtor receives payment for its services from five primary sources: (1) direct payments from patients ("Patient Payments"), (2) payments from its patients made by credit card ("Credit Card Payments"), (3) payments from private insurance companies on behalf of patients ("Commercial Insurance Payments"), (4) payment from the State of California under the Medi-Cal program ("Medi-Cal Payments") and (5) payments form the Federal Government under the Medicare or Medi-Cal programs (together with the Medi-Cal Payments, the "Government Payments"). These payments are deposited into the Depository Account. Each night, funds are swept from the Depository Account into the Master account. The Debtor transfers the funds from the Master Account to the other above listed accounts on an as needed basis.

Historically, the Debtor has transferred all of the funds from the Master Account to the various other accounts on a daily basis. This account is not interest bearing.

The Debtor transfers funds as available to the Payroll account so that it would contain approximately $100,000 for each pay run every other Friday. Payroll is calculated in the Debtor's Meditech accounting system, and the majority of the remaining employees are paid via direct deposit (which is processed by BofA).

Payroll taxes are remitted directly through the IRS's EFTPS system and the CA EDD system.

BofA is approved as a depository for funds of debtors in possession by the U.S. Trustee's Office so the funds in the BofA Accounts are protected as required by section 345 of the Bankruptcy Code.

### b. The Bearer Bond Account

The Debtor issued certain Bearer Bonds in 1978, 30 of which are still held by unknown persons. Public notice will be given regarding these bonds, and after paying out all legitimate claims, which will take some time, the Debtor will take the steps necessary to close this account and transfer the balance of the funds to the General Business Accounts. However, until the Debtor is able to accomplish the resolution of all 1978 Bearer Bond issues, it requests authority to keep this account open and to utilize it as necessary and, to the extent necessary, as otherwise approved by the Court to satisfy its Bearer Bond obligations.

Far and away, the preponderance of revenues are received electronically and mostly from governmental payors. Any disruption of the system would be extremely detrimental to MCH. When checks are written by MCH, they are electronically prepared and it will take at least seventy five (75) days before the software can be reprogrammed to say "Debtor in Possession."

The Debtor is requesting that it be authorized to leave its accounts open and to utilize them as described above.

///

///

///

Declaration of Karen Paolinelli in Support of Motion to Maintain Existing Bank Accounts and Use Existing Cash Management System

11

R:\Client\10538-002\PLEADINGS\WJH-4 Motion re Maintenance of Bank Accounts\Dec.031023.docx

I declare under penalty of perjury that the foregoing facts are true and correct under the laws of the United States of America and I would so testify if called as a witness.

Executed this 10th day of March, 2023, at Madera, California.

*Karen Paolinelli*
Karen Paolinelli

Declaration of Karen Paolinelli in Support of Motion to Maintain Existing Bank Accounts and Use Existing Cash Management System

12

R:\Client\10538-002\PLEADINGS\WJH-4 Motion re Maintenance of Bank Accounts\Dec.031023.docx