**10**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Kurt F. Vote #160496
Steven K. Vote #309152
Danielle J. Bethel #315945
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail: rwalter@wjhattorneys.com
        dbethel@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 23-10457 |
| MADERA COMMUNITY HOSPITAL, | Chapter 11 |
| Debtor in Possession. | DC No.: WJH-5 |
| Tax ID#: 23-7429117<br>Address: 1250 E Almond Avenue<br>         Madera, CA 93637 | Date: March 16, 2023<br>Time: 11:00 a.m.<br>Place: 2500 Tulare Street<br>        Courtroom 13<br>        Fresno, CA 93721<br>Judge: Honorable René Lastreto II |

### DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF EMERGENCY MOTION FOR ORDER (A) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE, AND (B) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

I, Karen Paolinelli, hereby declare and represent as follows:

1. I am the Chief Executive Officer of Madera Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor"). I am primarily responsible for the overall management of the Debtor. I am generally familiar with the day-to-day continuing operations, assets, and financial affairs of the Debtor.

Declaration of Karen Paolinelli in Support of Motion to
Prohibit Utility Companies from Altering Service and    1
Determine Adequate Assurance of Payment for Future
Services

R:\Client\10538-002\PLEADINGS\WJH-5 Motion
re Utilities\Dec.031023.docx

2.      Unless as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (my own or information gathered from others who report to me), my review of relevant documents, or my opinion based upon my experience.

3.      I submit this Declaration in support of the "first-day" relief that the Debtor has requested by the emergency motion (the "Emergency Motion") to prohibit utility companies from altering, refusing, or discontinuing service and to determine adequate assurance of payment for future utility services. The relief sought in this Emergency Motion is intended to enable the Debtor to continue to function. I have reviewed the Emergency Motion and believe that the relief sought in it is essential to the continued functioning of the Debtor's operations.

# I.

## BACKGROUND

Madera Community Hospital is a non-profit California Corporation ("MCH" or "Hospital"). It owns a general acute care hospital in Madera, California. The hospital is licensed (in suspense) for 106 beds and currently has 31 full time employees and 4 per diem employees, most of whom are administrative personnel and physical plant maintenance persons. Since December 26, 2022, the Debtor has laid off over 700 employees. It is the only adult hospital in the county and served a population of about 160,000 people, some of whom are uninsured and many of whom are of lower income. The closest hospitals with emergency rooms are 23.5 miles away in Fresno or 35 miles away in Merced, both of which are long distances in an emergency situation.

As discussed below, in December 2022, Saint Agnes Medical Center ("SAMC"), after receiving conditions imposed by the California Attorney General, terminated negotiation of an affiliation agreement with MCH which resulted in MCH shutting down all medical services. Since January 10, 2023 no medical services have been provided at the hospital. There are no patients. All patient care has ceased. Operations, however, continue as the Debtor is pursuing collections and recoveries, preserving its facilities, and pursuing suitors.

Declaration of Karen Paolinelli in Support of Motion to Prohibit Utility Companies from Altering Service and Determine Adequate Assurance of Payment for Future Services

2

R:\Client\10538-002\PLEADINGS\WJH-5 Motion re Utilities\Dec.031023.docx

The leadership of the hospital consists of myself, Karen Paolinelli, MSN, RN, FNP-C, PA-C, Chief Executive Officer. The CFO is Shondale Seymour on a contract basis. The Controller is Aaron Chambers, also on a contract basis.

As with many other rural hospitals serving a largely uninsured population, MCH has sustained many financial setbacks in recent years and the COVID pandemic accelerated the financial problems. The governmental reimbursement fees and health plan fees paid to MCH were wholly insufficient and did not cover the costs of care we are required to provide.

For the past two and a half years, MCH and the courageous nurses, physicians and caregivers that treat patients, went far above and beyond battling COVID. This response took a significant toll on the financial health of MCH. While there have been "lifelines" tossed out, the lifeline has dried up and without help MCH has withered and will soon die without immediate care.

Beginning in 2021 and continuing to this day, MCH embarked on evaluating and identifying potential relationships with other healthcare systems. In 2021 MCH identified a possible afflation with Saint Agnes Medical Center ("SAMC") and its parent, Trinity Health Care System ("Trinity"). Protracted negotiations ensued. SAMC made significant loans to MCH. When the proposed affiliation was presented to the Attorney General of the State of California, the Attorney General, after many months of delay, sought to impose conditions that were unacceptable to SAMC. As a result SAMC terminated the affiliation agreement. This, thus, forced MCH to file Chapter 11 as it ran out of money and was unable to pay employees.

MCH has the following major assets: Cash $5,000,000, Hospital campus $16,000,000-$60,000,000, incoming provider fees receivable/government transfers $24,000,000, $1,500,000 in receivables, $00.00 to $20,000,000 million of FEMA reimbursements, miscellaneous personal property assets $3,000,000 (est.) and a 35-acre farm property valued at $535,000, and a long term note valued at $485,000 which is secured by real property.

The major secured creditor of MCH is SAMC, to whom $15,400,000 is owed. New England Sheet Metal and one of its subcontractors, Patterson Drywall, together assert four mechanic's liens for about $1,100,000.

1  MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid
2  accumulated personal time off.  About $1,100,000 is entitled to priority status.  MCH also has
3  approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of
4  $1,100,000 owed to Citizens Business Bank.

5  MCH will have an additional, unknown amount owed due to claims resulting from the
6  rejection of executory contracts and leases.  There is also an overpayment claimed by Medicare
7  in the amount of $400,000.  Additionally, there are no less than $1,200,000 in self-insured
8  insurance claims.  MCH is a very sick hospital.

9  On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of
10  the Bankruptcy Code. The Debtor continues to operate and manages its affairs as a debtor in
11  possession. No trustee, examiner, ombudsman or committee has been appointed. There are no
12  patients being treated by the Debtor.  The Debtor is aggressively soliciting new suitors and
13  evaluating ways to restart and resume operations, including reopening its medical clinics.

## II.

## FINANCES

### A.     The Debtor's Campus

17  The Hospital is located at 1250 E Almond Avenue, Madera, California 93637. The facility
18  was designed and constructed as an acute care hospital, and over the years it has been renovated
19  and expanded to accommodate the needs of its patients and the communities it serves. The Debtor
20  owns the entire 39.5 acre campus with the hospital and medical buildings.  Two buildings on the
21  campus are owned by physicians on land leased from the Debtor.  The Debtor formerly leased
22  three other facilities: the Chowchilla Medical Center Rural Health Clinic in Chowchilla, the
23  Family Health Service Rural Health Clinic in Mendota, and the IT facility in Madera.  All three
24  facilities have been relinquished to the landlords.  The Debtor has three suspended construction
25  projects on the main campus.  The estimated value of the hospital campus is $16 million to $60
26  million.

27  ///

28  ///

**B.      The Debtor's Staff**

The Hospital is licensed ("in suspense") to operate 106 beds. The license is in suspense. Approximately 160 doctors have privileges at the Hospital. As of the Petition Date, the Debtor employed approximately 30-35 people. The current personnel include, but are not limited to, administrative and office staff, technicians, maintenance staff, IT staff, human resources staff, medical records personnel, engineering and housekeeping services.  The staff are needed to collect on money owed and to mothball the facility and preserve it for future use.  Over 700 employees were laid off since late-December 2022 following issuance of a WARN Act notice.

**C.      The Debtor's Management**

As noted above, I am the Debtor's Chief Executive Officer.  I have served in this position since November 2017.  Prior to that, I was the Chief Operating Officer.  I have a Nursing Degree and a Master of Science Degree and have worked at MCH for over 35 years.

The Chief Financial Officer, Shondale Seymour, joined MCH January 2023. The Controller is Aaron Chambers who joined December 2022. The Debtor's long time CFO retired in December 2022.

**D.      The Debtor's Revenues**

The Debtor will receive revenues for payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal.

The Debtor has been informed by State of California agencies that it should receive about $24,000,000+ over the period of about 24 months from January 2023 consisting of provider fees and disproportionate share money. It has about $5,000,000 cash, $1,500,000 in collectible accounts and large claim for funds from FEMA in an unknown amount ($00.00 to $20,000,000). MCH has considerable assets in addition to these expected cash revenues, including a 35 acre farm and a large 39.5 acre hospital campus having a significant value.  SAMC asserts a security interest in these assets, junior only to mechanic's liens.

**E.      The Chapter 11 Filing**

The fiscal crisis for the Debtor is the result of the collision of several factors.  First, the Debtor provided millions of dollars per year in care to low income, uninsured people, for which

1  it was inadequately compensated.  The percentage of the Debtor's resources expended on this care

2  increased because the Debtor serves a depressed community and the economic condition of this

3  community has worsened due to inflation and other factors.  The COVID pandemic has devastated

4  MCH.    According to a May 2022 article in the American Journal of Nursing, the COVID

5  pandemic "transformed a long-simmering nursing shortage into a full-blown crisis," leading

6  hospitals to turn to traveling nurses to fill the shortage.  MCH was not immune to this crisis and

7  was forced to hire traveling nurses of its own at very high costs in order to meet state mandated

8  nurse-to-patient ratios.

9      Second, the Hospital's campus is approximately 51 years old and the maintenance costs

10 for this campus are substantial and increasing every year.

11     Third, the fracture of the proposed affiliation agreement took MCH by surprise and

12 occurred as MCH was at a critically low cash point, leaving it with no cash to pay for continued

13 medical services.

14     Fourth, being a standalone, small rural area hospital in California is simply not an

15 advantageous financial situation.  Such hospitals, including MCH, suffered from a lack of

16 economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines,

17 and an overall lower revenue base.

18     Fifth, the costs resulting from COVID and the resulting costs of traveling nurses was

19 considerable, as have the high inflationary pressures and considerable legal expense in connection

20 with the affiliation process.

21     During the period of time that I have managed the Hospital, I have made extensive efforts

22 to deal with the financial crisis, including, but not limited to, begging the State of California and

23 elected representatives for more money while operating as efficiently as possible on a shoestring

24 budget. However, MCH lacked leverage and was not able to increase the governmental or health

25 plan contract rates.  Pleas for more money fell (and continue to fall) on deaf ears.  The

26 combination of low Medi-Cal rates plus lower than market contract rates with health plans meant

27 MCH could not cover the costs of operations.

28

Prior to closing, the Debtor needed to generate approximately $300,000 per day in revenue to cover its operating costs to stay in full operation. The Hospital was generating only approximately $225,000 per day in revenue when it closed. Thus, the Debtor lost money, $2 to $2.5 million, every month it operated in 2022.

Over a year ago, because the Debtor's CEO and Board concluded that the Debtor cannot survive at its then cash flow levels and would have to close absent drastic measures, representatives of the Board approached SAMC (and others), which had previously expressed an interest in acquiring or operating the Hospital, and negotiated an affiliation agreement subject to California Attorney General approval. After a long delay and review of over 13 months, on account of conditions imposed by the California Attorney General, SAMC withdrew from proceeding with the affiliation agreement. As a result of the withdrawn affiliation agreement and lack of money to pay employees, MCH concluded that it must shut down hospital operations, cease treating patients, shut down clinics, close its doors and find a suitor or liquidate its assets.

The emergency room closed on December 30, 2022. The WARN Act notice was sent to all employees on December 23, 2022.

Every effort to obtain a new suitor was, and is, being made as are efforts to reopen the clinics.

**F.     The Debtor's Secured Debt**

**1.     Saint Agnes Medical Center**

In April 2021, SAMC, entered into an agreement to provide financing to MCH.

As of the Petition Date, the Debtor owed SAMC a total of approximately $15,400,000 which is secured by a deed of trust against all real property and a security interest in almost all assets. The loan is in default. The Debtor believes SAMC is the only creditor with a security interest in cash collateral.

**2.     New England Sheet Metal**

The Debtor owes New England Sheet Metal and one of its subcontractors, Patterson Drywall, about $1,100,000 on account of works of improvement and four mechanic's liens against the hospital campus have been filed.

Declaration of Karen Paolinelli in Support of Motion to
Prohibit Utility Companies from Altering Service and
Determine Adequate Assurance of Payment for Future
Services                            7

R:\Client\10538-002\PLEADINGS\WJH-5 Motion
re Utilities\Dec.031023.docx

### 3.    Equipment Leases

The Debtor has numerous leases with numerous lessors of real and personal property, all of which are still being evaluated. An estimated $2,800,000 is owed on these equipment leases.

As of the Petition Date, the monthly payments called for on the leases total about $100,000 per month. The actual amounts are being investigated. No payments on the executory contracts have been made recently.

### G.    The Debtor's Unsecured Debt

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims.

### III.

### EMERGENCY MOTION

**Emergency Motion for Order (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (b) Determining Adequate Assurance of Payment for Future Utility Services (WJH-5)**

By the Emergency Motion for Order Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion") the Debtor is requesting an order (a) prohibiting each of the utilities (collectively, the "Utility Companies" and individually, a "Utility Company") from altering, refusing, or discontinuing services to the Debtor without further order of this Court; (b) finding that the following constitutes adequate assurance of payment for future utility services as contemplated by §§ 366(b) and (c)(3)(A): (i) a Deposit made by the Debtor to each of the Utility Companies in an amount equal to the average monthly invoice for prepetition services; and (ii)

the ability of the Utility Companies to obtain an expedited hearing twenty (20) days after the Debtor receives notice of a default and does not cure that default; and (c) requiring any Utility Company whose services are terminated by the Debtor to immediately refund any deposit in connection with this Motion (with no offset for prepetition claims) (provided that all postpetition invoices have been paid).

The relief sought in the Utilities Motion is needed because uninterrupted utilities are essential. In addition, certainty as to the amount of the deposits, if any, will provide the Debtor with much needed stability at this critical time. Furthermore, I am advised that the Bankruptcy Code sets forth a short time frame for resolving disputes with utility companies.

The Debtor receives essential utility services from several utility providers. A list of the utility providers together with the corresponding average monthly pre-petition invoice is attached hereto as Exhibit A ("List of Utility Companies"). The Debtor's facilities receive one or more of the essential water, sewer, gas, electric, telephone, cell, and garbage services from the Utility Companies.

The Debtor still operates a hospital facility that must be maintained twenty four/seven (24 hours a day, 7 days a week). While any interruption in utility services would certainly be detrimental to the Debtor's operations, the more important consideration in this case is that any utility interruption, no matter how brief, could be extremely harmful to the hospital facility. At this critical time and given the nature of the Debtor's operations, uninterrupted electricity, gas, water, sewer, garbage service, telephone and cell services, and internet services are essential to the ongoing operations of the Debtor and to the preservation of the value thereof.

The Debtor routinely pays its regular monthly utility obligations when due. In addition, the Debtor's chapter 11 filing occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, there are likely limited outstanding prepetition amounts owed to the Utility Companies.

The Debtor believes it will have adequate cash to meet all of its necessary post-petition operating expenses on a current basis for the initial 13-week period, including payments to the Utility Companies. The Debtor has specifically included in its budget amounts for payments to

Utility Companies, including the payment of potential Utility Deposits (as defined below).

The Debtor proposes to give each of the Utility Companies adequate assurance of payment for its future services in the form of cash deposits (the "Utility Deposits" and each, a "Utility Deposit") in amounts that are equal to the average monthly invoice for one month of prepetition services provided to the Debtor by each Utility Company. These amounts (as so calculated) are included in the List of Utility Companies. The Debtor proposes to pay the Utility Deposits within forty-five (45) days after the Court's entry of an order granting the Utilities Motion.

Additionally, the Debtor proposes that if the Debtor defaults on an obligation to pay a Utility Company for post-petition services and such default is not cured within twenty (20) days of such Debtor's receipt of written notice of default, then the applicable Utility Company may file a motion requesting that the Debtor furnish further adequate assurance of future payment, and such motion shall be heard on an expedited basis.

Last, the Debtor is requesting that Utility Companies must immediately refund any Utility Deposit (without offset for prepetition claims) in the event that the Debtor terminates the services of any Utility Company and after all post-petition invoices to that Utility Company have been paid.

Under the circumstances of this case in which the Debtor believes it has no significant outstanding prepetition utility obligations and has already arranged to maintain current payment for post-petition services, the Debtor believes that the proposed Utility Deposits combined with expedited access to a court hearing in the event of a default, together, constitute adequate assurance of payment under Section 366(c) of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing facts are true and correct under the laws of the United States of America and I would so testify if called as a witness.

Executed this 10th day of March, 2023, at Madera, California.

Karen Paolinelli

---

Declaration of Karen Paolinelli in Support of Motion to Prohibit Utility Companies from Altering Service and Determine Adequate Assurance of Payment for Future Services          10          R:\Client\10538-002\PLEADINGS\WJH-5 Motion re Utilities\Dec.031023.docx