**10**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Kurt F. Vote #160496
Steven K. Vote #309152
Danielle J. Bethel #315945
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail: rwalter@wjhattorneys.com
dbethel@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| In re:<br><br>MADERA COMMUNITY HOSPITAL,<br><br>Debtor in Possession.<br><br>Tax ID#: 23-7429117<br>Address: 1250 E. Almond Avenue<br>Madera, CA 93637 | Case No. 23-10457<br><br>Chapter 11<br><br>DCN: WJH-8<br><br>Date: March 16, 2023<br>Time: 11:00 a.m.<br>Place: 2500 Tulare Street<br>Courtroom 13<br>Fresno, CA 93721<br>Judge: Honorable René Lastreto II |

**DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO (A) MAINTAIN INSURANCE PROGRAM, (B) PAY INSURANCE PREMIUMS AND BROKERAGE COMMISSIONS IN THE ORDINARY COURSE, AND (C) PAY ALL OBLIGATIONS ASSOCIATED THEREWITH**

I, Karen Paolinelli, hereby declare and represent as follows:

1. I am the Chief Executive Officer of Madera Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor"). I am primarily responsible for the

overall management of the Debtor. I am generally familiar with the day-to-day continuing operations, assets, and financial affairs of the Debtor.

2. Unless as otherwise stated, all facts contained within this Declaration are based upon personal knowledge (my own or information gathered from others who report to me), my review of relevant documents, or my opinion based upon my experience.

3. I submit this Declaration in support of the "first-day" relief that the Debtor has requested by the emergency motion (the "Emergency Motion") to pay and maintain insurance and to assist the Court and other interested parties to understand this Case. The relief sought in this Emergency Motion is intended to enable the Debtor to continue to function. I have reviewed the Emergency Motion and believe that the relief sought in it essential to the continued functioning of the Debtor's operations.

## I.

## BACKGROUND

Madera Community Hospital is a non-profit California Corporation ("MCH" or "Hospital"). It owns a general acute care hospital in Madera, California. The hospital is licensed (in suspense) for 106 beds and currently has 31 full time employees and 4 per diem employees, most of whom are administrative personnel and physical plant maintenance persons. Since December 26, 2022, the Debtor has laid off over 700 employees. It is the only adult hospital in the county and served a population of about 160,000 people, some of whom are uninsured and many of whom are of lower income. The closest hospitals with emergency rooms are 23.5 miles away in Fresno or 35 miles away in Merced, both of which are long distances in an emergency situation.

As discussed below, in December 2022, Saint Agnes Medical Center ("SAMC"), after receiving conditions imposed by the California Attorney General, terminated negotiation of an affiliation agreement with MCH which resulted in MCH shutting down all medical services. Since January 10, 2023 no medical services have been provided at the hospital. There are no patients. All patient care has ceased. Operations, however, continue as the Debtor is pursuing collections and recoveries, preserving its facilities, and pursuing suitors.

The leadership of the hospital consists of myself, Karen Paolinelli, MSN, RN, FNP-C, PA-C, Chief Executive Officer. The CFO is Shondale Seymour on a contract basis. The Controller is Aaron Chambers, also on a contract basis.

As with many other rural hospitals serving a largely uninsured population, MCH has sustained many financial setbacks in recent years and the COVID pandemic accelerated the financial problems. The governmental reimbursement fees and health plan fees paid to MCH were wholly insufficient and did not cover the costs of care we are required to provide.

For the past two and a half years, MCH and the courageous nurses, physicians and caregivers that treat patients, went far above and beyond battling COVID. This response took a significant toll on the financial health of MCH. While there have been "lifelines" tossed out, the lifeline has dried up and without help MCH has withered and will soon die without immediate care.

Beginning in 2021 and continuing to this day, MCH embarked on evaluating and identifying potential relationships with other healthcare systems. In 2021 MCH identified a possible afflation with Saint Agnes Medical Center ("SAMC") and its parent, Trinity Health Care System ("Trinity"). Protracted negotiations ensued. SAMC made significant loans to MCH. When the proposed affiliation was presented to the Attorney General of the State of California, the Attorney General, after many months of delay, sought to impose conditions that were unacceptable to SAMC. As a result SAMC terminated the affiliation agreement. This, thus, forced MCH to file Chapter 11 as it ran out of money and was unable to pay employees.

MCH has the following major assets: Cash $5,000,000, Hospital campus $16,000,000-$60,000,000, incoming provider fees receivable/government transfers $24,000,000, $1,500,000 in receivables, $00.00 to $20,000,000 million of FEMA reimbursements, miscellaneous personal property assets $3,000,000 (est.) and a 35-acre farm property valued at $535,000, and a long term note valued at $485,000 which is secured by real property.

The major secured creditor of MCH is SAMC, to whom $15,400,000 is owed. New England Sheet Metal and one of its subcontractors, Patterson Drywall, together assert four mechanic's liens for about $1,100,000.

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims. MCH is a very sick hospital.

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manages its affairs as a debtor in possession. No trustee, examiner, ombudsman or committee has been appointed. There are no patients being treated by the Debtor. The Debtor is aggressively soliciting new suitors and evaluating ways to restart and resume operations, including reopening its medical clinics.

## II.

## FINANCES

### A. The Debtor's Campus

The Hospital is located at 1250 E Almond Avenue, Madera, California 93637. The facility was designed and constructed as an acute care hospital, and over the years it has been renovated and expanded to accommodate the needs of its patients and the communities it serves. The Debtor owns the entire 39.5 acre campus with the hospital and medical buildings. Two buildings on the campus are owned by physicians on land leased from the Debtor. The Debtor formerly leased three other facilities: the Chowchilla Medical Center Rural Health Clinic in Chowchilla, the Family Health Service Rural Health Clinic in Mendota, and the IT facility in Madera. All three facilities have been relinquished to the landlords. The Debtor has three suspended construction projects on the main campus. The estimated value of the hospital campus is $16 million to $60 million.

///

///

**B. The Debtor's Staff**

The Hospital is licensed ("in suspense") to operate 106 beds. The license is in suspense. Approximately 160 doctors had privileges at the Hospital. As of the Petition Date, the Debtor employed approximately 30 people. The current personnel include, but are not limited to, administrative and office staff, technicians, maintenance staff, IT staff, human resources staff, medical records personnel, engineering and housekeeping services. The staff are needed to collect on money owed and to mothball the facility and preserve it for future use. Over 700 employees were laid off since late-December 2022 following issuance of a WARN Act notice.

**C. The Debtor's Management**

As noted above, I am the Debtor's Chief Executive Officer. I have served in this position since November 2017. Prior to that, I was the Chief Operating Officer. I have a Nursing Degree and a Master of Science Degree and have worked at MCH for over 35 years.

The Chief Financial Officer, Shondale Seymour, joined MCH January 2023. The Controller is Aaron Chambers who joined December 2022. The Debtor's long time CFO retired in December 2022.

**D. The Debtor's Revenues**

The Debtor will receive revenues for payments for services provided to its patients from either health plans or from governmental programs such as Medicare and Medi-Cal.

The Debtor has been informed by State of California agencies that it should receive about $24,000,000+ over the period of about 24 months from January 2023 consisting of provider fees and disproportionate share money. It has about $5,000,000 cash, $1,500,000 in collectible accounts and large claim for funds from FEMA in an unknown amount ($00.00 to $20,000,000). MCH has considerable assets in addition to these expected cash revenues, including a 35 acre farm and a large 39.5 acre hospital campus having a significant value. SAMC asserts a security interest in these assets, junior only to mechanic's liens.

**E. The Chapter 11 Filing**

The fiscal crisis for the Debtor is the result of the collision of several factors. First, the Debtor provided millions of dollars per year in care to low income, uninsured people, for which

it was inadequately compensated. The percentage of the Debtor's resources expended on this care increased because the Debtor serves a depressed community and the economic condition of this community has worsened due to inflation and other factors. The COVID pandemic has devastated MCH.

Second, the Hospital's campus is approximately 51 years old and the maintenance costs for this campus are substantial and increasing every year.

Third, the fracture of the proposed affiliation agreement took MCH by surprise and occurred as MCH was at a critically low cash point, leaving it with no cash to pay for continued medical services.

Fourth, being a standalone, small rural area hospital in California is simply not an advantageous financial situation. Such hospitals, including MCH, suffered from a lack of economies of scale, poor payor mix, high overhead costs, less high-margin specialty service lines, and an overall lower revenue base.

Fifth, the costs resulting from COVID and the resulting costs of traveling nurses was considerable, as have the high inflationary pressures and considerable legal expense in connection with the affiliation process.

During the period of time that I have managed the Hospital, I have made extensive efforts to deal with the financial crisis, including, but not limited to, begging the State of California and elected representatives for more money while operating as efficiently as possible on a shoestring budget. However, MCH lacked leverage and was not able to increase the governmental or health plan contract rates. Pleas for more money fell (and continue to fall) on deaf ears. The combination of low Medi-Cal rates plus lower than market contract rates with health plans meant MCH could not cover the costs of operations.

Prior to closing, the Debtor needed to generate approximately $300,000 per day in revenue to cover its operating costs to stay in full operation. The Hospital was generating only approximately $225,000 per day in revenue when it closed. Thus, the Debtor lost money, $2 to $2.5 million, every month it operated in 2022.

Over a year ago, because the Debtor's CEO and Board concluded that the Debtor cannot survive at its then cash flow levels and would have to close absent drastic measures, representatives of the Board approached SAMC (and others), which had previously expressed an interest in acquiring or operating the Hospital, and negotiated an affiliation agreement subject to California Attorney General approval. After a long delay and review of over 13 months, on account of conditions imposed by the California Attorney General, SAMC withdrew from proceeding with the affiliation agreement. As a result of the withdrawn affiliation agreement and lack of money to pay employees, MCH concluded that it must shut down hospital operations, cease treating patients, shut down clinics, close its doors and find a suitor or liquidate its assets.

The emergency room closed on December 30, 2022. The WARN Act notice was sent to all employees on December 23, 2022.

Every effort to obtain a new suitor was, and is, being made as are efforts to reopen the clinics.

### F. The Debtor's Secured Debt

#### 1. Saint Agnes Medical Center

In April 2021, SAMC, entered into an agreement to provide financing to MCH.

As of the Petition Date, the Debtor owed SAMC a total of approximately $15,400,000 which is secured by a deed of trust against all real property and a security interest in almost all assets. The loan is in default. The Debtor believes SAMC is the only creditor with a security interest in cash collateral.

#### 2. New England Sheet Metal

The Debtor owes New England Sheet Metal and one of its subcontractors, Patterson Drywall, about $1,100,000 on account of works of improvement and four mechanic's liens against the hospital campus have been filed.

#### 3. Equipment Leases

The Debtor has numerous leases with numerous lessors of real and personal property, all of which are still being evaluated. An estimated $2,800,000 is owed on these equipment leases.

As of the Petition Date, the monthly payments called for on the leases total about $100,000 per month. The actual amounts are being investigated. No payments on the executory contracts have been made recently.

**G. <u>The Debtor's Unsecured Debt</u>**

MCH owes its former employees approximately $2,000,000 in the aggregate for unpaid accumulated personal time off. About $1,100,000 is entitled to priority status. MCH also has approximately $9,100,000 in general unsecured creditors, which includes an unsecured loan of $1,100,000 owed to Citizens Business Bank.

MCH will have an additional, unknown amount owed due to claims resulting from the rejection of executory contracts and leases. There is also an overpayment claimed by Medicare in the amount of $400,000. Additionally, there are no less than $1,200,000 in self-insured insurance claims.

## III.

## EMERGENCY MOTION

**Motion For Entry of an Order (I) Authorizing the Debtor to (a) Maintain Insurance Program, (b) Pay Insurance Premiums and Brokerage Commissions in the Ordinary Course, and (c) Pay All Obligations Associated Therewith [WJH-8].**

By the Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (a) Maintain Insurance Program, (b) Pay Insurance Premiums and Brokerage Commissions in the Ordinary Course, and (c) Pay All Obligations Associated Therewith (the "Insurance Motion"), the Debtor seeks an order allowing it to (1) maintain its current insurance coverage levels as set forth in the Insurance Motion, including the authority to revise, extend, supplement, renew or change insurance coverage as needed; (2) pay insurance premiums, self-insured retentions, broker fees and deductibles in the ordinary course of business; and (3) pay certain administrative obligations associated therewith.

The Debtor maintains various insurance policies issued by several insurance carriers (collectively, the "Insurance Carriers"). Collectively, these policies provide for coverage for,

among other things: workers' compensation and employee liability, general liability, and professional liability, commercial property, commercial automobile, D&O liability, employee benefits and other coverage (collectively, the "Insurance Policies"). A list of the Insurance Policies is attached hereto as Exhibit A ("Summary of Insurance Policies, Coverage, and Obligations").

Most of the Debtor's Insurance Policies will expire beginning on April 1, 2023, or later. It is critical that the Debtor continues to carry the necessary insurance coverage to operate. The Debtor seeks the authority to renew, modify, extend or enter into new Insurance Policies (collectively, the "New Insurance Policies") on a postpetition basis in the ordinary course of business.

In certain instances, the Debtor pays premiums for its Insurance Policies in full at the beginning of the policy and in other instances in monthly installments as reflected in the Summary of Insurance Policies, Coverage, and Obligations. To ensure continued insurance coverage in the ordinary course of the Debtor's operations, the Debtor seeks the authority to pay all premium payments that may come due on current Insurance Policies during the course of this Case. *See* the Summary of Insurance Policies. The Debtor also seeks authority to pay all premiums associated with the New Insurance Policies on a postpetition basis in the ordinary course of business.

The Debtor also seeks authority to pay its deductibles and self-insured retention amounts such amounts come due on a postpetition basis, including any amounts accrued and not due as of the Petition Date, in the ordinary course of business. Debtor also seeks to pay brokerage commission and other amounts due to its brokers in the ordinary course of business.

The premiums, deductibles, self-insured retention amounts, brokerage commissions and other amounts due to the Debtor's brokers, are collectively referred to hereafter as the "Insurance Obligations."

Payment of the Insurance Obligations represents a sound exercise of the Debtor's business judgment, because is necessary to avoid immediate and irreparable harm to the Debtor's estate. Paying insurance premiums, self-insured retentions, deductibles, and other Insurance Obligations

will benefit the Debtor's estate and its creditors by allowing the Debtor's operations to continue without interruption. Indeed, the Debtor believes that without the relief requested herein, it will be unable maintain its current insurance coverage or find suitable replacement or renewal insurance coverage.

For the reasons discussed herein, payment of the Insurance Obligations is necessary to ensure that the Debtor is able to maintain operations post-petition.

I declare under penalty of perjury that the foregoing facts are true and correct under the laws of the United States of America and I would so testify if called as a witness.

Executed this 10th day of March, 2023, at Madera, California.

Karen Paolinelli