14

GREGORY S. POWELL, SBN CA 182199
Assistant United States Trustee
JORGE A. GAITAN, State Bar No. 288427
Trial Attorney
TREVOR FEHR, State Bar No. 316699
Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
Office of the United States Trustee
2500 Tulare Street, Suite 1401
Fresno, CA 93721
Telephone:     (559) 487-5002
Facsimile:     (559) 487-5030
Email:  Jorge.A.Gaitan@usdoj.gov

Attorney for TRACY HOPE DAVIS
United States Trustee for Region 17

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| In re | ) Case No. 23-10457 |
| | ) |
| | ) DCN Nos: WJH-3; WJH-6; and WJH-4 |
| MADERA COMMUNITY HOSPITAL, | ) |
| | ) Date:  March 16, 2023 |
| | ) Time: 11:00 a.m. |
| Debtor. | ) Place: 2500 Tulare Street |
| | )          Courtroom 13 |
| | )          Fresno, CA 93721 |
| | ) |
| | ) Judge: Honorable René Lastreto II |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO**
**DEBTOR'S FIRST DAY MOTIONS AND RESERVATION OF RIGHTS**
**[WJH-4 WJH-6, and WGH-3]**

Tracy Hope Davis, United States Trustee for Region 17 (the "UST"), hereby files this

omnibus objection (the "Omnibus Objection") to three first-day motions filed in this case.  These

first day motions are referred to collectively hereafter as the "First Day Motions", or

individually, as set forth below:

- *[WJH-4] Emergency Motion for Order Authorizing (1) Maintenance of Existing Bank Accounts, (2) Continued Use of Existing Cash Management System and (3) Continued Use of Business Forms (the "Cash Management Motion");*

- *[WJH-6] Motion for Authority to Sell Personal Property of the Estate (Excess Medical Supplies) (the "Sale Motion"); and*
- *[WJH-3] Emergency Motion for Entry of Interim and Final Orders (a) Authorizing Use of Cash Collateral and (b) Granting Adequate Protection for Use of Cash Collateral (the "Cash Collateral Motion").*

This Omnibus Objection is supported by the following memorandum of points and authorities and any argument the Court may permit on the Omnibus Objection.[1]

## I.     MEMORANDUM OF POINTS AND AUTHORITIES

### A.   Introduction

The Debtor's requests for relief in the First Day Motions should be: (a) denied; (b) denied in part; or (c) limited to only emergency relief to permit the Debtor to sustain business operations. The UST is in the process of scheduling the initial debtor interview. The meeting of creditors pursuant to 11 U.S.C. § 341 will be held on April 17, 2023. The UST is in the process of soliciting for an official committee of unsecured creditors. Therefore, in the best interest of creditors, the Court should either sustain this Omnibus Objection or adjourn the hearing on these First Day Motions to a later date to allow any creditors committee or other creditors a meaningful opportunity to evaluate these First Day Motions.

The UST reserves all rights with respect to all of the Debtor's First Day Motions which are scheduled for hearing on the above-captioned date and time, including, but not limited to her right to take any appropriate action under the Bankruptcy Code, the Federal Rules of Bankruptcy

---

[1]     The UST requests that the Court take judicial notice of the pleadings and documents filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201. To the extent that the Omnibus Objection contains factual assertions predicated upon statements made by the Debtor, any of its current or former affiliates, agents, attorneys, professionals, officers, directors or employees, the UST submits that such factual assertions are supported by admissible evidence in the form of admissions of a party opponent under Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 801(d)(2).

Procedure, and the Local Bankruptcy Rules for the U.S. Bankruptcy Court for the Eastern

District of California.

**B.      Background Facts and Procedural Posture**

1.      On March 10, 2023 (the "Petition Date"), the Debtor commenced a voluntary case

under Chapter 11 of the United States Bankruptcy Code. *See* ECF No. 1 (Case No. 23-10457).

The Debtor is currently a debtor-in-possession under sections 1107 and 1108 of the Bankruptcy

Code.

2.      On the Petition Date, the Debtor filed its list of 20 largest unsecured creditors.

*See* ECF No. 1

3.      The Debtor has not yet filed the required Schedules and Statements, including

Schedule A/B, Schedule D, Schedule E/F and the Statement of Financial Affairs. *See*

Bankruptcy Docket, *generally*.

4.      The UST is in the process of scheduling the Initial Debtor Interview.

5.      The UST is in the process of soliciting for an official committee of unsecured

creditors. *See* Bankruptcy Docket, *generally*.

6.      The meeting of creditors will take place on April 17, 2023.

7.      According to the first day declaration of Karen Paolinelli (the "First Day

Declaration") (ECF Nos. 15, 21, 25 30, and 36), the Debtor is a non-profit California corporation

which owns a general acute care hospital in Madera, California and which was licensed for 106

beds. First Day Declaration, at 2:15-23. The Debtor asserts that it has shut down all medical

services and that none have been provided since January 10, 2023. *Id*. The Debtor further

underscores that it currently has no patients and that all patient care has ceased. *Id*., at pp. 2-3.

8.      The Debtor asserts that the COVID pandemic accelerated its financial problems, underscored by its service of a largely uninsured rural population for which governmental reimbursement of fees and health plan fees were insufficient to cover the costs of care. *Id*., at 3:6-14.

9.      The Debtor has major assets consisting of $5 million in cash, a hospital campus valued by the Debtor at $16 - $60 million, and several millions worth of receivables and government reimbursements due. *Id*., at 4:23-28. The Debtor's major secured creditor is Saint Agnes Medical Center ("SAMC"). *Id*.

10.      According to the Cash Management Motion, the Debtor maintains several accounts at Bank of America, N.A.  *See* Cash Management Motion, at p. 6 of 25.

11.      In addition, the Debtor maintains an account at Edward Jones.  *Id*. at p. 3.  Upon information and belief, the account at Edward Jones is a "Bearer Bond Account" that holds funds for "about 30 unknown persons who hold Bearer Bonds from a 1978 bond sale." *Id*. The Debtor also states that through the bankruptcy they will provide notice of these funds, pay out claims, and close the account. *Id*. at p. 4.

12.      By the Sale Motion, the Debtor seeks emergency authorization to sell personal property of the bankruptcy estate consisting of excess medical supplies. ECF No. 35, at p2.

13.      Finally, by the Cash Collateral Motion, the Debtor seeks authority to use cash collateral, specifically the Debtor's post-petition revenues that are subject to the security interest of SAMC. *See* Cash Collateral Motion; Exhibit "A" to Cash Collateral Motion.

14.      Related to the Cash Collateral Motion, on March 14, 2023, *MOTION FOR AUTHORIZATION TO ASSUME CONSULTING AGREEMENT* (*IMPOSSIBLE SERVICES GROUP, INC.*), WJH-10 (the "Consulting Agreement Motion").

15. In support of the Consulting Agreement Motion, the Debtor confirms that its current CFO and Controller were contracted for by Debtor and Impossible Services Group, Inc. ("ISGI") specifically for the purpose of preparing the Debtor for chapter 11 bankruptcy and that they will have central roles in the administration of the bankruptcy estate. *See* Paolinelli Declaration, ECF No. 64, at ¶ 10 ("…when SAMC, withdrew from the affiliation, our CFO abruptly retired, leaving MCH without a CFO or Controller, and a skeleton and relatively inexperienced accounting staff, all at a critical time as MCH had to begin preparing for a complex chapter 11 filing."). The Debtor describes the services being provided by ISGI as follows: "MCH has a great need for the services provided to it by ISGI. These services include preparing for the Chapter 11 filing, preparation of the bankruptcy schedules, assisting with and evaluating possible new suitors and related proposals, ….compliance with chapter 11 rules." *Id.*, at ¶ 13.

## II.    <u>ARGUMENT</u>

Four principles for Courts to consider with regard to first day motions are:

> First, the requested relief should be limited to that which is minimally necessary to maintain the existence of the debtor, until such time as the debtor can affect appropriate notice to creditors and parties in interest. In particular, a first day order should avoid substantive rulings that irrevocably determine the rights of parties.

> Second, first day orders must maintain a level of clarity and simplicity sufficient to allow reasonable confidence that an order will effect no unanticipated or untoward consequences.

> Third, first day orders are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established. In particular, first day orders should provide no substitute for the procedural and substantive protections of the plan confirmation process.

Fourth, no first day order should violate or disregard the substantive rights of parties, in ways not expressly authorized by the Bankruptcy Code.

*See In re The Colad Group, Inc.*, 324 B.R. 208, 213-14 (Bankr. W.D.N.Y. 2005).

**16.** Accordingly, the relief sought in the First Day Motions, if granted at all, should be granted only on an interim basis, with a final hearing set so that an Official Committee of Unsecured Creditors, if one can be formed, can review and respond to the final relief sought, preferably after schedules are filed and a meeting of creditors is held.

### A. The Cash Management Motion

**17.** In the Cash Management Motion, the Debtor seeks, *inter alia*, authorization for the Debtor to maintain its prepetition bank accounts held with Bank of America, N.A. and an account at Edward Jones. *See* Cash Management Motion, at p. 3. The account at Edward Jones is a "Bearer Bond Account" that holds funds for "about 30 unknown persons who hold Bearer Bonds from a 1978 bond sale." *Id*. The Debtor states that the Debtor will provide public notice regarding these bonds, pay out all "legitimate claims," and then work to close out the account. *Id*. at p. 4.

**18.** Bankruptcy Code Section 345(b) protects creditors against the loss of estate funds deposited or invested by debtors. *See In re CWNevada LLC*, 602 B.R. 717, 744 (Bankr. D. Nev. 2019) ("Those requirements are designed to ensure the safety of the funds held by a trustee or debtor in possession as a fiduciary of a bankruptcy estate.").

**19.** Specifically, Section 345(b) provides that money of the estate shall be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States. Money of the estate may also be deposited in an entity that has posted a bond in favor of the United States or has deposited

securities with the Federal Reserve Bank.  A court may waive the requirements of Section 345 upon a showing of "cause."  *See* 11 U.S.C. § 345(b).

20.     In order to ensure compliance with Section 345(b), the UST has implemented guidelines for debtors in possession regarding bank accounts (the "UST Guidelines").  Among other things, the UST Guidelines require debtors in possession to close their pre-petition bank accounts and open new bank accounts at an authorized depositary.  *See* United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession (Region 17), available at https://www.justice.gov/ust-regions-r17/file/guidelines.pdf/download.[2] Independent of the UST Guidelines, the Eastern District of California similarly requires chapter 11 debtors to close bank, deposit and investment accounts and to open a debtor-in-possession general bank account, tax account, and payroll account, unless the Court deems it unnecessary.  *See* LR 2015-2.

21.     The Debtor's assertion that LR 2015-2(c) provides an exception to the requirements of § 345(b) for monies deposited with an entity included on the U.S. Trustee's list of cooperating depositories is incorrect. *See* LR 2015-2(c).  Rather than excusing the § 345(b) requirement, LR 2015-2(c) supplements LR 2015-2(a) (which requires debtors to close all bank accounts and open new debtor-in-possession accounts) by further indicating that it may be necessary for additional insured accounts to be opened in different depositories so that "any deposit shall not exceed the insured limits of the account." *See* LR 2015-2(c). Thus, the Debtor's request for a waiver of the requirements of § 345(b) should be denied.

---

[2] The UST is mindful that some courts have concluded that guidelines established by the UST do not have the force and effect of law.  *See, e.g., In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn. 1997); *In re Lani Bird, Inc.*, 113 B.R. 672, 673 (Bankr. D. Hawaii 1990); *In re Gold Standard Baking, Inc.*, 179 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995); *In re Johnson*, 106 B.R. 623, 624-25 (Bankr. D. Neb. 1989).  As a result, "if the court is to require debtors to comply with particular provisions of the U.S.T.'s Guidelines, it must be for a reason independent of the Guidelines themselves." *Johnson*, 106 B.R. at 624.

22.     Authorized depositories have agreed to maintain collateral, unless an order of the bankruptcy court provides otherwise, in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* United States Trustee Program Policy and Practices Manual, Volume 7, "Banking and Bonding," (the "UST Manual"), §§ 7-1.1 and 7-1.2.1, pp. 1-2.[3]  Authorized depositories have also agreed to make periodic reports so that the UST can monitor compliance.  *See* UST Manual, § 7-1.3.2, p. 5.

23.     Here, according to the Cash Management Motion, the Debtor maintains several accounts at Bank of America, N.A.  *See* Cash Management Motion, at p. 6 of 25.  Bank of America is an authorized depository in the Eastern District of California.  *See* https://www.justice.gov/ust-regions-r17/file/authorized_depository_eca.pdf/download.

24.     The Cash Management Motion should be denied because the Debtor has failed to meet its burden of showing that a waiver of Section 345(b) is appropriate or necessary.  In contrast, by virtue of the collateralization and reporting requirements imposed on authorized depositories, compliance with the Guidelines will ensure compliance with the requirements of 11 U.S.C. § 345(b).

25.     To the extent the Court is inclined to approve the Cash Management Motion, such approval should be on an interim basis only and such relief should be limited. As to the Bank of America Accounts, the Order should require the Debtor to have these accounts designated as "Debtor-in-Possession" accounts by the institution within 15 days of entry of the Interim Order.

---

[3] The Manual is available for download at https://www.justice.gov/ust/united-states-trustee-program-policy-and-practices-manual.

26. As for the Bearer Bond Account, the Debtor fails to provide the balance of the account or an estimated timeline for closing the account. Without adequate disclosure, it is unclear what amount of estate funds may be at risk if a waiver of Section 345(b) is granted. Although the Debtor states that it will be working to resolve and close the account, a blanket waiver with no time for the resolution of this non-Debtor-in-Possession account is not appropriate and unnecessary. Accordingly, the request should be denied because the Debtor has failed to show that waiver of Section 345(b) is appropriate or necessary given the substantial risks to the estate.

**B.**     **The Sale Motion**

27. The Debtor seeks emergency authorization to sell personal property of the bankruptcy estate consisting of excess medical supplies. Sale Motion, ECF No. 35, at 2:11-18. By its Sale Motion, the Debtor requests wide authority to sell personal property of the Debtor "on a case-by-case basis for market value". *Id*., at 4:10-20.

28. The Debtor's rationale for the broad authority requested is that many of the supplies are subject to an expiration date "which greatly affects their value." *See* Paolinelli Declaration, ECF No. 36, at 8:18-24.

29. Sales in the first 21 days of the filing of a petition are specifically prohibited under FRBP 6003 absent a showing that relief is necessary to avoid immediate and irreparable harm to the Debtor. FRBP 6004(b).

30. Moreover, to obtain approval of a sale under Section 363(b), a debtor in possession "must establish that: (1) a sound business purpose exists for the sale; (2) the sale is in the best interest of the estate, *i.e*., the sale price is fair and reasonable; (3) notice to creditors was proper; and (4) the sale is made in good faith." *See In re Slates*, 2012 WL 5359489, at *11

(B.A.P. 9th Cir. Oct. 31, 2012); *see also In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887 (Bankr. D. Alaska 2018) ("Proposed sales are reviewed to determine whether they are within the best interests of the estate resulting from a fair and reasonable price, are supported by a valid business judgment and proposed in good faith.").

31.    The debtor in possession bears the burden of proof on these elements. *See In re Slates*, 2012 WL 5359489, at *11; *In re 240 N. Brand Partners, Ltd.*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996) ("debtors who wish to utilize § 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification.").

32.    Here, the Debtor provides no detail regarding the estimated value of the inventory it proposes to sell, gives no specifics as to how it intends to find buyers for its large inventory of medical supplies, and provides no indication of how it will safeguard the process to ensure that it obtains the highest and best price for the products being sold. Most importantly, the Debtor makes no attempt to limit the request by separating the inventory list into items with an expiration date in the short term versus items with a longer shelf life.[4]

33.    Here, without a more detailed description of how the Debtor is selling the inventory to obtain the best and highest prices and having failed to limit its request to inventory with a short-term expiration date, parties in interest do not have sufficient information to determine if the sales of the inventory are in the best interests of the estate. *See Slates*, 2012 WL 5359489, at *11; *see also In re Alaska Fishing Adventure, LLC*, 594 B.R. at 887. The Sale Motion should be denied.

---

[4] Exhibit A to the Sale Motion indicates that many of the inventory items will expire in 2024 and as such, a 21-day delay in seeking to sell such items with sufficient notice to creditors and parties in interest does not appear burdensome.

**C.      The Cash Collateral Motion**

34.      The Cash Collateral Motion seeks authority to use cash collateral, specifically the Debtor's post-petition revenues that are subject to the security interest of SAMC.

35.      By the Cash Collateral Motion, the Debtor seeks an order authorizing it to use cash collateral on an emergency basis for the period of March 11, 2023 to June 10, 2023. The Debtor requests that there be an initial emergency hearing on March 16, 2023 to authorize uses for the period of March 16, 2023 through March 31, 2023, pending a further hearing on March 29, 2023 for uses between April 1, 2023 and June 10, 2023, to be followed by a continued interim hearing on June 1, 2023 for uses after June 10, 2023. The Debtor also seeks an order granting adequate protection to the Secured Creditor (as defined below) on an interim basis in the form of replacement liens to the extent necessary to protect the Secured Creditor from diminution in value of its collateral.

36.      As a threshold matter, replacement liens should be subordinate to certain administrative "carve-outs."  Specifically, the UST requests that the Court condition the granting of  replacement liens on the following: (1) Any order granting interim relief for the use of cash collateral should provide a "carve-out" for quarterly fees due pursuant to 28 U.S.C. § 1930(a); (2) reasonable fees and expenses incurred by any trustee appointed under 11 U.S.C. § 1104 or any committee appointed under 11 U.S.C. § 1102; and (3) reasonable fees and expenses incurred by any professionals for such trustee or committee, employed under 11 U.S.C. §§ 327 and 1103(a); and (4) fees and expenses of a Chapter 7 trustee and his or her professionals, if the case is converted to Chapter 7.

37.      In addition to the foregoing, the UST specifically objects to the following specific line items in the Debtor's budget.

38.     First, the Debtor has separate line items for $10,000 for "Miscellaneous" items and $10,000 for "Contingency" items. Taken together, these two line items are too vague to provide parties-in-interest with the ability to gauge whether the expenses are necessary to avoid immediate and irreparable harm pursuant to Rule 6003.

39.     Second, the Debtor's budget includes payments to its CFO and Controller in the amount of $40,000 for each two-week period. In connection with this line item, the U.S. Trustee has also reviewed the related *MOTION FOR AUTHORIZATION TO ASSUME CONSULTING AGREEMENT (IMPOSSIBLE SERVICES GROUP, INC.)*, WJH-10 (the "Consulting Agreement Motion"). Although the Consulting Agreement Motion is not yet before the Court[5], the U.S. Trustee believes an actual dispute exists regarding whether the Consulting Agreement Motion seeks to employ professional persons that should be subject to employment under 11 U.S.C. § 327(a), and are thus compensable only pursuant to applications under 11 U.S.C. §§ 330 and 331.

40.     Specifically, the declaration filed by the Debtor in connection with the Consulting Management Motion confirms that the CFO and Controller were contracted specifically for the purpose of preparing the Debtor for chapter 11 bankruptcy and that they will have central roles in the administration of the bankruptcy estate. *See* Paolinelli Declaration, at ¶ 10 ("…when SAMC, withdrew from the affiliation, our CFO abruptly retired, leaving MCH without a CFO or Controller, and a skeleton and relatively inexperienced accounting staff, all at a critical time as MCH had to begin preparing for a complex chapter 11 filing."). The Debtor describes the services being provided by ISGI as follows: "MCH has a great need for the services provided to it by ISGI. These services include preparing for the Chapter 11 filing, preparation of the bankruptcy schedules, assisting with and evaluating possible new suitors and related proposals,

---

[5] The Debtor has noticed a hearing on the Consulting Agreement Motion for March 28, 2023.

….compliance with chapter 11 rules." *Id*., at ¶ 13. Based on the foregoing statements, the CFO and Controller of the Debtor are arguable professional persons which must be employed pursuant to 11 U.S.C § 327(a).

41.     Finally, based on the impending dispute regarding the employment of the CFO and Controller, the UST objects to the $40,000 payments being authorized by the budget absent (1) an employment order under 11 U.S.C § 327(a), and a court order authorizing payment to the CFO and Controller under 11 U.S.C. §§ 330 and 331.

42.     For the reasons set forth in paragraphs 34-42 above, the Court should (1) condition the granting of replacement liens as set forth herein; (2) deny the Debtor's request for use of $10,000 to pay unidentified Miscellaneous items; (3) deny the Debtor's request for use of $10,000 to pay unidentified Contingency items; and (4) deny the Debtor's request to pay the CFO and Controller absent further orders of the Court authorizing employment under 11 U.S.C § 327(a), and compensation under 11 U.S.C. §§ 330 and 331.

### III.     CONCLUSION

In view of the shortened notice provided to creditors and the Debtor's failure to establish a sufficient evidentiary record for the relief sought, the objected to First Day Motions should either be denied in their entirety, denied in part as set forth herein, or any relief granted should be limited for the Debtor to sustain operations and to provide adequate protection, if any. Alternatively, the First Day Motions should be adjourned until a later date.  The adjournment would permit parties that were not provided sufficient notice and any committee the opportunity to be heard on the First Day Motions.  The UST reserves all her rights with respect to the First Day Motions and other motions filed on the Petition Date.

**WHEREFORE**, the UST requests the Court to sustain her Omnibus Objection; and grant such other relief as is just under the circumstances.

Dated: March 15, 2023                    TRACY HOPE DAVIS
                                         UNITED STATES TRUSTEE

                                         By:/s/ *Jorge A. Gaitan*
                                         Jorge A. Gaitan
                                         Trial Attorney for the United States Trustee