**34**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Ian J. Quinn #342754
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail: rwalter@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re:<br><br>MADERA COMMUNITY HOSPITAL,<br><br>Debtor in Possession.<br><br>Tax ID#:  23-7429117<br>Address:  1250 E. Almond Avenue<br>Madera, CA 93637 | Case No. 23-10457<br><br>Chapter 11<br><br>DCN: WJH-63<br><br>Date:  September 12, 2023<br>Time:  9:30 a.m.<br>Place:  2500 Tulare Street<br>Courtroom 13<br>Fresno, CA 93721<br>Judge:  Honorable René Lastreto II |

### EXHIBITS TO DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF MOTION FOR AUTHORITY TO SELL REAL PROPERTY (35.58 ACRES OF FARM LAND)

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| A | Lease | 19 |
| B | Purchase Agreement | 14 |

Dated: September 5, 2023

WANGER JONES HELSLEY

By: _____
Ian J. Quinn
Attorneys for Debtor and Debtor in Possession,
Madera Community Hospital

## LEASE AGREEMENT

This Lease Agreement (this "Lease") is entered into between the Landlord and Tenant designated below as of the Effective Date set forth below. In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases the Premises to Tenant, and Tenant hereby rents the Premises from Landlord, upon the terms and conditions contained in this Lease.

## ARTICLE 1: FUNDAMENTAL LEASE PROVISIONS

**Effective Date:**     November 1, 2013

**Landlord:**     Madera Community Hospital ("Landlord" or "MCH")

**Tenant:**     S & K Management ("Tenant" or "S&K")

**Lease Term:**     The term shall be for a period of Twenty (20) years, commencing on November 1, 2013 and terminating on October 31, 2033 (the "Term"). Landlord and Tenant shall have the option to mutually agree to extend the Term for one (1) additional five (5) year period.

**Rent:**     The Parties agree that in consideration for Tenant conducting the cultivation and development of the property for purposes of planting the almond trees, the drilling of a well, and for the installation and repair of irrigation systems, the Tenant shall pay Landlord the sum of Zero Dollars ($0.00) per acre on an annual basis from the commencement date until crop production commences. The Parties acknowledge and agree that the first crops are expected four years from the Effective Date. Accordingly, upon crop production, the Rent as defined herein shall be adjusted, and the Tenant shall thereafter pay to Landlord an amount which is Twenty Percent (20%) of the Gross Proceeds (as defined below in this Lease) of the total annual yield collected from sales of the almond crop. The Rent shall be further addressed in Section 5.1, below.

**Premises:**     That real property and any appurtenances and easements thereto located in the County of Madera, State of California and described as Assessor's Parcel Number 047-014-008-000, containing approximately 35.58 acres and more particularly described in Exhibit "A," attached hereto and incorporated herein by reference.

Tenant shall be developing the existing ground and replanting the Premises with new almond trees that shall remain owned by Tenant throughout the terms hereof ("Improvements").

**Purpose/Use:**     The Premises are to be used for the planting, cultivation and maintenance of an almond orchard and all activities associated with such operations.

Memorandum:          The Parties agree to execute and record a Memorandum of Lease
                     Agreement in the form of Exhibit "B," attached hereto and incorporated
                     herein by reference.

Address for Notices:

          To Landlord:          Madera Community Hospital
                                 Attn: Mark Foote, CFO
                                 1250 E. Almond Ave.
                                 Madera, CA 93637

          To Tenant:            S & K Management
                                 27596 Avenue 11 1/2
                                 Madera, CA 93637

## ARTICLE 2: TITLE TO IMPROVEMENTS

Title to all Improvements made on the Premises, including the trees to be planted on the Premises by the Tenant, the well to be drilled by Tenant, and the irrigation system, are, and shall be owned by Tenant until expiration of the Term or earlier termination of this Lease. Upon the natural termination of this Lease at the end of the Term described above, or any extensions thereof, Tenant, at their own expense, shall remove the trees, return the Premises to its condition prior to commencement of the lease, and cap the well.

## ARTICLE 3. TERM OF LEASE

3.1     Original Term.   The Term of this Lease shall be for Twenty (20) years, commencing on November 1, 2013, and terminating on October 31, 2033. At the expiration of the Original Term, Landlord and Tenant shall have the option to mutually agree to extend the term for one (1) additional five (5) year period.

3.2     Holding Over.   Should Tenant hold over and continue in possession of the Premises after termination of the term of this Lease or any extension of the term of this Lease, Tenant's continued occupancy of the Premises shall be deemed merely a tenancy from year to year. The Rent during such hold over tenancy shall be as described in Article 1. The hold over tenancy shall be subject to all other terms and conditions contained in this Lease.

## ARTICLE 4. RIGHT OF FIRST REFUSAL

4.1     Notification to Tenant.   Should Landlord, during the Term of this Lease or any extension thereof, elect to sell or transfer the Premises, or any portion of the Premise, Landlord shall notify Tenant on the terms upon which Landlord is so willing to sell or transfer. If Tenant, within sixty (60) days after receipt of Landlord's notice ("Landlord's Notice"), indicates its agreement to purchase the Premises on the terms stated in the Landlord's Notice, Landlord shall sell and convey the Premises to Tenant on the terms stated in the Landlord's Notice. If Tenant

does not indicate its agreement in said sixty (60) day period to purchase the Premises, Landlord thereafter shall have the right to sell and convey the Premises to a third party on the same terms stated in Landlord's Notice. If Landlord does not sell and convey the Premises within one hundred eighty (180) days from the date of Landlord's Notice to Tenant of its intention to sell the Premises, any further transactions shall be deemed a new determination by Landlord to sell, transfer and convey the Premises and the provisions of this Section 4.1 shall once again be applicable. Any sale or other transfer of the Premises, or any portion thereof, during the term of this Lease, including extensions thereof, other than a sale to Tenant, shall be subject to this Section 4.1. If Tenant purchases the Premises, this Lease shall terminate on the date title vests to Tenant and Landlord shall remit Tenant any prepaid unearned rent.

4.2    Effect of Tenant Improvements. Landlord acknowledges that any sale or transfer of the Premises to a third party will be subject to the terms and conditions of this Lease. As such, all Improvements, as that term is defined in Section 2 above, shall be owned by Tenant subject to any such transfer, and this ownership will, by necessity, be factored into the purchase price of Premises. Tenant shall, at Tenant's option, be allowed the right to transfer their interest in the improvements concurrently with Landlord's sale of the Premises to the third party purchaser. Tenant's pro-rata share of the purchase price allocated to the Improvements shall be the fair market value of the Improvements as determined by way of appraisal at the time of the sale.

4.3    Termination Upon Sale of Tenant Improvements. In the event that Tenant elects to sell the Improvements in conjunction with a sale or transfer of the Premises by Landlord according to the above Section 4.2, this Lease will be deemed terminated upon the close of Escrow with no further obligations or duties owed by, or to, Landlord, Tenant or the third party purchaser, other than the duty to compensate Tenant as provided for therein.

## ARTICLE 5: RENT, TAXES AND UTILITIES

5.1    Rent. The Parties agree that in consideration for Tenant conducting the cultivation and development of the property for purposes of planting almond trees and for the installation and repair of irrigation systems, the Tenant shall pay Landlord the sum of Zero Dollars ($0.00) per acre on an annual basis from the commencement date until crop production commences. The Parties acknowledge and agree that the first crops are expected four years from the Effective Date. Accordingly, upon crop production, the Rent as defined herein shall be adjusted, and the Tenant shall thereafter pay to Landlord an amount which is Twenty Percent (20%) of the Gross Proceeds (as defined below in this Lease) of the total annual yield collected from sales of the almond crop. For purposes of this Section, "Gross Proceeds" shall include cash payments and also deferred payments and equity credits in the form of per-unit-retains.

5.2    Payment of Rent. Tenant shall pay Rent to Landlord within thirty (30) days from the collection of the proceeds from sales of crops harvested during the Term or any extension thereof. Notwithstanding the above, Landlord agrees that Tenant may, but shall not be required, to make an arrangement with the purchaser of the crop to have Landlord's share of the proceeds paid directly to the Landlord as Landlord may direct.

5.2.1   Landlord, by execution of this Lease, irrevocably constitutes and appoints Tenant as Landlord's true and lawful attorney-in-fact and agent, with full power and authority in such Landlord's name, place, and stead to negotiate, execute, and acknowledge all agreements related to the sale of almond crops and any other documents necessary or related to the sale of almonds grown on the Premises. This power of attorney will be deemed to be coupled with an interest and shall be considered a covenant running with the land. Notwithstanding the existence of this power of attorney, Landlord agrees to join in the execution, acknowledgement, and delivery of the instruments referred to above if requested to do so by Tenant. This power of attorney is limited power of attorney and does not authorize Tenant to act on behalf of a Landlord except as described in this Section.

5.2.2   Landlord acknowledges and agrees that almond market prices fluctuate throughout the market season and it is impossible to determine at the time of Tenant's delivery to purchaser what the fair market value of the delivered almonds will be. Landlord agrees that Tenant shall have sole discretion to determine whether to sell the almonds (i) at fixed price at the time the crop is harvested (Landlord acknowledges that such decision would cause the Parties to bear a risk that the price is either lower or higher than paid to other almond growers for the same year's crop); or (ii) agree on the purchase price for each year's crop at such time as purchaser determines the price, considering the grade of almonds and based on the industry standards, which may not be known and paid until the year following the harvest. Landlord agrees to be bound by the purchase price and terms for all crops grown on the Premises, as determined and agreed upon by the Tenant.

5.3   <u>Personal Property Taxes</u>.  Tenant shall pay before they become delinquent all taxes and assessments imposed on the personal property or trade fixtures, if any, belonging to Tenant and located on the Premises.

5.4   <u>Real Property Taxes and Assessments</u>.  Landlord shall promptly pay when due any and all real property taxes and assessments levied or assessed against the Premises, exclusive of trees and other improvements that Tenant has built on the Premises. Tenant shall pay any taxes and assessments levied or assessed against the improvements made to the Premises by Tenant in conjunction with Tenant's development of the Premises, including, but not limited to, those attributable to the planting of the almond trees.

5.5   <u>Utilities</u>.  Tenant shall pay the expense of the Madera Irrigation District standby fee. Tenant shall pay any additional charges for the furnishing of water that will be used to irrigate the orchard located on the Premises. Tenant shall pay for electricity, telephone service, removal of garbage and rubbish and other public utilities to the Premises during the Term of the Lease.

## ARTICLE 6:  USE OF PREMISES

6.1   <u>Permitted Use of Premises</u>.  Tenant shall use the Premises for the purposes stated in Article 1 and for no other purpose without the written consent of Landlord, which consent shall not be unreasonably withheld. Tenant's use of the Property shall be in a manner consistent with good husbandry techniques practiced in the geographical area of the Premises.

6.2    Proposed Development.  Landlord agrees that Tenant shall be allowed to develop the Premises for use as an orchard and authorizes Tenant to conduct all such activities customarily carried out in such developments, including, but not limited to, the removal of the existing crops, deep-ripping and other necessary ground preparation, drilling of a well, the installation of an irrigation system and the planting of trees (collectively "Tenant Improvements").  Tenant shall have the Tenant Improvements assessed separately for tax purposes and Tenant shall pay all such taxes during the Term of this Lease or any extension thereof.

6.3    Installation of Trade Fixtures and Signs.  Tenant shall have the right at all time, at Tenant's sole cost and expense, to install and affix on the Property any trade fixtures or signs for use in Tenant's business that Tenant may, at Tenant's sole discretion, deem necessary or desirable, provided that all signs erected or maintained by Tenant comply with all requirements of any State and local governmental authorities.  Any and all trade fixtures and signs owned by Tenant that can be removed without structural damage to the Premises, shall remain the property of Tenant and may be removed by Tenant at any time before the expiration or earlier termination of this Lease, provided Tenant repairs any damaged caused by the removal.

## ARTICLE 7:  REPAIRS AND MAINTENANCE

7.1    Maintenance and Repairs by Tenant.  Other than as provided in Section 7.2, below, during the term of this Lease and any renewal or extension of the term of this Lease, Tenant shall, at Tenant's own cost and expense, and at no cost and expense to Landlord, maintain the Premises and all portions of the Premises in good order and repair and make all repairs and replacements that may become necessary to the Premises.

7.2    Alterations.  Tenant may, at Tenant's own expense, from time to time, make such alterations, additions or changes in and to the Premises as it may deem necessary or suitable for Tenant's intended use.  Landlord shall, at Tenant's cost and expense, cooperate with Tenant in securing any permits or authorizations required from time to time for any work permitted hereunder or for installations made by Tenant.

7.3    Mechanic's Liens.  Tenant shall not permit any mechanic's or materialman's lien or liens to be made against the Premises, by reason of work done or materials furnished to the Premises by Tenant, its agents, contractors or any subcontractors.  Tenant shall satisfy and discharge any such lien or undertake to remove the same, and Tenant shall indemnify, protect, defend and hold Landlord free and harmless of any and all claims, demands, and causes of action by reason thereof.

7.4    Landlord's Right of Inspection.  Landlord or Landlord's duly authorized agents, may enter the Premises at any and all reasonable times during the Term of this Lease or any extension thereof to determine whether Tenant is complying with the terms and conditions of this Lease or to perform any other acts authorized by this Lease to be performed by Landlord or reasonably necessary to protect Landlord's rights under this Lease.

Page 5 of 15

Exhibit A - Page 5 of 19

7.5 _Surrender of Premises._ On expiration or sooner termination of this Lease, Tenant shall promptly surrender possession of the Premises to Landlord in as good condition as the Premises are on the Effective Date of this Lease, reasonable wear and tear excepted.

7.6 _Damage or Destruction._ In the event that more than ten percent (10%) of the Premises or the almond trees on the Premises are damaged by fire or other perils covered by extended coverage insurance, Tenant shall have the option either (1) to repair or restore such damage, this Lease continuing in full force and effect or (2) to give notice to Landlord at any time within thirty (30) days after such damage, terminating this Lease as of the date of the notice. In the event of giving such notice, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice.

## ARTICLE 8: INDEMNITY AND INSURANCE

8.1 _Indemnification of Landlord._ Tenant covenants and agrees that Landlord shall not be liable for any loss, injury, death or damage to persons or property which at any time during the Term of this Lease may be suffered or sustained by any person who may at any time during the Term of this Lease be using or occupying or visiting the Premises at Tenant's direction. Tenant shall indemnify, protect, defend, hold and save Landlord free and harmless of, from and against any and all claims, liability, loss or damage described in this Section; provided, however, that the foregoing indemnity and hold harmless shall not apply in the event such claims, liability, loss or damages shall be caused solely by the intentional or negligent acts or omissions of Landlord or Landlord's agents, employees, guests, licenses or invitees.

8.2 _Indemnification of Tenant._ Except for Tenant's own gross negligence, Landlord shall indemnify, protect and hold Tenant and Tenant's owners, officers, employees and agents harmless from, any and all claims, liabilities, causes of action, and demands, including attorneys' fees, expert fees, and court costs arising or occurring during the Term of this Lease, or any extensions thereof, by reason of any active or passive negligence, act, omission or use of the Premises by Landlord or Landlord's employees, agents, licensees, invitees, guests or permittees, or any other person, or by reason of any foreclosure of any lien that is recorded against or attached to the Premises. Landlord shall defend Tenant against any such claim or action at Landlord's expense, with counsel reasonably acceptable to Tenant or, at Tenant's election, Landlord shall reimburse Tenant for any legal fees or costs incurred by Tenant in any such claim or action.

8.3 _Insurance Provided by Tenant._ Tenant shall maintain during the Term of this Lease, the following insurance coverage at Tenant's sole cost and expense:

8.3.1 _Farm Policy._ Tenant, at Tenant's own cost and expense, shall acquire a farm policy on the Premises that shall include:

8.3.1.1. A coverage of comprehensive liability insurance with limits of liability for combined single limit bodily injury and property damage, of at least One Million Dollars ($1,000,000.00), insuring Tenant against all potential liability for bodily injury, property

damage (including loss of use of property) and personal injury arising out of the operation, use or occupancy of the Premises; and

        8.3.1.2  A coverage for their full insurable value of any crops grown on the Premises against damage or destruction by fire, hail, windstorms, tornadoes, and explosions. The losses recoverable under any policy issued in accordance with this paragraph shall be payable to Tenant and Landlord according to their respective interests in the crop.

        8.3.1.3  Tenant shall maintain during the Term of this Lease, at Tenant's sole cost and expense, a policy of workers' compensation insurance insuring Tenant's employees in the minimum limits and as otherwise required by the State of California.

    8.4  <u>Other Insurance Matters</u>.  All the insurance required in this Lease shall:

        8.4.1  Be issued as a primary policy (which may be a blanket policy of the Tenant); and

        8.4.2  Contain an endorsement requiring thirty (30) days' written notice from the insurance company to both Parties before cancellation or change in coverage, scope or amount of any policy.

    8.5  <u>Mutual Waiver of Claims and Subrogation Rights</u>.  Landlord and Tenant each waive any and all rights of recovery, including all subrogation rights, against the other and against the officers, employees, agents and representatives of the other, for loss, damage, injury, and death to property and persons, to the extent such loss, damage, injury, and death is covered by any insurance policy maintained by Landlord or Tenant, whether or not such insurance is described in this Lease, and whether or not the loss, damage, injury, or death is caused by active, passive, or gross negligence.  Upon obtaining required policies of insurance, Landlord and Tenant shall give notice to the insurance carriers of this mutual waiver of claims and subrogation rights.

## ARTICLE 9: CONDEMNATION

    9.1  <u>Effect of Condemnation</u>.  If a part of the Premises is condemned for a public use and the remaining part is susceptible to use by Tenant, this Lease shall terminate as to the part taken on the date title vests in the condemnor.  The Rent payable (including all other charges hereunder) under this Lease shall be adjusted so that Tenant shall be required to pay rental equitably reduced on a pro rata basis, based on acreage; provided, however, that Tenant shall have the option to terminate this Lease as of the date that a certified copy of the final order of condemnation is filed in the office of the County Recorder by providing written notice to Landlord within thirty (30) days after such date.  If the entire or a part of the lease Premises is taken or condemned so that there does not remain a portion capable of use by Tenant, this Lease shall terminate on the date title vests in the condemnor.

    9.2  <u>Payment to Tenant</u>.  In the event of a taking referred to in this Section, either partial or entire, Tenant may recover from the condemning authority or from Landlord (if

included in Landlord's award) the leasehold value and the loss of business goodwill. For purposes of this Section, an award or payment shall mean the entire award or payment for such taking, less expenses incurred in collecting such award or payment.

9.3　Definitions. The words "Condemnation," "condemned" or "taking" as used in this Lease shall mean the exercise of, or intent to exercise the power of eminent domain expressed by the condemnor in any writing as well as by the filing of any action of proceeding for such purpose by any entity having the power of eminent domain and shall include a voluntary sale by Landlord to any such entity either under threat of condemnation or while condemnation proceedings are pending.

## ARTICLE 10:  COVENANTS

10.1　Landlord's Covenants. During the term of this Lease and any extensions thereof, Landlord hereby agrees as follows:

10.1.1　Quiet Enjoyment. So long as Tenant is not in default of any of the covenants, terms, or conditions contained herein, Tenant shall, and may, peacefully and quietly have, hold and enjoy the Premises for the term aforesaid.

10.1.2　Payment of Landlord's Taxes. Landlord agrees to pay all taxes and assessments on the land comprising the Premises coming due during the Term of this Lease in accordance with Article 5 above.

10.1.3　Subordination of Future Encumbrances. It is agreed that any deeds of trust that may subsequently be placed on the Premises, and all advances made under them, and all renewals, replacements, and extensions of them, shall be subject and subordinate to this Lease.

10.2　Tenant's Covenants. During the Term of this Lease and any extensions thereof, Tenant hereby agrees as follows:

10.2.1　Farming Practices. Tenant shall use and farm the Premises in a professional and workman-like manner, according to the normal and customary practices carried out in the community surrounding the Premises.

10.2.2　Payment of Cultural Costs. To furnish, at Tenant's expense, all labor, plants, trees, fertilizer, machinery, equipment, tools and supplies required for growing and harvesting crops.

10.2.3　Payment of Taxes. Tenant shall pay all taxes in accordance with Article 5 above.

10.2.4　Avoidance of Waste. To use reasonable efforts to prevent all unnecessary waste or loss or damage to the Premises or any other property owned by Landlord.

10.2.5  Weed Control.  Tenant shall control and prevent the growing of weeds along all roads, canals, fences and property lines.

10.2.6  Compliance with Laws.  Tenant shall, at Tenant's cost and expense, comply with any and all laws, ordinances, rules, regulations, requirements, and orders present or future, of any federal, state, county or municipal governments which may in any way apply to the use, maintenance, operations or production of almonds on the Premises.

## ARTICLE 11: DEFAULT AND TERMINATION

11.1  Default by Tenant.  The occurrence of any of the following shall constitute a material default and breach of this lease by Tenant:

11.1.1  Failure to Pay Rent.  Any failure by Tenant to pay the rent or to make any other payment required to be made by Tenant under this lease (when that failure continues for 10 days after written notice of the failure is given by Landlord to Tenant);

11.1.2  Abandonment.  The abandonment or vacation of the Premises by Tenant;

11.1.3  Failure to Perform under Lease.  A failure by Tenant to observe and perform any other provision of this lease to be observed or performed by Tenant, when that failure continues for 30 days after written notice of Tenant's failure is given by Landlord to Tenant; provided, however, that if the nature of that default is such that it cannot reasonably be cured within a 30-day period, Tenant shall not be deemed to be in default if Tenant commences that cure within the 30-day period and thereafter diligently prosecutes it to completion; or

11.1.4  Bankruptcy.  The making by Tenant of any general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, it is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this lease, when possession is not restored to Tenant within 30 days; or the attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this lease, when that seizure is not discharged within 30 days.

The notices provided for in subsections 11.1.1 through 11.1.3 of this paragraph are not intended to replace, but rather are in addition to, any required statutory notices for unlawful detainer proceedings under Code of Civil Procedure Section 1161 et seq.

11.2  Remedies on Tenant's Default.  Should Tenant breach this Lease or abandon the Premises prior to the natural expiration of the Term of this Lease or any extensions thereof, Landlord, in addition to any other remedy given Landlord by law or equity, may terminate the Lease and, in addition to any recoveries Tenant may seek under this Lease, bring an action to reenter and regain possession of the Premises in the manner provided by the laws of unlawful detainer of the State of California then in effect.

11.3    Cumulative Remedies. The remedies given to Landlord to this Article shall not be exclusive but shall be cumulative and in addition to all other remedies now or hereafter allowed by law or authorized elsewhere in this Lease.

11.4    Waiver of Breach. The waiver by Landlord of any breach by Tenant of any of the provisions of this Lease shall not constitute a continuing waiver or waiver of any subsequent breach or default by Tenant either of the same or different provision of this Lease.

11.5    Default by Landlord. In the event of a default by Landlord, Tenant, in addition to any other remedy available at law or in equity, may at its option, incur any expense necessary to perform the obligation of Landlord and deduct such expense from the Rent or other charges that are assessed against Tenant under this Lease.

## ARTICLE 12: ASSIGNMENT AND SUBLEASING

Tenant shall not assign, transfer, or encumber this lease or any interest in this lease without the prior written consent of Landlord. Tenant shall not sublease all or any part of the leased premises or allow any persons other than Tenant's agents, family, or employees to occupy or use all or any part of the leased premises without the prior written consent of Landlord. Landlord's consent to one assignment, sublease, occupation, or use by another person shall not be deemed to be a consent to any subsequent assignment, sublease, occupation, or use by any other person. Any assignment or subleasing without the prior written consent of Landlord shall be void. The consent of Landlord to the assignment or subleasing of any interest in this lease by Tenant shall not be unreasonably withheld.

## ARTICLE 13: MISCELLANEOUS

13.1    Governing Law; Jurisdiction. Each of the Parties agrees that the laws of the State of California applicable to real property contracts, transactions, and obligations entered into and to be performed in the State of California are chosen (choice of law) to govern, enforce, determine, and construe this Lease and the legality, validity, and performance of the terms, conditions, covenants, provisions, and restrictions of this Lease. The Parties further agree that any such action which is any way relates to this Lease shall be venued in the Superior Court of the State of California in and for the County of Madera.

13.2    Successors and Assigns. Except as otherwise expressly provided for in this Lease, the terms, conditions, covenants, provisions, and restrictions of this Lease shall inure to the benefit of, and be binding upon, the successors and assigns of the Parties.

13.3    Parties in Interest. Except as expressly provided in this Lease, nothing in this Lease is intended to confer any rights or remedies under or by reason of this Lease on any persons other than the Parties.

13.4    Severability. If any section, subsection, term, condition, covenant, provision or restriction of this Lease is determined by a court or other judicial or administrative tribunal to be

invalid, illegal or unenforceable or otherwise ineffective or against public policy either in whole or in part, then this Lease shall be deemed amended to delete or modify, as necessary, the invalid, illegal or unenforceable section, subsection, term, condition, covenant, provision or restrict or portion thereof only to the extent necessary to make section, subsection, term, condition, covenant, provision or restriction or the portion thereof valid, legal or enforceable, and shall not affect the validity, legality or enforceability of the remainder of this Lease and so far as is reasonable and possible and allowable by law (i) the remainder of this Lease shall be considered valid, legal, and enforceable in accordance with its terms, conditions, covenants, provisions, and restrictions and (ii) effect shall be given to the intent manifested by the section, subsection, term, condition, covenant, provision or restriction or portion thereof determined to be invalid, illegal or unenforceable.

13.5   Notices.  All notices, requests, demands and other communications under this Lease shall be in writing and shall be deemed to have been duly given (i) on the date of service if served personally on the Party to whom notice is to be given (ii) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission, (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the U.S Postal Service or (iv) on the second day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the addressed mentioned in Article 1.  Any Party may change its address for the purpose of this Section by giving the other Party written notice of its new address in the manner set forth above.

13.6   Amendments; Waivers.  This Lease may be amended or modified, and any of the terms, covenants, representations, warranties or conditions thereof may be waived, only by a written instrument executed by the Parties hereto, or in the case of a waiver, by the Party waiving compliance.  Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Lease, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Lease.

13.7   Entire Agreement, Exhibits and Other Documents.  This Lease and the Exhibits contain the entire understanding between the Parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All Exhibits referred to in this Lease as being attached to this Lease and any documents and instruments delivered pursuant to any provision hereof are a part of this Lease and are incorporated into this Lease in their entirety as if set forth in full in this Lease.

13.8   Section and Paragraph Headings.  The section and paragraph headings in this Lease are for reference purposes only and shall not affect the meaning or interpretation of this Lease.

13.9   Counterparts.  This Lease may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

13.10 <u>Force Majeure.</u> Except for Tenant's obligation to timely pay rent, neither Landlord nor Tenant shall be deemed in default of any term or provision of this Lease if the nonperformance of any such term or provision is caused by strike, lockout, nonavailability of labor, materials, or irrigation water, war or national defense pre-emption, governmental restriction, acts of God, breach of this Lease by the other Party, or other causes of any nature beyond the control of the Party whose duty it is to perform.

13.11 <u>Interpretation.</u> The captions and headings of the paragraphs of this Lease are to assist the Parties in reading this Lease and are not a part of the terms or provisions of this Lease. Whenever required by the context of this Lease, the singular shall include the plural and the plural shall include the singular. The masculine, feminine and neuter genders shall include the other. In any provision relating to the conduct, acts or omissions of Tenant, the term "Tenant" shall include Tenant's agents, employees, contractors, invitees, successors or others using the Premises with Tenant's expressed or implied permission.

13.12 <u>Recordation of Memorandum.</u> Tenant shall not record this Lease without prior written consent from Landlord. However, the Parties agree that they shall record in the County of Madera a "Short Form" Memorandum of this Lease, which shall be executed by both Parties.

13.13 <u>Attorneys' Fees.</u> If any Party institutes any action or proceeding to enforce this Lease, the prevailing Party in such action or proceeding shall be entitled to recover from the nonprevailing Party or Parties all legal costs and expense incurred by the prevailing Party in such action, including, but not limited to, reasonable attorney fees, paralegal fees, law clerk fees and other legal costs and expenses, whether incurred at or before trial, and whether incurred at the trial level or in any appellate, bankruptcy or other legal proceeding.

13.14 <u>Independent Counsel.</u> Tenant acknowledges, understands, and agrees that Tenant (i) has been advised to seek and (ii) has had an adequate opportunity to obtain independent legal, tax, and/or other counsel regarding the meaning and effect of this Agreement. Tenant acknowledges, understands, and agrees that there are inherent conflicts of interest as between Parties to an agreement and that it is in the best interests of Tenant to seek professional legal, tax, and/or other counsel to aid Tenant in the preparation and negotiation of this Agreement. Tenant warrants and represents that Tenant has been represented by independent counsel solely chosen by Tenant or has had an adequate opportunity to obtain and utilize the services of independent counsel solely chosen by Tenant. Tenant acknowledges, understands, and agrees that Mason, Robbins, Browning & Godwin, has solely represented the Landlord in the preparation and negotiation of this Agreement.

Page 12 of 15

Exhibit A - Page 12 of 19

## EXECUTION

IN WITNESS WHEREOF, the undersigned have executed this Lease as a sealed instrument as of the day and year first above written.

"LANDLORD"                    "TENANT"

John Frye, Jr.,
Chief Executive Officer

Keith Bursey

Scott Bursey

EXHIBIT "A"
LEGAL DESCRIPTION

All that portion of the East Half of the Southwest Quarter of Section 31 and all that portion of the West half of the Southwest quarter of Section 32 Township 11 South, Range 18 East, MDB&M, in the County of Madera, State of California shown as Parcel 2 on Parcel Map No. 416, recorded December 15, 1970 in Vol. 16 of Maps, at Page 116, Madera County Records.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas and minerals in and under said lands: As reserved by Marjorie H. Sayrs in deed dated April 13, 1954 and recorded January 4, 1955 in Vol. 625 of Official Records, Page 538, Madera County Records.

ALSO EXCEPTING THEREFROM that portion conveyed to the County of Madera by deed recorded January 14, 1994 as Document No. 9401394, Madera County Records.

APN: 047-014-008

EXHIBIT "B"
MEMORANDUM OF LEASE AGREEMENT

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Richard T. Marchini
Mason, Robbins, Browning & Godwin
P.O. Box 2067
Merced, CA 95344

MAIL TAX STATEMENTS TO:

THIS SPACE FOR RECORDERS USE

APN: 047-014-008-000

## MEMORANDUM OF LEASE AGREEMENT

This MEMORANDUM OF LEASE AGREEMENT (this "Memorandum") is made and entered into by and among Madera Community Hospital ("Landlord") and S & K Management ("Tenant"). The Landlord and Tenant are collectively but nonspecifically referred to in this Agreement in the singular as a "Party" and the plural as the "Parties."

This Memorandum is concerned with that certain parcel of real property located in the County of Madera, State of California, which bears Madera County Assessor's Parcel Number 047-014-008-000 (the "Property") and is more particularly described in Exhibit "A" attached hereto.

This Memorandum is to witness that:

Landlord has leased the Property to Tenant for a period of twenty (20) years, commencing on November 1, 2013 and ending on October 31, 2033, pursuant to the terms of that certain agreement in writing entitled "LEASE AGREEMENT" by and between the Parties. All of the terms and conditions of the LEASE AGREEMENT, including but not limited to the right to renew the initial term of the lease for additional years and the right of first refusal in a proposed sale of the Property, are made a part hereof as though fully set forth in this Memorandum.

This Memorandum may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

This Memorandum is for the purpose of providing a public record of the Agreement and in no way modifies the express and particular terms, conditions and provisions of the LEASE AGREEMENT.

## EXECUTION

IN WITNESS WHEREOF, this Memorandum has been executed by the Parties as of this
_15th_ day of _November_, 2013, at ~~Merced~~, California.
                                    _MADERA_

"LANDLORD"                              "TENANT"


John Frye, Jr.,                         Keith Bursey
Chief Executive Officer


                                        Scott Bursey


STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF MADERA             )


On _November 15_, 2013, before me, _Betty R. Cates_, a Notary
Public in and for said State, personally appeared _John Frye, Jr._ who proved to me
on the basis of satisfactory evidence to be the person whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Notary Public in and for said State

> BETTY R. CATES
> Commission # 2043742
> Notary Public - California
> Madera County
> My Comm. Expires Oct 3, 2017


Page 2 of 4

STATE OF CALIFORNIA       )
                             ) ss.

COUNTY OF MADERA      )

On _NOVEMBER 15_____, 2013, before me, _Betty R Cates_____, a Notary Public in and for said State, personally appeared __KEITH Bursey__, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Betty R Cates_
Notary Public in and for said State

> BETTY R. CATES
> Commission # 2043742
> Notary Public - California
> Madera County
> My Comm. Expires Oct 3, 2017

STATE OF CALIFORNIA       )
                             ) ss.

COUNTY OF MADERA      )

On _NOVEMBER 15_____, 2013, before me, _Betty R Cates_____, a Notary Public in and for said State, personally appeared __Scott Bursey__, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Betty R Cates_
Notary Public in and for said State

> BETTY R. CATES
> Commission # 2043742
> Notary Public - California
> Madera County
> My Comm. Expires Oct 3, 2017

EXHIBIT "A"
LEGAL DESCRIPTION

All that portion of the East Half of the Southwest Quarter of Section 31 and all that portion of the West half of the Southwest quarter of Section 32 Township 11 South, Range 18 East, MDB&M, in the County of Madera, State of California shown as Parcel 2 on Parcel Map No. 416, recorded December 15, 1970 in Vol. 16 of Maps, at Page 116, Madera County Records.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas and minerals in and under said lands: As reserved by Marjorie H. Sayrs in deed dated April 13, 1954 and recorded January 4, 1955 in Vol. 625 of Official Records, Page 538, Madera County Records.

ALSO EXCEPTING THEREFROM that portion conveyed to the County of Madera by deed recorded January 14, 1994 as Document No. 9401394, Madera County Records.

APN: 047-014-008

## REAL PROPERTY PURCHASE AND SALE AGREEMENT
## AND ESCROW INSTRUCTIONS

     THIS REAL PROPERTY PURCHASE AND SALE AGREEMENT AND ESCROW INSTRUCTIONS (this "Agreement") is made effective as of July 24, 2023 (the "Effective Date"), by and between S & K Management ("Buyer"), and Madera Community Hospital ("Seller").

## R E C I T A L S:

    A.    Seller is the owner of that certain real property located in Madera County, California, consisting of approximately 35.58 acres of agricultural production land in Madera County, California 93637, APN: 047-014-008-000, which is more particularly described in Exhibit "A" hereto, and incorporated herein by this reference (the "Real Property").

    B.    The Real Property is leased to the buyer and currently under production and includes an almond orchard and irrigation system owned by Buyer.

    C.    The lease has an effective date as of November 1, 2023. The term of the lease expires October 31, 2033. The lease calls for an annual payment of a 20% crop share as rent.

    D.    The rent for the 2022 crop has been partially paid. Seller has received $10,911.79. The balance of the 2022 crop share will be paid when the remainder of the 2022 crop is sold.

    E.    There is a growing crop of almonds on the Real Property, due to be harvested in August-September 2023 and sold thereafter. Payment of the 20% crop share will be paid when the 2023 crop is sold.

    F.    Seller is the a Debtor in Possession in a Chapter 11 case pending in the Eastern District of California bearing Case No. 23-10457. Bankruptcy Court approval of this sale is required.

    G.    The payment of the balance of the rent owed for 2022 and all of the rent for 2023 will be handled outside of escrow. As the 2022 and 2023 almond crops are old the Buyer shall pay the 20% crop share to the Seller and provide an accounting.

    Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Real Property from Seller, on the terms and subject to the conditions set forth in this Agreement.

    NOW, THEREFORE, for valuable consideration, and in consideration of the mutual covenants contained herein, the parties hereby agree as follows:

{10538/011/01627748.DOCX}.071723.gaa

# ARTICLE I
## PURCHASE AND SALE

1.01   <u>Property</u>.   Seller hereby agrees to sell, grant, convey, and deliver the Property to Buyer, and Buyer hereby agrees to purchase the Property from Seller, on the terms and subject to the conditions set forth in this Agreement.

1.02   <u>Purchase Price</u>.   The purchase price to be paid by Buyer to Seller for the Property shall be Five Hundred Sixty-Nine Thousand, Two Hundred Eighty and No/100ths Dollars ($569,280) cash in United States currency ("Purchase Price").

1.03   <u>Payment of Purchase Price</u>. The Purchase Price shall be paid by Buyer to Seller in cash at the close of Escrow, in the following manner:

(a)   <u>Initial Deposit</u>. Buyer shall immediately deposit into the Escrow (as defined in <u>Section 6.01</u>) an amount equal to Ten Thousand and No/100ths Dollars ($10,000) (the "Deposit") as a good faith deposit.  Upon receipt of the Deposit, Escrow Holder (as defined in <u>Section 6.01</u>) shall place the Deposit into an interest-bearing account, approved by Buyer, with all interest thereon accruing as set forth herein.  In the event Buyer terminates the Escrow pursuant to <u>Sections 3.01</u>, <u>3.02</u> or <u>5.01</u> of this Agreement, or if Seller defaults under this Agreement, the Deposit and accrued interest shall be returned to Buyer within fifteen (15) days after the date of termination of the Escrow.  If Escrow fails to close for any other reason, Seller shall be entitled to retain the Deposit, and Escrow Holder shall deliver the Deposit and accrued interest to Seller within fifteen (15) days of the termination of the Escrow.

(b)   <u>Purchase Price Balance</u>.  Buyer shall pay the remainder of the Purchase Price at the close of Escrow in cash.

(c)   The payment of the balance of the rent owed for 2022 and all of the rent for 2023 will be handled outside of escrow.  As the 2022 and 2023 crops are sold the Buyer will pay the 20% crop share to the Seller and provide an accounting.

# ARTICLE II
## CONDITION OF TITLE AND POSSESSION

2.01   <u>Condition of Title</u>.  Seller shall convey fee simple title in and to the Real Property to Buyer by deed (the "Deed"), subject only to the following:

(a)   Those normal printed exceptions contained in a California Land Title Association ("CLTA") Owner's Policy of Title Insurance;

(b)   Any liens for current real and personal property taxes, assessments, and other like changes, not yet due and payable (prorated through

the date of the close of the Escrow); and

(c)     All other exceptions to title reflected on Schedule "B" to the Preliminary Report (as defined in Section 2.02(a)), not disapproved by Buyer, as provided in Section 2.02(a) of this Agreement (individually, a "Permitted Exception" and, collectively, the "Permitted Exceptions").

2.02    Objections to Title.

(a)     Title Review.  Within ten (10) days of the Effective Date, Escrow Holder, Chicago Title Company, 601 W. Yosemite Ave., Ste. 101, Madera, California 93637, shall deliver a copy of Escrow Holder's preliminary title report (the "Preliminary Report") for the Property, together with all copies of recorded exceptions to title as shown on Schedule "B" of the Preliminary Report.  Within ten (10) days of the Effective Date, Buyer shall provide written notice of disapproval of those exceptions to title reflected on Schedule "B" to the Preliminary Report which are not acceptable to Buyer (individually, a "Disapproved Exception" and, collectively, the "Disapproved Exceptions").  Any exceptions to title not disapproved by Buyer, as set forth in this Section 2.02(a), shall be deemed approved by Buyer, and shall be considered Permitted Exceptions.

(b)     Removal of Disapproved Exceptions.  For any Disapproved Exception, within ten (10) days of Buyer's written notice of disapproval, Seller shall either (i) cause such exception to be removed from record as of the close of Escrow, (ii) obtain an endorsement or endorsements to the policy of title insurance, acceptable to Buyer to be issued by the Escrow Holder to Buyer, insuring against such exception (the "Endorsement" or "Endorsements"), or (iii) notify Buyer that Seller is unable or unwilling to remove such Disapproved Exception.  Buyer hereby acknowledges Seller has no duty or obligation, whatsoever, to remove or provide an Endorsement or Endorsements insuring against any such Disapproved Exception or Disapproved Exceptions.  If Seller is unable or unwilling to cause any Disapproved Exception or Disapproved Exceptions to be removed, or to obtain an Endorsement or Endorsements insuring against such exception, then Seller shall notify Buyer thereof and Buyer shall, within five (5) days after receipt of such notice from Seller, elect to either (i) terminate the purchase of the Property from Seller, or (ii) elect to take title to the Property subject to such Disapproved Exception.  In the event Buyer elects to terminate this Agreement pursuant to this Section 2.02(b), the Deposit and accrued interest thereon shall be returned by Escrow Holder to Buyer.  If Buyer fails to elect to terminate the Escrow, within the prescribed time set forth in this Section 2.02(b), then each Disapproved Exception shall be deemed approved and become a Permitted Exception.

2.03    Title Insurance.  Seller shall cause the Escrow Holder to issue its standard form CLTA Owner's policy of title insurance for the protection of Buyer, with liability in

the amount of that portion of the Purchase Price specified in Section 1.02, insuring fee simple title in and to the Property, vested in Buyer, in the condition set forth in Section 2.01 of this Agreement (the "Policy of Title Insurance").

2.04   Lease.  At close of Escrow the lease described at Recital C will be cancelled as to future crops and Buyer agrees it will assert no claims of any nature against Seller's bankruptcy estate.

2.05   Lien Releases.  Seller shall not be required to provide Buyer with lien releases.  Buyer shall be relying on the Policy of Title Insurance regarding any liens.

2.06   Possession.  Seller shall deliver possession of the Real Property to Buyer at the close of Escrow.

**ARTICLE III**
**PHYSICAL CONDITION OF THE PROPERTY**

3.01   Inspection of the Property.  Buyer has been in possession of the Real Property for many years and is familiar with the Property.  Buyer waives any inspection of the Real Property and waives any requirement of any environmental assessment.

3.02   Buyer to take Property in "AS IS/WHERE IS" Condition.

(a)     Prior to closing Buyer shall have investigated and inspected the Property, to its satisfaction and become familiar and satisfied with the condition of the property, and made its own determination as to the merchantability, quantity, quality and condition of the Property, including (i) the possible presence of Hazardous Substances and (ii) the Property's suitability or fitness for any particular purpose or use.

(b)     Buyer acknowledges that except for any express warranties and representations contained in this agreement, Buyer is not relying on any written, oral, implied or other representations, statements or warranties by seller or any agent of Seller. All previous written, oral, implied or other statements, representations, warranties or agreements, if any, are merged into this agreement.  Seller has not made, does not make and expressly disclaims, any warranties and representations, expressed or implied, or arising by operation of law, as to the merchantability, habitability, quantity, quality or environmental condition of the Property, or its suitability or fitness for any particular purpose or use, whether or not such purpose or use has been communicated to Seller.

(c)     BUYER HEREBY ACCEPTS THE PROPERTY IN ITS PRESENT CONDITION ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS AND ACKNOWLEDGES THAT (i) WITHOUT THIS ACCEPTANCE, THIS SALE WOULD NOT BE MADE, AND (ii) THAT SELLER SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIR, ALTERATION, REMEDIATION OR OTHER WORK OF ANY KIND  WITH RESPECT TO ANY PORTION OF THE PROPERTY. THE PROVISIONS OF THIS SECTION 3.02 SHALL SURVIVE CLOSING.

(d)     The disclaimers of warranty contained in this Agreement shall be continuous and shall survive the close of Escrow.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES, AND COVENANTS

4.01  <u>Seller's Representations, Warranties, and Covenants</u>.  Seller hereby represents, warrants, and covenants to Buyer as follows:

(a)     <u>Owner</u>.  Seller is, or on the Closing Date will be, the owner of the Real Property.

(b)     <u>Authority</u>.  Seller has, or on the Closing Date will have, the full power, authority, and legal capacity to enter into and to perform Seller's obligations under this Agreement, and to sell, grant, convey, assign, and deliver the Property to Buyer, without obtaining the consent or approval of any other person, court or governmental agency, body, or subdivision, except as noted at Recital F.

(c)     Seller will maintain the Real Property in good repair and in the same condition, reasonable wear and tear excepted, as on the date of this Agreement.

4.02  <u>Buyer's Representations, Warranties, and Covenants</u>.  Buyer hereby jointly and severally represents, warrants, and covenants to Seller as follows:

(a)     <u>Authority</u>.  Buyer has the full power, authority, and legal capacity to (i) enter into and perform Buyer's obligations under this Agreement, and (ii) purchase the Property without obtaining the consent or approval of any other person, court or governmental agency, body or subdivisions.

(b)     <u>Litigation</u>.  To Buyer's current, actual knowledge, there are no actions, suits, claims, legal proceedings, or other matters pending or threatened against Buyer before any court or governmental entity which would prevent Buyer's performance hereunder.

(c)     <u>No Prospective Violations</u>.  To Buyer's current, actual knowledge, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, violates or will violate any contract, agreement or instrument to which Buyer is a party or is bound which would prevent Buyer's performance hereunder.

(d)     <u>Encumbrances</u>.  Buyer shall not enter into any agreement regarding the sale, lease, management, repair, improvement, or any other matter that would affect the Property prior to the close of escrow and that would be binding on Seller or the Property without the prior written consent of Seller.

4.03  <u>Broker Commissions</u>.  Buyer and Seller each represent and warrant to

and for the benefit of the other that such party has not caused liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify and save the other harmless from and against any liability for such commission or fee.

**ARTICLE V**
**CONDITIONS PRECEDENT**

5.01   <u>Conditions Precedent to Buyer's Obligation to Perform</u>.  Buyer's obligation to perform under this Agreement is hereby expressly conditioned on the satisfaction, on or before the Closing Date, of each of the following conditions precedent:

(a)   <u>Accuracy of Seller's Representations and Warranties</u>.  All of the representations and warranties of Seller set forth in Section 4.01 of this Agreement shall be true and correct on and as of the Closing Date, as though made on and as of that date.

(b)   <u>Covenants of Seller</u>.  Seller shall have performed, satisfied, and complied with all covenants, agreements, and conditions required by this Agreement to be performed, satisfied or complied with by Seller on or before the Closing Date.

(c)   <u>Condition of Title</u>.  Seller shall be in a position to convey fee simple title in, and to, the Property to Buyer in the condition of title set forth in Section 2.01 of this Agreement.

(d)   <u>Ability to Issue the Policy of Title Insurance</u>.  Escrow Holder shall have committed to issue the Policy of Title Insurance to Buyer, as set forth in Section 2.03 of this Agreement.

(e)   <u>Deposit of the Deed, Bill of Sale, and Other Documents of Title</u>.  Seller shall have executed and delivered to the Escrow Holder (i) the Deed, duly executed and acknowledged, conveying fee simple title in and to the Real Property to Buyer, (ii) the Bill of Sale, duly executed and conveying all of Seller's right, title and interest in and to the Equipment to Buyer, (iii) and such documents of title, and other instruments of transfer or conveyance, if any, that Buyer may reasonably request, in form reasonably acceptable to Seller and Buyer, conveying title in and to any other items to be transferred by Seller to Buyer pursuant to this Agreement.

(f)   <u>Buyer Financing.</u>  Buyer shall obtain financing for the purchase of the Property in an amount equal to the Purchase Price, less the Deposit.  If, within 30 days of the date escrow is opened Buyer fails to deliver notice to Seller of its inability to obtain such financing, then this contingency shall be considered waived and the transaction shall proceed to closing. If said notice is delivered to Seller within the time set forth in this paragraph, then this Agreement shall be rendered null and void and all sums paid or deposited by Buyer shall be returned to Buyer. Buyer agrees to use its best efforts to obtain such financing. The contingency period set forth in this paragraph

may not be extended except by express written consent of the Seller.

Buyer may waive any or all of the conditions precedent set forth in this Section 5.01, in whole or in part, by providing written notice thereof to Seller. A waiver of a condition precedent shall not constitute a waiver by Buyer of any of their rights or remedies, at law, in equity, or otherwise, if Seller shall be in default of any of its representations, warranties, covenants or agreements set forth in this Agreement. If escrow shall fail to close as the result of the failure of one or more of Buyer's conditions precedent as described in this Section 5.01, all funds or other things deposited by Buyer (including the Deposit) shall be returned to Buyer immediately on demand, and Seller shall pay any title company and escrow charges.

5.02  Conditions Precedent to Seller's Obligation to Perform. Seller's obligation to perform under this Agreement is expressly conditioned on the satisfaction, on or before the Closing Date, of each of the following conditions precedent:

(a)  Accuracy of Buyer's Representations and Warranties. All of the representations and warranties of Buyer set forth in Section 4.02 of this Agreement shall be true and correct on and as of the Closing Date, as though made on and as of that date.

(b)  Covenants of Buyer. Buyer shall have performed, satisfied, and complied with all covenants, agreements, and conditions required by this Agreement to be performed, satisfied or complied with by Buyer on or before the Closing Date.

(c)  Payment of the Purchase Price. Buyer shall have deposited into the escrow a cash amount equal to the Purchase Price.

(d)  Payment of Buyer's Closing Costs. Buyer shall have deposited an amount equal to Buyer's share of all prorations and closing costs into the Escrow, pursuant to Section 6.03 of this Agreement.

Seller may waive any or all of the conditions precedent set forth in this Section 5.02, in whole or in part, by providing written notice thereof to Buyer. Any waiver of a condition precedent shall not constitute a waiver by Seller of any of Seller's rights or remedies, at law, in equity or otherwise, if Buyer shall be in default of any of Buyer's respective representations, warranties, covenants or agreements under this Agreement. If Escrow fails to close due to a breach of or default by Buyer resulting in the failure of one or more of Seller's conditions precedent, then Seller shall retain the Deposit.

### ARTICLE VI
### ESCROW

6.01  Establishment of Escrow. Within five (5) days of the Effective Date, the parties shall open an escrow (the "Escrow") with Chicago Title Company, 6-1 W.

{10538/011/01627748.DOCX}.071723.gaa                    7

Yosemite Ave., Ste. 101, Madera, California 93637 ("Escrow Holder"). The parties shall deposit an executed original or copy of this Agreement as escrow instructions with Escrow Holder, subject to the provisions of Escrow Holder's standard conditions for acceptance of the Escrow, but only to the extent that such standard conditions impose no additional obligations or liabilities on the parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard conditions, this Agreement shall control unless otherwise agreed in writing by Buyer and Seller.

     6.02   <u>Closing Date</u>. Escrow Holder shall close the Escrow not later than September 15, 2023 (the "Closing Date"). Notwithstanding the foregoing, in the event that Escrow Holder is unable to close the Escrow on or before the Closing Date due to the default of a Party or one or more conditions precedent set forth in Sections 5.01 or 5.02 not having been satisfied or waived, unless the Closing Date is extended pursuant to the terms of this Agreement, then the non-defaulting party or party whose condition(s) precedent has failed may terminate the Escrow.

     6.03   <u>Prorations and Closing Costs</u>. Escrow Holder shall prorate real property taxes, assessments, and other like charges on the Property between the parties as of the Closing Date. All such prorations shall be made using the last equalized tax roll, and on the basis of a thirty (30) day month. Escrow Holder shall prorate all utility charges and assessments on the Property between the parties as of the Closing Date. All such prorations shall be made on the basis of a thirty (30) day month. Escrow Holder shall also prorate all personal property taxes, assessments, and other like charges (if any) on the Equipment and any personal property comprising a portion of the Property between the parties as of the Closing Date. All such prorations shall be made using the last equalized tax roll, and on the basis of a thirty (30) day month. Seller shall pay all demands of lienholders or all other amounts necessary to remove and retire such liens and encumbrances, as required to place title to the Property in the condition set forth in Section 2.01 of this Agreement. Seller shall pay premiums for the issuance of the Policy of Title Insurance. Documentary transfer taxes shall be paid by Buyer. All escrow fees and charges, the cost of drawing the deed and other instruments of transfer or conveyance and recording costs shall be paid one-half (½) by Buyer and one-half (½) by Seller. All other costs relating to the Escrow shall be paid according to Madera County custom for like escrows. At least one (1) business day prior to the Closing Date, Buyer shall deposit with Escrow Holder an amount equal to the Purchase Price and Buyer's share of any prorated taxes and assessments, closing costs, escrow fees, and other charges and costs related to the Escrow, in cash, by cashier's or certified check, by wire transfer or by other source of immediately available funds acceptable to Escrow Holder. At least one (1) business day prior to the Closing Date, Seller shall deposit with Escrow Holder, in cash, by cashier's or certified check, wire transfer, or other source of immediately available funds acceptable to Escrow Holder, or instruct Escrow Holder to deduct from funds payable to Seller on the Closing Date, an amount equal to the sum of (i) all demands of lien holders or other amounts necessary to remove and retire such liens and encumbrances, as required to place title to the Property in the condition set forth in Section 2.01 of this Agreement, (ii) the premium for the insurance of the Policy

of Title Insurance, and (iii) Seller's share of any prorated taxes and assessments, closing costs, escrow fees, and other charges and costs related to the Escrow.

6.04    Other Deposits Into the Escrow.

(a)    Seller's Other Deposits Into the Escrow.  In addition to the other items set forth in this Agreement, Seller shall deposit with Escrow Holder, one (1) business day prior to the Closing Date, the following:

(i)    The Deed described in Section 5.01(e) of this Agreement;

(ii)    Endorsements, documents of title, and other instruments of transfer or conveyance described in Section 5.01(e) of this Agreement (the "Other Transfer Documents");

(iii)    Such other documentation as Escrow Holder may require.

(b)    Buyer's Other Deposits Into the Escrow.  In addition to the other items set forth in this Agreement, Buyer shall deposit with Escrow Holder, one (1) business day prior to the Closing Date, the following:

(i)    A preliminary change in ownership report; and

(ii)    Such other documentation as Escrow Holder may require.

6.05  Procedure for Closing.  The Escrow shall be closed in accordance with the following procedure:

(a)    Escrow Holder shall close the Escrow on the Closing Date, but only if all of the applicable conditions precedent set forth in Sections 5.01 and 5.02 of this Agreement have been satisfied in full or waived.

(b)    Escrow Holder shall pay all demands of lien holders or other amounts necessary to remove and retire such liens and encumbrances, as required to place title to the Property in the condition set forth in Section 2.01 of this Agreement.

(c)    Escrow Holder shall record the Deed (marked for return to the Buyer) in the Official Records of Madera County, California.

(d)    Escrow Holder shall charge Buyer for those costs and expenses to be paid by Buyer pursuant to this Agreement.

(e)    Escrow Holder shall prorate taxes, assessments, and other charges of or relating to the Property as provided in Section 6.03 of this Agreement.

(f)     Escrow Holder shall disburse the Purchase Price to Saint Agnes Medical Center in accordance with separate written escrow instructions to be provided by Seller, minus the sum of all prorated amounts and charges to be paid by or on behalf of Seller pursuant to Section 6.03 of this Agreement.

(g)     Escrow Holder shall issue the Policy of Title Insurance to Buyer.

(h)     Escrow Holder shall prepare and deliver to both Seller and Buyer one (1) signed copy of Escrow Holder's closing statement for the Escrow, showing all receipts and disbursements of the Escrow.

(i)     Escrow Holder shall deliver the Other Transfer Documents to Buyer.

(j)     Escrow Holder shall deliver any remaining funds and/or documents held in Escrow as shall be directed, in writing, by Seller and Buyer, or as otherwise set forth in this Agreement.

6.06   Vesting. Conditioned upon the close of the Escrow, title to the Property shall be vested, as instructed by Buyer in Buyer's sole and absolute discretion, prior to the Closing Date.

## ARTICLE VII
## LIQUIDATED DAMAGES AND LIMITATIONS OF LIABILITY

7.01   BUYER'S DEFAULT/LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, THEN SELLER SHALL RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE; PROVIDED, HOWEVER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED TO LIMIT ANY OF THE OBLIGATIONS OF BUYER CONTAINED IN ARTICLE III OF THIS AGREEMENT.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S BREACH OR DEFAULT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY BUYER AND SELLER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE AMOUNT SET FORTH ABOVE REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF SUCH BREACH OR DEFAULT BY BUYER.  BY INITIALING THE SPACES WHICH FOLLOW, BUYER AND SELLER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION 7.01 CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF A DEFAULT BY BUYER.

Seller's Initials          Buyer's Initials

## ARTICLE VIII
## MISCELLANEOUS

8.01    Costs and Expenses. Buyer and Seller shall each pay their own respective costs and expenses incurred, or to be incurred, by said party in negotiating and preparing this Agreement, and all exhibits hereto, and in closing and carrying out the transactions contemplated by this Agreement (including, without limitation, attorneys', paralegals', and other professionals' fees and costs).

8.02    Time. Time is of the essence of this Agreement and each of its provisions.

8.03    Effect of Headings. The titles of the Articles, Sections, Subsections, and other parts of this Agreement are for the convenience of the reader only, and no presumption or implication of the intent of the parties as to the construction of this Agreement shall be drawn therefrom.

8.04    Waiver. A waiver of any breach of this Agreement, by any party to this Agreement, shall not constitute a continuing waiver or a waiver of any subsequent breach of the same, or a waiver of any breach of another provision of this Agreement.

8.05    Counterparts and Facsimile Signature. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. The parties agree that this Agreement, agreements ancillary to this Agreement, and related documents to be entered into in connection with this Agreement will be considered signed when the signature of a party is delivered by facsimile transmission. Such facsimile signature shall be treated in all respects as having the same effect as an original signature.

8.06    Binding Effect. This Agreement, the provisions of this Agreement, and the covenants and conditions contained herein, shall be continuous and binding upon and inure to the benefit of the heirs, executors, trustees, beneficiaries, administrators, personal representatives, successors, and assigns of the parties to this Agreement.

8.07    Notices. Except as otherwise expressly provided in this Agreement, all notices, requests, demands, and other communications required under this Agreement shall be in writing and shall be deemed to have been given (i) on the date of service, if served personally on the person to whom notice is to be given, (ii) on the date of receipt, if sent by telecopier to the person to whom notice is to be given at the telecopier number set forth below, or (iii) on the third day after mailing, if mailed to the person to whom notice is to be given, by first class mail, postage prepaid, and properly addressed as follows:

{10538/011/01627748.DOCX}.071723.gaa          11

To Seller at:      Madera Community Hospital
                   Attention: Karen Paolinelli, CEO
                   P.O. Box 1328
                   Madera, CA  93639
                   kpaolinelli@maderahospital.org

                   With a copy to:

                   Riley C. Walter
                   Wanger Jones Helsley
                   265 E. River Park Circle, Suite 310
                   Fresno, CA  93720
                   (559) 490-0949
                   rwalter@wjhattorneys.com

To Buyer at:       S & K Management
                   ATTN: Scott Bursey
                   40 Via Cerioni
                   Madera, CA 93637
                   kebursey@yahoo.com

      Any party or designated recipient may change his address for purposes of this Section 8.07, by giving written notice of such change to the other party or parties and/or designated recipients, in the manner provided for in this Section 8.07.

      8.08    Governing Law and Venue. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.  The parties to this Agreement agree that venue for any litigation arising under this Agreement shall be in the County of Madera, State of California, if instituted in a State court, or the Eastern District of California, Fresno, if instituted in a Federal court.

      8.09    Construction. All words used in this Agreement shall be construed to include the plural, as well as, the singular number and vice versa, all words used in this Agreement in the present tense shall include the future, as well as, the present, and all words used in this Agreement in masculine gender, shall include the feminine and neuter genders, whenever the context so indicates.  For purposes of this Agreement, references to a party's "current, actual knowledge" shall mean those items actually known by such party, without any inquiry, and shall not require such party to undertake any independent investigation or inquiry to confirm the truth or accuracy of the same.

      8.10    Entire Agreement. This Agreement and all exhibits attached hereto and the Escrow Holder's standard conditions described in Section 6.01 of this Agreement, shall constitute the entire agreement between the parties relating to the sale of the Property by Seller to Buyer, and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties with regard thereto.  No supplement, modification or amendment of this Agreement shall be binding unless

{10538/011/01627748.DOCX}.071723.gaa                    12

executed in writing by all of the parties to this Agreement.

    8.11 <u>Attorneys' Fees</u>. If any legal action or proceeding arising out of or relating to this Agreement is brought by either the Seller or the Buyer to this Agreement, the prevailing party shall be entitled to receive from the other party, in addition to any other relief that may be granted, the reasonable attorneys' fees, costs and expenses in the action or proceeding by the prevailing party.

    8.12 <u>Partial Invalidity</u>. If any provision of this Agreement, or any portion thereof, is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement, including, without limitation, the portions thereof not held to be invalid, void or unenforceable, shall nevertheless continue to be in full force and effect without being impaired or invalidated in any way.

    8.13 <u>Further Action</u>. The parties to this Agreement shall execute such other documents, and shall take such other actions, as may be necessary or appropriate to carry out the foregoing.

    8.14 <u>Survival</u>. The provisions of this Agreement shall be continuous and shall survive the close of Escrow.

    IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

**SELLER**

MADERA COMMUNITY HOSPITAL

Karen Paolinelli, Chief Executive Officer

**BUYER**

S & K MANAGEMENT

Scott Bursey, General Partner

EXHIBIT "A"
LEGAL DESCRIPTION

All that portion of the East Half of the Southwest Quarter of Section 31 and all that portion of the West half of the Southwest quarter of Section 32 Township 11 South, Range 18 East, MDB&M, in the County of Madera, State of California shown as Parcel 2 on Parcel Map No. 416, recorded December 15, 1970 in Vol. 16 of Maps, at Page 116, Madera County Records.

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas and minerals in and under said lands: As reserved by Marjorie H. Sayrs in deed dated April 13, 1954 and recorded January 4, 1955 in Vol. 625 of Official Records, Page 538, Madera County Records.

ALSO EXCEPTING THEREFROM that portion conveyed to the County of Madera by deed recorded January 14, 1994 as Document No. 9401394, Madera County Records.

APN: 047-014-008