**6**

WANGER JONES HELSLEY
Riley C. Walter #91839
Ian J. Quinn #342754
265 E. River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 490-0949
E-Mail:  rwalter@wjhattorneys.com
　　　　 iquinn@wjhattorneys.com

Attorneys for Debtor and Debtor in Possession, Madera Community Hospital

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re:<br><br>MADERA COMMUNITY HOSPITAL,<br><br>　　　Debtor in Possession.<br><br>Tax ID#:　　　23-7429117<br>Address:　　　1250 E. Almond Avenue<br>　　　　　　　Madera, CA 93637 | Case No. 23-10457<br><br>Chapter 11<br><br>DCN: WJH-67<br><br>Date:　　　September 28, 2023<br>Time:　　　9:30 a.m.<br>Place:　　　2500 Tulare Street<br>　　　　　　Courtroom 13<br>　　　　　　Fresno, CA 93721<br>Judge:　　　Honorable René Lastreto II |

**EXHIBIT TO DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF
MOTION FOR ORDER AUTHORIZING ASSUMPTION OF EXECUTORY
CONTRACTS (QUALITY REIMBURSEMENT SERVICES, INC.)**

Exhibit to Declaration of Karen Paolinelli in        1        C:\Users\ddurham\AppData\Local\Microsoft\Windows\I
Support of Motion for Order Authorizing                      NetCache\Content.Outlook\B7WJ5Z4Q\Exhibit.Pg.0908
Assumption of Executory Contracts (Quality

| Exh. | Description | Pages |
|------|-------------|-------|
| A | Accuracy of Standardized Payment Amount Appeal Services Agreement | 2 |
| B | Medicare Disproportionate Share – SSI Realignment Service Agreement | 2 |

Dated:  September 8, 2023

WANGER JONES HELSLEY

By: _____

Riley C. Walter
Attorneys for Debtor and Debtor in Possession,
Madera Community Hospital

## ACCURACY OF STANDARDIZED PAYMENT AMOUNT
## APPEAL SERVICES AGREEMENT

DCN : QR - 2940.3562

This Appeals Service Agreement is between **Madera Community Hospital (CCN 05-0568) (Provider)** and Quality Reimbursement Services, Inc. (QRS). QRS will provide services to review the accuracy of the standardized payment amount based on predicate facts as they relate to the calculation for Operating and Capital base payment rate. The base year 1981 data did not distinguish between patient discharges and patient transfers. Both were classified as discharges. Therefore, the 1981 data over-counted discharges, by including both discharges and transfers in the baseline data resulting in a lower base rate.

QRS will pursue corrections through the appeal and/or reopening process and legal venues, if necessary. This agreement covers QRS consulting services and legal services provided by outside counsel (if needed) for open cost reporting periods for which appeal rights can be established, until the issue is ultimately resolved.

1.  In consideration of the referenced services to be provided by QRS, the Provider agrees to pay QRS, upon credit by the respective agency, a fee equal to **fifteen (15%)** of all reimbursement amounts related to this appeal recovered by way of administrative resolution, PRRB decision, CMS Administrator decision, court decision, settlement, compromise, legislative solution or otherwise. Amounts recovered shall include all recoveries (inpatient, outpatient, operating, capital and interest payments) in the form of cash payments, a decrease in liabilities or an increase in receivables related to the cost reporting periods described above.

2.  QRS will provide drafts of letters to the Provider which the Provider may need to file in order to establish jurisdictionally valid appeal rights with respect to this issue. It is the responsibility of the Provider to file said letters.

3.  The Provider will notify QRS promptly each time a Notice of Program Reimbursement (NPR) or Revised NPR has been issued by the MAC in order for QRS to draft the letters referred to in Item 2 above. Upon the request of QRS, the Provider shall provide QRS with requested documentation. Requests for documentation could include: copies of letters, original and revised NPRs, audit adjustment reports, MAC audit workpapers (electronic and/or hardcopy), detail electronic PS&Rs, and other hard copy documentation to support the Providers' position. This information will be used to document jurisdiction, evaluate the MACs position and for calculating payment amounts. The Providers will notify QRS within 30 days of the date they are paid or credited with any amounts recovered, and will forward to QRS copies of all documents indicating amounts recovered, having been paid or otherwise credited to the Provider.

4.  QRS agrees to keep confidential and not to use or to disclose to others, during the term of this Agreement or any time thereafter, except as expressly consented to by the Provider as required by this Agreement, or as required by law, Provider Information or any other matter or thing learned or acquired by QRS through its association with the Provider that is not otherwise available to the public. "Provider Information" shall mean all information of the Provider, whether written, electronic or oral that contains Protected Health Information of patients (such as technology, proprietary information, patient or customer lists, trade secrets, the contents of this Agreement or other confidential information of the Provider).

1

## ACCURACY OF STANDARDIZED PAYMENT AMOUNT
## APPEAL SERVICES AGREEMENT

5.  QRS has not guaranteed, represented, predicted or stated that it will be successful in this matter or that any amounts whatsoever will or might be recovered.

6.  QRS is a Healthcare Consulting Firm and not a law firm. QRS, at times, retains outside legal counsel for litigation purposes. Neither the employees nor consultants of QRS are acting as your attorney.

7.  By signing below, an authorized representative of the Provider acknowledges that he/she has read this agreement and agrees to its terms on behalf of the Provider.

8.  Until the expiration of four years after the furnishing of services under this Agreement, QRS agrees to make available to the Secretary of Health & Human Services, the U.S. Comptroller General and their representatives this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of those services. If QRS carries out the duties of the contract through a subcontract worth $10,000 or more over a twelve-month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to the related organization's books and records.

9.  Provider acknowledges that it is impossible to predict with absolute certainty the amount of time that may be necessary to achieve a recovery, if any, relating to the services of QRS under this Agreement. Provider further acknowledges that QRS will invest substantial resources in providing its services under this engagement, and that QRS has a disincentive to delay the ultimate resolution of this engagement.

10. QRS will not modify or make any adjustments to the codes assigned by the Provider on patient billings to Medicare, Medicaid or third-party payers.

11. QRS will maintain the confidentiality of information received in compliance with applicable HIPAA regulations.

| **Madera Community Hospital** | **Quality Reimbursement Services, Inc.** |
|---|---|
| By: _Mark Foote_ | By: _J Chaund_ |
| Name: _MArk Foote_ | Name: J. C. Ravindran |
| Title: _VP-Finance/CFO_ | Title:    President |
| Dated: _10/8/18_ | Dated: _10/08/2018_ |

2

Exhibit A - Page 2 of 2

*QUALITY REIMBURSEMENT SERVICES*
*Healthcare Consultants*
*150 North Santa Anita Avenue, Suite 570A*
*Arcadia, California 91006*

**Medicare Disproportionate Share – SSI Realignment**
**SERVICE AGREEMENT**

1.  This Service Agreement is between **Madera Community Hospital (Hospital)** and **Quality Reimbursement Services, Inc. (QRS)**. QRS will provide services in an attempt to have SSI percentages realigned, when our work and analysis indicate realignment will result in favorable reimbursement outcomes for the hospital(s). This agreement covers legal services and services provided by QRS for Hospital cost-reporting periods ending on or after June 30, 1987 through June 30, 2020.

2.  In consideration of the referenced services to be provided by QRS, the Hospital agrees to pay QRS, upon credit by the respective agency, **a fee equal to twelve percent (12%)** of all reimbursement amounts related to the realigned SSI percentage (described above) used in the DSH reimbursement calculation recovered by way of administrative resolution, PRRB decision, CMS Administrator decision, court decision, settlement, compromise, legislative solution or otherwise. Amounts recovered shall include all recoveries (disproportionate share, capital DSH, and interest) in the form of cash payments, a decrease in liabilities or an increase in receivables related to each of the cost reporting periods described above. ("Additional Reimbursement")

3.  QRS will provide drafts of letters to the Hospital which the Hospital will need to prepare on hospital letterhead stationery, sign and return to QRS or submit to directly to the Medicare Administrative Contractor (MAC) in order to initiate potential recoveries or establish rights and/or jurisdiction with respect to this issue. It is the responsibility of Hospital to sign and return these letters to QRS, or file said letters directly with their Medicare Administrative Contractor (MAC).

4.  Hospital will provide QRS with requested documentation such as: copies of letters, original and/or revised NPRs, audit adjustment reports, Intermediary audit workpapers related to DSH, to support the hospitals' position. Hospital will notify QRS within 30 days of the date it is paid or credited with any amounts recovered and will forward to QRS copies of all documents indicating amounts recovered have been paid or otherwise credited to Hospital.

5.  QRS agrees to keep confidential and not to use or to disclose to others, during the term of this Agreement or any time thereafter, except as expressly consented to by Hospital as required by this Agreement, or as required by law, Hospital Information or any other matter or thing learned or acquired by QRS through its association with Hospital that is not otherwise available to the public. "Hospital Information" shall mean all information of Hospital, whether written, electronic or oral that contains Protected Health Information of patients (as technology, proprietary information, patient or customer lists, trade secrets, the contents of this Agreement or other confidential information of the Hospital.

6.  QRS does not guarantee, represent, predict or state that it will be successful in this matter or that any amounts whatsoever will or might be recovered.

7.  By signing below, an authorized representative of Hospital acknowledges that he/she has read this agreement and agrees to its terms on behalf of the Hospital.

8.  Until the expiration of four years after the furnishing of services under this Agreement, QRS agrees to make available to the Secretary of Health & Human Services, the U.S. Comptroller General and their representatives this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of those services. If QRS carries out the duties of the contract through a subcontract worth $10,000 or more over a twelve-month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to the related organization's books and records.

9.  Client acknowledges that it is impossible to predict with certainty the amount of time that may be necessary to achieve a recovery, if any, relating to the services of QRS under this Agreement. Client further acknowledges that QRS will invest substantial resources in providing its services under this engagement and that QRS has a disincentive to delay the ultimate resolution of this engagement.

10. QRS will maintain the confidentiality of information received in compliance with applicable HIPAA regulations.

Provider No(s) 050568                    Quality Reimbursement Services, Inc.


By: _Mary Forte_                         By: _J. Chaudan_

Title: _VP-Finance / CFO_                Title: President

Dated: _7/10/2020_                       Dated: 7/10/2020