**18**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Ian J. Quinn #342754
265 East River Park Circle, Suite 310
Fresno, California  93720
Telephone:      (559) 490-0949
E-mail: rwalter@wjhattorneys.com
            iquinn@wjhattorneys.com

Attorneys for Debtor in Possession, MADERA COMMUNITY HOSPITAL

### IN THE UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO. 23-10457 |
| MADERA COMMUNITY HOSPITAL, | Chapter 11 |
| Debtor in Possession. | DC No.: WJH-77 |
| Tax ID#:      23-7429117<br>Address:      1250 E. Almond Ave.<br>                    Madera, CA  93637 | Date:      February 13, 2024<br>Time:      9:30 a.m.<br>Place:      2500 Tulare Street<br>                  Fresno, CA 93721<br>                  Courtroom 13<br>Judge:      Honorable René Lastreto II |

**DECLARATION OF KAREN PAOLINELLI IN SUPPORT OF JOINT MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION**

I, Karen Paolinelli, hereby declare and represent as follows:

1.      I am the Chief Executive Officer of Madera Community Hospital, the above-captioned debtor and debtor in possession (the "Debtor" or "MCH").  I am responsible for the overall management of the Debtor.  I am familiar with the day-to-day continuing operations, assets, liabilities and financial affairs of the Debtor.  I have over 25 years' experience in healthcare and leadership.

///

---

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

1

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

2. Unless otherwise stated, all facts contained within this Declaration are based upon personal knowledge (my own or information gathered from others who report to me), my review of relevant documents, or my opinion based upon my experience.

3. I submit this Declaration in support of the Motion to Approve Transaction ("Motion") discussed below, and to assist the Court and other interested parties to understand this Case and the various discussions, meetings and negotiations leading up to the Motion. The relief sought in the Motion is intended to enable the hospital to re-open the 106-bed acute care hospital under a Management Services Agreement as soon as possible so the residents of Madera County have access to much needed emergency and primary care services.

4. I have reviewed the Motion and believe that the relief sought is essential to the Debtor's business and in the best interests of the Debtor, creditors and community.

## I.     GENERAL BACKGROUND

5. MCH, a 106-bed acute care hospital, and the sole adult hospital in Madera, California, has been serving the 160,000-plus residents of Madera County for the past fifty-one years.

6. Faced with an unprecedented convergence of challenges due to the COVID-19 pandemic in 2020 and subsequent years, MCH experienced a surge in patients requiring critical care, straining resources. Simultaneously, the COVID-19 lockdowns and disruptions to routine medical services resulted in a decline in revenue.

7. MCH grappled with soaring costs, including those for Personal Protective Equipment (PPE), the high expense of travel nurses, additional staff needs, and a sharp increase in the cost of medical supplies during the crisis. Early in the pandemic, MCH's Board of Trustees recognized MCH was facing financial instability and proactively navigated a journey to secure a relationship that would ensure MCH's financial stability.

## II.     SEARCH FOR A SUITOR—SAINT AGNES EMERGES

8. Recognizing the need to address these challenging times, MCH engaged in a 13-month-long process to affiliate with potential suitor, Saint Agnes Medical Center ("Saint Agnes").

---

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

2

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1 Unfortunately, MCH's aspirations were abruptly shattered when the potential suitor withdrew on

2 December 15, 2022, due to conditions imposed on the affiliation by the Attorney General.

3         9.      The compounding effects of the COVID-19 pandemic, coupled with MCH's

4 existing financial struggles, low reimbursement rates, the lengthy affiliation process, and Saint

5 Agnes' withdrawal from the affiliation drained MCH's financial resources. Consequently, MCH

6 was left with no viable alternative but to reluctantly close its doors on January 10, 2023, and

7 subsequently file Chapter 11 bankruptcy on March 10, 2023. The Chapter 11 filing aimed to

8 protect the Hospital while searching for a new suitor to continue MCH's mission to provide

9 accessible, quality healthcare to the community.

10         10.     As to the need for the Chapter 11 filing, and the specifics of the events leading up

11 thereto, I hereby incorporate by reference page 6, line 1 through page 7, line 17, of that

12 Declaration of Karen Paolinelli in Support of Motion of the Debtor for Entry of an Order: (I)

13 Authorizing the Debtor to (A) Pay Prepetition Wages and (B) Pay Reimbursable Employee

14 Expenses; and (II) Authorizing and Directing the Applicable Bank to Pay All Checks and

15 Electronic Payments Requests Made by the Debtor Relating to the Foregoing ("Paolinelli

16 Declaration"), filed in this case on March 13, 2023 (WJH-2).

17         11.     MCH then quickly embarked on a lengthy journey to evaluate new potential

18 suitors, aiming to secure a viable affiliation to ensure continued provision of healthcare services

19 for the community.

20 **III.     COMPREHENSIVE SEARCH FOR A NEW SUITOR**

21         12.     Recognizing the need for specialized guidance and the severity of the situation,

22 during these extraordinary times, MCH sought knowledgeable help in navigating the complexities

23 of Chapter 11 proceedings. MCH appointed Shondale Seymour as interim CFO, Aaron Chambers

24 as Interim Controller, Riley Walter of Wanger Jones Helsley, as bankruptcy counsel, and Robert

25 Ward, as transactions/healthcare attorney, to assist MCH navigate challenges inherent in vetting

26 a suitable affiliate.

27         13.     MCH adopted a comprehensive approach to identify potential suitors. Outreach

28 efforts targeted entities with a proven track record in both healthcare management and a

---

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

3

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1 commitment to community healthcare. The process began with an open invitation for expressions

2 of interest from various local, regional and national entities. Active engagement in outreach and

3 networking within the local healthcare community played a crucial role. This involved contacting

4 known healthcare providers, reaching out to industry associations, and participating in relevant

5 events to spread awareness about MCH and generate interest in the affiliation process.

6      14. The urgency of the financial predicament MCH faced made it challenging to attract

7 viable partners willing to navigate the complexities arising from the terminated affiliation and the

8 post-COVID-19 financial strain MCH and many other hospitals faced. Recognizing the

9 importance of finding a suitor capable of navigating the uncertain post-pandemic healthcare

10 environment was a critical consideration. Collaborating with regional and local healthcare

11 networks and associations provided access to a broader pool of potential suitors.

12      15. Public announcements of MCH's closure were disseminated through local

13 regional and national media, healthcare publications; and social media served to inform a wider

14 audience about the opportunity. The announcements included details about MCH's closure and

15 the search for a new suitor. Leveraging existing relationships with healthcare providers in the

16 community and establishing communication channels with entities already involved in healthcare

17 helped generate interest. Using this approach, MCH found itself with a diverse pool of over

18 twenty potential suitors.

19      16. The initial phase of finding a new suitor involved conducting a preliminary

20 assessment of those expressing interest in acquiring the closed hospital. This comprehensive

21 screening process aimed to categorize the potential suitor's level of interest. The primary

22 objectives of identifying a new suitor included reviewing suitor's ability to enhance patient care,

23 optimize operational efficiency, ensure regulatory compliance, strengthen financial stability,

24 improve the patient experience, achieve cultural alignment, and facilitate a smooth transition.

25      17. Recognizing the complexity of these objectives, the Board of Trustees took on the

26 responsibility of steering the evaluation process. Committed to compliance with fiduciary duty

27 and strategic oversight, the board ensured that the decision-making process aligned not only with

28 MCH's mission and vision but also with a comprehensive set of objectives laid out for the new

Declaration of Karen Paolinelli in Support of Debtor's Motion for Authority to Enter into Transaction

4

R:\Client\10538-002\PLEADINGS\WJH-77 Joint Motion to Enter into Transaction [AAM]\Declaration.Paolinelli.011924.ijq.docx

1 suitor. The Board of Trustees played a pivotal role throughout the evaluation process, ensuring

2 that every decision MCH made was well informed, aligned with MCH's mission and vision, and

3 in the best interest of all stakeholders involved. To navigate this complex landscape the Board

4 adopted a series of strategic approaches. This included using MCH's 2022 needs assessment,

5 establishing clear criteria for potential suitors, seeking input from various stakeholders,

6 researching potential partners, and laying down a systemic road map for the evaluation process.

7 Frequent communication with creditor constituencies was made.

8        18.     Using basic criteria, including financial stability, operations, expertise, and

9 experience in managing acute care hospitals with a very high medi-cal population, the Board of

10 Trustees filtered out entities that might not meet the fundamental prerequisites necessary to

11 reopen MCH. Following the initial screening, potential suitors were invited to formalize their

12 interest by signing Non-Disclosure Agreements, ("NDAs"). These legal agreements established

13 a framework for sharing confidential information. With the signed NDAs in hand, MCH shared

14 information about MCH's operations with the interested parties. This encompassed detailed

15 financial records, operational insights, historical data, and the unique challenges and opportunities

16 associated with MCH. This transparent exchange laid the groundwork for an informative and

17 equitable evaluation process.

18        19.     As information flowed to the potential suitors, the suitability criteria were refined

19 based on the specific nuances revealed during the information-sharing process. This ensured that

20 the evaluation criteria evolved to address the unique characteristics of MCH and the potential

21 suitor. MCH thoroughly reviewed each potential suitor's track record in managing or operating

22 acute care hospitals and clinics. The evaluation process resulted in the shortlisting of a select

23 number of potential suitors, while others decided not to move forward.

24        20.     Entities on the short list permitted MCH to delve deeper into the specifics of each

25 suitor for a more refined and focused approach. The process aimed to ensure the suitor's plans

26 and commitments were not only visionary, but also viable.

27        21.     Simultaneously, due diligence procedures were initiated, delving into the

28 financial, operational, and cultural aspects of each potential suitors. In the challenging landscape

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

5

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1 of a closed and bankrupt not-for-profit hospital navigating Chapter 11, the due diligence process

2 took on a different set of complexities.  With minimal hospital staff, consisting primarily of the

3 Board of Trustees, the financial consultants, and the CEO, and given MCH's financial distress,

4 the due diligence process focused intensively on suitor viability.

5      22.     The Board played a central role in facilitating discussions between MCH and

6 potential suitors.  MCH coordinated presentations to the Board of Trustees and site visits to allow

7 the parties to gain first hand insights into operations.  This involved an in-depth analysis of

8 potential suitors' ability to invest in a bankrupt entity, absorb liabilities, and inject the necessary

9 capital to resurrect the operations.

10      23.     Simultaneously, the legal team concentrated on using the intricacies of Chapter 11

11 bankruptcy to assess how each potential suitor could navigate the legal complexities, handle

12 outstanding debts, and negotiate with creditors.  Understanding the importance of finding a

13 partner with the legal acumen to maneuver throughout the bankruptcy proceeding and ensure a

14 smooth transition was of the utmost importance, and lacking in several suitors.

15      24.     Considering MCH's strategic vision and non-profit status, it was essential to ensure

16 the selected partner aligned with MCH's mission and values.  MCH engaged in direct

17 conversations with the potential suitors, focusing on their strategic vision for healthcare,

18 commitment to the community, and plans for the rejuvenation of MCH.  Conducting due diligence

19 became a paramount and very time-consuming phase in the evaluation process.

20      25.     MCH, in collaboration with its aforementioned advisors, conducted due diligence

21 on potential suitors'.  This involved assessments of financial stability, operational capabilities,

22 regulatory compliance, cultural alignment, and compatibility with MCH's mission of potential

23 suitors. MCH reviewed each potential suitor's experience in reopening closed hospitals and

24 operating acute care facilities.

25      26.     As proposals were received, the Board of Trustees engaged in the thorough

26 evaluation process.  Each proposal underwent a review process to ensure alignment with the

27 defined criteria.  Serious discussions ensued with a select few interested parties.

28

27.     Negotiations unfolded amidst the backdrop of the Chapter 11 bankruptcy, minimal staff, intense regulatory oversight and a closed hospital.  Negotiations with potential suitors proved challenging given MCH's weakened financial position.

28.     The negotiations began with a candid acknowledgment of the challenges at hand. Legal advisors laid out the stark financial reality MCH faced under Chapter 11 bankruptcy rules. The potential suitors were attentive, recognized the potential risks and rewards of undertaking such a venture.  The heart of the negotiations lay in the financial terms.  MCH needed from a suitor the wiliness to inject substantial capital to settle outstanding debts in Chapter 11, manage assets, and kick-start operations, as well as the creditors approval.

29.     The negotiations became a battleground of figures, with some of the potential suitors scrutinizing MCH's financial records and reviewing what it would take to reopen.  Beyond the financial requirements, the negotiations turned to operational commitments.   The CEO detailed the operational challenges MCH faced, including rates, regulatory compliance, staffing, equipment procurement, compliance, and patient care services. Discussions delved into the governance structure of reopening a closed hospital and the need for a collaborative approach between MCH, creditors and suitor.

30.     MCH heeded advice from counsel on the legal intricacies, addressing liabilities, creditor claims, governmental approvals and compliance with bankruptcy court procedures. Recognizing the importance of community support, the negotiation also touched upon a commitment to engage with the County of Madera to have representation of the community, maintain transparency, and uphold MCH's role as the healthcare provider in the community.

31.     MCH conducted due diligence systematically and through a competitive process. MCH, along with its legal representatives, guided the process to ensure it was competitive and aligned with the objectives.  After winnowing out various suitors, in collaboration with MCH's healthcare attorney, Robert Ward, the aim was to obtain requested information to review from the remaining two parties seeking to affiliate with MCH.  The board of trustees then thoroughly reviewed all the information, conducting a side-by-side comparison of the proposals from Praise, Inc. and American Advanced Management ("AAM") to ensure a competitive process that aligns

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction                    7                    R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1  with MCHs mission and vision, while also addressing the debt in the Chapter 11 bankruptcy.

2  Below is a synopsis of the potential suitors MCH engaged with during this due diligence process.

3       32.     Between January 2023 and December 2023, MCH's board of trustees met 33 times

4  and MCH's governing body finance committee met 59 times, sometimes three times per week.

5  **IV.     POTENTIAL SUITORS**

6       33.     The below paragraphs identify the short list of serious potential suitors and explain

7  the results of discussions with each suitor.

8  SAINT AGNES MEDICAL CENTER

9       34.     In December 2020, Saint Agnes, represented by Nancy Hollingsworth, approached

10  MCH about a deal.  Saint Agnes presented to MCH's board of trustees, which voted in favor of

11  pursuing a transaction.  An NDA was signed on August 24, 2021.  The Trinity Health (Saint

12  Agnes's parent entity) team conducted extensive due diligence.  Term sheets and affiliation

13  documents were prepared; months of further due diligence ensued.

14       35.     On February 3, 2022, Saint Agnes signed a Letter of Intent/Term Sheet with MCH.

15  Multiple discussions with the board of trustees, Trinity Health, Saint Agnes, and the California

16  Office of the Attorney General ("AG") office were conducted.  On December 15, 2022, the AG

17  made public the list of conditions for Saint Agnes to acquire MCH.  On December 16, 2022, Saint

18  Agnes terminated the Letter of Intent/Term Sheet affiliation due to the AG's conditions.

19  CALIFORNIA-BASED HEALTHCARE ENTITY

20       36.     In July 2022, a California-based healthcare entity submitted a proposal (prior to

21  MCH's closure); however, this suitor was not selected.  NDA was signed on July 12, 2022 and

22  financials shared.  MCH contacted this potential suitor again after the Saint Agnes deal fell apart

23  in early December 2022.  The suitor ultimately expressed no interest in pursuing MCH operations.

24  CHICAGO-BASED SUITOR

25       37.     In December 2022, a Chicago-based suitor, expressed interest in the acquisition

26  opportunity, including debtor-in-possession lending, in the event MCH filed for bankruptcy.

27  MCH engaged in numerous discussions with the suitor.  On December 2, 2022, the suitor signed

28  an NDA; the parties exchanged financials.  The suitor had not acquired any hospitals in the past.

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction
                                      8
R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1 The suitor requested a summary of MCH's accounts receivable, equipment leases, and real estate

2 holdings. MCH engaged in a series of e-mail exchanges and an on-site presentation and facility

3 tour. On January 19, 2023, the suitor proffered a letter of intent, which, was subsequently

4 reviewed by the MCH finance committee. The deal fell through because the suitor did not want

5 to infuse cash into MCH and planned to borrow on MCH equipment to operate the hospital.

6 Negotiations terminated at the end of January 2023.

7 AMERICAN ADVANCED MANAGEMENT (AAM)

8          38.          In December 2022, American Advance Management (AAM), represented by

9 Gurpreet Singh,M. D., made known its interest in acquiring MCH. AAM signed an NDA, and

10 MCH shared financial information with AAM. In January 2023, AAM came to MCH and toured

11 the facility and grounds. AAM presented to the MCH Finance Committee regarding interest in

12 the hospital and clinics. In March 2023, AAM submitted a letter of interest to MCH to purchase

13 the clinics. The MCH Finance Committee and the Board of Trustees reviewed the new document.

14 AAM's interest was originally in purchasing the clinics. AAM originally wanted to base hospital

15 operations for the clinics from its Coalinga location. Discussion ensued regarding the purchase

16 of the clinics between the two parties. In April 2023, the Board of Trustees reviewed the letter of

17 intent from AAM to purchase clinics and to complete the change of ownership; a decision was

18 made to not proceed with the letter of intent. The MCH Board of Trustees did not want to separate

19 the clinics from the hospital, as the Board understood their importance to the hospital if it were

20 to reopen.

21          39.          In May 2023, American Advanced Management reached back out to MCH with

22 interest in the hospital and provided another letter of interest. In June 2023, representatives from

23 AAM presented to the MCH Finance Committee and provided an updated management services

24 agreement ("MSA"). Based on the feedback from Finance Committee on the presentation, AAM

25 made revisions to the MSA. In August 2023, AAM submitted an updated term sheet, which was

26 shared with Board of Trustees. In October 2023, the Board of Trustees met and reviewed a revised

27 term sheet from AAM. A copy of the further revised AAM term sheet provided to the Board. In

28 October 2023, AAM asked to come back to the Board of Trustees and make a new presentation.

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

9

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1  AMM brought 23 staff members/Board members from the AAM management team to the

2  presentation. In November 2023, the MCH Finance Committee met with representatives from

3  AAM to discuss and review financial documents and information from AAM.

4          40.       The Board of Trustees reviewed various documents provided by AAM including

5  recommendation letters, affiliations, proofs of funding, the draft MSA, and various schedules

6  thereto. In December 2023, MCH received an updated draft MSA, Transfer Agreement, and

7  Asset Purchase Agreement from AAM. These documents were shared with the Creditors'

8  Committee, MCH Board, and attorneys. Bob Ward, transactions attorney, discussed the terms of

9  the AAM deal at the Board of Trustees meeting on December 12, 2023. On December 14, 2023,

10 the Board reviewed the response to additional questions submitted by Mr. Ward to AMM. On

11 December 18, 2023 the Board of Trustees met again. At that meeting, the board unanimously

12 voted to move forward with the AAM deal, subject to reaching agreement on all details.

13 PROVIDER GROUP

14         41.       A Medicare Advantage medical Group/IPA operating in Fresno County, Madera

15 County, Orange County, and Los Angeles County first reached out to MCH on December 24,

16 2022. The suitor is a Restricted Knox-Keene entity. The suitor signed an NDA in December

17 2022. Discussions ensued. The Board of Trustees reviewed the interest of this potential suitor.

18 The outcome resulted in the suitor not making any offers to MCH.

19 HEALTHCARE REVENUE SERVICES COMPANY

20         42.       A healthcare revenue services company entered into discussions with MCH in

21 January 2023. The preliminary phase involved the signing of a NDA, setting the stage for

22 transparent collaboration. The parties exchanged financials; substantive discussions ensued to

23 explore potential synergies between the organizations. MCH's board of trustees reviewed

24 information regarding the company. No more discussions ensued.

25 NATIONWIDE HEALTHCARE SYSTEM

26         43.       In January 2023, a national healthcare system e-mailed MCH about being

27 interested in keeping MCH open. The healthcare system inquired about the hospital but did not

28

Declaration of Karen Paolinelli in Support of        10        R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Debtor's Motion for Authority to Enter into                     Motion to Enter into Transaction
Transaction                                                     [AAM]\Declaration.Paolinelli.011924.ijq.docx

1 pursue interest.  The healthcare system never signed an NDA.  Due to the lack of an NDA between

2 the parties, the outcome was no engagement.

3 HEALTHCARE VALUE ADDED INVESTOR

4      44.     In January 2023, a healthcare value added investor reached out regarding

5 interested in MCH and MCH's clinics. The parties executed an NDA and shared financials.

6 Further communications ensued.  The investor elected not to pursue a transaction.

7 FINANCIAL INVESTMENT GROUP

8      45.      In January 2023, a representative of a financial investment group, interested in a

9 Management Service Agreement, notified MCH he knew of possible investors from the group

10 that may be interested in the hospital.  The representative stated the group would be contacting

11 MCH directly, but no contact was ever made.  No data was shared and no further communications

12 occurred.

13 CALIFORNIA HOSPITAL

14      46.     In January 2023, a California Hospital had discussions with MCH regarding

15 interest in MCH.    MCH shared financial data with the suitor.  MCH and the suitor had multiple

16 phone calls and e-mail discussions.  MCH was later notified by the hospital it was not interested

17 in pursuing a transaction.

18 PHYSICIANS GROUP

19      47.     In January 2023, MCH engaged in numerous discussions with a doctor, who

20 presented a proposal on behalf of a physicians group that had expressed an interest in purchasing

21 the MCH clinics.  The proposal was to parcel out the property for sale or long-term lease for thirty

22 years and transition ownership from MCH to a physician-owned, freestanding clinic.  A complete

23 sale of all clinic assets at the Madera clinic location for $1 would transpire.  The physician group

24 would purchase all physical clinic assets at an acceptable market price.  However, efforts to

25 complete this deal did not succeed because it was uncertain that the clinics could be sold (as they

26 are hospital based clinics), and the clinics would be an important part of an affiliation should an

27 affiliate be obtained in the future.  Negotiations terminated in January 2023, with the MCH Board

28 of trustees making decision to end further talks.

Declaration of Karen Paolinelli in Support of        11        R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Debtor's Motion for Authority to Enter into                        Motion to Enter into Transaction
Transaction                                          [AAM]\Declaration.Paolinelli.011924.ijq.docx

1 SECOND CHICAGO-BASED SUITOR (NONPROFIT)

2      48.     In January 2023, Chicago nonprofit, made a significant showing of interest in
3 MCH, to purchase the hospital property, operations and assets. The nonprofit signed an NDA and
4 MCH shared financial data.  The MCH Finance Committee met and discussed the nonprofit's
5 letter of intent, which included review of a management agreement (with no upfront funds to
6 MCH and no obligation to absorb MCH debt).  On February 2, 2023, the nonprofit came to MCH
7 and presented to the Finance Committee.

8      49.     On February 16, 2023, the MCH Finance Committee met, reviewed, and discussed
9 a letter of intent.  Discussion ensued regarding the terms in the letter, and comments were sent
10 back to the nonprofit by the MCH finance committee.  In May 2023, another version of the letter
11 of intent was provided to MCH, which the MCH Finance Committee reviewed.  In May 2023, the
12 nonprofit sent an operational plan for review.  On May 17, 2023, the nonprofit provided a non-
13 binding proposal for member substitution.  On May 24, 2023, legal counsel remarked that the
14 letter of intent lacked detailed information, and, that at that time, the letter of intent was not in a
15 state to present to the Board, creditor's committee, or Saint Agnes.

16      50.     On June 8, 2023, MCH reported that the nonprofit continued to have talks with
17 AG personnel.  The creditors' committee and Saint Agnes both reviewed the nonprofit's proposal;
18 neither was interested.  A deadline of June 21, 2023 was set for the nonprofit to bring forth
19 information and changes requested in the documents submitted.  As of June 21, 2023, no further
20 action or communication occurred.  After a few months of discussions, the nonprofit could not
21 come up with an acceptable plan for MCH, and communications ceased in June 2023.

22 HEALTHCARE MANAGEMENT SERVICES ENTITY

23      51.     In February 2023, a healthcare management services entity, met with MCH on
24 campus.  The entity owns one hospital and expressed interest in acquiring a distressed hospital.
25 An NDA was signed and financials shared.  The entity had no interest in infusing any money into
26 MCH.  No further negotiations occurred as the entity ended discussions.

27 ///

28 ///

Declaration of Karen Paolinelli in Support of       12        R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Debtor's Motion for Authority to Enter into                   Motion to Enter into Transaction
Transaction                                                   [AAM]\Declaration.Paolinelli.011924.ijq.docx

1 NEW-YORK BASED BEHAVIORAL HEALTH FACILITY

2       52.      March 2023, a company owning and operating certain behavioral health facilities

3 in New York State contacted MCH about a potential deal.  MCH participated in multiple phone

4 calls to discuss a potential partnership to either buy the facility, lease partial beds, or some other

5 arrangement.  The parties signed a NDA.  Financials were shared and discussions occurred at the

6 Board level.  The suitor decided not to pursue further because of the new behavioral hospital on

7 the Valley Children's campus in Madera.

8 ELECTRONIC HEALTH RECORDS COMPANY

9       53.      In March 2023, an electronic health records company contacted MCH about a

10 potential deal.  MCH shared financial data and held many phone discussions with the company.

11 The company's representative visited the MCH campus.  Nothing more became of these

12 discussions; the company had no interest in pursuing a deal.

13 NORTHERN-CALIFORNIA HOSPITAL

14       54.      Between March and April 2023, MCH engaged in numerous discussions with a

15 hospital based in Northern California.  MCH and the hospital had multiple telephone discussions

16 surrounding potential affiliation agreements.  A representative came out to tour the MCH campus

17 expressed interest in a possible affiliation by leveraging current services.  Discussions ensued

18 regarding a possible affiliation the necessary work to hammer out the details. On March 27, 2023,

19 the hospital signed an NDA and business associate agreement.  MCH and the hosptial each shared

20 financials with the other.  Discussions lasted for several months; but, in the end, the parties could

21 not make any progress with the suitor's leadership or board due to MCH's debt position and

22 MCH's Chapter 11 debtor in possession status.

23 NATIVE AMERICAN TRIBES

24       55.      On June 13, 2023, representatives from some Central California Native American

25 Tribes reached out to MCH with interest of getting information to share to determine if the tribes

26 were interested in helping MCH to get the hospital back open.  The suitor signed an NDA and

27 MCH shared financial data.  MCH also shared its distressed hospital loan program application.

28 Discussions continued, but, to date, no offers ever materialized.

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction
      13      
R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

1    INDEPENDENT INVESTMENT GROUP

2         56.     On July 25, 2023, a representative of an independent investment group reached

3    out showing interest in acquiring MCH.  The representative made a presentation to the Board of

4    Trustees on July 25, 2023, but the presentation fell short.  The representative gave a brief

5    overview of his group, including the acquisition of a rural hospital in another state.  On November

6    9, 2023, the representative contacted MCH when he heard the Adventist Health deal fell through.

7    On November 14, 2023, the representative emailed MCH with questions concerning licensing

8    and the bankruptcy process.  On November 15, MCH requested the representative submit a term

9    sheet and proof of funds (if interested in moving forward).  No further information was provided

10   by this group.

11   THIRD CHICAGO-BASED SUITOR (PRACTICE GROUP)

12        57.     A physician-owned practice out of Chicago, IL, expressed interest in acquiring

13   MCH.  The practice group signed an NDA, and MCH shared financial data.  The practice group

14   proffered a letter of interest on July 5, 2023.  The letter of interest lacked detail as to how to re-

15   open MCH and how creditors would be paid.  On July 24, 2023, the Board of Trustees met notified

16   the practice group that MCH would not be moving forward with its proposal.

17   ADVENTIST HEALTH (AH)

18        58.     On January 10, 2023, Adventist Health, represented by CEO Kerry Heinrich,

19   started discussions with MCH on a potential management agreement.  AH signed an NDA, and

20   MCH shared financial data with AH.  Communication continued between January and July 2023.

21   On July 12, 2023, MCH received a letter of intent, which was reviewed by the Board of Trustee.

22   On July 17, 2023, the Board of Trustees met and AH made a presentation.  On July 24, 2023,

23   CEO Kerry Heinrich, President of AH, presented to the Board of Trustees.  Discussions at these

24   meetings included the distressed hospital loan program.  On July 25, 2023, the Board of Trustees

25   met and discussed the MSA received from Adventist Health.  On July 31, 2023 the Board of

26   Trustees met and the AH Team presented its turnaround plan for the distressed hospital loan

27   program to the board.  On August 30, 2023, Adventist Health presented to the Board of Trustees,

28   at which meeting the board voted to continue working towards a deal with AH.

Declaration of Karen Paolinelli in Support of          14          R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Debtor's Motion for Authority to Enter into                        Motion to Enter into Transaction
Transaction                                                        [AAM]\Declaration.Paolinelli.011924.ijq.docx

59. On October 2, 2023, AH and Kauffman Hall presented a turnaround plan. AH planned to move forward, contingent on approval of the AH turnaround plan by the MCH board. The MCH board voted to approve the turnaround plan's presentation to the California Department of Health Care Access and Information (HCAI). AH had made it known to the Board that AH would require an additional $46 million to continue with the turnaround plan; $52 million would be used in year one, and additional monies would be needed for years two through five. AH expressed issues with federal regulations as it related to the MCH clinics. AH made it known it would need the distressed hospital loan program funds to be forgiven. On November 6, 2023 AH presented to the Board of Trustees, advising that absent a pathway forward for supplemental funding, Adventist Health would withdraw from the affiliation process. On November 15, 2023, AH sent me a letter stating AH would cease discussions with MCH based on a lack of committed of additional funds pursuant to the distressed hospital loan program.

PRAISE HEALTH

60. On November 1, 2023, Praise Health LLC (Praise), represented by Paul Tuft, contacted MCH about using a management agreement to re-open MCH. After Praise signed an NDA, MCH offered financial data. On November 1, 2023, Praise Health brought a team to MCH who presented to MCH's Board of Trustees. Praise provided a term sheet during that presentation. On November 15, 2023, the Board of Trustees met and reviewed received documents from Praise, including questions and answers from Praise to questions posed by MCH, financial documents, and related e-mail correspondence with Praise. The Board of Trustees further discussed Praise's suitability to take over operations. Bob Ward, transactions counsel, contacted Praise requesting additional information from Praise by December 15, 2023. Praise did not meet this deadline, and discussions ceased.

FOR-PROFIT HEALTH SYSTEM

61. On November 12, 2023 MCH spoke with a for-profit health system over the phone about a potential deal. MCH requested the entity sign an NDA. No NDA was signed, and no further discussions occurred.

///

## V.　　TRANSACTION

62.　　A summary of the transaction with AAM (all documents constituting the deal collectively referred to as "Transaction") is as follows:

63.　　The comprehensive set of Transaction documents consisting of the following, collectively (the "Agreements")[1]:

　　　　　a.　　Master Transition Agreement ("MTA");

　　　　　b.　　Management Services Agreement ("MSA");

　　　　　c.　　Asset Purchase Agreement (Real Property Asset); and

　　　　　d.　　Asset Purchase Agreement (Hospital Assets).

64.　　Taken all together, the Agreements set forth the manner in which AAM wishes to acquire the hospital assets and assume operational control of the facility.

65.　　The Motion, at paragraph 26 thereto, sets forth the key dates and trigger deadlines for approval of the Transaction and the proposed Chapter 11 plan.

66.　　Article 2 of the MSA provides for a continuing role for the Board of Trustees until the Bankruptcy Court confirms the Plan.　The Board will continue to exercise the responsibilities stated in the California Health and Safety Code and Title 22 of the California Code of Regulations but will be obligated to authorize AAM to operate the facility in accordance with the terms of the MSA, and will delegate to it the management responsibilities ordinarily exercised by hospital management.

67.　　The entire Transaction, from start to finish, is expected to take at least 12-16 months due to the number of regulatory approvals required to fully transition all operations to AAM all while staying compliant with all health and safety rules.

68.　　This Motion addresses each aspect of the Transaction and attendant requests for relief.

69.　　As a part of each of the closings, MCH will assign and assume contracts to AAM and will assigned certain licenses, subject to regulatory approval.

///

---

[1] In the event of any inconsistency between the terms of any of the Agreements and this Declaration, the terms of the Agreements shall control.

1　　70.　　MCH requests the assets be sold to AAM free and clear of certain liens, as
2　specified herein above.

3　**VI.　　THE COURT SHOULD APPROVE THE PROPOSED TRANSACTION**

4　　71.　　For the foregoing reasons, I request that the court approve this Transaction.

5　　72.　　As evidenced by section IV of this declaration, MCH negotiated with multiple
6　potential buyers in search for the best offer.  After potential deals with Saint Agnes and AH fell
7　through, MCH kept searching for the highest and best offer.  The deal on the table with AAM
8　represents the best opportunity to open the hospital and restore acute care for the residents of
9　Madera County.

10　　73.　　The proposed Transaction provides AAM the option to purchase the hospital and
11　contains significant drawbacks for AAM should AAM elect not to exercise that purchase option.

12　　74.　　MCH and AAM negotiated in good faith.  On information and belief, AAM is
13　represented by sophisticated lawyers with extensive bankruptcy experience.  I am unaware of any
14　undisclosed deals between AAM, on one hand, and MCH, me or any employees or Trustees, on
15　the other hand.

16　　75.　　AAM represents to MCH that AAM has experience turning around several
17　distressed or failing hospitals in California.

18　　76.　　MCH asserts the compensation AAM is providing in this Transaction is fair to
19　MCH and to MCH's secured and unsecured creditors.

20　　77.　　As a non-profit corporation, MCH is guided by certain principles not otherwise
21　applicable to for-profit corporations.  The MCH Board understands the reality that the Creditors'
22　Committee proposes to liquidate MCH's assets.  If the creditors committee's liquidation plan is
23　approved, then the hospital will not re-open.

24　　78.　　The fact that California is willing to fund up to $57 Million in distressed hospital
25　loan program funds to re-open the hospital demonstrates that re-opening the hospital is a priority
26　for this state, and would provide a benefit to the inhabitants of Madera County.

27　　79.　　MCH respectfully requests the Court waive the fourteen-day stay pursuant to
28　FRBP 6004(h).  MCH asserts good cause exists for the Court to grant such waiver.

Declaration of Karen Paolinelli in Support of
Debtor's Motion for Authority to Enter into
Transaction

17

R:\Client\10538-002\PLEADINGS\WJH-77 Joint
Motion to Enter into Transaction
[AAM]\Declaration.Paolinelli.011924.ijq.docx

80. The Court should approve the assignment of certain agreements, to be specified at a later date, to AAM. This will enable AAM to continue operations and benefit from certain existing, advantageous contracts with MCH.

81. Secured creditors will be paid in full should AAM proceed with consummating this transaction as set forth in the Agreements. This represents the best opportunity for repayment to unsecured creditors and is far superior to liquidation.

82. At a Board of Trustees meeting held January 17, 2024, the Board of Trustees unanimously approved a resolution authorizing MCH to proceed with the Transaction involving American Advanced Management, Inc., as shown by the exhibits to the Motion.

83. In my business judgment the sale is fair to both parties, and in the best interests of MCH, creditors and the community.

I declare under penalty of perjury that the foregoing facts are true and correct under the laws of the United States of America and I would so testify if called as a witness.


Executed this 19th day of January, 2024, at Madera, California.

Karen Paolinelli

Declaration of Karen Paolinelli in Support of Debtor's Motion for Authority to Enter into Transaction

18

R:\Client\10538-002\PLEADINGS\WJH-77 Joint Motion to Enter into Transaction [AAM]\Declaration.Paolinelli.011924.ijq.docx