**130**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Ian J. Quinn #342754
265 East River Park Circle, Suite 310
Fresno, California 93720
Telephone:     (559) 490-0949
E-mail: rwalter@wjhattorneys.com
            iquinn@wjhattorneys.com

Attorneys for Debtor in Possession, MADERA COMMUNITY HOSPITAL

Paul S. Jasper (CA Bar No. 200138)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile: 415.344.7050
Email:        PJasper@perkinscoie.com

Andrew H. Sherman (admitted *pro hac vice*)
Boris I. Mankovetskiy (admitted *pro hac vice*)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: 973.643.7000
Facsimile: 973.643.6500
Email:        ASherman@sillscummis.com
            BMankovetskiy@sillscummis.com

Co-Counsel to the Official Committee of Unsecured Creditors

**IN THE UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| In re | CASE NO. 23-10457 |
| MADERA COMMUNITY HOSPITAL, | Chapter 11 |
| Debtor in Possession. | DC No.: WJH-77 |
| Tax ID#:      23-7429117 | Date:     February 13, 2024 |
| Address:      1250 E. Almond Ave. | Time:     9:30 a.m. |
|                    Madera, CA 93637 | Place:    2500 Tulare Street |
| | Fresno, CA 93721 |
| | Courtroom 13 |
| | Judge:    Honorable René Lastreto II |

**EXHIBITS TO JOINT MOTION OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO ENTER INTO A MASTER TRANSITION AGREEMENT AND A MANAGEMENT SERVICES AGREEMENT WITH AMERICAN ADVANCED MANAGEMENT, INC.**

| Exhibit | Description | # of Pages |
|---------|-------------|------------|
| A | (Proposed) Order Authorizing The Debtor to into a Master Transition Agreement and a Management Services with American Advances Management, Inc. | 4 |
| B | Master Transition Agreement | 124 |

Dated: January 19 , 2024          WANGER JONES HELSLEY


By: _Riley C. Walter_____
Riley C. Walter
Attorneys for Debtor and Debtor in Possession,
MADERA COMMUNITY HOSPITAL


Dated: January 19 , 2024          PERKINS COIE LLP


By: _/s/ Paul S. Jasper_____
Paul S. Jasper
Co-Counsel of the Official Unsecured Creditor's Committee

**4**

**WANGER JONES HELSLEY**
Riley C. Walter #91839
Ian J. Quinn #342754
265 East River Park Circle, Suite 310
Fresno, California 93720
Telephone:     (559) 490-0949
E-mail:  rwalter@wjhattorneys.com
              iquinn@wjhattorneys.com

Attorneys for Debtor in Possession, MADERA COMMUNITY HOSPITAL

Paul S. Jasper (CA Bar No. 200138)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile: 415.344.7050
Email:        PJasper@perkinscoie.com

Andrew H. Sherman (admitted *pro hac vice*)
Boris I. Mankovetskiy (admitted *pro hac vice*)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: 973.643.7000
Facsimile: 973.643.6500
Email:        ASherman@sillscummis.com
              BMankovetskiy@sillscummis.com

Co-Counsel to the Official Committee of Unsecured Creditors

**IN THE UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| In re | CASE NO. 23-10457 |
| MADERA COMMUNITY HOSPITAL, | Chapter 11 |
| Debtor in Possession. | DC No.: WJH-77 |
| Tax ID#:      23-7429117<br>Address:      1250 E. Almond Ave.<br>                    Madera, CA 93637 | Date:      February 13, 2024<br>Time:      9:30 a.m.<br>Place:      2500 Tulare Street<br>                  Fresno, CA 93721<br>                  Courtroom 13<br>Judge:      Honorable René Lastreto II |

Order Authorizing Debtor to Enter Into
Transaction, etc.

1

R:\Client\10538-002\PLEADINGS\WJH-77 Joint Motion
to Enter into Transaction [AAM]\EXHIBIT A.docx

EXHIBIT  A- PAGE 1 OF 4

**ORDER AUTHORIZING THE DEBTOR TO ENTER INTO A MASTER TRANSITION AGREEMENT AND A MANAGEMENT SERVICES AGREEMENT WITH AMERICAN ADVANCED MANAGEMENT, INC.**

At Fresno, in the Eastern District of California.

Upon the *Joint Motion of the Debtor and the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing the Debtor to Enter Into a Master Transition Agreement and Management Services Agreement With American Advanced Management, Inc.* [Docket No. _] (the "<u>Motion</u>")[1] filed by Madera Community Hospital (the "<u>Debtor</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), pursuant to sections 105(a), and 363(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"); and the Court having jurisdiction over this matter and having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having found that venue of this proceeding and the Motion in this district is proper; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and this Court having reviewed the Motion and having heard any statements in support of the relief requested therein at the hearing on the Motion (if any); and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing on the Motion (if any) establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      All objections to the Motion or to the relief sought therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled and denied on the merits with prejudice.

3.      The Debtor is authorized to enter into the MTA, attached to the Motion as <u>Exhibit B</u>.

4.      The Debtor is authorized to enter into the MSA, attached to the Motion as <u>Exhibit C</u>.

5.      The Debtor, the Committee and AAM are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the terms of the Motion, the MTA and the MSA.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      In the event of any inconsistency between the Motion, the MTA, the MSA or this Order, this Order shall govern.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Order Authorizing Debtor to Enter Into
Transaction, etc.                    3            R:\Client\10538-002\PLEADINGS\WJH-77 Joint Motion
                                                to Enter into Transaction [AAM]\EXHIBIT A.docx

EXHIBIT  A- PAGE 3 OF 4

1    8.    The Court retains exclusive jurisdiction with respect to all matters arising from or

2    related to the implementation, interpretation, and enforcement of this Order and to enter any orders

3    in aid of or in furtherance of this Order.

4    Presented by:

5

6    _____

7    Riley C. Walter
     Attorneys for Debtor and Debtor in Possession,
     Madera Community Hospital

8

9

10   _____

11   Paul Jasper
     Attorneys for Creditor's Committee

12

13

14

15

16

17

18

19

20

21

22

23

24   IT IS SO ORDERED.

25

26

27   Dated: _____, 2024

     _____
28                                              Honorable René Lastreto II
                                                United States Bankruptcy Judge

Order Authorizing Debtor to Enter Into    4    R:\Client\10538-002\PLEADINGS\WJH-77 Joint Motion
Transaction, etc.                              to Enter into Transaction [AAM]\EXHIBIT A.docx

# MASTER TRANSITION AGREEMENT

### by and between

## AMERICAN ADVANCED MANAGEMENT, INC.

### and

## MADERA COMMUNITY HOSPITAL

**Date_____**

6081088.1

THIS TRANSITION AGREEMENT (the "**Transition Agreement**") is entered into as of January __, 2024 (the "**Execution Date**"), by and between **MADERA COMMUNITY HOSPITAL** ("**Owner**" or "**Debtor**"), and **AMERICAN ADVANCED MANAGEMENT, INC.)** ("**AAM**" or "**Manager**"). Owner and Manager are sometimes referred to in this Transition Agreement as a "**Party**" or, collectively, as the "**Parties.**" Capitalized terms used herein shall have the meaning set forth in Appendix 1 to this Transition Agreement.

**RECITALS**

A.      **Owner.** Owner is the owner of an acute care general hospital located in Madera, California heretofore known as Madera Community Hospital (the "**Hospital**"). As of the Execution Date, Owner has suspended` the Hospital's general acute care hospital license with the California Department of Public Health ("**CDPH**") and the Hospital is non-operational. Owner has also filed a petition under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on March 10, 2023, Case No. 23-10457 (the "**Bankruptcy Case**") with the United States Bankruptcy Court for the Eastern District of California (the "**Bankruptcy Court**").

B.      **Manager.** Manager is a Delaware for profit corporation experienced in the reopening and revitalization of rural hospitals in California.

C.      **Purpose of this Transition Agreement.** Manager is dedicated under this Transition Agreement to the reopening of Hospital under the terms set forth below. It is Manager's intention to assist Hospital in its reopening and continued operations under a Management Services Agreement ("**MSA**"), in the form attached hereto as **Exhibit A**, until the Parties can transition the operations and ownership of the Hospital Assets (defined below) to Manager, by which Manager will continue the delivery of health care for the benefit of communities served by Owner. The parties recognize and agree that it will take the combined financial resources of Owner and Manager to accomplish the reopening of the Hospital. Expected costs fall into three categories: (i) existing burn rate and re-opening investment; (ii) operational subsidy and continued capital investment once open; and (iii) creditor repayment through an approved chapter 11 bankruptcy plan. Because there will be a significant initial and ongoing investment in the reopening and operation of the Hospital by Manager, and Manager is unlikely to receive any net income or management fees during its management of the Hospital, Manager will be allowed to purchase the assets of the Hospital for the amount of its investment into the creditor repayment, management and operation of the Hospital, as further described herein.

D.      **Management of the Hospital.** Under the MSA, Manager will act as Owner's agent for, among other things: (i) applying for a change of ownership (as noted below) with the CDPH; (ii) applying for funding under the California Distressed Hospital Loan Program pursuant to California Health and Safety Code Sections 129380 et seq.; and (iii) applying for the necessary approvals with the California Attorney General's Nonprofit Health Facilities division.

EXHIBIT B

Page 2 of 114

E.     **Manager's Option to Acquire Hospital**.  At its election, but no later than thirty-six (36) months after the Execution Date, Manager may elect (in its sole discretion) to submit an application ("**CHOW Application**") for change of ownership or transfer of membership interests to CDPH to effect a change in licensed operator of the Hospital from Owner to Manager. The date of CDPH's approval of the CHOW Application shall be the date on which ownership of the Hospital Assets shall be transferred from Owner to Manager.  The "**Hospital Assets**" shall include the Hospital's operations and any personal property assets generated after the Operation Assumption Date, but shall <u>not</u> include the Estate Personal Assets (as defined below).

F.     **Bankruptcy Court Approval**. The Parties recognize that as Owner is a debtor in possession in the Bankruptcy Case, the Parties' entry into this Transition Agreement and the MSA is subject to Bankruptcy Court approval.   The Parties also recognize that for a plan of reorganization or liquidation (a "**Chapter 11 Plan**") to be approved, the Debtor will need to satisfy the requirements for confirmation of the Chapter 11 Plan under Section 1129 of the Bankruptcy Code which may include reaching agreements with certain creditors regarding their claims.  The Parties have agreed to certain key elements of a "Conforming Plan" (as defined in paragraph 3(e) below).

G.     **Transition Period**.  From the Operation Assumption Date of this Transition Agreement until the Closing Date (the **"Transition Period"**), the Parties desire for Manager to provide Owner with certain management and administrative services in support of the Hospital's operations as identified in this Transition Agreement. Owner and Manager believe that Manager's provision of the services identified in this Transition Agreement will enhance Owner's ability to provide high quality, efficient health care services to the community served by the Hospital during the Transition Period.

F.     **Post-Closing Date**.  After the Closing Date, Manager will operate the Hospital pursuant to its own acute care health facility license issued by CDPH pursuant to the approved CHOW Application, and Owner will cease to operate the Hospital.

**Definitions.** Capitalized terms used herein shall have the meaning set forth in Appendix 1 to this Transition Agreement.

NOW THEREFORE, in consideration of the recitals above, and the mutual exchange of promises contained in this Transition Agreement, the Parties hereto agree as set forth below.

EXHIBIT B
Page 3 of 124

## <u>TRANSITION AGREEMENT</u>

## TRANSITION PLAN AND BANKRUPTCY COURT APPROVAL

1. **Transition of Facilities:** Immediately upon execution of this Transition Agreement, the Debtor shall seek approval of the MSA and this Transition Agreement in the Bankruptcy Court;

   a. **Assumption of Financial Responsibility**: Immediately upon occurrence of the Operation Assumption Date, AAM shall assume all financial responsibility for the Hospital's operations.

   b. **Payment of Expenses**: AAM shall provide funding to the Hospital sufficient for the Hospital to pay all of its expenses associated with the Hospital's operations arising after the Operation Assumption Date (the "**OAD Expenses**") *provided* that AAM's obligation to fund the OAD Expenses shall not apply to expenses accruing after termination of the MSA. Commencing on the Operation Assumption Date and ending on the Effective Date of the Plan, on or before the tenth (10th) Business Day of each calendar month, AAM shall deliver to the Committee a written report detailing (a) all OAD Expenses that remain due and unpaid as of the first day of such calendar month that are not subject to a bona fide dispute ("**Undisputed OAD Expenses**") and (b) all OAD Expenses that remain due and unpaid as of the first day of such calendar month due to a bona fide dispute ("**Disputed OAD Expenses**").

   c. **Retention of Revenue by AAM**: Any and all revenue (other than revenue that constitutes, or arises from, the Estate Personal Assets) that arise after the Operation Assumption Date and prior to termination of the MSA shall be the sole and exclusive property of AAM (the "**OAD Revenues**").

   d. **Retention of Property by Debtor**: All Quality Assurance Fees, FEMA funds, cash on hand as of the Operation Assumption Date, accounts receivable, causes of action, the Almond Farm, and all other assets identified in the Debtor's Schedule of Assets and Liabilities or accruing prior to the Operation Assumption Date (collectively, the "**Estate Personal Assets**") shall remain the property of the Debtor's estate, available to pay the claims of all of the Debtor's creditors and shall not be: (1) subject to the MSA; (2) transferred or otherwise hypothecated, encumbered (except as such encumbrance existed on the Petition Date) or otherwise affected by the MSA or the transaction contemplated herein; or (3) impaired, impacted or otherwise affected by AAM or any affiliate thereof.

EXHIBIT B
Page 4 of 114

e. **Distressed Hospital Loan Program Funds**: Notwithstanding the foregoing, any amounts loaned to the Hospital by the California Health Facility Financing Authority (CHFFA) in connection with the $2 million bridge loan award and eligibility for another $50 million loan announced by the Department of Health Care Access and Information ("**HCAI**") on August 24, 2023, or pursuant to any other funds loaned, granted, or otherwise awarded by HCAI to the Hospital (or its then owner) pursuant to AB112 (all such proceeds constituting, collectively, the "**DHLP Funds**") shall be applied solely to fund operation of the Hospital so long as it continues to operate.

f. **Allowance of General Unsecured Claim to AAM**: AAM shall be deemed to have an allowed general unsecured claim in an amount equal to the OAD Expenses that it funds out-of-pocket minus the OAD Revenues (the "**AAM GUC**"). Beginning on the date on which the Hospital receives DHLP Funds (the "**DHLP Funds Receipt Date**"), no further OAD Expenses shall be added to the calculation of the AAM GUC except to the extent that the total OAD Expenses incurred after the DHLP Funds Receipt Date exceeds the total amount of DHLP Funds received by the Hospital. The AAM GUC shall be subordinated in all respects to the claims of all general unsecured creditors of the Debtor ("**Estate GUC Claims**") and shall only be payable upon the payment in full (without interest) of all Estate GUC Claims (other than the AAM GUC), except as set forth below.

g. **Cooperation by Debtor**: The Debtor shall fully cooperate in connection with such transfer of operations and, to the extent requested by AAM and/or otherwise applicable, cooperate with AAM in pursuing licenses for the Hospital.

2. **Treatment of Claims**     The net proceeds from the Estate Personal Assets and the Real Property Asset (as defined below) shall be used to pay allowed claims pursuant to the priorities set forth in the Bankruptcy Code pursuant to a Chapter 11 Plan. To the extent that the Hospital resumes operations and is sold or otherwise transitioned to a third party as an operating hospital either through a sale motion, a plan of reorganization, a management agreement, or in any other manner, the AAM GUC shall be treated as an allowed administrative claim payable solely from such proceeds of the sale of the Hospital (but shall not be payable from the proceeds of any Estate Personal Assets unless all Estate GUC Claims have been paid in full, without interest).

EXHIBIT B
Page 5 of 124

3.   **Sale of Real**
     **Property Asset**
     **and Hospital**
     **Assets**

a.    **Liquidation Trust:** Unless it elects to terminate the MSA pursuant to Paragraph 6 below on or before the Commitment Deadline (defined below), AAM shall contribute up to $30 million in cash (the "**AAM Cash Contribution**") to fund a liquidation trust (the "Liquidation Trust") established pursuant to a Conforming Plan (as defined below) for the benefit of the Estate GUC Claims in exchange for the sale to GSR Madera, L.P., a California limited partnership ("**GSR**" or "**Buyer**") created to hold the assets to be purchased pursuant to such Conforming Plan, of (1) the real property on which the Hospital is located (the "**Real Property Asset**")(memorialized in an asset purchase agreement that is substantially similar to the form attached as Exhibit B hereto) and (2) at the election of Manager, the transition of the Hospital Assets to Buyer (memorialized in an asset purchase agreement that is substantially similar to the form attached as Exhibit C hereto).

b.    **Funding of AAM Cash Contribution:** The AAM Cash Contribution shall be funded as follows:

   i.    Upon the Bankruptcy Court's approval of the Debtor's entry into the MSA and such order becoming a Final Order, AAM shall immediately deposit into an interest-bearing escrow account (the "**Escrow Account**") an initial deposit toward the AAM Cash Contribution in the amount of $15 million (the "**Initial Contribution**"). The Escrow Account shall meet the criteria for a Conforming Escrow Account (defined below).

   ii.   Immediately after the occurrence of the Conforming Plan Effective Date, the Initial Contribution shall be released from the Escrow Account to be transferred to the liquidation trustee (the "**Liquidation Trustee**") appointed pursuant to the Conforming Plan and deposited into the Liquidation Trust.

   iii.  The balance of the AAM Cash Contribution shall be paid by AAM to the Liquidation Trust in up to three (3) installments of $5 million each (each a "**Supplemental Contribution**") until such time as AAM has contributed into escrow or directly to the Liquidation Trust a total amount of cash (including the Initial Contribution but excluding any amounts paid by AAM toward OAD Expenses) equal to the lesser of (i) $30 million or (ii) an amount sufficient to pay in full all allowed Estate GUC Claims (other than the subordinated AAM GUC). The Supplemental Contributions shall be paid by AAM

6081060.1

EXHIBIT B
Page __ll__ of __l2Y__

to the Liquidation Trust according to the following
schedule:

| Supplemental Contribution Schedule | Deadline for Payment to Liquidation Trustee |
|---|---|
| 1st $5 million Supplemental Contribution | Within seven (7) days after written notice from the Liquidation Trustee that at least $15 million has been distributed to holders of allowed Estate GUC Claims and/or applied to pay professional or other expenses of the Liquidation Trust. |
| 2nd $5 million Supplemental Contribution | Within seven (7) days after written notice from the Liquidation Trustee that at least $20 million has been distributed to holders of allowed Estate GUC Claims and/or applied to pay professional or other expenses of the Liquidation Trust. |
| 3rd $5 million Supplemental Contribution | Within seven (7) days after written notice from the Liquidation Trustee that at least $25 million has been distributed to holders of allowed Estate GUC Claims and/or applied to pay professional or other expenses of the Liquidation Trust. |

c.      **AAM Contribution Lien**. AAM's obligation to pay the
AAM Cash Contribution shall be secured by a lien (the "**AAM
Contribution Lien**") in favor of the Liquidation Trust against all of
the Hospital's assets (but shall be subordinated to any lien granted

EXHIBIT  B
Page  7  of  124

to HCAI in connection with the loan of DHLP Funds). Upon the Liquidation Trust's receipt of the full amount of the AAM Cash Contribution, the AAM Contribution Lien shall be deemed released and the Liquidation Trustee shall (at AAM's request) execute requisite documentation to evidence release of the AAM Contribution Lien.

d.     **Surplus Funds.**    To the extent that, after paying all administrative claimants and Estate GUC Claims in full, the Debtor's estate has remaining assets, all such remaining assets (including, but not limited to, the Estate Personal Assets) shall be the sole and exclusive property of AAM. Notwithstanding anything to the contrary contained in this Agreement, this paragraph d. shall not apply to any DHLP Funds.

e.     **Conforming Plan.**    Upon passage of the Commitment Deadline without the MSA being terminated, the Committee shall promptly file (or, if already filed, pursue confirmation of) a Chapter 11 Plan (and related disclosure statement) that constitutes a Conforming Plan. To qualify as a "**Conforming Plan**," the Chapter 11 Plan must:

    i.      Provide for the sale to GSR of the Real Property Asset effective upon (a) the effective date of a Conforming Plan and (b) release of the Initial Contribution from the Escrow Account and deposit of such funds into the Liquidation Trust;

    ii.      As additional consideration for AAM's purchase of the Real Property Asset, obligate AAM to contribute the remainder of the AAM Cash Contribution to the Liquidation Trust in accordance with paragraph 3.b above;

    iii.      Grant AAM the option, at its sole discretion, to submit a CHOW Application to CDPH to effect a change in licensed operator of the Hospital from Owner to Manager within thirty-six (36) months after the Execution Date ("**CHOW Election**");

    iv.      Subject to AAM exercising the CHOW Election, provide for transfer of the Hospital Assets to GSR effective immediately upon (a) CDPH's approval of such timely submitted CHOW Application, and (b) GSR's payment to Owner of $1.00;[1]

---

[1] For the avoidance of doubt, the $1.00 sale price is in addition to consideration provided by AAM to Owner under the MSA, payment of the Initial Contribution, and AAM's obligation to fund the remainder of the AAM Cash Contribution.

EXHIBIT B
Page 8 of 130

     v.     Provide for the following treatment of executory contracts and unexpired leases:

          aa.     On or before the Plan Confirmation Date, Buyer may designate in a written notice to the Debtor and the Committee one or more executory contracts or unexpired leases to be assumed by the Debtor upon the effective date (the "**Conforming Plan Effective Date**") of the Conforming Plan (any such designated executory contract or unexpired Lease, a "**Designated Contract**");

          bb.     Each Designated Contract shall be assumed by the Debtor, and assigned to Buyer, on the Conforming Plan Effective Date subject to the Buyer's payment, prior to the Conforming Plan Effective Date, to the counterparty to such Designated Contract the amount(s), if any, required to cure all defaults under such Designated Contract(s), as required under the Bankruptcy Code or determined by the Bankruptcy Court pursuant to a Final Order (the "**Cure Costs**");

          cc.     Any Designated Contract with respect to which Buyer has not paid the respective Cure Costs directly to its counterparty shall be deemed rejected on the Conforming Plan Effective Date;

          dd.     Buyer's payment of Cure Costs shall not be credited towards, or otherwise reduce or alter in any way, AAM's obligation to pay to the Liquidating Trustee the AAM Cash Contribution;

          ee.     Owner shall have no obligation to assume or assign any executory contract or unexpired lease that is not a Designated Contract; and

     vi.     Grant AAM the following rights so long as this Transition Agreement and MSA have not been terminated:

          aa.     The selection of the initial Liquidation Trustee (and any replacement) shall be subject to AAM 's consent, not to be unreasonably withheld;

6081060.1

EXHIBIT B
Page 9 of 124

|     |     |     |
| --- | --- | --- |
|     | bb. | AAM shall have the right to serve as one of three members of a committee (a "**Liquidation Trust Oversight Committee**") formed to oversee the Liquidation Trust and consult with the Liquidation Trustee in connection with the implementation of the Conforming Plan;[2] and |
|     | cc. | Settlement of (a) any disputed claim asserted against Owner's bankruptcy estate where the amount in dispute exceeds $100,000 and/or (b) any claim held by the Liquidation Trust that seeks recovery of more than $500,000 shall require either (a) AAM's consent (not to be unreasonably withheld) or (b) an order of the Bankruptcy Court authorizing such settlement. |
| 4. | **Additional Payments:** | Upon the Bankruptcy Court's approval of the Debtor's entry into the MSA and such order becoming a Final Order, AAM shall (i) assume the liability for the unused portion of the $2 million bridge loan and for any other amounts loaned to the Hospital by HCAI in connection with AB112; and (ii) immediately deposit $1 million (the "**One Million Deposit**") into the Escrow Account for the payment of all interest and related expenses associated with the allowed secured claim (the "**Saint Agnes Claim**") asserted by Saint Agnes Medical Center ("**Saint Agnes**") against Owner until (a) the MSA is terminated; (b) the Saint Agnes Claim has been paid in full; or (c) the Plan Confirmation Deadline (defined below). The consideration due from AAM pursuant to this paragraph 4 is in addition to the AAM Cash Contribution and shall not be credited against, nor in any way reduce, the AAM Contribution due in accordance with paragraph 3 above. Upon payment in full of the Saint Agnes Claim, any unused balance of the One Million Deposit shall be applied in the following priority: first, to fund the Initial Contribution, second, to fund each Supplemental Contribution sequentially, and, third, after all of AAM's obligations to fund the Initial Contribution and the Supplemental Contributions have been satisfied in full, to be repaid to AAM. |

---

[2] For the avoidance of doubt, the Liquidation Trust Oversight Committee's powers may be limited to supervision and consultation, without any consent or direction rights.

6081060.1

| | | |
|---|---|---|
| 5. | **Exclusivity:** | The Bankruptcy Court's approval of the MSA shall mean that, solely until such time as the MSA is terminated, the Debtor and the Committee shall not solicit proposals or offers from other hospital management companies or parties interested in the acquisition of the Hospital or the Real Property Asset and shall agree to be bound by the terms of the MSA, and any order of the Bankruptcy Court approving the MSA. In order to fulfill their fiduciary duties, the Debtor and the Committee may receive (but not solicit) proposals or offers for alternative transactions from other parties (the "**Alternative Buyers**") and negotiate, provide due diligence, discuss, and/or analyze such alternative transactions received without breaching this provision or terminating the MSA; provided however, that, so long as the MSA remains in effect, neither the Debtor nor the Committee (or any of their respective members, officers, directors, professionals, representatives or agents) shall directly or indirectly encourage, solicit or support any attempt by such Alternative Buyers to seek the termination of the MSA or the approval of an alternative transaction (an "**Alternative Transaction**") to that contemplated by this Transition Agreement or the MSA. In the event that an Alternative Transaction is presented to the Bankruptcy Court, at AAM's request, the Debtor and the Committee shall join AAM in opposing the approval of such Alternative Transaction. |
| 6. | **Termination of the MSA** | a.　**AAM Right to Terminate on or before Commitment Deadline**. AAM shall have the right to terminate the MSA and this Transition Agreement in its sole and absolute discretion on or before the earlier to occur of (a) five days after any notification in writing received by AAM or its counsel (including via e-mail or other electronic means) that HCAI is not willing to loan at least $50 million of DHLP Funds to the Hospital (including, but not limited to, its unwillingness to loan at least $50 million of DHLP Funds if AAM is the Hospital's operator) or (b) April 15, 2024 (the "**Commitment Deadline**"). If the Bankruptcy Court enters an order approving the MSA *after* February 15, 2024 (the "**MSA Approval Deadline**"), the Commitment Deadline shall be extended by an amount of days equal to the number of days that fall between the MSA Approval Deadline and the date on which such order is entered by the Bankruptcy Court (the "**MSA Approval Order Date**"). |
| | | b.　**AAM Right to Terminate if Plan Not Timely Confirmed**. If the Bankruptcy Court does not confirm a Conforming Plan within ninety (90) days after the Commitment Deadline (the "**Plan Confirmation Deadline**"), AAM shall have the option during the seven (7) days immediately following the Plan Confirmation Deadline, exercisable in its sole and absolute discretion, to terminate |

EXHIBIT B
Page 11 of 124

the MSA and this Transition Agreement by providing written notice of termination to counsel for the Debtor and the Committee. The Plan Confirmation Deadline may be extended by AAM or by order of the Bankruptcy Court.

c.     **Owner Right to Terminate**. Owner shall have the right to terminate the MSA and this Transition Agreement, in its sole and absolute discretion, by written notice to AAM, if (a) the Commitment Deadline has passed and (b) at the time such written notice of termination is delivered to AAM, HCAI has not confirmed in writing its commitment to loan at least $50 million of DHLP Funds to the Hospital.

d.     **Termination for Cause**. Either party may terminate the MSA and this Transition Agreement for Cause upon written notice to the other party specifying the basis for the termination. For purposes of this Transition Agreement, "**Cause**" shall mean any of the following:

i.     A material breach of any of the terms of this Transition Agreement by the other party that is not cured within seven (7) days after written notice of the breach; or

ii.     The other party's engaging in any illegal or fraudulent activity that materially affects the other party's ability to perform under this Transition Agreement.

e.     **No Waiver**. Neither Party's delay in exercising its right of termination hereunder shall constitute a waiver of such rights. No waiver of any kind shall be valid unless in writing and signed by the waiving Party.

f.     **Effect of Termination**. Upon termination of this Transition Agreement for any reason, any portion of the Initial Contribution or the One Million Deposit remaining in the Escrow Account shall be applied in the following order: *first*, to (i) pay any OAD Expenses incurred on or before, and that remain unpaid as of, the date this Transition Agreement terminates (the "**Termination Date Expenses**") or (ii) deposit with the Liquidation Trustee an amount sufficient to pay all Termination Date Expenses, and, *second*, to refund to AAM any funds remaining in the Escrow Account after all OAD Expenses have been paid in full. This subparagraph shall survive termination of this Transition Agreement.

6081060.1

EXHIBIT B
Page 18 of 124

7. **Uses and Replenishment of Escrowed Funds**

a. *Uses of Escrowed Funds.*

i. Until the earlier of (a) the Conforming Plan Effective Date, or (b) the first date on which (i) this Transition Agreement has terminated and (ii) all OAD Expenses incurred by the Hospital during the Transition Period have been paid in full, the Initial Contribution shall be held in the Escrow Account as security for AAM's obligations to (a) pay OAD Expenses and (b) pay the first $15 million of the AAM Cash Contribution.

ii. The One Million Deposit shall be held in the Escrow Account as security for AAM's obligations to (a) pay OAD Expenses, (b) pay all interest and related expenses associated with the Saint Agnes Claim, and (c) pay the first $15 million of the AAM Cash Contribution.

b. *Conforming Escrow Agreement.* In order to constitute a "**Conforming Escrow Account**," the Escrow Account must be subject to an escrow agreement between AAM, Owner, the Committee, and the escrow agent that provides as follows:

i. All funds held in the Conforming Escrow Account shall be held in trust for the benefit of the general unsecured creditors of Debtor's bankruptcy estate.

ii. *Release from Escrow.* Funds contained in the Escrow Account shall not be released from the Escrow Account to AAM, the Debtor, the Liquidation Trustee, or otherwise, except as follows:

aa. On or before the tenth Business Day of each calendar month (as to each calendar month, its "**Expense Payment Deadline**"), funds held in the Escrow Account shall be released to Owner in an amount sufficient to pay all Undisputed OAD Expenses that were due and unpaid as of the first day of the prior calendar month (and as to which Manager has not provided to the Committee (or, if appointed pursuant to a Conforming Plan, the Liquidation Trustee) proof of payment prior to the Expense Payment Deadline) and shall be immediately applied by Owner solely to pay such Undisputed OAD Expenses;

6081060.1

EXHIBIT B
Page 19 of 130

bb.    On or before the Expense Payment Deadline of each calendar month, a portion of the One Million Deposit shall be released to Owner in an amount sufficient to pay all interest and related expenses associated with the Saint Agnes Claim that accrued during the prior calendar month, and shall be immediately applied by Owner solely to pay such interest and related expenses;

cc.    Upon the occurrence of the Conforming Plan Effective Date, all funds remaining in the Escrow Account (which shall be no less than $15 million) shall be released to the Liquidation Trustee to fund the initial portion of the AAM Cash Contribution; and

dd.    Upon (i) order of the Bankruptcy Court confirming that this Transition Agreement has been validly terminated, or (ii) written confirmation by AAM, on the one hand, and either the Committee or the Liquidation Trustee, on the other hand, that this Transition Agreement has been validly terminated, any funds remaining in the Escrow Account shall be applied in the following order: *first*, to (i) pay any OAD Expenses incurred on or before, and that remain unpaid as of, the date this Transition Agreement terminates (the "**Termination Date Expenses**") or (ii) deposit with the Liquidation Trustee an amount sufficient to pay all Termination Date Expenses, and, *second*, to refund to AAM any funds remaining in the Escrow Account after all OAD Expenses have been paid in full.

c.    *Replenishment of Escrow.*

i.    On or before the fifteenth Business Day of each calendar month, AAM shall deposit into the Escrow Account an amount sufficient such that the Initial Contribution held in the Escrow Account is no less than $15 million.

ii.    On or before the Conforming Plan Effective Date, AAM shall deposit into the Escrow Account an amount sufficient such that, as of the occurrence of the Conforming Plan Effective Date, the Initial Contribution held in the Escrow Account is no less than $15 million.

EXHIBIT B
Page 14 of 124

| 8. | **Alternative Proposal:** | In the event that AAM determines to terminate this Transition Agreement in accordance with paragraph 6 above, AAM shall submit to Debtor (or if a Plan has been confirmed, the Liquidation Trustee) a binding $3 million stalking horse bid for the Real Property Asset if requested to do so by the Committee (or if a Plan has been confirmed, the Liquidation Trustee). This paragraph shall survive termination of this Transition Agreement. |
| 9. | **Closing:** | The MSA and Transition Agreement shall become binding upon entry of an order by the Bankruptcy Court approving the MSA and Transition Agreement and said order becoming a final and non-appealable order. |

*[Signature Page Follows]*

6081060.1

EXHIBIT B
Page 15 of 124

The Parties have executed this Transition Agreement as of the date first above written.

**OWNER**

By:_____

**MANAGER**

**By:**_____

6081060.1

EXHIBIT B
Page 16 of 124

### Appendix 1

**AAM GUC** has the meaning ascribed to it in paragraph 1(f) of this Transition Agreement.

**Almond Farm** means approximately 35 acres of farmland located on Avenue 12 in Madera, Madera County, California, assessor parcel number 047-014-008-000, and any proceeds of sale thereof.

**Business Day** means any day other than Saturday, Sunday or a day on which banking institutions are authorized or obligated by law, regulation or executive order to close in New Yor, New York.

**CHOW Application** has the meaning ascribed to it the Recitals to this Transition Agreement.

**CHOW Election** has the meaning ascribed to it in paragraph 3(e) of this Transition Agreement.

**Closing Date** means the date on which the Real Property Asset and Hospital Assets (other than the Estate Personal Assets) are transferred from Owner to Buyer.

**Commitment Deadline** means the earlier to occur of (a) five days after any notification in writing received by AAM or its counsel (including via e-mail or other electronic means) that HCAI is not willing to loan at least $50 million of DHLP Funds to the Hospital (including, but not limited to, its unwillingness to loan at least $50 million of DHLP Funds if AAM is the Hospital's operator) or (b) April 15, 2024.

**Committee** means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

**Conforming Escrow Account** has the meaning ascribed to it in paragraph 7(b) of this Transition Agreement.

**Conforming Plan** has the meaning ascribed to it in paragraph 3(e) of this Transition Agreement.

**Conforming Plan Effective Date** has the meaning ascribed to it in paragraph 3(e) of this Transition Agreement.

**Cure Costs** has the meaning ascribed to it in paragraph 3(e) of this Transition Agreement.

**Designated Contract** has the meaning ascribed to it in paragraph 3(e) of this Transition Agreement.

**Disputed OAD Expenses** has the meaning ascribed to it in paragraph 1(b) of this Transition Agreement.

EXHIBIT B
Page 17 of 124

**Estate GUC Claims** has the meaning ascribed to it in paragraph 1(f) of this Transition Agreement.

**Estate Personal Assets** means all of the Debtor's rights and interest in Quality Assurance Fees, FEMA funds, cash on hand as of the Operation Assumption Date, accounts receivable, causes of action, the Almond Farm, and all other assets identified in the Debtor's Schedule of Assets and Liabilities or accruing prior to the Operation Assumption Date.

**Execution Date** means the first date on which the Transition Agreement and MSA are both signed by all parties thereto.

**Final Order** means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or such an appeal has been rendered statutorily moot pursuant to Section 363(m) of the Bankruptcy Code or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, and a stay pending appeal has been entered, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; *provided that* the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

**Hospital Assets** means the Hospital's operational assets and any other personal property assets generated after the Operation Assumption Date, but does <u>not</u> include the Estate Personal Assets.

**MSA** has the meaning ascribed to it the Recitals to this Transition Agreement.

**MSA Approval Order Date** has the meaning ascribed to it in paragraph 6(a) of this Transition Agreement.

**MSA Approval Deadline** has the meaning ascribed to it in paragraph 6(a) of this Transition Agreement.

**OAD Expenses** has the meaning ascribed to it in paragraph 1(b) of this Transition Agreement.

**OAD Revenues** has the meaning ascribed to it in paragraph 1(c) of this Transition Agreement.

EXHIBIT B
Page 18 of 124

**Operation Assumption Date** means the first date on which both of the following conditions have occurred: (a) the Bankruptcy Court's order approving the Transition Agreement and MSA has become a Final Order, and (b) AAM has deposited both the Initial Contribution and the One Million Deposit into a Conforming Escrow Account.

**Petition Date** means the date on which the Bankruptcy Case commenced, or March 10, 2023.

**Real Property Asset** means the real property on which the Hospital is located.

**Transition Period** means the period beginning on the Operation Assumption Date and ending on the Closing Date.

**Undisputed OAD Expenses** has the meaning ascribed to it in paragraph 1(b) of this Transition Agreement.

EXHIBIT _B_
Page _19_ of _124_

# EXHIBIT A

## MANAGEMENT SERVICES AGREEMENT

EXHIBIT B
Page 12 of 124

**MANAGEMENT SERVICES AGREEMENT**

**by and between**

**AMERICAN ADVANCED MANAGEMENT, INC. ("Manager")**

**and**

**MADERA COMMUNITY HOSPITAL ("Owner")**

**Date_____**

6081088.1

# MANAGEMENT SERVICES AGREEMENT

This **Management Services Agreement** (the **"Agreement"**) is entered into as of _____, 2024 (the **"Execution Date"**), by and between **MADERA COMMUNITY HOSPITAL** (**"Owner"** or **"Debtor"**), and **AMERICAN ADVANCED MANAGEMENT, INC. ("Manager")**. Owner and Manager are sometimes referred to in this Agreement as a **"Party"** or, collectively, as the **"Parties."**

## RECITALS

A.     The Recitals in the Master Transition Agreement (the **"Transition Agreement"**) dated as of _____ by and between the Parties are incorporated herein by reference.

B.     **Capitalized Terms not otherwise defined herein shall have the meanings ascribed to them in the Transition Agreement.**

## ARTICLE 1

## DUTIES OF MANAGER

1.1.     **Management**. Subject to those duties which shall remain the responsibility of Owner as set forth in Article II, Manager shall provide day-to-day management and operations support for the Hospital and shall do so in a fiscally responsible manner seeking to provide high-quality services to the community. Manager shall provide its services in a manner that meets the day-to-day requirements of the business, and the operational and administrative needs of the Hospital. Manager shall have the exclusive authority to perform these functions, subject to Owner's ultimate authority and control over the professional, administrative and other operations of the Hospital as required under applicable conditions of participation (42 C.F.R. 482), California Health & Safety Code Section 1250 et seq., and regulations thereunder, and subject to the approvals, as necessary, of the Bankruptcy Court.

1.2.     **Executives and Specific Responsibilities**. Manager shall provide the Chief Executive Officer, Chief Financial Officer, Chief Nursing Officer, and general vice presidents for the Hospital.

1.3.     **Manager's Duties**. Manager shall assume and discharge all usual and customary responsibilities, duties and obligations in connection with operating and maintaining the Hospital as a public hospital in full compliance with all regulations and standards required of a general acute care hospital so licensed, including, without limitation, the following services:

       a.     Maintenance of the Hospital;

6081060.1

b.     Supervision of all patient care as required by law, regulations and community standards for a general acute care hospital;

c.     Coordination with the Hospital's medical staff;

d.     Management and supervision of all personnel and staff;

e.     Billing and collection services for services provided by the Hospital before and after the Operation Assumption Date (as defined in Section 6.1 herein);

f.     Processing and payment of all accounts payable of the Hospital in accordance with the provisions of this Agreement;

g.     Payroll processing, including processing of payroll taxes;

h.     Purchasing all supplies, consumable goods, and other items necessary for the operation of the Hospital, as provided herein;

i.     Bookkeeping and accounting for the operation of the Hospital; provided, however, that Owner shall arrange for accounting review by a qualified firm independent of Manager to validate financial statements prepared by Manager on behalf of Owner during the term of this Agreement;

j.     The timely filing of all reports required by the government and/or any other person or entity, provided that such filing shall be provided to Owner for review and possible revision at least twenty (20) days prior to its filing;

k.     Negotiate payment to creditors as part of the Chapter 11 bankruptcy proceedings, to the extent not inconsistent with the terms of any confirmed Chapter 11 Plan;

l.     Fund the current operational expenses;

m.     Assume management and responsibility for the accounts payable and accounts receivable including, but not limited to, collection of Estate Personal Assets (such as California Quality Assurance Fees (QAF) and FEMA funds) for the sole benefit of Owner's pre-petition creditors; provided, however, that distributions on account of prepetition claims shall be addressed as set forth in the Chapter 11 Plan; and

n.     Resume necessary capital improvements to hospital's physical plant necessary for its reopening and continued operations.

1.4.     **Supervision of Personnel**. Manager shall manage and supervise any and all Hospital employed or contracted personnel ("**Personnel**"), in compliance with all applicable

EXHIBIT B
Page 22 of 124

federal, state and local laws and ordinances, rules, regulations and orders, and ensure compliance with all staffing requirements and all related obligations under California licensure, accreditation and certification and payor participation standards.

**1.5.**    **Financial Management.**

a.    Owner shall maintain at least one of the bank accounts that it has at the time of the Operation Assumption Date ("**Old Bank Accounts**").

b.    From and after the Operation Assumption Date, Manager shall pay all expenses, invoices, accounts payable and other obligations of Owner necessary for the reopening and operational management of Hospital. Manager shall pay all expenses, invoices, accounts payable and other obligations of Owner from additional funds of Manager as may be reasonably required to fund operations of the Hospital during the Transition Period.

c.    Manager shall undertake, manage, and administer: (i) the timely payment of all Hospital expenses and accounts payable incurred on or after the Operation Assumption Date; (ii) the timely billing of fees for all services, goods and other items provided at the Hospital on or after the Operation Assumption Date; and (iii) the collection of accounts receivable pertaining to services and items provided after the Operation Assumption Date. Manager shall take such actions on behalf of Owner and under Owner's provider numbers, including, without limitation, Owner's provider numbers issued by Medicare, Medi-Cal or their fiscal intermediaries or paying agents (the "**Programs**").

d.    After the Operation Assumption Date, Manager shall maintain all accounting books and records that relate to the Hospital.

e.    Owner hereby appoints Manager as its agent for purposes of billing and collecting Owner's accounts receivable and Owner hereby agrees to execute any and all documents reasonably necessary to memorialize such appointments. Owner further appoints Manager to be its true and lawful attorney-in-fact during the term of this Agreement for purposes of (i) billing and collecting in the name of Owner, and (ii) receiving, taking possession of and endorsing in the name of Owner any notes, checks, money orders, insurance payments and other instruments received in payment of accounts receivable of Owner. Owner agrees to cooperate with Manager, and to execute such documents and take such other actions as may be reasonably necessary or desirable, in connection with the efficient day-to-day billing and collection of the fees and charges of Owner, including, without limitation, the addition of Manager and its designated agents as authorized signatories on the Old Bank Accounts, and granting Manager the right to make withdrawals from such Old Bank Accounts when and as required to pay expenses pertaining to operations on or after the Operation Assumption Date.

EXHiBiT B
Page 24 of 124

   f. In connection with its administration, management and payment of all Owner expenses and accounts payable pertaining to the time on or after the Operation Assumption Date, Manager shall have full and complete authority to draw, by check or other means, all available amounts in the Old Bank Accounts to cover the payment of such fees and expenses.

   g. Manager has the responsibility to maintain and report on all Distressed Hospital Loan Program ("**DHLP**") financial records and compliance programs that are required by the Department of Health Care Access and Information ("**HCAI**") and the California Health Facilities Financing Authority (**"CHFFA"**) .

  1.6. **Legal Compliance**. Manager shall supervise the provision of patient care at the Hospital in compliance with all applicable federal, state and local laws and ordinances, rules, regulations and orders. Manager shall use all commercially reasonable efforts to manage the Hospital (including, without limitation, its billing and collection activities) in a manner that (i) is intended to result in the delivery of quality medical care, and (ii) eliminates as reasonably practical, grounds for complaints, investigations or adverse action against the Hospital or Owner's license (or against Owner, by virtue of Owner holding such license) by any governmental authority or third party relating to patient care or the operation and maintenance of the Hospital during the term of this Agreement.

  1.7. **Patient Information**.

   a. **Compliance with HIPAA**.  Manager shall comply at all times, in all material respects, with the requirements of all applicable HIPAA Regulations (as defined in **Exhibit A** attached hereto) and the business associate agreement by and between the Parties attached hereto as **Exhibit A** (the "**BAA**") and incorporated herein by this reference.

   b. **Patient Records and Information**.  All patient records and information shall remain the property of Owner during the term of this Agreement. Manager shall properly and completely maintain all patient records of the Hospital during the term of this Agreement. Manager will adequately staff the medical records office. Manager shall have the right, to the extent permitted by applicable law, to analyze and obtain information from such records and report same to Owner. Nothing in this section constitutes the waiver of any attorney-client privilege or other privilege or confidentiality obligation and neither Party shall be required hereunder to give the other Party documents if, as a result, an existing attorney-client privilege or other privilege or confidentiality obligation would be waived. All records, files, proceedings and related information with respect to patients, and of Owner and of Owner's medical staff ("**Medical Staff**") and its committees pertaining to the evaluation and improvement of the quality of patient care at the Hospital, shall be kept strictly confidential by Manager and its personnel according to any applicable federal

EXHIBIT B
Page 25 of 124

and state laws and Owner policies. Manager shall take all steps necessary to assure that the confidentiality of medical records and health information of Hospital patients is preserved in accordance with HIPAA Regulations as defined in the BAA, and that all employees and agents of Manager shall use such information solely for the purposes necessary to perform Manager's obligations under this Agreement. Neither Manager nor its personnel shall voluntarily disclose such records or information, either orally or in writing, except as expressly required by law.

1.8.    **Utilities and Supplies**. Manager shall order all utilities, services, materials and supplies reasonably required in the proper day-to-day operations of the Hospital, as required by all laws, regulations, certifications and payer requirements. Manager, on behalf of Owner, shall also arrange and manage the acquisition of all pharmaceutical items for the Hospital, to the extent allowed by law. Manager timely shall timely pay for all such utilities, services, materials, supplies and pharmaceutical items following the Operation Assumption Date; provided that the cost and expense of utilities, services and supplies as reasonably required up to the Operation Assumption Date (including a reasonable and customary inventory in the case of supplies and pharmaceutical items) shall be provided at the cost and expense of the Owner.

1.9.    **Public Communications**. Owner and Manager may make public comments about its own actions. Notwithstanding this provision, Owner shall make all required public reports and filings as required in the Chapter 11 bankruptcy filing.

1.10.    **Owner Access; Manager Liaison with Owner**. Owner shall at all times during the term of this Agreement have full and unrestricted access to the Hospital, including all of its facilities, Personnel, accounts, books and records, contracts and otherwise, as the owner and operator of the Hospital and in furtherance of Owner's discharge of its duties thereby. Manager shall facilitate such access by the Owner's board of directors (the "**Board of Directors**") and its representatives. Manager also shall use its reasonable best efforts to ensure its attendance, through Manager's representatives, at all meetings of the Board of Directors during the term of this Agreement and provide reports or presentations to the Board of Directors with respect to Hospital operations upon Owner's reasonable prior request.

1.11.    **Information Systems**. Manager shall maintain and shall not change any application applicable to Owner's current information system or information technology, without board or Bankruptcy Court approval, during the term of this Agreement; provided, however, that following the confirmation of the Plan, Manager may initiate implementation of Manager's standard electronic medical record system for the Hospital at Manager's cost and expense.

**1.12.    Government Reporting Requirement.**

a.　　**Medicare Reporting Requirements.** Manager agrees that it will keep, and will make available upon written request to the Secretary of Health and Human Services, or upon request, to the Comptroller General or any of their duly authorized representatives the contract and books, documents and records necessary to comply with the provisions of Section 1861(v)(1)(I) of the Social Security Act, which are in the possession of Manager, until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, subject to applicable privileges and immunities. This Agreement (as stated in the first sentence of this Section) shall continue to be effective between the Parties notwithstanding the termination or rescission of all or part of the remainder of this Agreement.

b.　　**Related Organization Reporting.** Manager shall not carry out any of its duties under this Agreement through a subcontract without the advance written agreement of Owner.

1.13.　**Contracts**. Subject to those bankruptcy rules respecting the assumption or rejection of contracts, Manager shall not bind Owner to any contracts without the prior approval of Owner or the Bankruptcy Court's approval, except that Manager may obligate Owner to any new contract if that contract will be automatically assigned to Manager on the closing date of any asset purchase agreement for a sale of the Real Property Asset or the Hospital Assets to Manager ("**Asset Sale**"). Manager may terminate any contract on behalf of Owner, provided that such termination does not jeopardize the operations of the Hospital, and Manager is responsible for any liabilities arising out of such termination. Otherwise, Manager must obtain Owner's approval prior to any such termination.

1.14.　**Final Cost Reporting**. Manager shall provide to Owner all financial and administrative resources and support that are reasonably necessary to permit Owner to file a final cost report with all necessary governmental and nongovernmental payors, including but not limited to the CDPH and the Centers for Medicare & Medicaid Services ("**CMS**"), within forty-five (45) days following the closing date of an Asset Sale, in accordance with Section 1815(a) of the Social Security Act and the regulations thereunder. Notwithstanding the foregoing deadlines, the time for the Parties' respective performance concerning the delivery and filing of the final cost report will be reasonably extended in the event that an extension for filing is obtained in writing from CMS.

1.15.　**Management & Shared Service Fees**.

a.　　In exchange for services rendered under this Agreement, the Manager will accrue a management fee (the "**Management Fee**") to cover the shared services provided by Manager to the Hospital, including, but not limited to, shared staff and resources for services such as Revenue Cycle, Finance, IT, Human Resources, Marketing & Communication, and other shared leadership positions. At the beginning of each 12-

month period that Manager provides management services to the Hospital following the Operation Assumption Date, the Management Fee will be re-calculated as follows:

| Time Period | Management Fee Calculation |
|---|---|
| 0 to 12 months following the Operation Assumption Date | 8% of the Debtor's historical operating revenue averaged across calendar years 2021 and 2022. |
| 12 to 24 months following the Operation Assumption Date | 8% of the greater of (a) the Debtor's historical operating revenue averaged across calendar years 2021 and 2022 or (b) the Debtor's historical operating revenue averaged across the first 12 months following the Operation Assumption Date. |
| 24 to 36 months following the Operation Assumption Date | 8% of the greater of (a) the Debtor's historical operating revenue averaged across calendar years 2021 and 2022 or (b) the Debtor's historical operating revenue averaged across the second 12 months following the Operation Assumption Date. |
| Each subsequent 12-month period beginning 36 months after the Operation Assumption Date | 8% of the Debtor's historical operating revenue averaged across the prior 12 months. |

    b.      The Management Fee shall be paid solely from revenues of the Hospital arising on and after the Operation Assumption Date. Under no circumstances shall the Estate Personal Assets, the AAM Cash Contribution, or the Real Property Asset (or any proceeds from its sale) be applied to pay any portion of the Management Fee.

    c.      If the Manager terminates the MSA, Manager will forgive any Management Fee balance due as of the date of termination.

## ARTICLE 2
## DUTIES OF OWNER

    2.1.   **Owner's Board of Directors; Role and Responsibilities.** Without limiting (a) the responsibility of Owner and its Board of Trustees concerning establishment of the mission and vision of the Hospital and determination of appropriate strategic goals, objectives and relationships for the Hospital, or (b) the duties of Owner's Board of Trustees as prescribed under applicable conditions of participation (42 C.F.R. 482) and by the California Health & Safety Code Sections 1250 and 129380 , *et seq.*, the Board of Trustees of Owner, acting in its duly appointed role, shall appoint

EXHIBIT B
Page 28 of 124

Manager as Owner's representative in connection with the operations of the Hospital, the DHLP Funds, and all matters relating thereto.

2.2. **Board Control.** Until such time as the Chapter 11 Plan is confirmed in the Bankruptcy Case, Owner shall exercise ultimate control over the assets and operation of the Hospital, except that Manager (as provided in Section 1.1) shall act as Owner's agent for the management of the Hospital, and shall have the authority to supervise and manage its day-to-day operations in accordance with the policy directives, rules and regulations adopted by the Board and as otherwise expressly set forth herein. Notwithstanding the foregoing, Owner shall at all times during the term of this Agreement have full and unrestricted access to the Hospital, including all of its facilities, Personnel, accounts, books and records, contracts and otherwise, as the owner and operator of the Hospital.

2.3. **Medical Staff Appointments and Privileges.** Owner shall approve all Medical Staff appointments, as well as define, adjust, withhold, or withdraw any and all practice privileges in the Hospital. Such action will be based upon the recommendations of the Medical Staff within the provisions of the Bylaws of the Hospital. The Chief Executive Officer shall serve as the liaison between the Medical Staff and Owner's Board, and Manager shall have the responsibility to consult with Owner's Board and/or the Medical Staff in regard to matters pertaining to appointments, the definition of privileges, and Medical Staff function within the Hospital.

2.4. **Policies and Procedures.** Owner shall review, approve and adopt the policies and procedures recommended by Manager from time to time.

2.5. **Licensure.**

a. Provided that the Hospital's general acute care hospital license and other licenses, permits, certifications, etc. that were placed in suspension are reinstated, both Owner and Manager shall use commercially reasonable efforts to keep in full force and effect all licenses, certifications, permits, provider numbers and similar items necessary or appropriate to the continued operation of the Hospital, and both Parties shall use commercially reasonable efforts to not allow any of the same to become invalid, restricted, or otherwise adversely affected by the acts or omissions of any of their officers, employees, agents or representatives. Owner, with assistance from Manager, shall perform those obligations and responsibilities that must be performed by Owner for the Hospital to remain licensed, but the Parties recognize that the Hospital will be managed and operated by Manager, and that Manager therefore shall have the primary responsibility for taking all actions necessary to maintain all licenses, certifications and provider numbers. Manager shall notify Owner of any actions that must be affirmatively taken by Owner in order to maintain any of the above items during the term of this Agreement.

EXHIBIT B
Page 101 of 124

       b.       Owner shall not: (i) take any action or fail to take any action that could be reasonably anticipated to terminate or jeopardize the effectiveness of any licenses, certifications, approvals or provider numbers necessary for operation of the Hospital; or (ii) take any action or adopt any policy that would interfere with Manager's provision of the services described herein, except as allowed by this Agreement.

       c.       Owner shall: (i) notify Manager immediately if Owner receives any written notice or communication relating to the Hospital or operation thereof; and (ii) execute and return, in a timely manner, all contracts and agreements (including extensions and renewals thereof) reasonably necessary to continue in effect the Hospital's participation in and eligibility for the Programs.

    2.6.   **Consent by Owner**. Owner shall not unreasonably withhold consent from any action requested by Manager hereunder and shall not unreasonably interfere with Manager's activities hereunder. Owner shall not interfere with the day-to-day operations of the Hospital.

    2.7.   **Owner Actions**. During the term of this Agreement, Owner shall not, without the consent of Manager:

       a.   Subject to the Bankruptcy Court's jurisdiction over sales and dispositions under 11 U.S.C. § 363, authorize or approve the transfer, sale or other disposition of any of the Hospital's real or personal property other than in the ordinary and usual course of business as heretofore conducted, except for such items as are no longer useful, or obsolete, worn out or incapable of any further use, and as will be replaced in accordance with Owner's usual practice with other items of substantially the same value and utility as the items transferred, sold, exchanged or otherwise disposed of;

       b.   Authorize or approve the creation, participation in or agreement to the creation of any liens, encumbrances or hypothecations of any of the Hospital's real or personal property, except any liens for current taxes not yet due and payable and liens created in the ordinary and usual course of its business as heretofore conducted;

       c.   Authorize or approve the execution of any lease, contract or agreement of any kind or character with respect to the Hospital or its licensed operations, or incur any liabilities in connection therewith, save for those to which it is presently committed or that arise in the ordinary course of business as heretofore conducted, provided however it is understood and agreed the Owner may incur expenses relating to maintenance of insurance coverage for the Board of Trustees in the event the coverage referred to in Section 4.1 a. hereinafter is deemed inadequate in the sole discretion of the Board of Trustees, engaging legal representation and obtaining

EXHiBiT *B*
Page 20 of 64

financial and accounting advice, the payment of which shall be the responsibility of Manager as set forth in Section 1.5 b. hereof;

d. Authorize or approve the termination of any permits concerning the Hospital or its licensed operations;

e. Authorize or approve the waiver or release of any right or claim of Owner with respect to the Hospital or its licensed operations except in the ordinary course of business; or

f. Take any action that in any way alters Manager's rights to access Hospital assets as set forth in this Agreement.

## ARTICLE 3
## OWNER'S EMPLOYEES

3.1.    **Management of Employees**.  During the Transition Period, Manager shall have management authority over Owner's employees.  Owner shall cooperate with Manager in connection with all decisions regarding employment status and roles during the Transition Period.

3.2.    **WARN Notices**. During the Transition Period, at the direction of Manager, Owner shall take any and all action which may be necessary to comply with any federal or state WARN Act obligations as a result of the transactions contemplated between the Parties.  Manager shall be solely responsible for any and all claims resulting from violation of the WARN Act (defined below) arising during the Transition Period.

3.3.    **Notice to Manager of Pre-Operation Assumption Date Changes**. Owner shall promptly provide Manager written notice (each, an "**Update**") of:

a. any of the Owner's employees whose employment with Owner is terminated between the Execution Date and the Operation Assumption Date or who otherwise incurs an Employment Loss, indicating the nature and date of any such Employment Loss;

b. any person who is hired by Owner between the Execution Date and the Operation Assumption Date, and the reason for such hire. Manager shall maintain employee information and Updates in strict confidence, shall not disclose any such employee information or Updates to any third person or entity, and shall not use any such employee information or Updates for any purpose other than in connection with the transactions contemplated herein, unless legally compelled by a court of competent jurisdiction to do so.

6081060.1

3.4. **Continued Liability of Owner**. Any liability arising prior to the Operation Assumption Date that relates to, or resulting from: (a) Owner's actual or prospective employment or engagement, retention and/or termination of any current or former employee of Owner or any affiliate of Owner (including liabilities for compensation or benefits or liabilities with respect to a claim of an unfair labor practice, Union activities or under any employment Law or regulation), or (b) Owner's compliance or failure to comply with the notification requirements under the Worker Adjustment and Retraining Notification Act 29 U.S.C. Section 2100 *et seq.* or any similar state Law, including California Labor Code Section 1400 *et seq.* (collectively, the **"WARN Act"**) and any liability under the WARN Act related to Manager's not offering employment to or not hiring any of Owner's employees, shall remain that of Owner and Manager shall have no obligation with respect to any such liability. Owner will provide its employees and former employees with continuous coverage during the Transition Period in accordance with the terms of its employee welfare benefit plans, and Owner shall comply with the continuation coverage requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any similar state laws.

3.5. **Manager's Rights and Obligations**. The understandings set forth in this Article 3 are solely for the purpose of defining the obligations between Manager and Owner and shall not be construed as creating any employment contract or other agreement between either Manager or Owner, on the one hand, and any Owner employee, on the other hand. The terms and provisions of this Article 3 are intended solely for the benefit of Owner and Manager and their respective permitted successors or assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other person, including any Owner employee or former employee. All Owner employees shall remain terminable "at-will" by Manager, as the case may be, except to the extent otherwise required by law or by any preexisting employment or other agreement which has been specifically assumed by Manager under this Agreement. Nothing in this Agreement shall modify or amend Owner's employee benefit plan or other agreement, plan, program, or document unless this Agreement explicitly states that the provision "amends" such Owner employee benefit plan or other agreement, plan, program, or document.

## ARTICLE 4
## INSURANCE AND INDEMNITY

4.1. **Insurance**.

a. **Coverage Requirements**. During the term of this Agreement and any extensions or continuations, pursuant to Section 1(b) of the Master Transition Agreement, Manager shall provide funding to Owner sufficient to allow the Hospital to purchase or provide, keep and maintain, and require any agents or contractors providing services pursuant to this Agreement to do the same, insurance coverage for the Hospital as follows:

| Coverage Type | Owner | Manager |
|---|---|---|
| Hospital Professional Liability | Primary | Additional Insured |
| General Liability | Primary | Additional Insured |
| Directors and Officers Liability | Owner-employed **and Elected** | n/a |
| Property Insurance | Primary | Additional Insured |
| Automobile Liability | Owner-owned vehicles | n/a |
| Worker's Compensation Liability (including Employer's Liability) | Yes, covering Owner employees | n/a |
| Fiduciary and ERISA Liability | Yes, covering Owner Employees and Trustees | n/a |
| Privacy (Cyber Risk) Liability | Primary | Additional Insured |
| Pollution Liability | Primary | Additional Insured |
| Fidelity (Crime) | Yes, covering Owner employees | n/a |
| Peer Review (follows HPL coverage) | Primary | Additional Insured |
| Employment Practices Liability | Yes, covering Owner employees | n/a |

Such insurance shall be with carriers with a minimum Best rating (or equivalent) of A- VII, or through an acceptable program of self-insurance. Such insurance shall be in amounts and in a form necessary to protect against loss from claims arising out of the Hospital's operations and Manager's management of the Hospital. Reasonable changes in the amounts or types of coverage necessary to protect against loss will be made upon the mutual agreement of the Parties. Evidence of current coverage shall be provided by Owner to Manager within thirty (30) days of Execution Date. Unless notified in writing within thirty (30) days thereafter, the insurance coverages in place will be deemed reasonable as of the date of the Agreement. Changes can be requested by written notice of one Party to the other.

     b.    **Evidence of Coverage.**  Owner shall maintain evidence of each coverage required in this Agreement on or as mutually agreed to after the Operation Assumption Date and shall provide it upon request to Manager. Owner agrees that the following policies shall name Manager as Additional Insured during the term of this Agreement: Hospital

EXHIBIT B
Page 33 of 124

Professional Liability, General Liability, Property Insurance, Privacy (Cyber Risk) Liability and Pollution Liability as respects the management and operations support of the Hospital.

         c.    **Notice of Changes in Coverage; Tail Requirements**. Each of the Parties shall provide at least thirty (30) days' advance written notice to the other Party as to any material alteration or amendment of coverage including cancellation or other termination. If any policy is written on a "claims made" basis and is later converted to "occurrence" or canceled for any reason, "prior acts" or "tail" coverage shall be obtained in the amounts specified for an unlimited reporting period (except for D&O which tail coverage shall be as long as Owner deems appropriate).

      4.2.    **Owner's Indemnification**. Except as and to the extent relating to Manager's or any of its affiliates' gross negligence or willful misconduct, bad faith or fraud, Owner shall indemnify and hold harmless Manager, its affiliates, and its and their respective officers, directors, partners, managers, shareholders, members, principals, attorneys, agents, employees and other representatives (collectively, the **"Manager Indemnified Parties"**) from and against any and all Losses (as defined below) that any such Manager Indemnified Party incurs as a result of, arising out of, relating to or in connection with: (i) any breach or nonfulfillment of any covenants or other agreements made by Owner in this Agreement; (ii) Owner's non-compliance with any Law; or (iii) any gross negligence, fraud, willful misconduct or criminal acts of Owner or its current and past officers, directors, members, employees, agents and/or independent contractors.

      4.3.    **Manager's Indemnification**. Except as and to the extent relating to Owner's or any of its affiliates' gross negligence or willful misconduct, bad faith or fraud, including the gross negligence, willful misconduct, bad faith or fraud of Owner's employees or contractors, Manager shall indemnify and hold harmless Owner, its affiliates, and its and their respective officers, directors, partners, managers, shareholders, members, principals, attorneys, agents, employees and other representatives (collectively, the **"Owner Indemnified Parties"**) from and against any and all Losses that any such Owner Indemnified Party incurs as a result of, or arising from: (i) any breach or non-fulfillment of any of the covenants or other agreements made by Manager in this Agreement; and (ii) any gross negligence, fraud, willful misconduct or criminal acts of Manager or its officers, directors, employees, agents and independent contractors.

      4.4.    **Adjustments to Indemnification Liability**. The amount of any Losses shall be reduced or reimbursed, as the case may be, by any amount received by any Manager Indemnified Parties or any Owner Indemnified Parties, as applicable, with respect thereto under any insurance coverage provided by any third party or from any other party alleged to be responsible therefor, provided that such reduction or reimbursement shall be net of any (i) increase in premiums in any such insurance coverage or (ii) costs of collection. The Manager Indemnified Parties and the Owner Indemnified Parties, as applicable, shall use commercially reasonable efforts to collect any

EXHIBIT 13
Page 34 of 124

amounts available under such insurance coverage and from such other party alleged to have responsibility.

4.5. **Reimbursement by Indemnified Parties**. If a Manager Indemnified Party or Owner Indemnified Party, as applicable, receives an amount under insurance coverage or from such other party with respect to Losses at any time subsequent to any indemnification provided by Owner pursuant to Section 4.2 or by Manager pursuant to Section 4.3, then such Manager Indemnified Party or Owner Indemnified Party, as applicable, shall promptly reimburse Manager or Owner, as applicable, for any payment made or out-of-pocket expense incurred by such Person in connection with providing such indemnification up to such amount received (less any costs or expenses incurred in recovering such amounts) by the Manager Indemnified Party or Owner Indemnified Party, as applicable. Notwithstanding the foregoing, nothing in this Section 4.5 shall be construed to relieve any insurance carrier of its obligations under any insurance coverage maintained by Owner, Manager or any affiliate of Owner or Manager, which in all cases shall be primary to the indemnification obligations hereunder.

4.6. **Notice of Third-Party Claims and Control of Litigation**.

a. If a Governmental Authority or other third party asserts a claim or potential liability (a "**Third Party Claim**") against a Person entitled to indemnification under this Article 4 (the "**Indemnified Party**") that would give rise to a claim under this Article 4, the Indemnified Party promptly shall provide written notice of the Third Party Claim (a "**Claim Notice**") to the Person providing indemnity hereunder ("**Indemnifying Party**"); provided, however, that the failure to provide such notice as so indicated shall not affect the Indemnifying Party's obligation to indemnify the Indemnified Party unless such notice is not provided prior to the expiration of the Survival Period (as defined below in Section 4.7 for such Third Party Claim), and the Indemnifying Party shall have no remedy by reason of such failure except to the extent of any actual prejudice resulting from such delay. The Indemnifying Party, at its sole cost and expense, will be entitled to participate in the defense of any Third Party Claim and will have the right to defend the Indemnified Party against the Third Party Claim so long as (i) the Indemnifying Party gives written notice to the Indemnified Party within ten (10) business days after receipt of a Claim Notice that it will indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, or in connection with the Third Party Claim described in such Claim Notice, (ii) the Third Party Claim involves only claims for monetary damages and does not seek an injunction or other equitable relief against the Indemnified Party, (iii) the Indemnified Party has not been advised by counsel that a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (iv) the Third Party Claim does not relate to or otherwise arise in connection with any criminal or regulatory enforcement action, and (v) the Indemnifying Party conducts the defense of

the Third Party Claim actively and diligently. If the Indemnifying Party, within ten (10) business days after receipt of a Claim Notice, fails to defend such Third Party Claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such Third Party Claim on behalf of and for the account and risk of the Indemnifying Party and seek indemnification under therefore

      b.     If the Indemnifying Party assumes the defense of a Third Party Claim in accordance with Section 4.6(a), the Indemnified Party shall cooperate in all commercially reasonable respects with the Indemnifying Party in the investigation, trial and defense of any Proceeding relating to such Third Party Claim, including any appeal arising therefrom; provided, however, that the Indemnified Party may, at its own cost, participate in the investigation, trial and defense of such Proceeding or any appeal arising therefrom. The Parties shall cooperate with each other in any notifications to insurers. The Indemnified Party shall reasonably assist and cooperate, at the cost and expense of the Indemnifying Party, with the Indemnifying Party in the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any Person or entity in connection with the subject matter of any litigation subject to indemnification hereunder.

    4.7.   **Notice of Non-Third-Party Claims**. If an Indemnified Party seeks indemnification under this Article 4 with respect to any matter which does not involve a Third-Party Claim, the Indemnified Party shall give written notice to the Indemnifying Party promptly after discovering the liability, obligation or facts giving rise to such claim for indemnification, describing the nature of the claim in reasonable detail, the amount thereof (if known and quantifiable), and the basis thereof (the **"Indemnity Notice"**); provided that any failure to so notify or any delay in notifying the Indemnifying Party shall not relieve the Indemnifying Party of its or his obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure or delay. If the Indemnifying Party does not notify the Indemnified Party in writing within thirty (30) days from its receipt of the Indemnity Notice that the Indemnifying Party disputes such claim, the Indemnifying Party shall be deemed to have accepted and agreed to indemnify the Indemnified Party from and against the entirety of any Losses described in the Indemnity Notice, subject to the limitations on indemnification set forth in this Article 7. If the Indemnifying Party delivers a notice disputing the indemnification claim to the Indemnified Party within thirty (30) days from its receipt of the Indemnity Notice, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution to such dispute. If the Indemnifying Party and the Indemnified Party cannot resolve such dispute within forty-five (45) days after delivery of the indemnity dispute notice, such dispute shall be resolved in accordance with Article 7.

    4.8.   **Certain Definitions**.

EXHIBIT B
Page 36 of 124

a.    **"Losses"** means all losses, liabilities, claims, damages, penalties, fines, judgments, awards, settlements, costs, fees (including court costs and costs of appeal), disbursements and expenses (including reasonable costs of investigation and defense and reasonable attorneys' fees) or diminution in value incurred or suffered by an indemnified Party, whether or not involving a third-party claim, including reasonably foreseeable lost profits and other similar economic losses or damages.

b.    **"Governmental Authority"** means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any self-regulatory organization.

c.    **"Person"** means an individual, association, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

d.    **"Proceeding"** means any claim, action, arbitration, audit (including any Recovery Audit Contractor, Medicaid Integrity Contractor, Comprehensive Error Rate Testing, Zone Program Integrity Contractor or similar audits), hearing, investigation, litigation suit or other similar proceeding by or before a Governmental Authority.

4.9.    **Survival.** The provisions in Section 4.2 through Section 4.8 shall survive any expiration or termination of this Agreement until the later of (i) ninety (90) days after the expiration of the applicable statute of limitations, including any applicable tolling period or (ii) fully performed or observed in accordance with its terms (each such period, a **"Survival Period"**).

## ARTICLE 5

## RELATIONSHIP BETWEEN THE PARTIES

5.1.    **Independent Contractor.** Manager shall at all times be an independent contractor with respect to Owner in meeting Manager's responsibilities under this Agreement. Nothing in this Agreement is intended nor shall be construed to create a partnership, employer-employee or joint venture relationship between Manager and Owner or between Manager and any Owner Practitioner.

5.2.    **Limitation on Control.** Manager shall neither have nor exercise any control or direction over the professional medical judgment of any professional provider contracted with Owner, or the methods by any professional provider contracted with Owner performs professional medical services; provided, however, that Owner and any professional provider contracted with

EXHIBIT _B_
Page _37_ of _104_

Owner shall be subject to and shall at all times comply with the bylaws, guidelines, policies and rules of Manager. Neither Party shall have any right, power or authority to act for or enter into binding agreements on behalf of the other Party, except as specifically set forth in this Agreement

5.3. **Referrals**. No term of this Agreement shall be construed as requiring or inducing Owner or any person employed or retained by Owner to refer patients to Manager or any Manager-affiliated entity. Owner's rights under this Agreement shall not be dependent in any way on the referral of patients to Manager or its affiliated organizations by Owner or any person employed or retained by Owner.

## ARTICLE 6
## TERM AND TERMINATION

6.1. **Term**. This Agreement shall become effective on the first date on which all of the following have occurred: (a) the Bankruptcy Court has issued an order (an "**Approval Order**") authorizing the Debtor to enter into this Agreement and the Transition Agreement, (b) this Agreement has been executed by the Owner and Manager, and (c) the Approval Order has become a final, non-appealable order (the "**Operation Assumption Date**"). It is anticipated that Manager's management services will be for an initial period of one (1) year, and shall continue for a period of two (2) years, or such longer period as the parties may agree to, subject to the termination provisions of this Agreement. The Agreement will otherwise terminate on the effective date of Manager electing to and closing the purchase of the hospital assets under any Asset Sale.

6.2. **Termination by Manager**. Manager shall have the right to terminate this Agreement in its sole and absolute discretion on or before the earlier to occur of (a) five days after any notification in writing received by Manager or its counsel (including via e-mail or other electronic means) that HCAI is unable to loan at least $50 million of DHLP Funds to the Hospital (including, but not limited to, its inability to loan at least $50 million of DHLP Funds if Manager is the Hospital's operator) or (b) April 15, 2024 (the "**Commitment Deadline**").

6.3. **Termination by Manager Without Cause**. If during the term of this Agreement, Manager should terminate this Agreement without cause, then Manager will forfeit all monies it has expended for operations, capital, creditor payments, or other expenditures. Manager and Owner agree that in the event of such termination, there will be an accounting for all QAF and FEMA monies received. In the event that all such QAF and FEMA monies have not been used to fulfill Chapter 11 obligations during this Agreement, Manager will reimburse Owner for the shortfall, if any, of such funds invested.

6081060.1

EXHIBIT B
Page 34 of 124

6.4. **Termination by Either Party for Cause**.     Either party may terminate this Agreement for cause upon written notice to the other party specifying the basis for the termination. For purposes of this Agreement, **"Cause"** shall mean any of the following:

a.     A material breach of any of the terms of this Agreement by the other party that is not cured within 60 days after written notice of the breach; or

b.     The other party's engaging in any illegal or fraudulent activity that materially affects the other party's ability to perform under this Agreement; or

c.     The Transition Agreement has been terminated in accordance with its terms by any party thereto.

6.5. **Rights Upon Owner's Breach**.  If Owner breaches any material provision of this Agreement, then Manager may, at its option, upon thirty (30) days written notice to Owner, unless Owner has cured said default before said thirty (30) days have elapsed, or immediately in the case of danger to patient care, (i) terminate this Agreement, or (ii) maintain this Agreement in full force and effect, and in either case seek damages or other relief appropriate thereto.

6.6. **Rights Upon Termination.** Upon any termination or expiration of this Agreement, all rights and obligations of the Parties under this Agreement shall cease except those rights and obligations that have accrued or expressly survive such termination or expiration.

## ARTICLE 7
## DISPUTE RESOLUTION

7.1. **Dispute Resolution**. Except as otherwise provided in this Agreement, any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate (collectively, a **"Dispute"**) shall be settled in accordance with the following procedures. Notwithstanding anything that may be construed to the contrary herein, each of the Parties expressly acknowledges that (i) it has an affirmative duty to expedite the process and procedures described below to the extent reasonably practical in order to facilitate a prompt resolution of any Dispute and (ii) each Party has a mission of serving their communities, and all communications and proposed resolutions of the Dispute shall take these missions into consideration. Notwithstanding this provision, it is understood that certain disputes may be subject to the continuing jurisdiction of the Bankruptcy Court.

7.2. **Dispute Notice.** Notice by either Party of the existence of a Dispute shall (i) be delivered in writing, (ii) specify what provision of the Agreement such Party believes is under Dispute and (iii) recommend a course of action to resolve the Dispute (the **"Dispute Notice"**).

EXHIBIT ___B___
Page 24 of 124

7.3.    **Meet and Confer.** If, within fifteen (15) days after receipt by the applicable Party of a Dispute Notice, the Parties do not resolve such dispute, then the Dispute shall be referred to the designated senior executives with authority to resolve the Dispute from each Party for further negotiation (the "**Meet and Confer**"). The obligation to conduct a Meet and Confer pursuant to this section does not obligate any Party to agree to any compromise or resolution of the Dispute that such Party does not determine, in its sole and absolute discretion, to be a satisfactory resolution of the Dispute. The Meet and Confer shall be considered a settlement negotiation for the purpose of all applicable laws protecting statements, disclosures, or conduct in such context, and any offer in compromise or other statements or conduct made at or in connection with any Meet and Confer shall be protected under such laws, including California Evidence Code Section 1152.

7.4.    **Arbitration.** If any Dispute is not resolved to the mutual satisfaction of the Parties within thirty (30) days after delivery of the Dispute Notice (or such other period as may be mutually agreed upon by the Parties in writing), the Dispute shall be determined by arbitration in Stanislaus County. The arbitration shall be administered by Judicial Arbitration and Mediation Services, Inc. ("*JAMS*") pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction.

a.    Either Party may commence arbitration by giving written notice to the other Party demanding arbitration (the "**Arbitration Notice**"). The Arbitration Notice shall specify the Dispute, the particular claims and/or causes of action alleged by the Party demanding arbitration, and the factual and legal basis in support of such claims and/or causes of action.

b.    The parties shall cooperate in good faith to identify one person that is acceptable to both Parties to act as an arbitrator within fifteen (15) days after the commencement of arbitration. In the event the Parties are unable or fail to agree upon the arbitrator within the allotted time, the arbitrator shall be appointed by JAMS in accordance with its rules. All arbitrators shall serve as neutral, independent and impartial arbitrators, and they shall have the authority to grant any relief permitted by law, including equitable relief.

c.    The Parties shall be entitled to reasonable production of relevant, non-privileged documents, carried out expeditiously. If the Parties are unable to agree upon same, the arbitrator shall have the power, upon application of any Party, to make all appropriate orders for production of documents by any Party. Depositions shall be permitted only upon a showing of substantial need.

d.    The substantive internal law (and not the conflict of laws) of the State of California shall be applied by the arbitrator to the resolution of the Dispute.

EXHIBIT B
Page 46 of 124

e.      The following time limits are to apply to any arbitration arising out of or related to this Agreement: The evidentiary hearing on the merits ("**Hearing**") is to commence within six (6) months of the service of the arbitration demand. A brief, reasoned award is to be rendered within forty-five (45) days of the close of the Hearing or within forty- five (45) days of service of post-hearing briefs if the arbitrator directs the service of such briefs. The arbitrator must agree to the foregoing deadlines before accepting appointment. Failure to meet any of the foregoing deadlines will not render the award invalid, unenforceable or subject to being vacated.

f.      The Parties shall maintain the confidential nature of the arbitration proceeding and the award, including the Hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision.

g.      The award of the arbitrator shall be final and binding upon the Parties without appeal or review except as permitted by applicable law.

7.5.    **Provisional Measures**. Nothing in this Agreement shall prevent either Party from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

7.6.    **Attorneys' Fees and Costs**. The arbitrator(s) appointed in this Article 7 shall award to the prevailing Party, if any, the costs and attorneys' fees reasonably incurred by the prevailing Party in connection with the arbitration. In addition, the prevailing Party shall be entitled to its reasonable attorneys' fees and other costs for any other action, including court proceedings for provisional measures or for the enforcement of any arbitral award.

### ARTICLE 8
### GENERAL PROVISIONS

8.1.    **Amendment**. This Agreement may be modified or amended only by mutual written agreement of the Parties and, with respect to modification affecting the DHLP loan, with approval by HCAI. Any such modification or amendment must be in writing, dated, signed by the Parties and attached to this Agreement.

8.2.    **Assignment**. Except for assignment by Manager to an entity owned, controlled by, or under common control with Manager, neither Party may assign any interest or obligation under this Agreement without the other Party's prior written consent. Subject to the foregoing, this Agreement shall be binding on and shall inure to the benefit of the Parties and their respective successors and assigns.

EXHIBIT B
Page 41 of 124

8.3.  **Attorneys' Fees**. If either Party brings an action for any relief or collection against the other Party, declaratory or otherwise, arising out of the arrangement described in this Agreement, the losing Party shall pay to the prevailing Party a reasonable sum for attorneys' fees and costs actually incurred in bringing such action, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such judgment. For the purpose of this Section, attorneys' fees shall include fees incurred in connection with discovery, post judgment motions, contempt proceedings, garnishment and levy.

8.4.  **Authorized Persons**. Whenever any consent, approval or determination of a Party is required pursuant to this Agreement, the consent, approval or determination shall be rendered on behalf of the Party by the person or persons duly authorized to do so, which the other Party shall be justified in assuming means any officer of the Party rendering such consent, approval or determination, or the Party's board of directors.

8.5.  **Choice of Law and Venue**. This Agreement shall be construed in accordance with and governed by the laws of the State of California, except choice of law rules that would require the application of the laws of any other jurisdiction. Venue for any dispute under this Agreement shall be in the Bankruptcy Court.

8.6.  **Compliance With Laws**. The Parties shall comply with applicable laws, ordinances, codes and regulations of federal, state and local governments, including laws that require Owner and or any professional provider contracted with Owner to disclose any economic interest or relationship with Manager.

8.7.  **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

8.8.  **Entire Agreement**. This Agreement is the entire understanding and agreement of the Parties regarding its subject matter, and supersedes any prior oral or written agreements, representations, understandings or discussions between the Parties. No other understanding between the Parties shall be binding on them unless set forth in writing, signed and attached to this Agreement.

8.9.  **Schedules and Exhibits**. The attached schedules and exhibits, together with all documents incorporated by reference in the schedules and exhibits, form an integral part of this Agreement and are incorporated into this Agreement wherever reference is made to them to the same extent as if they were set out in full at the point at which such reference is made.

EXHIBIT B
Page 48 of 124

8.10. **Force Majeure**. Neither Party is liable for nonperformance or defective or late performance of any of its obligations under this Agreement to the extent and for such periods of time as such nonperformance, defective performance or late performance is due to reasons outside such Party's control, including acts of God, war (declared or undeclared), action of any governmental authority, riots, revolutions, fire, floods, explosions, sabotage, nuclear incidents, lightning, weather, earthquakes, storms, sinkholes, epidemics, strikes or similar nonperformance or defective performance or late performance of employees, suppliers or subcontractors.

8.11. **Further Assurances**. Each Party shall, at the reasonable request of the other Party, execute and deliver to the other party all further instruments, assignments, assurances and other documents, and take any actions as the other Party reasonably requests in connection with the carrying out of this Agreement.

8.12. **Headings**. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

8.13. **Notices**. All notices or communications required or permitted under this Agreement shall be given in writing and delivered personally or sent by United States registered or certified mail with postage prepaid and return receipt requested or by overnight delivery service (e.g., Federal Express, DHL). Notice is deemed given when sent if sent as specified in this paragraph, or otherwise deemed given when received. In each case, notice shall be delivered or sent to:

OWNER:

With a copy to:

MANAGER:

NAME

With a copy to:

8.14. **Severability**. If any provision of this Agreement is determined to be illegal or unenforceable, that provision shall be severed from this Agreement, and such severance shall have no effect upon the enforceability of the remainder of this Agreement unless the purpose of this Agreement is thereby destroyed.

8.15. **No Third-Party Beneficiary Rights**. The Parties do not intend to confer and this Agreement shall not be construed to confer any rights or benefits to any person, firm, Owner, corporation or entity other than the Parties.

6081060.1

8.16.   **Waiver**. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. Any waiver granted by a Party must be in writing to be effective, and shall apply solely to the specific instance expressly stated.

8.17.   **No Recourse to Estate Personal Assets, AAM Cash Contribution, or Real Property Asset**. Notwithstanding any provision in this Agreement to the contrary, Manager shall have no recourse to the Estate Personal Assets, the AAM Cash Contribution or the Real Property Asset (as those terms are defined in the Transition Agreement) in connection with any right of payment, right of indemnification, or claim that Manager may hold against Owner hereunder. Under no circumstances shall Manager have any right to recovery against the Estate Personal Assets, the AAM Cash Contribution, or the Real Property Asset. Rather, Manager's sole recourse shall be to revenues and other assets of the Hospital that arise after the Operation Assumption Date.

*[Signature Page Follows]*

EXHiBiT B
Page 44 of 124

The Parties have executed this Agreement as of the date first above written.

**OWNER**

By:_____

**MANAGER**

By:_____

EXHIBIT B
Page 45 of 124

## Exhibit A

### BUSINESS ASSOCIATE AGREEMENT

This BUSINESS ASSOCIATE AGREEMENT (this "**BAA**") is made by and between _____ ("**Provider**") and _____ ("**Vendor**"), and is effective as of _____ (the "**BAA Operation Assumption Date**").

## RECITALS

- Vendor provides certain services for or on behalf of Provider ("**Services**"), pursuant to an agreement or arrangement (the "**Underlying Agreement**"), and, in the performance of the Services, Vendor may create, receive, maintain or transmit Protected Health Information on behalf of Provider ("**Provider PHI**").

- Provider and Vendor intend to protect the privacy and provide for the security of the Provider PHI in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("**HIPAA**"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "**HITECH Act**"), and the implementation regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "**HIPAA Regulations**") and other applicable laws.

- The HIPAA Regulations require Provider to enter into an agreement containing specific requirements with its business associates prior to the disclosure of Protected Health Information.

In consideration of the mutual promises below and the exchange of information pursuant to this BAA, the parties agree as follows:

- **Definitions**.

  - **General Definitions.** Unless otherwise provided in this BAA, all capitalized terms that are used in this BAA will have the same meaning as defined under HIPAA, the HITECH Act, and the HIPAA Regulations.

  - "**Privacy Rule**" means the HIPAA Regulations that are codified at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

  - "**Security Rule**" means the HIPAA Regulations that are codified at 45 C.F.R. Part 160 and Part 164, Subparts A and C.

6081060.1

EXHIBIT B
Page 440 of 1241

- **Obligations of BA**.

  - **Permitted Uses**. Vendor may not use Provider PHI except for the purpose of performing the Services, or as otherwise explicitly permitted by this BAA or as Required By Law. Further, Vendor may not use Provider PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by Provider. However, Vendor may use Provider PHI: (i) for the proper management and administration of Vendor; (ii) to carry out the legal responsibilities of Vendor; and (iii) for Data Aggregation purposes for the Health Care Operations of Provider.

  - **Permitted Disclosures**. Vendor may not disclose Provider PHI except for the purpose of performing the Services, or as otherwise explicitly permitted by this BAA or as Required By Law. Vendor may not disclose Provider PHI in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by Provider. However, Vendor may disclose Provider PHI: (i) for the proper management and administration of Vendor; (ii) to carry out the legal responsibilities of Vendor; or (iii) for Data Aggregation purposes for the Health Care Operations of Provider. If Vendor discloses Provider PHI to a third party for Vendor's proper management and administration or to carry out Vendor's legal responsibilities, the disclosure must be Required By Law, or prior to making any such disclosure, Vendor must obtain (i) reasonable written assurances from such third party that such Provider PHI will be held confidentially and only used or further disclosed as Required By Law or for the purposes for which it was disclosed to such third party; and (ii) a written agreement from such third party to immediately notify Vendor of any breach of its confidentiality obligations of which it becomes aware.

  - **Appropriate Safeguards**. Vendor must comply with all applicable requirements of the Security Rule to the same extent the Security Rule applies to Provider. Vendor will implement appropriate administrative, physical and technical safeguards as are necessary to prevent the improper use or disclosure of Provider PHI other than as permitted by this BAA. Without limiting the foregoing, Vendor may not (i) transmit Provider PHI over a network that is not protected by Encryption technology, such as the Internet (e.g., a virtual private network must be used), or (ii) maintain Provider PHI on a laptop or other portable electronic media, unless such Provider PHI has been secured by the use of Encryption technology. Vendor will not (a) store any decryption key on the same device as encrypted Provider PHI, or (b) transmit any decryption key over an open network. Any Encryption technologies utilized in complying with this Section must at a minimum meet the Federal Information Processing Standard ("FIPS") 140-2 encryption standard and any of its successor security standards. Vendor represents and warrants that all of its Workforce members who may have access to Provider PHI have been appropriately trained on their obligations under the HIPAA Regulations.

EXHIBIT _B_
Page _44_ of _124_

- **Mitigation**. Vendor agrees to mitigate, to the maximum extent practicable, any harmful effect that is known to Vendor of a use or disclosure of Provider PHI in violation of this BAA.

- **Reporting of Improper Access, Use or Disclosure**. Vendor will notify Provider in writing of any access to, use or disclosure of Provider PHI not permitted by this BAA, including any Breach of Unsecured Provider PHI and Security Incident, without unreasonable delay (and in no case later than sixty (60) days after discovery of any Breach of Unsecured Provider PHI). Such notifications will include, to the extent known by Vendor at the time of the notification, the following:

  - A description of the impermissible access, use or disclosure of Provider PHI;

  - Identification of each Individual whose Unsecured Provider PHI has been or is reasonably believed by Vendor to have been impermissibly accessed, used or disclosed;

  - The date the incident occurred and the date the incident was discovered;

- A description of the type(s) and amount of Provider PHI involved in the incident;

- A description of the investigation process used by Vendor to determine the cause and extent of the incident;

- A description of the actions Vendor is taking to mitigate and protect against further impermissible uses or disclosures and losses; and

- A description of any steps individuals should take to protect themselves from potential harm resulting from the impermissible use or disclosure of Provider PHI.

  Notwithstanding the foregoing, Provider and Vendor acknowledge the ongoing existence and occurrence of attempted but unsuccessful Security Incidents that are trivial in nature, such as pings and port scans, and Provider acknowledges and agrees that no additional notification to Provider of such unsuccessful Security Incidents is necessary. However, to the extent that Vendor becomes aware of an unusually high number of such unsuccessful Security Incidents due to the repeated acts of a single party, Vendor shall notify Provider of these attempts and provide the name, if available, of said party.

6081060.1

- **Vendor's Agents and Subcontractors**. Vendor will ensure that any Subcontractors that create, receive, maintain or transmit Provider PHI on behalf of Vendor agree in writing to restrictions and conditions no less stringent than those that apply to Vendor under this BAA (with respect to such Provider PHI). Vendor will implement and maintain sanctions against Subcontractors that violate such restrictions and conditions and shall mitigate the effects of any such violation. Vendor will be legally responsible to Provider for the actions and conduct of its Subcontractors involving Provider PHI.

- **Access to Provider PHI**. Vendor will make Provider PHI it maintains in Designated Record Sets available to Provider for inspection and copying within ten business days of a request by Provider in a manner that enables Provider to fulfill its obligations under 45 C.F.R. § 164.524. If any Individual asks to inspect or access his or her Provider PHI directly from Vendor, Vendor will notify Provider in writing of the request within five business days of the request. Any approval or denial of an Individual's request to access or inspect his or her Provider PHI is the responsibility of Provider.

- **Amendment of Provider PHI**. Within ten business days of the receipt of a request from Provider for an amendment to Provider PHI that is maintained in a Designated Record Set by Vendor, Vendor will make the Provider PHI available to Provider for amendment in such a manner so as to enable Provider to fulfill its obligations under 45 C.F.R. § 164.526.

    If any Individual requests an amendment of Provider PHI directly from Vendor, Vendor will notify Provider in writing of the request within five business days of the request. Any approval or denial of an amendment of Provider PHI is the responsibility of Provider.

- **Accounting Rights**. Vendor will maintain a record of all disclosures of Provider PHI that Vendor makes, if Provider would be required to provide an accounting to an Individual of such Disclosures under 45 C.F.R. § 164.528. Within ten business days of notice by Provider of a request for an accounting of disclosures of Provider PHI, Vendor will make available to Provider all information related to disclosures by Vendor and its Subcontractors necessary for Provider to fulfill its obligations under 45 C.F.R. § 164.528. Vendor agrees to implement a process that allows for an accounting to be collected and maintained by Vendor for at least six years. At a minimum the information collected and maintained will include: (i) the date of disclosure; (ii) the name of the person who received the Provider PHI and, if known, the address of the person; (iii) a brief description of Provider PHI disclosed; and (iv) a brief statement of purpose of the disclosure that reasonably informs the Individual of the basis for the disclosure, or a copy of the Individual's authorization, or a copy of the written request for disclosure. In the event that the request for an accounting is delivered directly to Vendor, Vendor will, within five business days of a request, forward it to Provider in writing. It is Provider's responsibility

EXHIBIT B
Page 49 of 124

to prepare and deliver any such accounting requested, and Vendor will not provide an accounting directly to an Individual.

- **Delegations of Obligations**. To the extent that Vendor contracts with Provider to carry out Provider's obligations under the Privacy Rule, Vendor shall comply with the requirements of the Privacy Rule that apply to Provider in the performance of such obligations.

- **Access to Records**. Vendor will make its internal practices, books and records relating to the use and disclosure of Provider PHI available, upon request, to Provider and the Secretary for purposes of determining Provider's and Vendor's compliance with the Privacy Rule and this BAA.

- **Minimum Necessary**. Provider and Vendor will work together to ensure that only the minimum amount of Provider PHI necessary to accomplish the purpose of the Services will be disclosed by Provider to Vendor. The Parties understand and agree that the definition of "minimum necessary" is in flux, and they will keep themselves informed of guidance issued by the Secretary with respect to what constitutes "minimum necessary."

- **Data Ownership**. Unless otherwise explicitly addressed in the Underlying Agreement, Vendor acknowledges that Vendor has no ownership rights in the Provider PHI.

- **Term and Termination**.

  - **Term**. The Term of this BAA is concurrent with that of the Underlying Agreement.

  - **Material Breach of Provisions Applicable to Provider PHI**. Any other provision of the Underlying Agreement notwithstanding, the Underlying Agreement and this BAA may be terminated by a party (the "**Non-Breaching Party**") upon thirty (30) days written notice to the other party (the "**Breaching Party**") in the event that the Breaching Party materially breaches any provision in this BAA applicable to Provider PHI in any material respect and such breach is not cured within such thirty-day period.

  - **Judicial or Administrative Proceedings**. Provider may terminate this BAA and the Underlying Agreement, despite any contrary term in the Underlying Agreement, effective immediately, if (i) Vendor is named as a defendant in a criminal proceeding for a violation of HIPAA, the HITECH Act, the HIPAA Regulations or other security or privacy laws, or (ii) a finding or stipulation that Vendor has violated any standard or requirement of HIPAA, the HITECH Act, the HIPAA Regulations or other security or privacy laws is made in any administrative or civil proceeding in which Provider has been joined.

6081060.1

EXHIBIT _B_
Page _61_ of _124_

- **Effect of Termination**. Upon termination of this BAA for any reason, Vendor will return or destroy all Provider PHI that Vendor still maintains in any form, and will not retain any copies of such Provider PHI. Notwithstanding the foregoing, if Vendor determines that returning or destroying such Provider PHI is infeasible, then Vendor will provide to Provider notification of the conditions that make return or destruction of the Provider PHI infeasible. Vendor will continue to extend the protections of this BAA to such information and limit further use of such Provider PHI to those purposes that make the return or destruction of such Provider PHI infeasible. Vendor will be responsible for returning or destroying any Provider PHI in the possession of its Subcontractors consistent with the requirements of this Section related to return and destruction of Provider PHI.

- **Amendment to Comply with Law**. The parties acknowledge that state and federal laws relating to data security and privacy are rapidly evolving and that amendment of this BAA may be required to provide for procedures to ensure compliance with such developments. The parties specifically agree to take such action as is necessary to implement the standards and requirements of HIPAA, the HITECH Act, the Privacy Rule, the Security Rule and other applicable laws relating to the security or confidentiality of Provider PHI. Upon the request of either party, the other party agrees to promptly enter into negotiations concerning the terms of an amendment to this BAA embodying written assurances consistent with the standards and requirements of HIPAA, the HITECH Act, the Privacy Rule, the Security Rule or other applicable laws. Despite any contrary term in the Underlying Agreement, Provider may terminate the Underlying Agreement and this BAA upon thirty (30) days written notice in the event (i) Vendor does not promptly enter into negotiations to amend this BAA when requested by Provider pursuant to this Section, or (ii) Vendor does not enter into an amendment to this BAA providing assurances regarding the safeguarding of Provider PHI that is sufficient to satisfy the standards and requirements of applicable laws.

**Indemnification**. In addition to any other rights to indemnification, reimbursement or recovery, each party (the "Indemnifying Party") agrees to indemnify, defend and hold harmless the other party and its respective employees, officers and directors, ("Indemnified Parties") from and against any and all losses or costs the Indemnified Parties may suffer, pay or incur as a result of third party claims, demands or actions against the Indemnified Parties to the extent such losses are attributable to the actions of the Indemnifying Party or its Workforce or Subcontractors or the failure of the Indemnifying Party or its Workforce or Subcontractors to comply with this BAA or applicable laws, rules and regulations. However, in no event shall either party or its agents. offices, or employees, be liable for any special damages, incidental damages. indirect damages, or consequential damages whatsoever (including without limitation. damages for loss of profits, business interruption. and loss of information).

EXHIBIT B
Page 51 of 124

- **No Third-Party Beneficiaries .** Nothing express or implied in this BAA is intended to confer, nor shall anything herein confer, upon any person other than Provider, Vendor and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

- **Interpretation.** The provisions of this BAA prevail over any provisions in the Underlying Agreement that may conflict or appear inconsistent with any provision in this BAA, provided that any terms in the Underlying Agreement that may provide greater protections to the privacy and security of Provider PHI than are set forth in this BAA govern. This BAA and the Underlying Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA. the HITECH Act, the Privacy Rule and the Security Rule.  The parties agree that any ambiguity in this BAA will be resolved in favor of a meaning that complies and is consistent with HIPAA, the HIT ECH Act, the Privacy Rule and the Security Rule.

- **Survival.** The rights and obligation under Sections 2.i., 3.d., and 5 expressly survive termination of this BAA.

      IN WITNESS WHEREOF, the parties here to have duly executed this BAA as of the BAA Effective

Date.

PROVIDER                                        VENDOR

EXHIBIT B
Page 58 of 124

**EXHIBIT B**

**FORM OF ASSET PURCHASE AGREEMENT (REAL PROPERTY ASSET)**

EXHIBIT B
Page 59 of 124

**ASSET PURCHASE AGREEMENT (REAL PROPERTY ASSET)**

by and among

MADERA COMMUNITY HOSPITAL, AS SELLER

and

GSR MADERA, L.P., AS BUYER

dated as of _____, 2024

10283285 v4

| EXHIBIT LIST | SECTION REFERENCE |
|---|---|
| **Exhibit A** – Location | Recitals |
| **Exhibit B** – Form of Bill of Sale | 3.02(a)(ii) |
| **Exhibit C** – Form of Deed | 3.02(a)(i) |
| **Exhibit D** – Other Excluded Assets | 2.02(d) |

i



EXHIBIT B
Page 55 of 124

### DISCLOSURE SCHEDULE SECTIONS

| | |
|---|---|
| 4.00 | Carveouts from Seller Representations and Warranties |
| 4.05 | Permitted Encumbrances |
| 4.06 | Real Property Asset (Legal Descriptions) |
| 4.07 | Insurance policies, binders and claims |
| 4.08(a) | Permits and Regulatory Approvals |
| 4.08(b) | Seller Legal Proceedings and Actions |

32316603.2
10283285 v4

EXHIBIT B
Page 62 of 114



## ASSET PURCHASE AGREEMENT (REAL PROPERTY ASSET)

THIS ASSET PURCHASE AGREEMENT (REAL PROPERTY ASSET) ("*Agreement*"), dated as of _____ (the "*Execution Date*"), 2024, is entered into by and between [insert Liquidation Trustee] in [his/her/its] capacities as liquidation trustee of the [insert name of Liquidation Trust] and representative of the bankruptcy estate of debtor Madera Community Hospital ("*Madera*," the "*Debtor*," or the "*Seller*") and GSR Madera L.P. ("*GSR*" or the "*Buyer*") or its designees.

### Recitals

**WHEREAS**, Seller is engaged in the business of operating an acute-care, full-service hospital and related facilities in Madera County, California (collectively, the "*Hospital*") located at 1250 E. Almond Avenue, Madera, California 93637 (the "*Location*"); and

**WHEREAS**, on March 10, 2023 (the "*Petition Date*"), Seller filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, currently pending in the United States Bankruptcy Court for the Eastern District of California as case number 23-10457 (the "*Bankruptcy Case*"). In the Bankruptcy Case, Seller is managing its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

**WHEREAS**, on _____, 20[ ], the Bankruptcy Court approved the Debtor's entry into that certain Master Transition Agreement ("*MTA*") by and between American Advanced Management, Inc. ("*AAM*") and the Debtor, dated [_____] (the "*MTA Execution Date*") and effective _____, AAM and the Debtor entered into the MTA and that certain Management Services Agreement ("*MSA*"), pursuant to which AAM has assumed day to day operational responsibilities for, and authority over, the Hospital during the term of the MSA; and

**WHEREAS**, on November 17, 2023, the Official Committee of Unsecured Creditors (the "*Committee*") appointed in the Bankruptcy Case filed the Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors (the "*Plan*"); and

**WHEREAS**, the Plan provides for the establishment of a liquidation trust (the "*Trust*"), and appointment of a liquidation trustee (the "*Liquidation Trustee*") to be the representative of the Debtor and its estate, and to exercise the rights, power and authority of the Debtor under applicable provisions of the Plan; and

**WHEREAS**, the Plan was modified on [_____] to authorize the Liquidation Trustee to sell to Buyer, pursuant to section 1123 of the Bankruptcy Code: (a) the Real Property Asset (as defined below) and (b) at AAM's election, exercisable no later than thirty-six (36) months after the MTA Execution Date, the Hospital Assets (as defined in the MTA) on the terms memorialized herein; and

**WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court (the "*Confirmation Order*"), entered on [_____] the "*Plan Confirmation Date*") which became a Final Order on [_____]; and

32316603.2

EXHiBiT B
Page 57 of 124

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Real Property Asset (as hereinafter defined).

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, the consideration provided pursuant to the MTA, and other good and valuable considerations, the receipt and adequacy of which are conclusively acknowledged, in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

The following terms have the meanings specified or referred to in this **Article I**:

"*AAM Cash Contribution*" has the meaning ascribed to it in the MTA.

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

"*Agreement*" has the meaning set forth in the preamble.

"*Almond Farm*" means approximately 35 acres of farmland located on Avenue 12 in Madera, Madera County, California, assessor parcel number 047-014-008-000, and any proceeds of sale thereof.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including actions or remedies arising under sections 502, 510, or 542-553 of the Bankruptcy Code, and the proceeds thereof.

"*Bankruptcy Case*" has the meaning specified in the Recitals.

"*Bankruptcy Code*" means specifically 11 U.S.C. § 101 *et seq.*

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of California.

"*Bankruptcy Rules*" means the Bankruptcy Rules of Civil Procedure and any other rules that are applicable to the Bankruptcy Court.

"*Bills of Sale*" has the meaning set forth in **Section 3.02(a)(i)** and substantially in the form set forth in **Exhibit B** hereto.

"*Business Day*" means any day except Saturday, Sunday, or any other day on which commercial banks, located in San Francisco, California, are authorized or required by Law to be closed for business.

10283285 v4

EXHIBIT B
Page 58 of 114

"*Buyer*" has the meaning set forth in the preamble.

"*Buyer Closing Certificate*" has the meaning set forth in **Section 7.03(g)**.

"*Casualty Loss*" has the meaning set forth in **Section 6.05(b)**.

"*Casualty Notice*" has the meaning set forth in **Section 6.05(b)**.

"*Causes of Action*" means any action, claim, cause of action, cross-claim, third-party claim, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever belonging to the Debtor or its Estate, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertible directly or derivatively (including under alter ego theories), in contract or in tort, in law or in equity or pursuant to any other theory of law, and the proceeds thereof. For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 and any and all Avoidance Actions; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state, federal or foreign law; (f) all Tort Claims and D&O Claims; (g) any and all claims under any D&O Liability Insurance Policies; and (h) all Retained Causes of Action, including those enumerated in Article V.R of this Plan. The definition of "Causes of Action" shall be construed in accordance with its broadest possible meaning, and any doubts or ambiguities shall be resolved in favor of inclusiveness.

"*Claims*" means, with respect to the period prior to the Closing Date, any right to payment from Seller, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Seller, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"*Closing*" has the meaning set forth in **Section 3.01**.

"*Closing Certificate*" has the meaning set forth in **Section 7.02(e)**.

"*Closing Date*" has the meaning set forth in **Section 3.01**.

"*Closing Statement*" has the meaning set forth in **Section 3.02(a)(iii)**.

"*Condition Satisfaction Date*" has the meaning set forth in **Section 8.01(b)(ii)**.

"*Confirmation Order*" means an order confirming Seller's chapter 11 plan pursuant to 11 U.S.C. § 1129.

EXHiBiT B
Page 54 of 124

"*Conforming Plan*" has the meaning ascribed to such term in the MTA.

"*Contracts*" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments, and legally binding arrangements, whether written or oral.

"*Deeds*" has the meaning set forth in **Section 3.02(a)(iii)**.

"*Disclosure Schedules*" means the Disclosure Schedules delivered by Seller and Buyer in accordance with this Agreement.

"*Dollars or $*" means the lawful currency of the United States.

"*Due Diligence Materials*" has the meaning set forth in **Section 5.06**.

"*Effective Time*" has the meaning set forth in **Section 3.01**.

"*Encumbrance*" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of sellership.

"*Environmental Claim*" means any Action, governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law.

"*Environmental Law*" means any applicable Law: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

10283285 v4

EXHIBIT __B__
Page __62__ of __124__

"*Environmental Permit*" has the meaning set forth in **Section 4.11(b)**.

"*Escrow Agent*" means any party designated by the Parties to function as an escrow agent for purposes of documentation and/or holding and distributing funds at Closing in connection with this Agreement and the MTA.

"*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Case.

"*Estate Personal Assets*" means, collectively, all of the Debtor's rights and interest in Quality Assurance Fees, Federal Emergency Management Agency funds, cash on hand as of the Operation Assumption Date, accounts receivable, Causes of Action, the Almond Farm, and all other assets identified in the Debtor's Schedule of Assets and Liabilities or accruing prior to the Operation Assumption Date.

"*Execution Date*" has the meaning set forth in the preamble.

"*Excluded Assets*" has the meaning set forth in **Section 2.02**.

"*Excluded Liabilities*" has the meaning set forth in **Section 2.04**.

"*Final Order*" means an Order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or such an appeal has been rendered statutorily moot pursuant to Section 363(m) of the Bankruptcy Code or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, and a stay pending appeal has been entered, the Order or judgment has been affirmed by the highest court to which such Order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such Order or judgment shall not prevent such Order or judgment from being considered a Final Order.

"*Financial Statements*" has the meaning set forth in **Section 4.04**.

"*Hospital*" has the meaning set forth in the Recitals.

"*Hospital Assets*" has the meaning ascribed to such term in the MTA.

"*Insurance Policies*" has the meaning set forth in **Section 4.07**.

"*Law*" means any statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any governmental authority.

EXHIBIT B
Page 61 of 124

"*Liabilities*" means liabilities, obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute, or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"*Lien*" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option, or other encumbrance.

"*Location*" has the meaning set forth in the Recitals.

"*Loss*" or "*Losses*" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a governmental authority or other third party.

"*Material Adverse Effect*" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Hospital taken as a whole, (b) the value of the Real Property Asset, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however,* "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Hospital operates; (iii) failure of Seller to meet financial projections; (iv) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, natural disasters, pandemics or the escalation or worsening thereof; (vi) any actions required pursuant to this Agreement; (vii) any changes in applicable Laws or accounting rules; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; or (viii) the filing of the Bankruptcy Case.

"*MTA*" shall have the meaning set forth in the Recitals.

"*Operation Assumption Date*" means the date on which the Bankruptcy Court's order approving the MTA and becomes a final, non-appealable order.

"*Order*" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made, or rendered by any government entity or the Bankruptcy Court affecting such Person or any of its properties.

"*Permits and Regulatory Approvals*" means all permits, licenses, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from governmental authorities, all as identified in **Schedule 4.08(a)**.

"*Permitted Encumbrances*" has the meaning set forth in **Section 4.05**.

EXHIBIT B
Page 67 of 44

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Plan*" has the meaning set forth in the Recitals.

"*Proration Time*" means 12:01 a.m. on the Closing Date.

"*Purchase Price*" has the meaning set forth in **Section 2.03**.

"*Purchase Price Allocation*" has the meaning set forth in **Section 2.09**.

"*Real Property Asset*" has the meaning set forth in **Section 4.06.**

"*Representative*" means, with respect to any Person, all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"*Response Deadline*" has the meaning set forth in **Section 6.14(b)**.

"*Sale*" means the sale of the Real Property Asset in accordance with the Plan and Confirmation Order. "**Seller**" and "**Seller**" have the meanings set forth in the preamble.

"*Survey*" has the meaning set forth in **Section 6.14**.

"*Taxes*" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"*Title Insurance Commitments*" has the meaning set forth in **Section 6.14(a)**.

"*Title Objection*" has the meaning set forth in **Section 6.14(b)**.

"*Tort Claims*" means any and all claims or Causes of Action of the Debtor or its Estate against any of the Debtor's current or former professionals, directors, officers, trustees, managers and similar parties, including but not limited to any D&O Claims.

"*Transaction Documents*" means this Agreement, the Bills of Sale, Deeds, and the other agreements, instruments and documents required to be delivered at the Closing.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01   Purchase of Real Property Asset.**  Subject to the terms and conditions set forth herein and in the Confirmation Order, at the Closing, Seller shall sell, assign, transfer, convey

EXHIBIT *B*
Page *103* of *124*

and deliver to Buyer or its designees, and Buyer shall purchase from Seller, free and clear of any Liens, Claims, and Encumbrances other than Permitted Encumbrances, all of Seller' right, title and interest in, to and under the Real Property Asset (as defined in Section 4.06).

**Section 2.02     Excluded Assets.** Notwithstanding any other provision of this Agreement, Seller shall retain all assets other than the Real Property Asset (collectively, the "**Excluded Assets**") which shall not be transferred to Buyer.  The Excluded Assets include, without limitation, the following:

(a)     **Hospital Assets**.  All personal property assets of the Hospital used in the operation of the business.

(b)     **Seller Business Records**. All business records of Seller that do not relate to the Real Property Asset or that do not pertain primarily to the Seller;

(c)     **All Estate Personal Assets**; and

(d)     **Other Excluded Assets**. All other assets of Seller that are specified in Exhibit D hereto.

**Section 2.03   Purchase Price.** In exchange for the sale, transfer, assignment, conveyance and delivery of the Real Property Asset by Seller to Buyer, Buyer shall, upon the terms and subject to the conditions set forth herein, pay $1.00 (the "*Purchase Price*").

**Section 2.04   Payment of Purchase Price.**  Buyer shall remit the Purchase Price to Seller at the Closing.

**Section 2.05   Reserved.**

**Section 2.06   Reserved.**

**Section 2.07   Reserved.**

**Section 2.08   Reserved.**

**Section 2.09   Reserved.**

**Section 2.10   Prorations.** The following items shall be prorated as of the Proration Time and paid or credited at Closing, as shall be set forth on the Closing Statement:

(a)     All state, county, city, school, ad valorem, and other local real property taxes and assessments relating to or assessed against the Real Property Asset shall be prorated as of the Proration Time.

(b)     To the extent all utilities and other periodic charges cannot be changed to Buyer's designee's account by the Closing Date, the same shall be prorated as of the Proration Time.

10283285 v4

EXHIBIT _B_
Page _64_ of _124_

## ARTICLE III
## CLOSING

**Section 3.01    Closing.**   Subject to the terms and conditions of this Agreement and the Confirmation Order, the consummation of the transactions contemplated by this Agreement (the "*Closing*") shall be conducted remotely, via the exchange of emails, the pre-depositing of original executed documents with Escrow Agent for recording purposes, and the requisite wiring of funds as appropriately directed by the respective interested parties, no later than the close of business on the first (1st) day of a calendar month that occurs after five (5) business days following the date on which conditions to Closing set forth in **Article VII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing occurs is herein referred to as the "*Closing Date.*" The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date (the "*Effective Time*").

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer or its designees the following:

(i)    with respect to each parcel of the Real Property Asset, a quitclaim deed in the form set forth in **Exhibit C** ( "*Deeds*") to Buyer or its designees duly executed and acknowledged by such Seller transferring the Real Property Asset to Buyer; and

(ii)    a Bill of Sale in the form set forth in **Exhibit B**; and

(iii)    a closing statement setting forth all prorations and adjustments (the "*Closing Statement*") duly executed by Seller; and

(iv)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer and the Escrow Agent, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer and/or its designees shall deliver to Seller the following:

(i)    the Buyer Closing Certificate;

(ii)    the certificates of the Secretary or authorized representative of Buyer required by **Sections 7.03(g), (h), and (i)**;

(iii)    the Closing Statement duly executed by Buyer; and

(iv)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

10283285 v4

EXHIBIT B
Page 65 of 124

(c)     On the Closing Date, Buyer shall cause the Escrow Agent to deliver the Purchase Price and any unpaid portion of the AAM Cash Contribution (as defined in the MTA) to Seller.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the Execution Date and will be true and correct as of the Closing Date, except as otherwise provided in Schedule 4.00.

**Section 4.01   Organization and Qualification of Seller.** Seller is a not for profit corporation duly organized, validly existing and in full force and effect under the Laws of the State of California.

**Section 4.02   Authority of Seller.** The execution and delivery of the Transaction Documents have been duly authorized by all requisite authority and corporate action on the part of Seller. The performance and consummation of the Transaction Documents and the transactions contemplated thereby shall be authorized by and subject to the Confirmation Order.

**Section 4.03   Intentionally Omitted.**

**Section 4.04   Intentionally Omitted.**

**Section 4.05   Title to Real Property Asset.** Seller has good and valid title to all of the Real Property Asset. The Real Property Asset is free and clear of Liens, Claims, and Encumbrances except for those encumbrances on Schedule 4.05 ("***Permitted Encumbrances***") which Permitted Encumbrances include, without limitation:

(a)     Liens for Taxes not yet due and payable;

(b)     easements, rights of way, zoning ordinances and other similar encumbrances affecting the Real Property Asset which are not, individually or in the aggregate, material to the Hospital or the Real Property Asset, which do not prohibit or interfere with the current operation of any of the Real Property Asset, and which do not render title to any of the Real Property Asset unmarketable; and

(c)     any matters set out in a Title Insurance Commitment which Seller is not obligated to remove in accordance with **Section 6.14** hereof.

**Section 4.06   Real Property Asset. Schedule 4.06** sets forth each parcel of real property owned by Seller and used in or necessary for the conduct of the Hospital as currently conducted (together with all buildings, fixtures, structures, and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "***Real Property Asset***"), including with respect to each property, the address location and use. Seller has delivered to Buyer copies of the Deeds and other instruments (as recorded) by which such applicable Seller acquired such parcels of the Real Property Asset, and copies of all title

10

10283285 v4

EXHIBIT _B_
Page _ _ of _ _

insurance policies, opinions, abstracts, and surveys in the possession of such applicable Seller with respect to such parcels.

Section 4.07  **Insurance. Schedule 4.07** sets forth (a) a true and complete list of all policies or binders, as of the Execution Date, of fire, liability, product liability, umbrella liability, professional liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller or their affiliates and relating to the Real Property Asset and the Hospital (the "*Insurance Policies*"); and (b) with respect to the Hospital, and the Real Property Asset, a list of all pending claims and the claims history for the three (3) years prior to the Execution Date.

**Section 4.08   Permits; No Actions.**

(a)      All Permits and Regulatory Approvals held by the Seller, as of the Execution Date, to use the Real Property Asset as used as of the Execution Date are set forth in **Schedule 4.08(a).**

(b)      Except as set forth in **Schedule 4.08(b)**, there are no Actions pending or, to Seller's knowledge, threatened against or by any Seller: (a) relating to or affecting the Real Property Asset or (b) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.

**Section 4.09   Environmental Matters.**

(a)      **Intentionally Omitted**.

(b)      **Intentionally Omitted**.

Section 4.10   **Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

Section 4.11   **Accuracy of Representations and Warranties.** All representations and warranties of Seller contained in this Agreement are true and correct as of the Execution Date and shall be true and correct as of the Closing Date.

Section 4.15   **Expiration of Representations and Warranties.** The representations and warranties of Seller contained in this Agreement shall expire upon and shall not survive the Closing for any purpose whatsoever.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the Execution Date and will be true and correct as of the Closing Date.

10283285 v4

EXHIBIT _B_
Page _68_ of _124_

**Section 5.01　Organization of Buyer.**　Buyer is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of California.

**Section 5.02　Authority of Buyer.**　Buyer has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer, or a Buyer designee, is a party, the performance by Buyer, or its designees, of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby (i) have been duly authorized by all requisite limited liability company action on the part of Buyer or its designees and (ii) will not violate or conflict in any material respect with any of Buyer's organizational documents or with any material note, contract, lease, mortgage or other obligation of any kind to which Buyer is a party or by which Buyer is bound. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer or a Buyer designee is or will be a party has been duly executed and delivered by such Buyer designee (assuming due authorization, execution, and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03　Adequate Funds.**　As of the Execution Date, Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price and other funds needed to consummate the transaction (including payment of any portion of the AAM Cash Contribution due under the MTA and outstanding as of the Closing Date) and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price, any portion of the AAM Cash Contribution due under the MTA and outstanding as of the Closing Date, and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein.

**Section 5.04　Brokers.**　No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05　Legal Proceedings.**　There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any affiliate of Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred, nor circumstances exist, that may give rise or serve as a basis for any such Action.

**Section 5.06　Due Diligence Materials.**　Seller has provided certain documents which relate to the operations and financial conditions of the Hospital, which are hereby referred to as "**_Due Diligence Materials_**". Prior to the Execution Date, Buyer has been provided access to the Due Diligence Materials. Until the Effective Time, Seller will continue to cooperate in providing information to Buyer as requested, in a timely manner, but is under no obligation to create documents or provide any related documents which are outside those in the possession of Seller. Buyer acknowledges that certain Due Diligence Materials may be limited to summaries, or otherwise contain redactions, if the Seller reasonably believe the disclosure of such information

EXHIBIT _B_
Page _68_ of _124_

would be a violation of Law protecting the personal, financial or protected health information of any resident or patient or affiliate of a resident or patient, including, but not limited to, all Laws adopted under the Health Insurance Portability and Accountability Act.

**Section 5.07    Fitness for and Timing of Application for Obtaining Permits and Regulatory Approvals.**  Buyer has no knowledge of any material fact or other information related to Buyer or any of its affiliates which could be reasonably expected to have an adverse impact on Buyer's or its designees' ability to obtain the Permits and Regulatory Approvals. To Buyer's knowledge, it has been in material compliance with healthcare regulatory laws and has not received any communication from a governmental authority or third-party payors that would prohibit or delay the Buyer from consummating the transaction contemplated herein or obtaining the Permits and Regulatory Approvals necessary to operate the Hospital.

**Section 5.08    No Guarantee of License.**  Buyer acknowledges that the Hospital operations are regulated by local, state, or federal Laws and that the Hospital's operations must be conducted under a license or licenses issued or authorized by the State of California.

**Section 5.09    Accuracy of Representations and Warranties.**  All representations and warranties of Buyer contained in this Agreement are true and correct as of the Execution Date and shall be true and correct as of the Closing Date.

**Section 5.10    Disclaimers; Releases and Limitations.**  Buyer represents and warrants to Seller that Buyer is a knowledgeable, experienced, and sophisticated buyer of real estate and/or hospitals. Buyer acknowledges that, except for the representations and warranties made by Seller in **Article IV** hereof, Buyer has not relied upon and will not rely upon, either directly or indirectly, any statement of Seller or any of their officers, directors, trustees, agents, employees, or other person acting or purporting to act on behalf of Seller.

**Section 5.11    No Other Warranty**  Without in any manner limiting the provisions of the preceding paragraph, as a material part of the consideration for this agreement, Seller and Buyer agree that Buyer is taking the property "as is", "where is" and "with all faults" and with any and all latent and patent defects and that there is no warranty or representation, express or implied, of any kind or nature (including, without limitation, warranties with respect to habitability, marketability, use or fitness for a particular purpose) made by Seller with respect to the property (except for the representations of Seller expressly set forth in **Article IV**), all other representations and warranties, both express and implied, are hereby expressly disclaimed and denied. Buyer acknowledges that it has been or will be given adequate time to conduct whatever examination, evaluations, inspections, reviews, studies or tests of the property and its condition as Buyer may desire or determine warranted, and that Buyer is not relying on any representation, warranty, statement or other assertion with respect to the property or its condition by Seller or any of Seller' officer, director, trustee, agent, employee, attorney or other person acting or purporting to act on behalf of any Seller or any of its affiliates, but Buyer is relying solely on its own examination, evaluations, inspections, reviews, studies or tests of the property. Without limiting the provisions of preceding paragraphs, Buyer expressly releases and discharges Seller, its respective affiliates, members, partners, officers, directors, shareholders, employees, attorneys, agents, brokers, and contractors from any and all obligations, claims, administrative proceedings, judgements,

EXHIBIT B
Page 69 of 124

damages, fines, costs, and liabilities arising out of or relating to the physical condition of the property or any portion thereof.

## ARTICLE VI
## COVENANTS

**Section 6.01   Intentionally Omitted.**

**Section 6.02   Access to Information; Books and Records.**

(a)     From the Execution Date until the Closing Date, Seller shall during normal business hours and without interruption of operations: (i) afford Buyer and its Representatives full and free access to and the right to inspect and appraise all of the Real Property Asset, properties, assets, premises, books and records, Contracts and other documents and data related to the Hospital; and (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Hospital as Buyer or any of its Representatives may reasonably request.

(b)     After the Closing, the Buyer shall permit, for a period of not less than six (6) years, each of the Debtors, any direct or indirect successor to the Debtors and their respective professionals, the Committee and its professionals (collectively, the "***Permitted Parties***") reasonable access to all books and records that are in connection with or that otherwise relate to the Debtors and their operations prior to the Closing and that are in the control or the possession of the Buyer or any of its affiliates or their respective agents or representatives (collectively, "***Business Records***") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets or Excluded Liabilities (including, without limitation, Causes of Action), (ii) pursuing, assessing, defending, settling, or otherwise dealing with Causes of Action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Debtors, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process relating to any of the Debtors, including, without limitation, with respect to Causes of Action against any person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative claims and any general unsecured claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering the Debtors' estates including, without limitation, the preparation and confirmation of a plan relating to any of the Debtors and the preparation of accompanying disclosure statement, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down the Debtors' estates, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose. For the avoidance of doubt, the Permitted Parties shall not have access to the Buyer's books and records that are created subsequent to the Closing and do not relate to the Debtors and their operations prior to the Closing.

10283285 v4

EXHIBIT B
Page 70 of 124

(i) The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party, upon reasonable notice during regular business hours, to copy at the Permitted Party's premises or the Purchaser's premises (including any location formerly operated by any of the Debtors) at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to herein and (ii) Buyer's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may reasonably be requested, but only to the extent such Permitted Party furnishes the Buyer with reasonable written descriptions of the materials to be so copied. The Buyer shall not dispose of or destroy any of the Business Records before the sixth (6th) anniversary of the Closing Date and will provide the Permitted Parties and the Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Permitted Party that requests copies of any Business Records within such ninety (90) day period copies of all requested Business Records at the cost of the requesting Permitted Party.

(ii) The Buyer shall use commercially reasonable efforts to make reasonably available to Permitted Parties employees of the business to assist the Debtors and the Committee in connection with the administration of the Debtors' estates as set forth herein, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

**Section 6.03    Notice of Certain Events.**

From the Execution Date until the Closing, Seller shall promptly notify Buyer in writing of:

(a)     any fact, circumstance, event or action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by any Seller hereunder not being true and correct, or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 7.02** to be satisfied;

(b)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(c)     any notice or other communication from any governmental authority in connection with the transactions contemplated by this Agreement; and

(d)     any Actions commenced or, to Seller's knowledge, threatened against, relating to or involving or otherwise affecting the Hospital or the Real Property Asset that, if pending on the Execution Date, would have been required to have been disclosed pursuant to **Schedule 4.08(a) or (b)** or that relates to the consummation of the transactions contemplated by this Agreement.

EXHIBIT _B_
Page _71_ of _124_

**Section 6.04   Reserved.**

**Section 6.05   Risk of Loss; Condemnation.**

(a)   The risk of loss, destruction, condemnation, eminent domain or damage to any of the Real Property Asset, or any portion thereof, by any cause prior to the Effective Time are assumed by Seller, and Seller shall maintain insurance coverages in full force and effect through the Effective Time in accordance with **Section 6.07** hereof.  Seller shall immediately notify Buyer if, prior to the Effective Time, there shall have been any loss, destruction or damage to, or any taking or threatened or proposed taking of, any of the Real Property Asset.

(b)   As used herein, the term "***Casualty Loss***" means any destruction by fire, storm or other casualty, or any taking or pending or threatened taking, in condemnation or under the right of eminent domain, of any of the Real Property Asset, or a portion thereof, in each case, prior to the Effective Time.  Seller shall promptly give Buyer written notice ("***Casualty Notice***") of any Casualty Loss of which Seller becomes aware.  To the extent such Casualty Loss exceeds $1,500,000 in cost, Buyer shall have the option, which must be exercised within ten (10) days after its receipt of the Casualty Notice, to terminate this Agreement or to proceed with the Closing.  If Buyer elects to terminate this Agreement, all rights, duties, obligations and liabilities created hereunder shall cease.  If Buyer elects to proceed with Closing (or if the Casualty Loss is less than $1,500,000), Buyer shall acquire the Real Property Asset in accordance with the terms hereof without a credit against the Purchase Price and Seller shall transfer to Buyer all of their rights to unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss and pay to Buyer all sums paid to Seller as insurance proceeds, awards or other payments arising out of such Casualty Loss less any amounts Seller have paid to repair or mitigate such Casualty Loss.  Seller shall not voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Buyer, such consent not to be unreasonably withheld, conditioned, or delayed.

**Section 6.06   Reserved.**

**Section 6.07   Maintenance of Insurance.**  From the Execution Date until the Effective Time, Seller shall keep in full force and effect all insurance coverages existing on the Execution Date.

**Section 6.08   Commercially Reasonable Efforts.**  From the Execution Date until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VII** hereof.  Additionally, Buyer shall, within ten (10) days after entry of the Confirmation Order, submit the necessary applications to the applicable regulatory authorities to obtain such Permits and Regulatory Approvals as are needed to consummate the sale (with copies of such applications promptly provided to Seller) and shall diligently and expeditiously follow up on and pursue such Permits and Regulatory Approvals.  Notwithstanding anything contained herein, upon written notice by Buyer to Seller delivered prior to the then-scheduled Condition Satisfaction Date, Buyer may on a single instance, extend the Condition Satisfaction Date by a period not to exceed thirty

EXHIBIT B
Page 78 of 124

(30) days if, despite using diligent and continuous efforts to obtain such Permits and Regulatory Approvals as are needed to consummate the sale, it reasonably appears that the Permits and Regulatory Approvals will not be issued prior to the then-scheduled Condition Satisfaction Date.

**Section 6.09   Public Announcements.**  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate  as to the timing and contents of any such announcement. Disclosures made to the Bankruptcy Court or in pleadings in Court or related notices shall not be considered a public announcement.

**Section 6.10   Reserved.**

**Section 6.11   Transfer Taxes.**  All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller.

**Section 6.12   Further Assurances.**  Following the Closing, each of the parties hereto shall, and shall cause their respective affiliates (if any) to, execute, and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 6.13   Good Faith.**  Each party agrees, in the exercise of good faith and fair dealing, to take actions necessary or appropriate to satisfy all conditions to closing and to consummate the Closing under this Agreement. Each party agrees to provide prompt notice to the other party of any circumstance or condition which such party has reason to believe may cause a condition of the Closing not to be fulfilled or otherwise create any impediment to the Closing.

**Section 6.14   Title Insurance Commitment and Survey.**

(a)      Buyer shall be responsible for obtaining current form ALTA title insurance commitments, issued by a nationally recognized title company, of the condition of title to the Real Property Asset (collectively, the "***Title Insurance Commitments***").

(b)      Not later than twenty (20) days following Buyer's receipt of both the Title Insurance Commitments and Surveys, Buyer shall deliver to Seller written notification (the "***Title Objection***") of any matters reflected in the Title Insurance Commitments or Surveys of any liens, claims, encroachments, exceptions, or defects which in Buyer's reasonable discretion adversely impact the Real Property Asset, the Hospital, or operation thereof (collectively, "***Defects***"). Any matter which is included in the Title Insurance Commitments and/or the Surveys which is not included in the Title Objection delivered to Seller with the Title Objection as described above shall be a Permitted Encumbrance. The applicable Seller shall elect whether it will cure the Defects, and if such Seller fails to give such notice of its decision not later than five (5) days after Buyer shall deliver the Title Objection (the "***Response Deadline***"), such Seller shall be deemed to have elected to cure

EXHIBIT B
Page 23 of 124

the Defects. If such Seller elects not to cure the Defects, it shall give written notice to Buyer prior to the expiration of the Response Deadline of its decision not to cure. A Seller may elect to address any Defects through the Sale Motion whereby holders of Liens, Claims, or Encumbrances may be adequately protected by having their Liens, Claims, or Encumbrances, if any, attach to the portion of the Purchase Price ultimately attributable to the Real Property Asset against or in which they claim an interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Real Property Asset, subject to any claims and defenses the Debtor or its estate may possess with respect thereto. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that all Liens, Claims, and Encumbrances that can be satisfied by the payment of money shall be addressed in the Confirmation Order.

**Section 6.15    Delivery of Schedules.**  Within thirty (30) days of the Execution Date, Seller shall deliver all of Seller' schedules referenced in Article II and Article IV of this Agreement. Except as provided in Article VIII, such delivery of Seller' schedules shall not result in any amendment to this Agreement or termination right of Buyer and shall not contain a disclosure on behalf of Seller that constitutes a Material Adverse Effect. Notwithstanding anything contained herein, should Seller's schedules contain a disclosure that constitutes a Material Adverse Effect, Buyer shall have the right to terminate this Agreement. Buyer shall provide notice to Seller of its termination of this Agreement pursuant to the preceding sentence within five (5) business days of delivery of the schedule that Buyer asserts contains a disclosure constituting a Material Adverse Effect. If Buyer elects to terminate this Agreement within such period, all rights, duties, obligations and liabilities created hereunder shall cease. If Buyer does not elect to terminate this Agreement within such period, Buyer shall be deemed to have waived any right to terminate this Agreement pursuant to this Section 6.15 relating to such schedule.

**Section 6.16    Reserved.**

**Section 6.17    Reserved.**

**Section 6.18    Bulk Sales Laws.** The parties hereby waive compliance with the provisions of Division 6 of the California Uniform Commercial Code ("***Bulk Sales Law***") with respect to Buyer's purchase of the Purchased Assets.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01    Conditions to Obligations of All Parties.**  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No governmental authority shall have enacted, issued, promulgated, enforced, or entered any governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

10283285 v4

EXHIBIT B
Page 24 of 124

(b)     The Bankruptcy Court shall have entered the orders approving the Debtor's entry into the MSA, the MTA, the Plan, and the Sale (pursuant to the Plan or otherwise), and each such order shall have become a Final Order.

(c)     Buyer's designees shall have received all Permits and Regulatory Approvals that are set forth on **Schedule 4.08(a)**.

**Section 7.02   Conditions to Obligations of Buyer.**   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The Bankruptcy Court has entered an order approving the MTA in form and substance acceptable to Buyer and such order has become a Final Order;

(b)     The Bankruptcy Court has entered an order approving the MSA in form and substance acceptable to Buyer and such order has become a Final Order;

(c)     The Bankruptcy Court has entered an order approving this Agreement, either as part of the approval of the MTA or by separate order, in form and substance acceptable to Buyer, and such order has become a Final Order;

(d)     The Bankruptcy Court has entered an order confirming a Conforming Plan pursuant to Section 1129 of the Bankruptcy Code and such order has become a Final Order;

(e)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date shall occur concurrently with the Closing hereunder; *provided,* with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(f)     The representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the Execution Date and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(g)     No injunction or restraining Order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(h)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

10283285 v4

EXHIBIT B
Page 75 of 124

**Section 7.03   Conditions to Obligations of Seller.**   The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the applicable Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)   Buyer shall have made the Initial Contribution and all of the Supplemental Contributions required under the MTA.

(b)   Buyer shall have delivered the Purchase Price.

(c)   The representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the Execution Date and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(d)   Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement, the MTA, and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; *provided,* with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(e)   No injunction or restraining Order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(f)   Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(g)   Seller shall have received a certificate, dated the Closing Date, and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied (the "***Buyer Closing Certificate***").

(h)   Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the officers of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(i)   Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the

10283285 v4

EXHIBIT B
Page 76 of 124

officers of Buyer authorized to sign this Agreement, the Transaction Documents, and the other documents to be delivered hereunder and thereunder.

(j)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## TERMINATION

**Section 8.01   Termination.**  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby and thereby abandoned at any time on or prior to the Closing Date:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     Buyer is not then in material breach of any provision of this Agreement or the MTA and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller' receipt of written notice of such breach from Buyer;

(ii)     any of the conditions set forth in **Section 7.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the date which is ninety (90) days following the Plan Confirmation Date (the "*Condition Satisfaction Date*"); or

(iii)     any of the conditions set forth in **Section 7.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)     by Seller by written notice to Buyer if:

(i)     Seller is not then in material breach of any provision of this Agreement or the MTA and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach from Seller; or

EXHIBIT B
Page 77 of 124

(ii)     any of the conditions set forth in **Section 7.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date; or

(iii)     any of the conditions set forth in **Section 7.03** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

(d)     by Buyer or Seller in the event that: (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; (ii) any governmental authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable; or (iii) if the Closing Date shall not have occurred on or before the close of business on the first (1st) day of a calendar month that occurs after five (5) business days following the date on which conditions to Closing set forth in **Article VII** are either satisfied or waived.

**Section 8.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.01   Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with this Agreement and the transactions contemplated hereby, shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02   Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

| If to Seller: | |
|---|---|
| with a copy to: | |

EXHIBIT *B*
Page ~~78~~ of 124

| If to Buyer: | |
|---|---|
| With a copy to:<br><br>(which shall not constitute notice) | |

**Section 9.03   Interpretation.**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04   Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05   Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06   Entire Agreement.**  This Agreement, the MTA, the MSA, and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the MTA will control.

**Section 9.07   Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that if Buyer shall assign its rights under this Agreement to a party (or parties) which are not an affiliate

EXHIBIT B
Page 79 of 124

(or affiliates) of Buyer, then Buyer shall have the obligation to pay the balance of the Purchase Price at the Closing, subject to prorations and adjustments as provided herein.

**Section 9.08   No Third-Party Beneficiaries.**   Except with respect to rights of the Liquidation Trustee, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express, or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09   Amendment and Modification; Waiver.**   This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 9.10   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

(b)     VENUE AND RETENTION OF JURISDICTION. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND THE BANKRUPTCY COURT SHALL RETAIN JURISDICTION TO DETERMINE ANY AND ALL SUCH ACTIONS.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND

EXHIBIT B
Page 80 of 124

(D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.10(c)**.

**Section 9.11   Specific Performance.**  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.12   Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.13.  No Recourse to Estate Personal Assets or AAM Cash Contribution.** Notwithstanding any provision in this Agreement to the contrary, Buyer shall have no recourse to the Estate Personal Assets nor to the AAM Cash Contribution (as those terms are defined in the Transition Agreement) in connection with any claim or right of indemnification that Buyer may hold against Seller hereunder.  Under no circumstances shall Buyer have any right to recovery against the Estate Personal Assets or the AAM Cash Contribution.

[SIGNATURE PAGE FOLLOWS]

10283285 v4

EXHIBIT _B_
Page _87_ of _130_

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed by their duly authorized representatives, effective as of the day and year first written above.

<u>**SELLER**</u>:

**MADERA COMMUNITY HOSPITAL**

By:_____
Name:_____
Title: _____

<u>**BUYER**</u>:

**GSR MADERA, L.P.**

By:_____
Name:_____
Title: _____

26

EXHIBIT B
Page 81 of 124

**EXHIBIT A**
**LOCATION**

- 1250 E. Almond Avenue, Madera, California 93637

10283285 v4



EXHIBIT _B_
Page _89_ of _124_

**EXHIBIT B**
**BILL OF SALE**

**BILL OF SALE**

Dated: [MONTH] [DAY], [YEAR]

[SELLER NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE], having an office at [ADDRESS] ("**Seller**"), for and in consideration of [[NUMBER IN WORDS] ($[NUMBER])/TEN ($10.00) DOLLARS] and other good and valuable consideration paid by [PURCHASER NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE], having an office at [ADDRESS] ("**Purchaser**"), the receipt and sufficiency of which is hereby acknowledged, hereby sells, assigns, transfers, and sets over unto Purchaser, its successors and assigns, from and after the date hereof, [without representation or warranty by or recourse to Seller, express or implied, by operation of law or otherwise, except as expressly provided herein or in that certain [PURCHASE AGREEMENT TITLE], dated as of [DATE], by and between Seller and Purchaser (the "**Purchase Agreement**"), all of Seller's right, title, and interest in and to the Personal Property (as defined in the Purchase Agreement) owned by Seller and which is located at, and used or usable in connection with, the real estate [commonly known as [REAL ESTATE ADDRESS]/more particularly described on Exhibit [LETTER] attached hereto and made a part hereof], excluding, however, any such fixtures, machinery, equipment, furniture, furnishings, fittings, articles of personal property, and improvements in the nature of personal property, belonging to any tenant under any lease, any public utility, or any other person or entity except Seller.

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever, from, and after the date hereof.

Seller agrees to execute, acknowledge (where appropriate), and deliver individual bills of sale for the Personal Property or such other or further instruments of transfer or sale as Purchaser may reasonably require to confirm the foregoing or as may be otherwise reasonably requested by Purchaser to carry out the intent and purposes hereof.

This Bill of Sale is made by Seller without recourse and without any expressed or implied representation or warranty whatsoever, except as expressly set forth in the Purchase Agreement (but subject to any limitations set forth in the Purchase Agreement as to Purchaser's rights to make claims with respect to such representations and warranties). By Purchaser's acceptance of this Bill of Sale, Purchaser acknowledges that Purchaser has fully inspected the Personal Property, and Purchaser accepts the Personal Property in its present used and "**AS IS**" condition.

[SIGNATURE PAGE FOLLOWS]

10283285 v4

EXHIBIT B
Page 94 of 124

**IN WITNESS WHEREOF**, Seller has signed this Bill of Sale as of the date set forth above.

[SELLER NAME], a[n] [STATE OF ORGANIZATION][ENTITY TYPE]

By:_____

Name:

Title:

29

EXHIBIT B
Page __ of __

## EXHIBIT C
## QUITCLAIM DEED

RECORDING REQUESTED BY:

[NAME]

WHEN RECORDED MAIL DEED [AND/TO:]

[[NAME]
[ADDRESS]]

[MAIL] TAX STATEMENTS TO:

[NAME]
[ADDRESS]

---

Assessor's Parcel No.: [NUMBER]          (Above Space for Recorder's Use Only)

### QUITCLAIM DEED

The undersigned Grantor hereby declares:

DOCUMENTARY TRANSFER TAX: $[NUMBER]  CITY TRANSFER TAX: $[NUMBER]

[ ] computed on the consideration or full value of the property conveyed; or

[ ] computed on consideration or full value less the value of liens or encumbrances remaining at time of sale.

The property conveyed is located in [ ] the City of [CITY] or [ ] an unincorporated area of the county.

[EXEMPTION EXPLANATION]

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [GRANTOR NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE] ("**Grantor**"), hereby releases, remises, and quitclaims in favor of [GRANTEE NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE] ("**Grantee**"), that certain real property situated in [COUNTY] County, California, described on Exhibit [LETTER] attached hereto and by this reference incorporated herein.

[SIGNATURE PAGE FOLLOWS]

EXHIBIT B
Page 90 of 114

**IN WITNESS WHEREOF**, the Grantor has executed this Quitclaim Deed as of [DATE].

GRANTOR:

[GRANTOR NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE]

By: _____
Name:
Title:

### ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

| | |
|---|---|
| State of California | ) |
| | ) ss. |
| County of [COUNTY] | ) |

On [DATE] before me, [NOTARY OR OTHER AUTHORIZED OFFICER NAME AND TITLE], personally appeared, [EXECUTING INDIVIDUAL NAME] who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____     (Seal)

31

EXHIBIT B
Page 54 of 124

**<u>EXHIBIT [LETTER]</u>**

**LEGAL DESCRIPTION**

[LEGAL DESCRIPTION OF THE REAL PROPERTY]

10283285 v4

EXHIBIT B
Page 88 of 44

**EXHIBIT D**
**OTHER EXCLUDED ASSETS**

10283285 v4


EXHIBIT B
Page 89 of 124

# EXHIBIT C

## FORM OF ASSET PURCHASE AGREEMENT (HOSPITAL ASSETS)

EXHIBIT _B_
Page _90_ of _124_

**ASSET PURCHASE AGREEMENT (HOSPITAL ASSETS)**

by and among

MADERA COMMUNITY HOSPITAL, AS SELLER

and

GSR MADERA, L.P., AS BUYER

dated as of _____, 2024

EXHIBIT B
Page 91 of 124

| EXHIBIT LIST | SECTION REFERENCE |
|---|---|
| **Exhibit A** – Other Excluded Assets | 2.02(d) |
| **Exhibit B** – Form of Bills of Sale | 3.02(a)(i) |
| **Exhibit C** – Reserved | n/a |
| **Exhibit D** – Reserved | n/a |
| **Exhibit E** – Purchase Price Allocation | 2.09 |
| **Exhibit F** – Reserved | n/a |
| **Exhibit G** – Reserved | n/a |

32316603.2

EXHIBIT B
Page 92 of 124

## DISCLOSURE SCHEDULE SECTIONS

| | |
|---|---|
| 1.01(c) | Prepaids |
| 2.01(a) | Assumed Designated Contracts |
| 2.05 | General Assignment of Rights |
| 2.08(c) | Tort and Contract Claims |
| 4.00 | Carveouts from Seller Representations and Warranties |
| 4.05 | Permitted Encumbrances |
| 4.06 | Intellectual Property Registrations and Intellectual Property Assets |
| 4.09 | Insurance policies, binders and claims |
| 4.10(a) | Permits and Regulatory Approvals |
| 4.10(b) | Seller Legal Proceedings and Actions |
| 4.11(b) | Environmental Permits |



EXHIBIT B
Page 93 of 124

## ASSET PURCHASE AGREEMENT (HOSPITAL ASSETS)

THIS ASSET PURCHASE AGREEMENT (HOSPITAL ASSETS) ("*Agreement*"), dated as of _____ (the "*Execution Date*"), 2024, is entered into by and between [insert Liquidation Trustee] in [his/her/its] capacities as liquidation trustee of the [insert name of Liquidation Trust] and representative of the bankruptcy estate of debtor Madera Community Hospital ("*Madera*," the "*Debtor*," or the "*Seller*") and GSR Madera L.P. ("*GSR*" or the "*Buyer*") or its designees.

### Recitals

**WHEREAS**, Seller is engaged in the business of operating an acute-care, full service hospital and related facilities in Madera County, California located at 1250 E. Almond Avenue, Madera, California 93637 (the "*Hospital*"); and

**WHEREAS**, on March 10, 2023 (the "*Petition Date*"), Seller filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, currently pending in the United States Bankruptcy Court for the Eastern District of California as case number 23-10457 (the "*Bankruptcy Case*"). In the Bankruptcy Case, Seller is managing its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

**WHEREAS**, on _____, 20[ ], the Bankruptcy Court approved the Debtor's entry into that certain Master Transition Agreement ("*MTA*") by and between American Advanced Management, Inc. ("*AAM*") and the Debtor, dated [_____] (the "*MTA Execution Date*") and effective _____, AAM and the Debtor entered into the MTA and that certain Management Services Agreement ("*MSA*"), pursuant to which AAM has assumed day to day operational responsibilities for, and authority over, the Hospital during the term of the MSA; and

**WHEREAS**, on November 17, 2023, the Official Committee of Unsecured Creditors (the "*Committee*") appointed in the Bankruptcy Case filed the Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors (the "*Plan*"); and

**WHEREAS**, the Plan provides for the establishment of a liquidation trust (the "*Trust*"), and appointment of a liquidation trustee (the "*Liquidation Trustee*") to be the representative of the Debtor and its estate, and to exercise the rights, power and authority of the Debtor under applicable provisions of the Plan; and

**WHEREAS**, the Plan was modified on [_____] to authorize the Liquidation Trustee to sell to Buyer, pursuant to section 1123 of the Bankruptcy Code: (a) the Real Property Asset (as defined below) pursuant to the Real Property APA (as defined herein) and (b) at AAM's election, exercisable no later than thirty-six (36) months after the MTA Execution Date, the Hospital Assets (as defined herein) on the terms memorialized herein; and

**WHEREAS**, the Plan was confirmed by order of the Bankruptcy Court (the "*Confirmation Order*"), entered on [_____] the "*Plan Confirmation Date*") which became a Final Order on [_____]; and

EXHIBIT _D_
Page _94_ of _114_

**WHEREAS**, on [_____], the Liquidation Trustee and Buyer entered into that certain Asset Purchase Agreement (Real Property Asset) (the **"Real Property APA"**) whereby the Liquidation Trustee sold, and Buyer purchased, the real property on which the Hospital is located (the **"Real Property Asset"**), as more particularly described in Schedule 2.01 to the Real Property APA; and

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, all the Purchased Assets (as hereinafter defined), and Buyer is willing to assume all the Assumed Liabilities (as hereinafter defined), relating to or used in connection with the Hospital.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, the consideration provided pursuant to the MTA and the Real Property APA, and other good and valuable considerations, the receipt and adequacy of which are conclusively acknowledged, in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

The following terms have the meanings specified or referred to in this **Article I**:

*"AAM Cash Contribution"* has the meaning ascribed to it in the MTA.

*"Action"* means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

**"Agreement"** has the meaning set forth in the preamble.

*"Almond Farm"* means approximately 35 acres of farmland located on Avenue 12 in Madera, Madera County, California, assessor parcel number 047-014-008-000, and any proceeds of sale thereof.

*"Assignment and Assumption Agreements"* has the meaning set forth in **Section 3.02(a)(ii)**.

*"Assumed Designated Contract"* means a Designated Contract that is assumed and assigned to the Buyer.

*"Assumed Liabilities"* has the meaning set forth in **Section 2.06**.

*"Avoidance Actions"* means any and all avoidance, recovery, subordination, or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including actions or remedies arising under sections 502, 510, or 542-553 of the Bankruptcy Code, and the proceeds thereof.

*"Bankruptcy Case"* has the meaning specified in the Recitals.

10283289 v4

EXHIBIT B
Page 95 of 124

"*Bankruptcy Code*" means specifically 11 U.S.C. § 101 *et seq.*

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of California.

"*Bankruptcy Rules*" means the Bankruptcy Rules of Civil Procedure and any other rules that are applicable to the Bankruptcy Court.

"*Bills of Sale*" has the meaning set forth in **Section 3.02(a)(i)** and substantially in the form set forth in **Exhibit B** hereto.

"*Business Day*" means any day except Saturday, Sunday, or any other day on which commercial banks, located in San Francisco, California, are authorized or required by Law to be closed for business.

"*Buyer*" has the meaning set forth in the preamble.

"*Buyer Closing Certificate*" has the meaning set forth in **Section 7.03(g)**.

"*Causes of Action*" means any action, claim, cause of action, cross-claim, third-party claim, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever belonging to the Debtor or its Estate, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertible directly or derivatively (including under alter ego theories), in contract or in tort, in law or in equity or pursuant to any other theory of law, and the proceeds thereof. For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to section 362 and any and all Avoidance Actions; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state, federal or foreign law; (f) all Tort Claims and D&O Claims; (g) any and all claims under any D&O Liability Insurance Policies; and (h) all Retained Causes of Action, including those enumerated in Article V.R of this Plan. The definition of "Causes of Action" shall be construed in accordance with its broadest possible meaning, and any doubts or ambiguities shall be resolved in favor of inclusiveness.

"*CDPH*" means the California Department of Public Health.

"*CHOW Application*" means the application submitted by Buyer to the CDPH to approve and effect a change in licensed operator of the Hospital from Seller to Buyer.

"*Claims*" means, with respect to the period prior to the Closing Date, any right to payment from Seller, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Seller, whether or not such right to an equitable remedy is

10283289 v4

EXHIBIT D
Page 96 of 124

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"*Closing*" has the meaning set forth in **Section 3.01**.

"*Closing Date*" has the meaning set forth in **Section 3.01**.

"*Closing Certificate*" has the meaning set forth in **Section 7.02(e)**.

"*Closing Statement*" has the meaning set forth in **Section 3.02(a)(iii)**.

"*Condition Satisfaction Date*" has the meaning set forth in **Section 8.01(b)(ii)**.

"*Confirmation Order*" means an order confirming Seller's chapter 11 plan pursuant to 11 U.S.C. § 1129.

"*Conforming Plan*" has the meaning ascribed to such term in the MTA.

"*Contracts*" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments, and legally binding arrangements, whether written or oral.

"*Cure Amount*" means all cure amounts payable in order to cure any defaults or otherwise effectuate pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of the Assumed Designated Contracts assigned to Buyer under the Confirmation Order.

"*D&O Claims*" means any and all rights, Causes of Action and claims arising under state, federal or other applicable law against the Debtor's current or former directors, trustees, managers, officers and similar parties, including claims for breach of fiduciary duty, and the proceeds of any such rights, Causes of Action and claims, including from any D&O Liability Insurance Policies.

"*D&O Liability Insurance Policies*" means all insurance policies for directors', officers', managers', trustees' and/or similar parties' liability maintained by the Debtor as of the Petition Date and/or the Effective Date, including tail coverage after the termination of any such policies, and the proceeds thereof.

"*Designated Contract*" has the meaning ascribed to such term in the MTA.

"*Disclosure Schedules*" means the Disclosure Schedules delivered by Seller and Buyer in accordance with this Agreement.

"*Dollars or $*" means the lawful currency of the United States.

"*Due Diligence Materials*" has the meaning set forth in **Section 5.06**.

"*Effective Time*" has the meaning set forth in **Section 3.01**.

10283289 v4

EXHIBIT B
Page 97 of 44

"*Encumbrance*" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of sellership.

"*Environmental Claim*" means any Action, governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law.

"*Environmental Law*" means any applicable Law: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"*Environmental Permit*" has the meaning set forth in **Section 4.11(b)**.

"*Escrow Agent*" means any party designated by the Parties to function as an escrow agent for purposes of documentation and/or holding and distributing funds at Closing in connection with this Agreement, the MTA, and the Real Property APA.

"*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Case.

"*Estate Personal Assets*" means, collectively, all of the Debtor's rights and interest in Quality Assurance Fees, Federal Emergency Management Agency funds, cash on hand as of the Operation Assumption Date, accounts receivable, Causes of Action, the Almond Farm, and all other assets identified in the Debtor's Schedule of Assets and Liabilities or accruing prior to the

EXHIBIT B
Page 9Y of 1U4

Operation Assumption Date.

"*Execution Date*" has the meaning set forth in the preamble.

"*Excluded Assets*" has the meaning set forth in **Section 2.02**.

"*Excluded Liabilities*" has the meaning set forth in **Section 2.04**.

"*Final Order*" means an Order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or such an appeal has been rendered statutorily moot pursuant to Section 363(m) of the Bankruptcy Code or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, and a stay pending appeal has been entered, the Order or judgment has been affirmed by the highest court to which such Order or judgment was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order or judgment, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such Order or judgment shall not prevent such Order or judgment from being considered a Final Order.

"*Financial Statements*" has the meaning set forth in **Section 4.04**.

"*Hospital*" has the meaning set forth in the Recitals.

"*Hospital Asset Claims*" has the meaning set forth in **Section 2.01(d)**.

"*Hospital Assets*" has the meaning set forth in **Section 2.01**.

"*Insurance Policies*" has the meaning set forth in **Section 4.09**.

"*Intangible Personal Property*" has the meaning set forth in **Section 2.01(e)**.

"*Intellectual Property*" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered.

"*Intellectual Property Assets*" means all Intellectual Property that is owned by Seller and used in or necessary for the conduct of the Hospital as currently conducted. Intellectual Property Assets shall exclude computer software used by Seller in operation of the Hospital, which Seller have no right to sell, including computer software which can be purchased through retail outlets.

"*Intellectual Property Registrations*" means all Intellectual Property Assets that are subject to any issuance, registration, application, or other filing by, to or with any governmental authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

10283289 v4

EXHIBIT B
Page 99 of 130

"*Inventory*" has the meaning set forth in **Section 2.01(b)**.

"*IT Assets*" means IT Inventories, technical documentation, software contracts and computer equipment, in each case related to the Hospital.

"*IT Inventories*" means (i) computer software code (in all media) and materials, including all software programs; (ii) computer software documentation, including user materials; and (iii) all other unused or reusable materials, stores, and supplies related to computer software, in each case to the extent used in, relating to, or arising out of the Hospital.

"*Law*" means any statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any governmental authority.

"*Liabilities*" means liabilities, obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute, or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"*Lien*" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option, or other encumbrance.

"*Material Adverse Effect*" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Hospital taken as a whole, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however,* "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Hospital operates; (iii) failure of Seller to meet financial projections; (iv) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, natural disasters, pandemics or the escalation or worsening thereof; (vi) any actions required pursuant to this Agreement; (vii) any changes in applicable Laws or accounting rules; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; or (viii) the filing of the Bankruptcy Case.

"*Material Contracts*" has the meaning set forth in **Section 4.07**.

"*MTA*" shall have the meaning set forth in the Recitals.

"*Operation Assumption Date*" means the date on which the Bankruptcy Court's order approving the MTA and becomes a final, non-appealable order.

"*Order*" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made, or rendered by any government entity or the Bankruptcy Court affecting such Person or any of its properties.

"*Other Excluded Assets*" has the meaning set forth in **Section 2.02(d)**.

EXHiBiT B
Page 100 of 124

"***Permits and Regulatory Approvals***" means all permits, licenses, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from governmental authorities, all as identified in **Schedule 4.10(a)**.

"***Permitted Encumbrances***" has the meaning set forth in **Section 4.05**.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Plan***" has the meaning set forth in the Recitals.

"***Plan Confirmation***" has the meaning set forth in the Recitals.

"***Prepaids***" has the meaning set forth in **Section 2.01(c)**.

"***Purchase Price***" has the meaning set forth in **Section 2.03**.

"***Purchase Price Allocation***" has the meaning set forth in **Section 2.09**.

"***Purchased Assets***" has the meaning set forth in **Section 2.01**.

"***Real Property Asset***" has the meaning ascribed to it in the Real Property APA.

"***Sale***" means the sale of the Purchased Assets in accordance with the Plan and Confirmation Order.

"***Seller***" and "***Seller***" have the meanings set forth in the preamble.

"***Tangible Personal Property***" has the meaning set forth in **Section 2.01(e)**.

"***Taxes***" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"***Tort Claims***" means any and all claims or Causes of Action of the Debtor or its Estate against any of the Debtor's current or former professionals, directors, officers, trustees, managers and similar parties, including but not limited to any D&O Claims.

"***Transaction Documents***" means this Agreement, the Bills of Sale, the Assignment and Assumption Agreements, and the other agreements, instruments and documents required to be delivered at the Closing.

10283289 v4

EXHIBIT *B*

Page 101 of 101

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase of Hospital Assets.** Subject to the terms and conditions set forth herein and in the Confirmation Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer or its designees, and Buyer shall purchase from Seller, free and clear of any Liens, Claims, and Encumbrances other than Permitted Encumbrances, all of Seller' right, title and interest in, to and under the following assets (collectively, the "*Hospital Assets*" or "*Purchased Assets*"), which shall include all personal property used in the Hospital's operations that was generated after the Operation Assumption Date, but shall not include the Estate Personal Assets. Specifically, the Hospital Assets include:

(a)    **Assumed Designated Contracts and Grants**. All right, title and interest of Seller in and to each Assumed Designated Contract and all deposits and prepayments made by Seller under all such Assumed Designated Contracts after the Operation Assumption Date. For all Assumed Designated Contracts, Seller shall give all contractually required notices related to assignment of such Assumed Designated Contracts, and Seller and Buyer shall, in good faith, cooperate to obtain all necessary consents from the other party to the Assumed Designated Contract to the assignment of the Assumed Designated Contracts from Seller to Buyer.

(b)    **Inventory**. All of Seller's inventories of supplies, raw materials, parts, merchandise, drugs, food, janitorial and office supplies, maintenance and shop supplies, and other disposables and consumables (collectively, the "*Inventory*") generated after the Operation Assumption Date and located within the Hospital premises or any location in which the Hospital's operations are conducted;

(c)    **Prepaids**. All of Seller's advance payments, prepayments, prepaid rentals, prepaid expenses and deposits (including any prepaid deposits for the Inventory) made by or on behalf of Seller in the ordinary course of business for goods and services, including those set forth on **Schedule 1.01(c)**, whether or not pursuant to an Assumed Designated Contract, where such goods or services have not been received by Seller as of the Closing (the "**Prepaids**"), but, in each case, solely to the extent such Prepaids were paid on or after the Operations Assumption Date;

(d)    **Claims**. All claims, causes of action, rights of recovery and rights of setoff and recoupment of any kind (including rights to insurance proceeds and rights under and pursuant to all warranties, representations, and guarantees made by suppliers of services, products, materials, or equipment, or components thereof) that arise out of or inure to the benefit of the Seller with respect to the Hospital Assets ("**Hospital Asset Claims**"), but only to the extent such Hospital Asset Claims first arose on or after the Operation Assumption Date;

(e)    **Tangible Personal Property**. All tangible personal property owned by Sellers and utilized in the operation of the Business, including all machinery and equipment of Sellers utilized in the Business (the "*Tangible Personal Property*");

9

10283289 v4

EXHIBIT *B*
Page ~~107~~ of ~~124~~

(f)     **Intangible Personal Property**. All of Seller's Intangible Personal Property (the "*Intangible Personal Property*") used in connection with the Seller, including the following:

(i)     all Government Authorizations, to the extent assignable or transferable, owned, utilized, licensed, or issued to Seller relating to the development and business or operation of the Seller or the Hospital Assets (including any pending Government Authorizations related to the Seller or the Hospital Assets);

(ii)    all Intellectual Property Rights of Seller related to the Seller, licenses and sublicenses granted and obtained with respect thereto, copies of tangible embodiments thereof in whatever form or medium, website for Seller, all rights to sue and recover damages for infringement occurring on or after the Closing Date, misappropriation or breach thereof, rights to protection of interests therein under the Laws of all jurisdictions, and the goodwill associated therewith;

(iii)   all goodwill associated with the Seller;

(iv)    all warranties and guarantees of third parties relating to the Seller;

(v)     all Books and Records;

(vi)    originals, or where not available, copies (including in electronic format), of patient medical and financial records, to the extent transferable by Law;

(vii)   all business phone numbers, advertising and all sales and promotional literature, samples, and catalogs used in the marketing of the Seller.

**Section 2.02     Excluded Assets.** Notwithstanding any other provision of this Agreement, Seller shall retain all assets other than the Hospital Assets (collectively, the "*Excluded Assets*") which shall not be transferred to Buyer under this Agreement.  The Excluded Assets include, without limitation, the following:

(a)     **Seller Business Records**. All business records of Seller that do not relate to the Hospital Assets and/or that do not pertain primarily to the Seller;

(b)     **All Estate Personal Assets;**

(c)     **The Real Property Asset**; and

(d)     **Other Excluded Assets**. All other assets of Seller that are specified in **Exhibit A** hereto (collectively, the "*Other Excluded Assets*").

**Section 2.03     Purchase Price.** In exchange for the sale, transfer, assignment, conveyance and delivery of the Hospital Assets by Seller to Buyer, Buyer shall, upon the terms and subject to the conditions set forth herein, pay $1.00 for the Hospital Assets (the "*Purchase Price*").

10283289 v4

EXHIBIT B
Page 103 of 124

Section 2.04    **Payment of Purchase Price.** Buyer shall remit the Purchase Price to Seller at the Closing.

Section 2.05    **RESERVED.**

Section 2.06    **Assumed Liabilities**. Subject to the terms and conditions set forth herein, and effective as of the Closing Date, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "***Assumed Liabilities***"), and no other Liabilities:

(a)    **Assumed Designated Contracts**. All liabilities and obligations of Seller arising under any Assumed Designated Contract other than liabilities or obligations arising in connection with the breach of any such arrangement on or prior to the Operation Assumption Date; and

(b)    **Post-Closing Date Liabilities**. All liabilities and obligations of Seller arising on or after the Operation Assumption Date.

Section 2.07    **Excluded Liabilities.**    Notwithstanding any other provision of this Agreement, Buyer shall not assume, or otherwise be responsible for, any liabilities or obligations of Seller, whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown, and not expressly assumed hereunder as Assumed Liabilities or otherwise agreed to in writing by Buyer, including, without limitation, the following (collectively, the "***Excluded Liabilities***"):

(a)    **Professional and Comprehensive General Liability Claims**. Professional liability or general liability claims that relate to incidents, actions or omissions occurring prior to the Operation Assumption Date with respect to the Seller.

(b)    **Employment Liabilities**. Any liability, but only to the extent it arose from events occurring prior to the Operation Assumption Date, relating to, resulting from, or arising out of (and whether or not such liabilities arise prior to, on or following the Operation Assumption Date) Seller's actual or prospective employment or engagement, retention and/or termination of any current or former employee of Seller (including liabilities for compensation, benefits, accrued paid time off or liabilities with respect to a claim of an unfair labor practice or under any employment Law or regulation).

(c)    **Tort and Contract Claims**. Any other claim or liability (including litigation identified in **Schedule 2.07(c)**), whether in contract or tort, which arises from the conduct of Seller prior to the Operation Assumption Date that is not expressly assumed by Buyer under the terms of this Agreement.

(d)    **Other Claims**. Any other debts, obligations or liabilities of Seller that relate to incidents, actions or omissions of Seller or Seller's directors, officers, employees, contractors, agents or representatives occurring prior to the Operation Assumption Date that is not expressly assumed by Buyer under the terms of this Agreement.

EXHIBIT _B_
Page _104_ of _130_

Section 2.08    **Purchase Price Allocation.** Seller and Buyer acknowledge that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among Seller' Purchased Assets, for Tax and financial accounting purposes only, as set forth on **Exhibit E** (the "*Purchase Price Allocation*"). Buyer and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with the Purchase Price Allocation.  For the avoidance of doubt, the Purchase Price Allocation is not binding on any party for any other purposes.

Section 2.09    **Third Party Consents.** To the extent that Seller' rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not, pursuant to Section 365(c) of the Bankruptcy Code, be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful.

Section 2.10    **RESERVED.**

## ARTICLE III
## CLOSING

Section 3.01    **Closing.**  Subject to the terms and conditions of this Agreement and the Confirmation Order, the consummation of the transactions contemplated by this Agreement (the "*Closing*") shall be conducted remotely, via the exchange of emails, the pre-depositing of original executed documents with Escrow Agent for recording purposes, and the requisite wiring of funds as appropriately directed by the respective interested parties, no later than the close of business on the first (1st) day of a calendar month that occurs after five (5) business days following the date on which conditions to Closing set forth in **Article VII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing occurs is herein referred to as the "**Closing Date**." The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date (the "*Effective Time*").

Section 3.02    **Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer or its designees the following:

(i)    bills of sale in the form of **Exhibit B** (the "**Bills of Sale**") duly executed by Seller, transferring the Intellectual Property Assets, the Intangible Personal Property, the Tangible Personal Property, and the IT Assets to Buyer or its designees;

(ii)    a closing statement setting forth all prorations and adjustments (the "*Closing Statement*") duly executed by Seller; and

(iii)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer and the Escrow Agent, as may be required to give effect to this Agreement.

10283289 v4

EXHIBIT B
Page 105 of 124

(b)     At the Closing, Buyer and/or its designees shall deliver to Seller the following:

(i)     the Buyer Closing Certificate;

(ii)    the certificates of the Secretary or authorized representative of Buyer required by **Sections 7.03(g), (h)** and **(i)**;

(iii)   a Closing Statement duly executed by Buyer; and

(iv)    such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

(c)     On the Closing Date, Buyer shall cause the Escrow Agent to deliver the Purchase Price and any unpaid portion of the AAM Cash Contribution (as defined in the MTA) to Seller.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this **Article IV** are true and correct as of the Execution Date and will be true and correct as of the Closing Date, except as otherwise provided in Schedule 4.00.

**Section 4.01    Organization and Qualification of Seller.** Seller is a not for profit corporation duly organized, validly existing and in full force and effect under the Laws of the State of California.

**Section 4.02    Authority of Seller.** The execution and delivery of the Transaction Documents have been duly authorized by all requisite authority and corporate action on the part of Seller. The performance and consummation of the Transaction Documents and the transactions contemplated thereby shall be authorized by and subject to the Confirmation Order.

**Section 4.03    Intentionally Omitted.**

**Section 4.04    Intentionally Omitted.**

**Section 4.05    Title to Purchased Assets.** Seller has good and valid title to all the applicable Purchased Assets. All such Purchased Assets are free and clear of Liens, Claims, and Encumbrances except for those encumbrances on Schedule 4.05 ("*Permitted Encumbrances*").

**Section 4.06    Intellectual Property.**

(a)     **Schedule 4.06** lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets, including software, that are not registered but that are material to the operation of the Hospital. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials,

EXHIBIT _B_
Page 109 of 124

in each case to the extent material to the operation of the Hospital, related to all Intellectual Property Registrations.

(b)     Seller is the sole and exclusive legal and beneficial seller of the applicable Intellectual Property Registrations.

**Section 4.07     Reserved.**

**Section 4.08     Reserved.**

**Section 4.09** Insurance. **Schedule 4.09** sets forth (a) a true and complete list of all policies or binders, as of the Execution Date, of fire, liability, product liability, umbrella liability, professional liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller or their affiliates and relating to the Hospital, the Purchased Assets and the Assumed Liabilities (collectively, the "*Insurance Policies*"); and (b) with respect to the Hospital, the Purchased Assets or the Assumed Liabilities, a list of all pending tendered claims and the claims history for the Insurance Policies for the three (3) years prior to the Execution Date.

**Section 4.10     Permits; No Actions.**

(a)     All Permits and Regulatory Approvals held by the Seller, as of the Execution Date, to conduct the Hospital as conducted as of the Execution Date are set forth in **Schedule 4.10(a)**.

(b)     Except as set forth in **Schedule 4.10(b)**, there are no Actions pending or, to Seller's knowledge, threatened against or by any Seller: (a) relating to or affecting the Hospital, the Purchased Assets, or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.

**Section 4.11     Environmental Matters.**

(a)     **Intentionally Omitted**.

(b)     **Intentionally Omitted**.

**Section 4.12** Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 4.13     Accuracy of Representations and Warranties.** All representations and warranties of Seller contained in this Agreement are true and correct as of the Execution Date and shall be true and correct as of the Closing Date.

**Section 4.15     Expiration of Representations and Warranties.** The representations and warranties of Seller contained in this Agreement shall expire upon and shall not survive the Closing for any purpose whatsoever.

10283289 v4

EXHIBIT *B*

Page ~~109~~ of ~~124~~

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article V** are true and correct as of the Execution Date and will be true and correct as of the Closing Date.

**Section 5.01    Organization of Buyer.** Buyer is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of California.

**Section 5.02    Authority of Buyer.** Buyer has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer, or a Buyer designee, is a party, the performance by Buyer, or its designees, of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby (i) have been duly authorized by all requisite limited liability company action on the part of Buyer or its designees and (ii) will not violate or conflict in any material respect with any of Buyer's organizational documents or with any material note, contract, lease, mortgage or other obligation of any kind to which Buyer is a party or by which Buyer is bound. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer or a Buyer designee is or will be a party has been duly executed and delivered by such Buyer designee (assuming due authorization, execution, and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03    Adequate Funds.** As of the Execution Date, Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price and other funds needed to consummate the transaction (including payment of any portion of the AAM Cash Contribution due under the MTA and outstanding as of the Closing Date) and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price, any portion of the AAM Cash Contribution due under the MTA and outstanding as of the Closing Date, and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein.

**Section 5.04    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any affiliate of Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred, nor circumstances exist, that may give rise or serve as a basis for any such Action.

EXHIBIT B
Page 108 of 124

**Section 5.06     Due Diligence Materials.**  Seller has provided certain documents which relate to the operations and financial conditions of the Hospital, which are hereby referred to as "***Due Diligence Materials***". Prior to the Execution Date, Buyer has been provided access to the Due Diligence Materials. Until the Effective Time, Seller will continue to cooperate in providing information to Buyer as requested, in a timely manner, but is under no obligation to create documents or provide any related documents which are outside those in the possession of Seller. Buyer acknowledges that certain Due Diligence Materials may be limited to summaries, or otherwise contain redactions, if the Seller reasonably believe the disclosure of such information would be a violation of Law protecting the personal, financial or protected health information of any resident or patient or affiliate of a resident or patient, including, but not limited to, all Laws adopted under the Health Insurance Portability and Accountability Act.

**Section 5.07     Fitness for and Timing of Application for Obtaining Permits and Regulatory Approvals.**  Buyer has no knowledge of any material fact or other information related to Buyer or any of its affiliates which could be reasonably expected to have an adverse impact on Buyer's or its designees' ability to obtain the Permits and Regulatory Approvals. To Buyer's knowledge, it has been in material compliance with healthcare regulatory laws and has not received any communication from a governmental authority or third-party payors that would prohibit or delay the Buyer from consummating the transaction contemplated herein or obtaining the Permits and Regulatory Approvals necessary to operate the Hospital. Buyer shall have applied for (or caused its designees to apply for) all Permits and Regulatory Approvals no later than ten (10) days after the entry of the Confirmation Order.

**Section 5.08     No  Guarantee of License.**  Buyer acknowledges that the Hospital operations are regulated by local, state, or federal Laws and that the Hospital's operations must be conducted under a license or licenses issued or authorized by the State of California.

**Section 5.09     Accuracy of Representations and Warranties.**  All representations and warranties of Buyer contained in this Agreement are true and correct as of the Execution Date and shall be true and correct as of the Closing Date.

**Section 5.10     Disclaimers; Releases and Limitations.**  Buyer represents and warrants to Seller that Buyer is a knowledgeable, experienced, and sophisticated buyer of real estate and/or hospitals. Buyer acknowledges that, except for the representations and warranties made by Seller in **Article IV** hereof, Buyer has not relied upon and will not rely upon, either directly or indirectly, any statement of Seller or any of their officers, directors, trustees, agents, employees, or other person acting or purporting to act on behalf of Seller.

**Section 5.11     No Other Warranty**  Without in any manner limiting the provisions of the preceding paragraph, as a material part of the consideration for this agreement, Seller and Buyer agree that Buyer is taking the property "as is", "where is" and "with all faults" and with any and all latent and patent defects and that there is no warranty or representation, express or implied, of any kind or nature (including, without limitation, warranties with respect to habitability, marketability, use or fitness for a particular purpose) made by Seller with respect to the property (except for the representations of Seller expressly set forth in **Article IV**), all other representations and warranties, both express and implied, are hereby expressly disclaimed and denied. Buyer acknowledges that it has been or will be given adequate time to conduct whatever examination, evaluations, inspections,

10283289 v4

EXHIBIT B
Page 104 of 124

reviews, studies or tests of the property and its condition as Buyer may desire or determine warranted, and that Buyer is not relying on any representation, warranty, statement or other assertion with respect to the property or its condition by Seller or any of Seller' officer, director, trustee, agent, employee, attorney or other person acting or purporting to act on behalf of any Seller or any of its affiliates, but Buyer is relying solely on its own examination, evaluations, inspections, reviews, studies or tests of the property. Without limiting the provisions of preceding paragraphs, Buyer expressly releases and discharges Seller, its respective affiliates, members, partners, officers, directors, shareholders, employees, attorneys, agents, brokers, and contractors from any and all obligations, claims, administrative proceedings, judgements, damages, fines, costs, and liabilities arising out of or relating to the physical condition of the property or any portion thereof.

## ARTICLE VI
## OPERATIONS PENDING CLOSING

**Section 6.01    Intentionally Omitted.**

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01    Conditions to Obligations of All Parties.**  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No governmental authority shall have enacted, issued, promulgated, enforced, or entered any governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    The Bankruptcy Court shall have entered the orders approving the Debtor's entry into the MSA, the MTA, the Plan, and the Sale (pursuant to the Plan or otherwise), and each such order shall have become a Final Order.

(c)    Buyer's designees shall have received all Permits and Regulatory Approvals that are set forth on **Schedule 4.10(a)**.

**Section 7.02    Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court has entered an order approving the MTA in form and substance acceptable to Buyer and such order has become a Final Order;

(b)    The Bankruptcy Court has entered an order approving the MSA in form and substance acceptable to Buyer and such order has become a Final Order;

10283289 v4

EXHIBIT _B_
Page _110_ of _124_

(c)     The Bankruptcy Court has entered an order approving this Agreement, either as part of the approval of the MTA or by separate order, in form and substance acceptable to Buyer, and such order has become a Final Order;

(d)     The Bankruptcy Court has entered an order confirming a Conforming Plan pursuant to Section 1129 of the Bankruptcy Code and such order has become a Final Order;

(e)     The CDHP shall have approved the CHOW Application in favor of Buyer;

(f)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement, and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date shall occur concurrently with the Closing hereunder; *provided,* with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(g)     The representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the Execution Date and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(h)     No injunction or restraining Order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(i)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(a)**.

**Section 7.03    Conditions to Obligations of Seller.**    The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the applicable Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Buyer shall have made the Initial Contribution and all of the Supplemental Contributions required under the MTA.

(b)     Buyer shall have delivered the Purchase Price.

(c)     The representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect)

10283289 v4

EXHIBIT M
Page 117 of 194

on and as of the Execution Date and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(d)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement, the MTA, and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date; *provided,* with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(e)     No injunction or restraining Order shall have been issued by any governmental authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(f)     Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.02(b)**.

(g)     Seller shall have received a certificate, dated the Closing Date, and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 7.03(a)** and **Section 7.03(b)** have been satisfied (the "***Buyer Closing Certificate***").

(h)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the officers of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(i)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents, and the other documents to be delivered hereunder and thereunder.

(j)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.04   Access to Information; Books and Records.**

(a)     After the Closing, the Buyer shall permit, for a period of not less than six (6) years, each of the Debtors, any direct or indirect successor to the Debtors and their respective professionals, the Committee and its professionals (collectively, the "***Permitted Parties***") reasonable access to all books and records that are in connection with or that otherwise relate to the Debtors and their operations prior to the Closing and that are in the

19

EXHIBIT _B_
Page _119_ of _124_

control or the possession of the Buyer or any of its affiliates or their respective agents or representatives (collectively, "*Business Records*") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets or Excluded Liabilities (including, without limitation, Causes of Action), (ii) pursuing, assessing, defending, settling, or otherwise dealing with Causes of Action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Debtors, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process relating to any of the Debtors, including, without limitation, with respect to Causes of Action against any person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative claims and any general unsecured claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering the Debtors' estates including, without limitation, the preparation and confirmation of a plan relating to any of the Debtors and the preparation of accompanying disclosure statement, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down the Debtors' estates, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose. For the avoidance of doubt, the Permitted Parties shall not have access to the Buyer's books and records that are created subsequent to the Closing and do not relate to the Debtors and their operations prior to the Closing.

(i) The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party, upon reasonable notice during regular business hours, to copy at the Permitted Party's premises or the Purchaser's premises (including any location formerly operated by any of the Debtors) at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to herein and (ii) Buyer's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may reasonably be requested, but only to the extent such Permitted Party furnishes the Buyer with reasonable written descriptions of the materials to be so copied. The Buyer shall not dispose of or destroy any of the Business Records before the sixth (6th) anniversary of the Closing Date and will provide the Permitted Parties and the Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Permitted Party that requests copies of any Business Records within such ninety (90) day period copies of all requested Business Records at the cost of the requesting Permitted Party.

(ii) The Buyer shall use commercially reasonable efforts to make reasonably available to Permitted Parties employees of the business to assist the Debtors and the Committee in connection with the administration of the Debtors' estates as set forth herein, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

10283289 v4

EXHIBIT B
Page 113 of 114

     **Section 7.05  Bulk Sales Laws.** The parties hereby waive compliance with the provisions of Division 6 of the California Uniform Commercial Code ("***Bulk Sales Law***") with respect to Buyer's purchase of the Purchased Assets.

**ARTICLE VIII**
**TERMINATION**

     **Section 8.01  Termination.** Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby and thereby abandoned at any time on or prior to the Closing Date:

     (a)    by the mutual written consent of Seller and Buyer;

     (b)    by Buyer by written notice to Seller if:

     (i)    Buyer is not then in material breach of any provision of this Agreement or the MTA and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller' receipt of written notice of such breach from Buyer;

     (ii)    any of the conditions set forth in **Section 7.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the date which is ninety (90) days following the Plan Confirmation Date (the "***Condition Satisfaction Date***"); or

     (iii)    any of the conditions set forth in **Section 7.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

     (c)    by Seller by written notice to Buyer if:

     (i)    Seller is not then in material breach of any provision of this Agreement or the MTA and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach from Seller; or

10283289 v4

EXHIBIT *B*
Page 114 of 124

(ii)     any of the conditions set forth in **Section 7.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date; or

(iii)    any of the conditions set forth in **Section 7.03** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Condition Satisfaction Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

(d)     by Buyer or Seller in the event that: (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; (ii) any governmental authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable; or (iii) if the Closing Date shall not have occurred on or before the close of business on the first (1st) day of a calendar month that occurs after five (5) business days following the date on which conditions to Closing set forth in **Article VII** are either satisfied or waived.

**Section 8.02     Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01     Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with this Agreement and the transactions contemplated hereby, shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02     Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

| If to Seller: | |
|---|---|
| with a copy to: | |

10283289 v4

EXHIBIT __B__
Page __115__ of __124__

| If to Buyer: | |
|---|---|
| With a copy to:<br><br>(which shall not constitute notice) | |

**Section 9.03    Interpretation.**  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires,  references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04    Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05    Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06    Entire Agreement.**  This Agreement, the MTA, the MSA, the Real Property APA, and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the MTA will control.

**Section 9.07    Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that

10283289 v4

EXHIBIT B
Page 116 of 124

if Buyer shall assign its rights under this Agreement to a party (or parties) which are not an affiliate (or affiliates) of Buyer, then Buyer shall have the obligation to pay the Purchase Price at the Closing.

    **Section 9.08    No Third-Party Beneficiaries.**    Except with respect to rights of the Liquidation Trustee, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express, or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

    **Section 9.09    Amendment and Modification; Waiver.**    This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

    **Section 9.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

        (a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

        (b)    VENUE AND RETENTION OF JURISDICTION. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND THE BANKRUPTCY COURT SHALL RETAIN JURISDICTION TO DETERMINE ANY AND ALL SUCH ACTIONS.

        (c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND

EXHIBIT B
Page 117 of 124

(D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.10(c)**.

**Section 9.11    Specific Performance.**  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.12    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.13.  No Recourse to Estate Personal Assets or AAM Cash Contribution.** Notwithstanding any provision in this Agreement to the contrary, AAM shall have no recourse to the Estate Personal Assets nor to the AAM Cash Contribution (as those terms are defined in the Transition Agreement) in connection with any claim or right of indemnification that AAM may hold against Seller hereunder.  Under no circumstances shall AAM have any right to recovery against the Estate Personal Assets or the AAM Cash Contribution.

[SIGNATURE PAGE FOLLOWS]

10283289 v4

EXHIBIT _B_
Page _118_ of _124_

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their duly authorized representatives, effective as of the day and year first written above.

**SELLER**:

**MADERA COMMUNITY HOSPITAL**

By:_____
Name:_____
Title: _____

**BUYER**:

**GSR MADERA, L.P.**

By:_____
Name:_____
Title: _____

10283289 v4

EXHIBIT _B_
Page 119 of 124

**EXHIBIT A**
**EXCLUDED ASSETS**

10283289 v4



EXHIBIT B
Page 126 of 130

**EXHIBIT B**

**BILL OF SALE**

        This Bill of Sale is entered into [as of/on] [DATE] by [SELLER NAME], a [STATE OF ORGANIZATION] [TYPE OF ENTITY] ("**Seller**"), in favor of [BUYER NAME], a [STATE OF ORGANIZATION] [TYPE OF ENTITY] ("**Buyer**"). [This Bill of Sale is made pursuant to the [AGREEMENT NAME] (the "**Agreement**") [dated [DATE]] by and between Seller and Buyer, to transfer the Goods, as fully defined herein. Any capitalized terms used but not defined in this Bill of Sale, if any, have the meaning set forth in the Agreement.]

        1.     Conveyance. For good and valuable consideration [in the amount of $[PAYMENT AMOUNT]/in the [form/amount] paid under Section [NUMBER] of the Agreement], the receipt and adequacy of which Seller hereby acknowledges, Seller hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to Buyer, all of its right, title and interest in and to the goods listed [in Section [NUMBER] of the Agreement/on ~~EXHIBIT A~~exhibit A attached to and made a part of this Bill of Sale] ("**Goods**").

        2.     Disclaimer of Warranties. [EXCEPT AS SPECIFICALLY SET FORTH IN THE AGREEMENT,] SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE GOODS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE. BY ACCEPTING THIS BILL OF SALE, BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY SELLER, OR ANY OTHER PERSON ON SELLER'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT.

        3.     Further Assurances. Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time on Buyer's written request, Seller will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

        4.     Governing Law. This Bill of Sale is governed by[, and construed in accordance with,] the laws of the State of [STATE], United States of America[, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of [STATE]].

10283289 v4

EXHIBIT B
Page 127 of 130

5.　　__Incorporation of Agreement__. This Bill of Sale incorporates by reference all of the terms of the Agreement, including but not limited to Seller's representations, warranties, covenants, and agreements relating to the Goods, as if each term was fully set forth herein. In the event of conflict between the terms of the Agreement and the terms of this Bill of Sale, the terms of the Agreement govern and control.

6.　　__Counterparts__. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile[, e-mail, or other means of electronic transmission] shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

10283289 v4

EXHIBIT B
Page 122 of 124

**IN WITNESS WHEREOF**, Seller [and Buyer] [has/have each] duly executed [and delivered] this Bill of Sale [as of/on] the date first written above.

[SELLER NAME]                 [Witness

By_____       By_____

Name:                      Name:

Title:                        Title:]

[[BUYER NAME]               [Witness

By_____       By_____

Name:                      Name:

Title:]                       Title:]

10283289 v4



EXHIBIT B
Page 123 of 124

**EXHIBIT E**
**PURCHASE PRICE ALLOCATION**

10283289 v4



EXHIBIT B
Page 124 of 124