**70 PAGES**

1

JASON E. RIOS, State Bar No. 190086
FELDERSTEIN FITZGERALD

2

WILLOUGHBY PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250

3

Sacramento, CA 95814
Telephone:    (916) 329-7400

4

Facsimile:    (916) 329-7435
Email: jrios@ffwplaw.com

5

Attorneys for County of Madera

6

7

8

JENNIFER L. NASSIRI, State Bar No. 209796
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
1901 Avenue of The Stars, Ste 1600
Los Angeles, CA 90067-6055
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:        jnassiri@sheppardmullin.com

Attorneys for The Regents of the University of
California, on behalf of its San Francisco
Campus and Academic Medical Center

JOSHUA M. MESTER, State Bar No. 194783

9

JONES DAY
555 South Flower Street, Fiftieth Floor

10

Los Angeles, CA 90071
Telephone:    (213) 243-2508

11

Facsimile:    (213) 243-2539
Email:        jmester@jonesday.com

12

Attorneys for Adventist Health System/West

13

14

**UNITED STATES BANKRUPTCY COURT**

15

**EASTERN DISTRICT OF CALIFORNIA**

16

**FRESNO DIVISION**

17

In re

18

MADERA COMMUNITY HOSPITAL,

19

                    Debtor-in-Possession,

20

21

Tax ID#:      23-7429117

22

Address:      1250 E. Almond Ave.
              Madera, CA 93637

23

24

25

26

27

28

Case No. 23-10457

Chapter 11

DC No.:  WJH-77

**EXHIBITS TO NOTICE OF PROPOSED
ALTERNATIVE TRANSACTION TO JOINT
MOTION OF THE DEBTOR AND THE
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER
PURSUANT TO SECTIONS 105(A) AND
363(B) OF THE BANKRUPTCY CODE
AUTHORIZING THE DEBTOR TO ENTER
INTO A MASTER TRANSITION
AGREEMENT AND A MANAGEMENT
SERVICES AGREEMENT WITH
AMERICAN ADVANCED MANAGEMENT,
INC.**

Date:      February 13, 2024
Time:      9:30 a.m.
Location:  2500 Tulare Street
           Fresno, CA  93721
           Courtroom 13
           Via ZoomGov
Judge:     Hon. René Lastreto II

| Exhibit | Description | # of Pages |
|---|---|---|
| Exhibit A | Authority Agreement | 18 Pages |
| Exhibit B | Commitment Letters | 18 Pages |
| Exhibit C | PSA/Plan Term Sheet | 10 Pages |
| Exhibit D | MSA LOI | 6 Pages |
| Exhibit E | Stakeholder Letters of Support | 10 Pages |

*[Signature Page Follows]*

Dated: February 12, 2024

FELDERSTEIN FITZGERALD
WILLOUGHBY PASCUZZI & RIOS LLP

By:    */s/ Jason E. Rios*
JASON E. RIOS
Attorneys for County of Madera

Dated: February 12, 2024

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

By:    */s/ Jennifer L. Nassiri*
JENNIFER L. NASSIRI
Attorneys for The Regents of the University of
California, on behalf of its San Francisco Campus and
Academic Medical Center

Dated: February 12, 2024

JONES DAY

By:    */s/ Joshua M. Mester*
JOSHUA M. MESTER
Attorneys for Adventist Health System/West

## **Exhibit A**

**Authority Agreement**

*MCC#12678-24*

## MADERA HEALTH AND HOSPITAL JOINT POWERS AUTHORITY

### JOINT EXERCISE OF POWERS AGREEMENT

THIS JOINT POWERS AGREEMENT ("**Agreement**"), is made and entered into by and between The Regents of the University of California, on behalf of its San Francisco campus and academic medical center ("**UCSF Health**") organized and exiting pursuant to Article IX, Section 9 of the Constitution of the State of California, and the County of Madera ("**County**") organized and existing as a general law county under the general laws of the state of California including Government Code section 23000 *et seq*. UCSF Health and the County are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties."

### RECITALS

A.   Each Party to this Agreement is a public entity authorized and empowered to contract for the joint exercise of powers under Articles 1 through 4, Chapter 5, Division 7, Title 1 (commencing with Section 6500) of the Government Code of the State of California;

B.   Each Party to this Agreement possesses the power to, among other things:

1. Acquire and operate hospital and related assets, and to apply for and maintain related licenses, accreditations, permits, and other authorizations;

2. Employ or contract with physicians, administrators, and staff necessary to operate such facilities and programs and enter into management and professional services agreements with third parties;

3. Enroll in Medicare, Medi-Cal, and other government-sponsored healthcare programs as a provider or supplier and contract with commercial payors;

4. Take any actions necessary to contribute to, qualify for, earn and/or distribute supplemental payments or fees associated with the Parties' participation in and treatment of beneficiaries eligible for Medicare, Medi-Cal and other government-sponsored healthcare programs; and

5. Issue debt, pledge assets, and guarantee obligations.

C.   The only community hospital in the County, Madera Community Hospital, ceased operations as of January 2023 and subsequently filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Eastern District of California, Fresno Division ("**Bankruptcy Court**").

D.   The Parties wish to jointly exercise the above powers to advance the County's public health priorities and UCSF Health's public service and academic mission by: (i) stabilizing the availability of community hospital services to all residents of Madera County and surrounding areas regardless of payor or funding source; (ii) supporting access to specialists, tertiary and quaternary care, and advanced clinical trials; (iii) facilitating and supporting development and implementation of disaster and

emergency protocols for the benefit of the County and its residents; (iv) supporting health care workforce planning and development and deploying resources to address critical gaps or shortages; and (v) identifying and adopting evidence-based clinical protocols and best practices and coordinating and advancing patient safety and quality improvement initiatives.

**NOW THEREFORE,** in consideration of the above Recitals and of the mutual promises and agreements contained herein, the Parties agree as follows:

**ARTICLE 1**
**GENERAL PROVISIONS**

1.1     **Definitions**. Unless the context otherwise requires, the words and terms defined in this Section 1.1 shall, for the purposes of this Agreement, have the meanings herein specified.

1.1.1   Act means Articles 1 through 4, Chapter 5, Division 7, Title 1 of the Government Code of the State of California (commencing with Section 6500) relating to the joint exercise of powers common to public agencies.

1.1.2   Administrator means the County.

1.1.3   Agreement means this Joint Exercise of Powers Agreement.

1.1.4   Annual Budget means the budget adopted pursuant to Section 6.2.2 of this Agreement.

1.1.5   Authority means the Madera Health and Hospital Joint Powers Authority, which is created by this Agreement.

1.1.6   Bankruptcy Court refers to the United States Bankruptcy Court for the Eastern District of California, where the Bankruptcy Case is pending as of the execution of this Agreement.

1.1.7   Bankruptcy Case means *In re Madera Community Hospital*, Case No. 23-10457 pending before the Bankruptcy Court.

1.1.8   Board or Board of Directors means the Board of Directors referred to in Article 2 of this Agreement.

1.1.9   CDPH means the California Department of Public Health.

1.1.10  Distressed Hospital Loan Program or DHLP refers to the program established under Chapter 6, Statutes of 2023 (Assembly Bill 112).

1.1.11  Director means a member of the Board appointed to the Board pursuant to Section 2.2 of this Agreement.

1.1.12  Effective Date means February 12, 2024.

**1.1.13** <u>Governing Body</u> means, with respect to the Authority, its Board of Directors, established pursuant to and operating consistent with this Agreement; with respect to the County, its Board of Supervisors; and, with respect to UCSF Health, the UCSF Chancellor.

**1.1.14** <u>Hospital</u> means a health facility operating as a general acute care facility.

**1.1.15** <u>Madera Campus</u> refers to the site formerly operated as Madera Community Hospital, located at 1250 East Almond Avenue, Madera, California, 93637, and associated outpatient and freestanding clinics.

**1.1.16** <u>Member Agency(ies)</u> means UCSF Health, the County, and any other entity added to this Agreement by a subsequent amendment.

**1.1.17** <u>Member of the Board</u> or <u>Board Member</u> means a Director.

**1.1.18** <u>Operator</u> means the County or a Qualified Third Party designated by the County to provide facility, operations, administrative, and related services to any hospitals, health facilities, clinics, or other health care providers or suppliers owned or controlled by the Authority under an operating agreement or a management services agreement.

**1.1.19** <u>Party(ies)</u> means those entities who have executed this Agreement or any Amendment to this Agreement and who have not withdrawn from the Authority.

**1.1.20** <u>Qualified Third Party</u> means a public or not-for-profit health facility or health system that: (i) operates at least one licensed general acute care hospital that is either a designated public hospital or disproportionate share hospital in California; and (ii) is approved by CDPH to manage the Madera Campus.

**1.1.21** <u>Service Line</u> means a group of health care services, often offered through an interdisciplinary team, focused around a particular medical specialty, disease state, or population. Examples of service lines include, but are not limited to, women's health, cardiovascular disease, orthopedics, pediatrics, and gastrointestinal disease.

**1.2**  **Purpose**. This Agreement is made pursuant to the Act by UCSF Health and the County, each of which is authorized to contract with other pursuant hereto. The purposes of this Agreement are to (1) create the ***Madera Health and Hospital Joint Powers Authority*** ("**Authority**"); (2) provide for the administration of the Authority; (3) acquire, reopen and operate the Madera Campus; and (4) act as a member of Madera Community Hospital.

**1.3**  **Creation of Authority**. Pursuant to the Act, the Authority is hereby created. The Authority shall be a public entity separate and apart from the Member Agencies and shall administer this Agreement.

**1.4**   **Term**. The term of this Agreement shall commence on the Effective Date and shall continue until terminated by the Parties as provided in Article 7 of this Agreement.

**1.5**   **Powers of Authority**

**1.5.1**   General Powers. The Authority shall exercise, in the manner herein provided, the powers common to the Member Agencies, powers otherwise permitted under the Act, and powers necessary to accomplish the purposes of this Agreement, subject however to such restrictions as are applicable to the County under the provisions of Government Code section 23000 *et seq.* and other applicable provisions of law, as required by Government Code section 6509.

**1.5.2**   Specific Powers. Subject to the limitations set out in Section 1.5.1, the Authority is hereby authorized, in its own name, to do all acts necessary, convenient and appropriate for the exercise of the foregoing powers for the purposes set forth in this Agreement and to do any or all of the following:

**(a)**   Acquire or otherwise secure control of and to operate health facilities, clinics, and related assets and apply for, secure, and maintain related licenses, permits, accreditation, and other authorizations;

**(b)**   Enroll in Medicare, Medi-Cal, and other government health care programs as a provider or supplier, and contract with commercial payors to deliver health care services to their members;

**(c)**   Take any actions necessary to contribute to, qualify for, earn, fund, and/or distribute supplemental payments or fees associated with the Parties' participation in and treatment of beneficiaries eligible for Medicare, Medi-Cal and other government-sponsored healthcare programs;

**(d)**   Make and enter contracts, including without limitation management and professional services agreements with third parties;

**(e)**   Employ or contract with employees, agents, and physicians and other independent licensed health professionals;

**(f)**   Lease, acquire, construct, manage, maintain or operate any building, works or improvements, or related real property;

**(g)**   Acquire, hold or dispose of property;

**(h)**   Incur debts, pledge assets, and assume liabilities or obligations, which do not constitute a debt, liability or obligation of any Member Agency;

**(i)**   Receive gifts, contributions and donations of property, funds, services and other forms of assistance from persons, firms, corporations, and governmental entities, provided that the Authority consents to such gifts, contributions and donations;

**(j)**     Fix the compensation, if any, paid to the Board of Directors, Secretary, Treasurer, Controller and Attorney, in compliance with all applicable laws;

**(k)**     Prescribe the duties, compensation and other terms and conditions of employment of other agents, officers and employees of the Authority;

**(l)**     Adopt reasonable rules and regulations for the conduct of the day-to-day operations of the Authority;

**(m)**     Apply for, accept, receive and disburse grants, loans and other aid from any city, municipality, county or agency of the United States of America or of the State of California;

**(n)**     Sue and be sued in its own name;

**(o)**     Invest money in the treasury, pursuant to Government Code section 6505.5, that is not required for the immediate necessities of the Authority, as the Authority determines advisable, in the same manner and on the same conditions as local agencies, pursuant to Section 53601 of the Government Code;

**(p)**     Carry out all purposes and enforce all provisions of this Agreement; and

**(q)**     Exercise any and all powers which are provided for in the Act and in Government Code section 6540 *et seq.*, and section 6584 *et seq.* including, without limitation Government Code section 6588, as they exist on the Effective Date of this Agreement or may hereafter be amended.

**1.6**    **<u>Responsibilities of and Powers Reserved to the Member Agencies and Operator</u>**

**1.6.1**    <u>Governance</u>. Each of the Member Agencies, and the Operator should the County appoint an Operator, shall participate in the governance of the Madera Campus, consistent with the allocation of governance rights and responsibilities reflected in Article III below.

**1.6.2**    <u>Administrative and Operational Management</u>. The County, or the Operator on its behalf, shall retain the following responsibilities with respect to operating or managing the Madera Campus:

- Hospital and clinic operations and regulatory compliance;
- Public finance;
- Coordination with county public health and social services departments and programs;
- Public accountability including Authority governance administration, as well as Authority compliance with open meetings laws, public records laws, and the Political Reform Act; and
- Community engagement.

5

**1.6.3** <u>Clinical and Academic Program Management</u>. UCSF Health shall retain the following responsibilities with respect to the Madera Campus:

- Clinical policy development and programming;
- Quality and safety oversight;
- Support recruitment and retention of physicians and other clinical workforce development initiatives;
- Brand affiliation; and
- Sponsorship of any academic programs that may be approved from time to time by the Board as provided in Section 3.3.2 below.

**ARTICLE 2**
**BOARD OF DIRECTORS**

**2.1** **<u>Creation of the Board of Directors</u>**. The Authority shall be governed by a board of seven (7) members, which is hereby established, and which shall be composed of: one (1) representative employed by or elected to represent the County; three (3) representatives nominated by the Operator and appointed by the County; and three (3) representatives nominated and appointed by UCSF Health. Each Member Agency may also appoint one (1) non-voting Board observer. The Authority's Governing Body shall be known as the "Board of Directors of the Madera Health and Hospital Joint Powers Authority" or the "Board." All voting power shall reside in the Board.

**2.2** **<u>Members of the Board of Directors</u>**.

**2.2.1** <u>Directors and Alternates Appointed</u>. Within thirty (30) days of the Effective Date, each Member Agency that has not already done so shall produce documentation to the other(s) and to the Board of any action of its Governing Body required to complete the nominations and appointments referenced in Section 2.1 above, as well as one individual to act as an alternate to each Director so appointed. The alternate appointed by each Member Agency shall have the authority to attend, participate in and vote at any meeting of the Board when the regular Director is absent.

**2.2.2** <u>Membership</u>. Each Director and alternate of the Board of Directors shall serve until a successor is appointed. Each Director and alternate shall serve at the pleasure of the appointing Member Agency, except that those who are nominated by the Operator shall serve at the pleasure of the Operator. Each Director and alternate nominated and appointed by a Member Agency serves at the pleasure of the Member Agency's Governing Body and may be removed at any time, with or without cause, at the sole discretion of the appointing Member Agency's Governing Body. If a Director or alternate's affiliation with the appointing Member Agency or Operator, as applicable, ceases, their membership on the Board also shall automatically cease.

6

**2.2.3** <u>Board Compensation</u>. The Directors shall serve without compensation from the Authority. Compensation may be provided as approved by the Member Agencies appointing each Director and alternate (or in the case of those Directors nominated by the Operator, may be compensated by the Operator), and any such compensation will be the responsibility of the Member Agency or the Operator, as applicable.

**2.3** **Powers of the Board**. All the power and authority of the Authority shall be exercised by or subject to the oversight and governance of the Board of Directors.

**2.4** **Commitments of the Board and Member Agencies in Connection with the Madera Campus**. The Member Agencies hereby make the following commitments on behalf of themselves and the Authority with respect to the Madera Campus:

**2.4.1** <u>Madera Campus Plan</u>. The County, or the Operator on its behalf, shall develop and establish, in consultation with the Member Agencies and subject to the approval of the Board of Directors pursuant to Section 3.3.2 below, a plan to acquire, reopen and operate the Madera Campus. The date that the Madera Campus reopens as a licensed general acute care hospital shall be referred to herein as the "**Hospital Reopening Date**."

    **(a)** The reopening plan shall, at a minimum, describe the steps that will be taken to reinstate or apply for applicable licensing and regulatory approvals from the California Department of Public Health and other agencies and accreditation organizations as required to reopen and operate Madera Community Hospital as a licensed general acute care hospital, as defined in California Health and Safety Code section 1250, subdivision (a), for the operation of general acute care services and emergency medical services, and for the reopening and operation of any current or future rural health clinics at the Madera Campus.

    **(b)** The plan will be submitted to the Department of Health Care Access and Information (HCAI) and the California Health Facilities Financing Authority (CHFFA) pursuant to Chapter 6, Statutes of 2023 (Assembly Bill 112).

**2.4.2** <u>Authority Capitalization and Assessments</u>

    **(a)** Thirty-Five Million Dollars ($35,000,000) have been committed to the Authority pursuant to letters issued by UCSF Health and the Operator to fund the Authority's acquisition of the Madera Campus. Any amount not used to fund the acquisition shall become cash reserves of the Authority to be held for the benefit of the Madera Campus.

    **(b)** The Board may, from time to time, assess UCSF Health and the County, or the Operator on its behalf (collectively the "**Funders**") additional amounts to properly capitalize the operations of the Madera Campus, either directly or through related entities holding the assets of the Madera

Campus, and to fund the Authority's approved strategic plan and budget. The Funders each shall assume budgetary and operational risk as mutually agreed and provided in written funding commitments and related documents.

**(c)**    If at any time the operations of the Madera Campus generate margin above and beyond its direct operating costs, that margin will be allocated first, to fund appropriate reserves for the Madera Campus consistent with industry practices; second, to repay any loans made by the Funders to the Madera Campus; and thereafter to support the Madera Campus and the health of the Madera community.

**(d)**    The County hereby commits any balance remaining from the State General Fund Assistance appropriated by AB 179 that has not been utilized as of the Effective Date to cover minimum operating expenses of the Madera Campus from and after the Effective Date.

**2.4.3**    Reports. The Authority shall prepare an annual report describing its activities, which shall be made publicly available on the Authority's website.

**2.4.4**    The Authority shall require that the Madera Campus comply with all applicable law and implementing regulations including, without limitation: (i) the Federal Civil Rights Act and the Unruh Civil Rights Act; (ii) the Emergency Medical Treatment and Active Labor Act (EMTALA) and corresponding California law; (iii) Federal and California laws requiring accommodation of individuals with limited English proficiency or who are deaf or hearing-impaired, including laws requiring language access assistance and translation of critical documents such as financial assistance program applications into Spanish.

**2.5**    **Provision for Bylaws**. The Board may cause to be developed and may adopt, from time to time, such bylaws for the Authority to govern its day-to-day operations. Each Member Agency, and the Operator, shall receive a copy of any bylaws developed and adopted under this Section.

## ARTICLE 3
## MEETINGS OF THE BOARD

**3.1**    **Meetings**. The Board shall provide for its regular meetings by resolution; provided, however, that at least one regular meeting shall be held each fiscal quarter. The date, hour and place of the regular meetings shall be fixed by Resolution of the Board and filed with the Governing Body of each of the Member Agencies and the Operator. The Board may meet in joint session with other public agencies and advisory bodies in accordance with State law.

**3.2**    **Ralph M. Brown Act**. All meetings of the Board, including without limitation, regular, adjourned regular, and special meetings, shall be called, noticed, held, and conducted in accordance with the provisions of the Ralph M. Brown Act, commencing with section 54950 of the Government Code.

**3.3**   **Voting**. Each Board Member shall have one vote.

    **3.3.1**   <u>Regular Votes</u>. Except as otherwise provided by law or by this Agreement, all actions of the Board shall be approved on the affirmative vote of a majority of the Members of the Board present at a meeting with a quorum in attendance.

    **3.3.2**   <u>Supermajority Required</u>. The following actions require an affirmative vote of at least five (5) Directors: (i) amendment of this Agreement, any Authority bylaws, or the corporate articles, corporate bylaws, or Medical Staff bylaws of any hospital or other health facility owned or controlled by the Authority; (ii) any merger, joint venture, acquisition, disposition, dissolution, or affiliation involving the Authority or any hospital, health facility or clinic owned or controlled by the Authority; (iii) participation by additional entities in the Authority; (iv) appointment of the Chief Executive Officer (nominated by the Operator), Chief Financial Officer, and Chief Medical Officer (nominated by UCSF Health) of any hospital, health facility or clinic (as applicable) owned or controlled by the Authority; (v) approval of the annual strategic plan and budget of the Authority and of any hospital, health facility or clinic owned or operated by the Authority; (vi) approval of capital expenditures and other material agreements valued at more than five hundred thousand dollars ($500,000) and not provided for in the annual budget; and (vii) establishment or closure of Service Lines or educational programs operated by or on behalf of the Authority or any hospital, health facility or clinic owned or controlled by the Authority.

**3.4**   **Quorum**. A majority of the Directors including at least one (1) Director (or alternate) appointed by each Member Agency and one (1) Director (or alternate) nominated by the Operator and appointed by the County shall constitute a quorum for the transaction of business, except that less than a quorum may adjourn from time to time.

**3.5**   **Minutes**. The Secretary of the Authority shall cause minutes of regular, adjourned regular, and special meetings to be kept and shall, as soon as possible after each meeting, cause a copy of the minutes to be forwarded to each Member of the Board and to each Member Agency.

**3.6**   **Rules**. The Board may adopt from time to time such rules and regulations for the conduct of its affairs as may be required.

## ARTICLE 4
## OFFICERS AND EMPLOYEES OF THE AUTHORITY

**4.1**   **Chair**. The Board of Directors shall elect one of its members as Chair of the Board. The term of office for the Chair of the Board shall be two (2) years. The Chair of the Board shall preside at all meetings and shall perform such other duties as are specified by the Board of Directors.

**4.2**   **Vice-Chair**. The Board of Directors shall elect one of its members as Vice-Chair. The term of office for the Vice-Chair shall be two (2) years. The Vice-Chair shall perform all the duties of the Chair of the Board in the absence of the Chair of the Board or in the

event the Chair of the Board is unable to perform such duties and shall perform such other duties as are specified by the Board of Directors.

**4.3**    **Secretary**. The Board of Directors shall elect a Secretary who shall serve at the pleasure of the Board. The Secretary may but need not be a member of the Board of Directors. The Secretary shall be responsible for the minutes and other records of the proceedings of the Board of Directors and shall perform such other duties as the Board of Directors specifies.

**4.4**    **Treasurer and Auditor Controller**. The Board of Directors shall appoint a Treasurer and an Auditor/Controller from those persons eligible under Government Code sections 6505.5 and 6505.6. The Treasurer shall be the depository and have custody of all money of the Authority, from whatever source, and shall have all of the duties and obligations set forth in Sections 6505 and 6505.5 of the Government Code. Such offices may be held by separate officers or employees, or combined and held by one officer or employee as the Board may elect. The Treasurer and Auditor/Controller shall serve at the pleasure of the Board.

**4.5**    **Authority Attorney**. The Attorney for the Authority shall be appointed by the Board of Directors. The Attorney for the Authority or a designated deputy shall attend all meetings of the Board of Directors; provided, however, that the absence of the Authority Attorney shall not affect the validity of any meeting. The Attorney shall perform such other duties the Board of Directors specifies. Attorneys representing each of the Member Agencies and the Operator may also attend all meetings (including closed sessions), subject to a Common Interest Agreement mutually agreed by the Parties and with the Operator.

**4.6**    **Official Bond**. Pursuant to Government Code section 6505.1, the public officer, officers or persons who have charge of, handle or have access to any property of the Authority shall file an official bond in an amount to be fixed by the Parties to this Agreement.

**4.7**    **Additional Officers and Employees**. The Board shall have the power to appoint such additional officers and to employ such employees, assistants, contractors, consultants and others as may be appropriate. Such power shall include, but not be limited to, the power to appoint an Administrator for the purposes of managing and administering the Authority.

**ARTICLE 5**
**COMMITTEES**

**5.1**    **Committees**.

**5.1.1**    Standing Committees. The Board of Directors shall create the following committees, for which no compensation shall be payable to committee members unless approved by the Board:

**(a)**    Executive Committee. The Executive Committee shall consist of one individual appointed by each Member Agency and one individual nominated by the Operator and appointed by the County. The Executive

10

Committee will meet as needed and be empowered to transact business on behalf of the Authority between meetings; provided, however, that: (i) the Executive Committee may not take action requiring a supermajority vote under Section 3.3.2 above; and (ii) any actions approved by the Executive Committee must be promptly reported to all Members of the Board and each Member Agency.

**(b)** <u>Technical Advisory Committee</u>. The Technical Advisory Committee (TAC) shall review on behalf of the Board of Directors, technical issues associated with accomplishing the purposes of this Agreement. The County shall appoint the TAC chair and UCSF Health and the Operator each shall appoint up to five (5) employees to the TAC.

**5.1.2** <u>Additional Committees</u>. The Board of Directors, by a majority vote, may form additional committees for any purpose. Such vote shall designate the method for appointing committee members, the scope of the duties and responsibility of the committee, whether the committee is a standing or ad hoc committee, and such other matters as the Board may deem appropriate. No compensation shall be payable to committee members unless approved by the Board.

## ARTICLE 6
## FINANCES

**6.1** **Fiscal year**. The Fiscal Year of the Authority shall be the period commencing on July 1 of each year and ending on and including the following June 30.

**6.2** **Annual Budget**.

**6.2.1** <u>Interim Budget</u>. The Board shall, within thirty (30) days of the Effective Date of this Agreement, approve an interim budget, which shall constitute the operating budget until the Annual Budget is adopted.

**6.2.2** <u>Annual Budget</u>. Annually, prior to July 1 of each year, the Board shall adopt a budget for all expenses to be made by the Authority during the ensuing Fiscal Year and an allocation of contributions from Member Agencies and the Operator. Each annual budget shall be adopted and shall be effective on the affirmative vote of a supermajority of the Directors as provided in Section 3.3.2 above.

**6.2.3** <u>Failure to Obtain Budget Approval</u>. In the event the Board does not adopt a budget prior to start of a fiscal year, the budgeted amounts of all expenses and allocation of contributions from Member Agencies shall remain the same as the amounts last approved by the Board in its most recently adopted budget; provided, however, that the amounts shall be increased by the Producer Price Index ("**PPI**") with a minimum increase of no less than three percent (3%). The PPI shall mean PPI for Inpatient Health Care Services for the twelve (12) month period ending the December prior to the beginning of the fiscal year. This factor shall be applied to the budget until such time as a new budget is adopted by the Board. Any shortfall in revenues shall be made up from: (i) available reserves

dedicated by the Board for such purpose; (ii) if insufficient to cover the shortfall, any available reserve funds which have not been designated by the Board for a particular purpose or otherwise legally restricted for other purposes; and (iii) if still insufficient to cover the shortfall, from assessments made to the Member Agencies and the Operator consistent with this Agreement and the Operating Agreement. Reserves shall mean any available cash or investments.

**6.3** **Funds, Accounts and Reports**. There shall be strict accountability of all funds and reporting of all receipts and disbursements.

**6.3.1** <u>Sources of Funds</u>. The sources of funds available to the Authority may include, but are not limited to, the following:

**(a)** Grants, donations, and loans received by the Authority from local, State, or Federal agencies or from individuals or businesses.

**(b)** Funds collected as user charges or user fees by Member Agencies.

**(c)** Funds collected as connection fees by Member Agencies.

**(d)** Funds received from State and Federal disaster relief agencies.

**(e)** Funds obtained by issuing bonds, notes, warrants and other evidences of indebtedness.

**(f)** Cash and "In kind" contributions from Member Agencies and the Operator.

**(g)** Funds from any other source derived.

The Authority shall arrange for the receipt of such funds from the above sources as are available to the Authority and as are necessary for the conduct of the Authority's activities. Member Agencies and the Operator may, in the appropriate circumstances: (a) make contributions from their treasuries for the purposes set forth in this Agreement; (b) make payments of public (or in the case of the Operator, corporate) funds to defray the cost of such purposes; and (c) make advances of public (or in the case of the Operator, corporate) funds for such purposes. The provisions of Government Code section 6513 are incorporated into this Agreement. A cost-sharing formula for determining contributions from Member Agencies and the Operator shall be mutually agreed among the Member Agencies and the Operator.

**6.3.2** <u>Accounts</u>. Revenues or funds received by or made available to the Authority from any source whatsoever, shall be deposited into accounts that may be established by the Treasurer, and may be expended by the Authority in any legal manner, subject to such reservations as may be imposed by the Authority from time to time.

**6.3.3** <u>Reports</u>. The Treasurer shall, within one hundred eighty (180) days after the close of each Fiscal Year, give a complete written report of all financial activities for such fiscal year to the Board of Directors and to each Member Agency and the Operator. The Authority's books and records shall be open to inspection at all reasonable times by representatives of each Member Agency and the Operator.

**6.4** **<u>Payments and Advances</u>**. No expenditures in excess of those budgeted shall be made without approval of a revised or amended budget, which may from time to time be submitted to and approved by the Board of Directors as provided in Section 3.3.2 above.

**6.5** **<u>Audit</u>**. The Treasurer and Auditor/Controller shall cause an annual audit of the accounts and records of the Authority to be made and reported in accordance with Sections 6505 through 6505.6 of the Government Code. The audit shall conform to generally accepted auditing standards. Such report shall be filed within [four (4)] months of the end of the Fiscal Year under examination.

**6.6** **<u>Procurement Methods</u>**. The Board may adopt such policies relating to procurement of services, equipment, supplies and other materials needed to accomplish the purposes of this Agreement.

**ARTICLE 7**
**TERMINATION / AMENDMENT**

**7.1** **<u>Duration and Termination</u>**.

**7.1.1** <u>Effective Date</u>. This Agreement shall become effective as of the Effective Date and shall continue in full force and effect until terminated by the mutual written consent of all of the Member Agencies and the Operator; provided, however, that this Agreement and the Authority shall continue to exist for the purpose of disposing of all claims, distribution of assets, and all other functions necessary to conclude the affairs of the Authority.

**7.1.2** <u>Minimum Five (5) Year Term</u>. Notwithstanding the above, the Parties hereto agree and acknowledge that this Agreement may not be terminated until the latter of: (i) five (5) years from the Effective Date; or (ii) four (4) years after the Hospital Reopening Date, which period shall be considered a non-cancelable commitment.

**7.1.3** <u>Early Termination</u>. This Agreement shall be terminated if the Bankruptcy Court, fails to approve the acquisition of the Madera Campus by the Authority or upon approval of the Board pursuant to Section 3.3.2 above. Any such early termination shall be effective no earlier than ninety (90) days (or such longer period as may be required by law) after notice is provided to the Member Agencies' and Operator's respective Governing Bodies, CDPH, the Healthcare Rights and Access Section of the Public Rights Division of the California Office of the Attorney General, the Madera community, and the public.

7.2    **Amendment**. This Agreement may be amended at any time by the Board of Directors consistent with the provisions of Section 3.3.2 above following written consent of each Member Agency's Governing Body.

7.3    **Withdrawal**. Notwithstanding any other provision of this Agreement, any Member Agency may withdraw from the Authority by providing the Authority with written notice of its intent to withdraw [within the first thirty (30) days] of each Fiscal Year after the [fifth (5th)] year following the Effective Date. Such notice shall not become effective [until the last day of fiscal year in which notice was given]. A withdrawal from the Authority constitutes a withdrawal of that Member Agency's representatives from the Board of Directors.

7.4    **Effect of Withdrawal**. The withdrawal of a Member Agency shall not terminate its responsibility to contribute its share of any obligation incurred by the Authority, including amounts determined by the Board for (1) liabilities and claims accrued during the time the agency was a Member Agency or (2) budgeted expenses for the Fiscal Year in which notice of intent to withdraw is given. Except as the withdrawing Member Agency may agree, in writing, with the Board, the withdrawing Member Agency shall automatically relinquish all rights as a Member Agency under this Agreement, on the effective date of the withdrawal. Upon termination of this Agreement, a Member Agency that has withdrawn will be treated like all other Member Agencies for purposes of disbursement of Authority assets, unless otherwise agreed in writing.

7.5    **Disbursement**. Upon termination of this Agreement and after payment of all liabilities, costs, expenses and charges validly incurred under this Agreement, all remaining assets of the Authority shall be disbursed among Member Agencies, including any Member Agencies which previously withdrew from the Authority. All assets shall be divided among the Member Agencies in accordance with and proportionate to their cash contributions (including payments for services received and property at market value when received) made during the term of this Agreement, if it is feasible to do so. However, the Board may, in its discretion and by a majority vote of the then-current Directors of the Board of Directors, distribute assets without regard to a Member Agency's contribution.

## ARTICLE 8
## SPECIAL PROVISIONS

8.1    **Insurance**. The Authority shall maintain types and levels of insurance coverage for the Authority as the Board of Directors determines to be reasonably adequate.

8.2    **Liability of Authority, Board, Officers, Employees**. Pursuant to Government Code section 6508.1, the debts, liabilities, and obligations of the Authority shall not be the debts, liabilities and obligations of any of the Member Agencies or any of their respective members, officers, directors, employees or agents. The Authority, its Directors, officers, employees, staff and agents shall use ordinary care and reasonable diligence in the exercise of their powers and in the performance of their duties pursuant to this

Agreement. No Member Agency, its officer, director or employee shall be responsible for any action taken or omitted by any other Member Agency, or its officers, or employees.

8.3    **Indemnity**. The Authority shall indemnify, defend and hold harmless the Board of Directors, the individual Member Agencies, and their members, officers, directors, employees and agents from and against any and all liability, loss, damages, expenses, costs (including, without limitations, costs and fees of litigation or arbitration) of every nature, arising out of any act or omission related to this Agreement, except such loss or damage which was caused by the willful misconduct of the Board of Directors, any individual Member Agency, or their members, officers, directors, employees and agents. The Authority's duty to indemnify each Member Agency pursuant to this Agreement shall survive that Member Agency's withdrawal from the Agency.

8.4    **Conflict of Interest Code**. The Authority shall, by resolution, adopt a conflict of interest code as required by law.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

9.1    **Severability**. If any section, clause or phrase of this Agreement or the application thereof to any Party or any other person or circumstance is for any reason held to be invalid by a court of competent jurisdiction, it shall be deemed severable, and the remainder of the Agreement or the application of such provisions to the other Party or to other persons or circumstances shall not be affected thereby. Each Party hereby declares that it would have entered into this Agreement, and each subsection, sentence, clause and phrase thereof, irrespective that one or more sections, subsections sentences, clauses or phrases or the application thereof might be held invalid.

9.2    **Notices**. Notices required or permitted hereunder shall be sufficiently given if made in writing and delivered either personally or by registered or certified mail, postage prepaid to the respective Parties, as follows:

| | |
|---|---|
| **The County of Madera** | **The Regents of the University of** |
| **Board of Supervisors** | **California** |
| ATTN: Chief Clerk | ATTN: Chancellor |
| 200 West 4th Street | 550 16th Street, Box 0402 |
| Madera, CA 93637 | San Francisco, CA 94143 |
| | |
| With a copy to: | With a copy to: |
| | |
| Madera County | UCSF Health |
| ATTN: County Administrative Officer | ATTN: Chief Executive Officer |
| 200 West 4th Street | 1800 Owens Street, Box 0296 |
| Madera, CA 93637 | San Francisco, CA 94143 |

And:                                              And:

Office of the County Counsel                      UCSF Health
c/o Regina A. Garza, Esq.                         ATTN: Chief Counsel
Lozano Smith                                      1800 Owens Street, Box 0296
7404 N. Spalding Ave.                             San Francisco, CA 94143
Fresno, CA 93720

9.3     **Other Obligations**. The responsibilities and obligations of each Party to this Agreement shall be solely as provided in this Agreement, or as may be provided for in other agreements to be executed by the Parties.

9.4     **Consent**. Whenever in this Agreement or in any amendment thereto consent or approval is required, the same shall not be unreasonably withheld.

9.5     **Other Agreements Not Prohibited**. Other agreements by and between the Parties of this Agreement or any other entity are neither prohibited nor modified in any manner by execution of this Agreement.

9.6     **Assignment**. The rights, titles and interests of any Party to this Agreement shall not be assignable or transferable without the consent of the Governing Body of each Member Agency and a vote of the Board of Directors consistent with the requirements of Section 3.3.2 above.

9.7     **Section Headings**. The section headings herein are for convenience of the Parties only, and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions or language of this Agreement.

9.8     **Laws of California**. This Agreement is made in the State of California, under the Constitution and laws of such State, and shall be construed and enforced in accordance with the laws of such State.

9.9     **Construction of Language**. It is the intention of the Parties hereto that if any provision of this Agreement is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.

9.10     **Cooperation**. The Parties recognize the necessity and hereby agree to cooperate with each other in carrying out the purposes of this Agreement.

9.11     **Successors**. This Agreement shall be binding upon and shall inure to the benefit of the successors of the Parties hereto.

9.12     **Enforcement**. The Authority is hereby authorized to take any and all legal or equitable actions, including but not limited to an injunction and specific performance, necessary or permitted by law to enforce this Agreement.

9.13   **<u>Integration</u>**. This Agreement constitutes the full and complete Agreement of the Parties.

9.14   **<u>Counterparts</u>**. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the Parties have caused this Joint Exercise of Powers Agreement to be executed and attested by their proper officers thereunto duly authorized on the day and year set forth below, making the same effective on the date signed by the last of all Parties hereto.

**THE COUNTY OF MADERA**

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**

_____
Chair, Board of Supervisors

DocuSigned by:
Chancellor Sam Hawgood
6B213000DEE946A...
Sam Hawgood, MBBS
Chancellor, UCSF

_____
ATTEST:
Clerk, Board of Supervisors

DocuSigned by:
D34B80640E5546A...
Suresh Gunasekaran, MBA
President and CEO, UCSF Health

Approved as to Legal Form:

_____
Regina A. Garza, Esq.
County Counsel

## **Exhibit B**

**Commitment Letters**



ONE Adventist Health Way
PO Box 619002
Roseville, CA 95661
916-406-0000
AdventistHealth.org

*Commitment Letter*

**February 12, 2024**

**Madera Health and Hospital Joint Powers Authority**

**$17,500,000 Credit Facility**

Ladies and Gentlemen:

You have advised Adventist Health System/West, a California nonprofit religious corporation ("<u>Adventist Health</u>") that the Madera Health and Hospital Joint Powers Authority ("<u>you</u>" or the "<u>Authority</u>") seeks financing in the form of a $17,500,000 delay-draw term loan credit facility (the "<u>Credit Facility</u>"), as more fully described in the Summary of Terms and Conditions attached as <u>Exhibit A</u> hereto and incorporated herein by this reference (the "<u>Summary of Terms</u>"), to facilitate the Authority's acquisition of Madera Community Hospital ("<u>MCH</u>") in its pending bankruptcy proceeding in the United States Bankruptcy Court for the Eastern District of California (the "<u>Bankruptcy Case</u>").  Adventist Health is pleased to offer its commitment to provide the Credit Facility (the "<u>Commitment</u>"), upon and subject to the terms and conditions set forth in this letter (this "<u>Commitment Letter</u>") and in the Summary of Terms.

The Commitment of Adventist Health is subject to the satisfaction of each of the following conditions precedent in a manner acceptable to Adventist Health: (a) the accuracy and completeness of all representations that you make to Adventist Health and your compliance with the terms of this Commitment Letter (including the Summary of Terms); (b) the negotiation, execution and delivery of definitive documentation for the Credit Facility consistent with the Summary of Terms and otherwise satisfactory to Adventist Health; (c) The Regents of the University of California, on behalf of its San Francisco campus and academic medical center ("<u>UCSF Health</u>") and the Authority shall have entered into a commitment letter substantially similar to this Commitment Letter for UCSF Health to provide $17,500,000 in financing to the Authority; and (d) the Authority shall have entered into an agreement, in a form acceptable to Adventist Health, with MCH and the Official Committee of Unsecured Creditors in the Bankruptcy Case for the Authority to acquire reorganized MCH through a plan of reorganization.

You represent, warrant and covenant that all information that has been or is hereafter made available to Adventist Health by you or any of your representatives (or on your or their behalf) in connection with any aspect of the transactions contemplated hereby (the "<u>Information</u>"), as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading.  You agree to furnish us with further and supplemental information from time to time until the date of the effectiveness of the Credit Facility (the "<u>Closing Date</u>") so that the representation, warranty and covenant in the immediately preceding sentence is correct on the Closing Date as if the Information were being furnished, and such representation, warranty and covenant were being made, on such date.  In issuing this commitment, Adventist Health is and will be using and relying on the Information without independent verification thereof.

You agree to indemnify and hold harmless Adventist Health and each of its affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "<u>Indemnified Party</u>") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of

counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transaction or (b) the Credit Facility and any other financings, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your members or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree that: (a) (i) the services and transactions described herein regarding the Credit Facility are arm's-length commercial transactions between you and your affiliates, on the one hand, and Adventist Health, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transaction contemplated hereby; (b) (i) Adventist Health has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) Adventist Health has no obligation to you or your affiliates with respect to the transaction contemplated hereby except those obligations expressly set forth herein or any another written agreement; and (c) Adventist Health and its affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and Adventist Health has no obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against Adventist Health with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

The provisions of the immediately preceding two paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Credit Facility shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of Adventist Health hereunder.

This Commitment Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in .pdf format) will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter may be in the form of an Electronic Record (as defined herein) and may be executed using Electronic Signatures (as defined herein) (including, without limitation, facsimile and .pdf) and shall be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by Adventist Health of a manually signed paper communication which has been converted into electronic form (such as scanned into ".pdf" format), or an electronically signed communication converted into another format, for transmission, delivery and/or retention. Notwithstanding anything contained herein to the contrary, Adventist Health is under no obligation to accept an

Madera Health and Hospital Joint Powers Authority
Commitment Letter
Page 3

Electronic Signature in any form or in any format unless expressly agreed to by Adventist Health pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent Adventist Health has agreed to accept such Electronic Signature, Adventist Health shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower without further veritification and (b) upon the request of Adventist Health, any Electronic Signature shall be promptly followed by a manually executed, original counterpart. *"Electronic Record"* and *"Electronic Signature"* shall have the meanings assigned to them, respectively, by 15 USC § 7006, as it may be amended from time to time.

This Commitment Letter (including the Summary of Terms) shall be governed by, and construed in accordance with, the laws of the State of California. Each of you and Adventist Health hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including the Summary of Terms), the transactions contemplated hereby and thereby or the actions of Adventist Health in the negotiation, performance or enforcement hereof. The commitments and undertakings of Adventist Health may be terminated by us if you fail to perform your obligations under this Commitment Letter on a timely basis.

This Commitment Letter (including the Summary of Terms) embodies the entire agreement and understanding among Adventist Health, you and your affiliates with respect to the Credit Facility and supersede all prior agreements and understandings relating to the specific matters hereof. However, please note that the terms and conditions of the commitment of Adventist Health hereunder are not limited to those set forth herein or in the Summary of Terms. Those matters that are not covered or made clear herein or in the Summary of Terms are subject to mutual agreement of the parties. No party has been authorized by Adventist Health to make any oral or written statements that are inconsistent with this Commitment Letter. This Commitment Letter is not assignable by the Authority without our prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.

This Commitment Letter and all commitments and undertakings of Adventist Health hereunder will expire at 5:00 p.m. (Pacific time) on February 19, 2024 unless you execute this Commitment Letter and return it to us prior to that time (which may be by fax transmission or other electronic mail transmission), whereupon this Commitment Letter (including the Summary of Terms) (which may be signed in one or more counterparts) shall become a binding agreement. Thereafter, all commitments and undertakings of Adventist Health hereunder will expire on February 26, 2024 unless definitive documentation for the Credit Facility is executed and delivered prior to such date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Madera Health and Hospital Joint Powers Authority
Commitment Letter
Page 4


We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**ADVENTIST HEALTH SYSTEM/WEST**


By: *Kerry L. Heinrich*
Name:  Kerry L. Heinrich
Title:     President and CEO



ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

**MADERA HEALTH AND HOSPITAL
JOINT POWERS AUTHORITY**


By:
Name:
Title:

# Exhibit A

**SUMMARY OF TERMS AND CONDITIONS**
**MADERA HEALTH AND HOSPITAL JOINT POWERS AUTHORITY**
**$17,500,000 CREDIT FACILITY**

*Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the commitment letter (the "Commitment Letter") to which this Summary of Terms and Conditions is attached.*

| | |
|---|---|
| **BORROWER:** | Madera Health and Hospital Joint Powers Authority (the "Borrower"), a joint powers authority formed by The Regents of the University of California, on behalf of its San Francisco campus and academic medical center organized and existing pursuant to Article IX, Section 9 of the Constitution of the State of California ("UCSF Health"), and the County of Madera organized and existing as a general law county under the general laws of the state of California including Government Code section 23000 et seq. (the "County"). |
| **LENDER:** | Adventist Health System/West, a California nonprofit religious corporation, or an affiliate it designates (the "Lender"). |
| **CREDIT FACILITY:** | An aggregate principal amount of up to $17,500,000 will be available in the form of delay-draw term loans (the "Credit Facility"). |
| **PURPOSE:** | The proceeds of the Credit Facility shall be used for to fund the Borrower's obligations in connection with its offer to acquire Madera Community Hospital ("MCH") through a plan of reorganization in MCH's pending chapter 11 bankruptcy proceeding (the "Acquisition Transaction") and the operation of reorganized MCH after the closing of the Acquisition Transaction ("Reorganized MCH"). |
| **CLOSING DATE:** | The execution of definitive Loan Documents (the "Closing Date"). |
| **INTEREST RATE:** | The interest rate per annum applicable to the Credit Facility shall be the Prime Rate on the date that is immediately before the Closing Date, which shall be payable in kind. |
| **MATURITY:** | The Credit Facility shall be subject to repayment according to the Scheduled Amortization (as hereinafter defined), with the final payment of all amounts outstanding, *plus* accrued interest, being due 15 years after the Closing Date. |
| **AVAILABILITY/SCHEDULED AMORTIZATION:** | |
| | The Credit Facility will be subject to annual amortization of principal in amounts to be determined (the "Scheduled Amortization"). |
| **MANDATORY PREPAYMENTS:** | In addition to the amortization set forth above and subject to exceptions and baskets to be mutually agreed upon, (a) 100% of Excess Cash Flow (to be defined in the Loan Documents), and (b) 100% of all net cash proceeds of asset sales and dispositions and involuntary dispositions (subject to exceptions to be agreed), shall be applied to the prepayment of |

the Credit Facility (in each such case, with such payments to be made on a *pari passu* basis to the Lender and UCSF Health under the UCSF Health Credit Facility (as defined below)).

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:**

The Borrower may prepay the Credit Facility in whole or in part at any time without premium or penalty. Each such prepayment of the Term Facility shall be applied to the principal installments thereof. The unutilized portion of the commitments under the Credit Facility may be irrevocably reduced or terminated by the Borrower at any time without penalty.

**PRIORITY:**

The Credit Facility shall be *pari passu* in all respects, including, without limitation, in terms of payment priority and collateral priority, with any loan from UCSF Health to the Borrower or Reorganized MCH (the "UCSF Health Credit Facility").

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the Lender including, but not limited to, the following, in each case, in form and substance reasonably satisfactory to the Lender:

(a)　Loan Documentation. The negotiation, execution and delivery of definitive documentation with respect to the Credit Facility in forms mutually agreeable to the Lender and the Borrower (collectively, the "Loan Documents").

(b)　Organizational Documents. The Lender shall have received a true and correct copy of the executed joint powers agreement for the Borrower and the certification of an officer that the joint powers agreement is in full force and effect.

(c)　Consents. The Lender shall have received evidence that all approvals of the Borrower, UCSF Health, and the County necessary in connection with the Loan Documents have been obtained.

(d)　UCSF Health Funding. UCSF Health shall have committed to loan the Borrower $17,500,000 on substantially similar terms to the Credit Facility and such financing shall close simultaneously with the Credit Facility.

(e)　Acquisition Transaction. The Borrower shall have entered into an agreement, in a form mutually acceptable to Lender and Borrower, with MCH and the Official Committee of Unsecured Creditors in MCH's pending bankruptcy case for the Borrower to acquire MCH through a plan of reorganization (the "Acquisition Transaction").

(f)  <u>Miscellaneous</u>.  The Lender shall have received such other documents and additional information that the Lender shall reasonably request or require.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**

Usual and customary for transactions of this type, including, without limitation, the following:  (a) all of the representations and warranties in the Loan Documents be true and correct in all material respects, in each case, as of the date of such extension of credit; (b) no material default or event of default under the Credit Facility shall have occurred and be continuing, or would result from such extension of credit; (c) all material documentation concerning the Acquisition Transaction shall be in a form acceptable to Lender and Borrower; (d) any agreement between Adventist Health and the Borrower concerning the potential provision of management services for Reorganized MCH shall be in full force and effect; and (e) any material agreements between Borrower and MCH related to the Acquisition Transaction shall be in full force and effect and not terminated or materially breached by any party thereto.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary for transactions of this type, including, without limitation, the following: (a) existence, qualification and power; (b) authorization and no contravention; (c) receipt of governmental authorizations and other consents; (d) binding effect; (e) no material adverse effect; (f) no litigation; (g) no default; and (h) authorized officers.

**COVENANTS:**

Upon the closing of the Acquisition Transaction, Borrower shall cause Reorganized MCH to assume all obligations under the Credit Facility and grant the Lender (for the benefit of itself and the other secured parties, collectively, the "<u>Secured Parties</u>")) valid and perfected first priority (subject to certain exceptions to be set forth in the Loan Documents) liens and security interests in all of the following (the "<u>Collateral</u>"):

(a)  <u>Real and Personal Property</u>. All of its present and future property and assets, real and personal, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real estate, leaseholds, letter of credit rights, fixtures, bank accounts, general intangibles, financial assets, investment property, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.

(b)  <u>Proceeds, Products, Etc.</u> All proceeds and products of the property and assets described in clause (a) above.

The Collateral shall either (i) exclude any assets required to secure a loan to Reorganized MCH from the Distressed Hospital Loan Program (the "<u>DHLP Loan</u>"), or, if permitted (ii) subordinate any liens securing the Credit Facility in any assets securing such DHLP Loan to the DHLP Loan.

| | |
|---|---|
| **EVENTS OF DEFAULT:** | Usual and customary in transactions of this type, including, without limitation, the following: (a) non-payment; (b) default of specific covenants; (c) other material defaults; (d) breach of representations and warranties; (e) cross-defaults to other indebtedness in an amount to be agreed and other material contracts; (f) insolvency proceedings; (g) inability to pay debts or attachment; (h) judgments; (i) ERISA; (j) invalidity of Loan Documents; and (k) change of control. |
| **AMENDMENTS:** | Amendments and waivers of the provisions of the Loan Documents will require the approval of the Lender and the Borrower. |
| **EXPENSES:** | The Borrower and the Lender will each pay all of its own costs and expenses associated with the preparation, due diligence, administration, and closing of all Loan Documents and the Acquisition Transaction, including, without limitation, such parties' legal fees of counsel. The Borrower will pay the expenses of the Lender in connection with the enforcement of any of the Loan Documents. |
| **INDEMNIFICATION:** | The Borrower will indemnify and hold harmless the Lender and its affiliates and their respective partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives (each such person, an "<u>Indemnitee</u>") from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Credit Facility, the Loan Documents, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| **GOVERNING LAW:** | State of California |
| **DISCLAIMER:** | **The Borrower acknowledges and agrees that: (a) the transaction contemplated by this Summary of Terms and Conditions is an arm's length, commercial transaction between the Borrower and the Lender in which the Lender is acting solely as a principal and for its own interest; (b) the Lender is not acting as a municipal advisor or financial advisor to the Borrower; (c) the Lender has no fiduciary duty pursuant to Section 15B of the Securities Exchange Act of 1934 to the Borrower with respect to the transaction contemplated hereby and the discussions, undertakings and procedures leading thereto (irrespective of whether the Lender has provided other services or is currently providing other services to the Borrower on other matters); (d) the only obligations the Lender has to the Borrower with respect to the transaction contemplated hereby expressly are set forth in this Summary of Terms and Conditions; and (e) the Lender is not recommending that the Borrower take an action with respect to the** |

**transaction contemplated by this Summary of Terms and Conditions, and before taking any action with respect to the contemplated transaction, the Borrower should discuss the information contained herein with its own legal, accounting, tax, financial and other advisors, as it deems appropriate. If the Borrower would like a municipal advisor in this transaction that has legal fiduciary duties to the Borrower, it is free to engage a municipal advisor to serve in that capacity.**

OTHER:                      Each of the parties shall (a) waive its right to a trial by jury and (b) submit to California jurisdiction.

*Commitment Letter*

February 12, 2024

**Madera Health and Hospital Joint Powers Authority**

**$17,500,000 Credit Facility**

Ladies and Gentlemen:

You have advised The Regents of the University of California, on behalf of its San Francisco campus and academic medical center ("UCSF Health") that the Madera Health and Hospital Joint Powers Authority ("you" or the "Authority") seeks financing in the form of a $17,500,000 delay-draw term loan credit facility (the "Credit Facility"), as more fully described in the Summary of Terms and Conditions attached as Exhibit A hereto and incorporated herein by this reference (the "Summary of Terms"), to facilitate the Authority's acquisition of Madera Community Hospital ("MCH") in its pending bankruptcy proceeding in the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Case"). UCSF Health is pleased to offer its commitment to provide the Credit Facility (the "Commitment"), upon and subject to the terms and conditions set forth in this letter (this "Commitment Letter") and in the Summary of Terms.

The Commitment of UCSF Health is subject to the satisfaction of each of the following conditions precedent in a manner acceptable to UCSF Health: (a) the accuracy and completeness of all representations that you make to UCSF Health and your compliance with the terms of this Commitment Letter (including the Summary of Terms); (b) the negotiation, execution and delivery of definitive documentation for the Credit Facility consistent with the Summary of Terms and otherwise satisfactory to UCSF Health; (c) Adventist Health System/West, a California nonprofit religious corporation ("Adventist Health") and the Authority shall have entered into a commitment letter substantially similar to this Commitment Letter for Adventist Health to provide $17,500,000 in financing to the Authority; and (d) the Authority shall have entered into an agreement, in a form acceptable to UCSF Health, with MCH and the Official Committee of Unsecured Creditors in the Bankruptcy Case for the Authority to acquire reorganized MCH through a plan of reorganization.

You represent, warrant and covenant that all information that has been or is hereafter made available to UCSF Health by you or any of your representatives (or on your or their behalf) in connection with any aspect of the transactions contemplated hereby (the "Information"), as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading. You agree to furnish us with further and supplemental information from time to time until the date of the effectiveness of the Credit Facility (the "Closing Date") so that the representation, warranty and covenant in the immediately preceding sentence is correct on the Closing Date as if the Information were being furnished, and such representation, warranty and covenant were being made, on such date. In issuing this commitment, UCSF Health is and will be using and relying on the Information without independent verification thereof.

You agree to indemnify and hold harmless UCSF Health and each of its affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "Indemnified Party")

from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transaction or (b) the Credit Facility and any other financings, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your members or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree that: (a) (i) the services and transactions described herein regarding the Credit Facility are arm's-length commercial transactions between you and your affiliates, on the one hand, and UCSF Health, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transaction contemplated hereby; (b) (i) UCSF Health has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) UCSF Health has no obligation to you or your affiliates with respect to the transaction contemplated hereby except those obligations expressly set forth herein or any another written agreement; and (c) UCSF Health and its affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and UCSF Health has no obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against UCSF Health with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

The provisions of the immediately preceding two paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Credit Facility shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of UCSF Health hereunder.

This Commitment Letter may be executed in multiple counterparts and by different parties hereto in separate counterparts, all of which, taken together, shall constitute an original. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in .pdf format) will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter may be in the form of an Electronic Record (as defined herein) and may be executed using Electronic Signatures (as defined herein) (including, without limitation, facsimile and .pdf) and shall

be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by UCSF Health of a manually signed paper communication which has been converted into electronic form (such as scanned into ".pdf" format), or an electronically signed communication converted into another format, for transmission, delivery and/or retention. Notwithstanding anything contained herein to the contrary, UCSF Health is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by UCSF Health pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent UCSF Health has agreed to accept such Electronic Signature, UCSF Health shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower without further veritification and (b) upon the request of UCSF Health, any Electronic Signature shall be promptly followed by a manually executed, original counterpart. *"Electronic Record"* and *"Electronic Signature"* shall have the meanings assigned to them, respectively, by 15 USC § 7006, as it may be amended from time to time.

This Commitment Letter (including the Summary of Terms) shall be governed by, and construed in accordance with, the laws of the State of California. Each of you and UCSF Health hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including the Summary of Terms), the transactions contemplated hereby and thereby or the actions of UCSF Health in the negotiation, performance or enforcement hereof. The commitments and undertakings of UCSF Health may be terminated by us if you fail to perform your obligations under this Commitment Letter on a timely basis.

This Commitment Letter (including the Summary of Terms) embodies the entire agreement and understanding among UCSF Health, you and your affiliates with respect to the Credit Facility and supersede all prior agreements and understandings relating to the specific matters hereof. However, please note that the terms and conditions of the commitment of UCSF Health hereunder are not limited to those set forth herein or in the Summary of Terms. Those matters that are not covered or made clear herein or in the Summary of Terms are subject to mutual agreement of the parties. No party has been authorized by UCSF Health to make any oral or written statements that are inconsistent with this Commitment Letter. This Commitment Letter is not assignable by the Authority without our prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.

This Commitment Letter and all commitments and undertakings of UCSF Health hereunder will expire at 5:00 p.m. (Pacific time) on **February 19, 2024** unless you execute this Commitment Letter and return it to us prior to that time (which may be by fax transmission or other electronic mail transmission), whereupon this Commitment Letter (including the Summary of Terms) (which may be signed in one or more counterparts) shall become a binding agreement. Thereafter, all commitments and undertakings of UCSF Health hereunder will expire on **February 26, 2024** unless definitive documentation for the Credit Facility is executed and delivered prior to such date.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**

By: _____

Suresh Gunasekaran, MBA
President and CEO, UCSF Health

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

**MADERA HEALTH AND HOSPITAL
JOINT POWERS AUTHORITY**

By:_____

Name:_____

Title:_____

NAI-1539311003v2

# Exhibit A

## SUMMARY OF TERMS AND CONDITIONS
## MADERA HEALTH AND HOSPITAL JOINT POWERS AUTHORITY
## $17,500,000 CREDIT FACILITY

*Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the commitment letter (the "Commitment Letter") to which this Summary of Terms and Conditions is attached.*

| | |
|---|---|
| **BORROWER:** | Madera Health and Hospital Joint Powers Authority (the "Borrower"), a joint powers authority formed by The Regents of the University of California, on behalf of its San Francisco campus and academic medical center organized and existing pursuant to Article IX, Section 9 of the Constitution of the State of California ("UCSF Health"), and the County of Madera organized and existing as a general law county under the general laws of the state of California including Government Code section 23000 et seq. (the "County"). |
| **LENDER:** | UCSF Health (the "Lender"). |
| **CREDIT FACILITY:** | An aggregate principal amount of up to $17,500,000 will be available in the form of delay-draw term loans (the "Credit Facility"). |
| **PURPOSE:** | The proceeds of the Credit Facility shall be used for to fund the Borrower's obligations in connection with its offer to acquire Madera Community Hospital ("MCH") through a plan of reorganization in MCH's pending chapter 11 bankruptcy proceeding (the "Acquisition Transaction") and the operation of reorganized MCH after the closing of the Acquisition Transaction ("Reorganized MCH"). |
| **CLOSING DATE:** | The execution of definitive Loan Documents (the "Closing Date"). |
| **INTEREST RATE:** | The interest rate per annum applicable to the Credit Facility shall be the Prime Rate on the date that is immediately before the Closing Date, which shall be payable in kind. |
| **MATURITY:** | The Credit Facility shall be subject to repayment according to the Scheduled Amortization (as hereinafter defined), with the final payment of all amounts outstanding, *plus* accrued interest, being due 15 years after the Closing Date. |
| **AVAILABILITY/SCHEDULED AMORTIZATION:** | The Credit Facility will be subject to annual amortization of principal in amounts to be determined (the "Scheduled Amortization"). |
| **MANDATORY PREPAYMENTS:** | In addition to the amortization set forth above and subject to exceptions and baskets to be mutually agreed upon, (a) 100% of Excess Cash Flow (to be defined in the Loan Documents), and (b) 100% of all net cash proceeds of asset sales and dispositions and involuntary dispositions (subject to exceptions to be agreed), shall be applied to the prepayment of the Credit Facility (in each such case, with such payments to be made on a *pari passu* basis to the Lender and Adventist Health System/West, a |

California nonprofit religious corporation, or an affiliate it designates ("Adventist Health") under the Adventist Health Credit Facility (as defined below)).

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:**

The Borrower may prepay the Credit Facility in whole or in part at any time without premium or penalty. Each such prepayment of the Term Facility shall be applied to the principal installments thereof. The unutilized portion of the commitments under the Credit Facility may be irrevocably reduced or terminated by the Borrower at any time without penalty.

**PRIORITY:**

The Credit Facility shall be *pari passu* in all respects, including, without limitation, in terms of payment priority and collateral priority, with any loan from Adventist Health to the Borrower or Reorganized MCH (the "Adventist Health Credit Facility").

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the Lender including, but not limited to, the following, in each case, in form and substance reasonably satisfactory to the Lender:

(a) Loan Documentation. The negotiation, execution and delivery of definitive documentation with respect to the Credit Facility in forms mutually agreeable to the Lender and the Borrower (collectively, the "Loan Documents").

(b) Organizational Documents. The Lender shall have received a true and correct copy of the executed joint powers agreement for the Borrower and the certification of an officer that the joint powers agreement is in full force and effect.

(c) Consents. The Lender shall have received evidence that all approvals of the Borrower, Adventist Health, and the County necessary in connection with the Loan Documents have been obtained.

(d) Adventist Health Funding. Adventist Health shall have committed to loan the Borrower $17,500,000 on substantially similar terms to the Credit Facility and such financing shall close simultaneously with the Credit Facility.

(e) Acquisition Transaction. The Borrower shall have entered into an agreement, in a form mutually acceptable to Lender and Borrower, with MCH and the Official Committee of Unsecured Creditors in

MCH's pending bankruptcy case for the Borrower to acquire MCH through a plan of reorganization (the "<u>Acquisition Transaction</u>").

(f)    <u>Miscellaneous</u>.   The Lender shall have received such other documents and additional information that the Lender shall reasonably request or require.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**

Usual and customary for transactions of this type, including, without limitation, the following: (a) all of the representations and warranties in the Loan Documents be true and correct in all material respects, in each case, as of the date of such extension of credit; (b) no material default or event of default under the Credit Facility shall have occurred and be continuing, or would result from such extension of credit; (c) all material documentation concerning the Acquisition Transaction shall be in a form acceptable to Lender and Borrower; and (d) any material agreements between Borrower and MCH related to the Acquisition Transaction shall be in full force and effect and not terminated or materially breached by any party thereto.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary for transactions of this type, including, without limitation, the following: (a) existence, qualification and power; (b) authorization and no contravention; (c) receipt of governmental authorizations and other consents; (d) binding effect; (e) no material adverse effect; (f) no litigation; (g) no default; and (h) authorized officers.

**COVENANTS:**

Upon the closing of the Acquisition Transaction, Borrower shall cause Reorganized MCH to assume all obligations under the Credit Facility and grant the Lender (for the benefit of itself and the other secured parties, collectively, the "<u>Secured Parties</u>")) valid and perfected first priority (subject to certain exceptions to be set forth in the Loan Documents) liens and security interests in all of the following (the "<u>Collateral</u>"):

(a)    <u>Real and Personal Property</u>. All of its present and future property and assets, real and personal, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real estate, leaseholds, letter of credit rights, fixtures, bank accounts, general intangibles, financial assets, investment property, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.

(b)    <u>Proceeds, Products, Etc.</u> All proceeds and products of the property and assets described in clause (a) above.

The Collateral shall either (i) exclude any assets required to secure a loan to Reorganized MCH from the Distressed Hospital Loan Program (the

"DHLP Loan"), or, if permitted (ii) subordinate any liens securing the Credit Facility in any assets securing such DHLP Loan to the DHLP Loan.

**EVENTS OF DEFAULT:**     Usual and customary in transactions of this type, including, without limitation, the following:  (a) non-payment; (b) default of specific covenants; (c) other material defaults; (d) breach of representations and warranties; (e) cross-defaults to other indebtedness in an amount to be agreed and other material contracts; (f) insolvency proceedings; (g) inability to pay debts or attachment; (h) judgments; (i) ERISA; (j) invalidity of Loan Documents; and (k) change of control.

**AMENDMENTS:**     Amendments and waivers of the provisions of the Loan Documents will require the approval of the Lender and the Borrower.

**EXPENSES:**     The Borrower and the Lender will each pay all of its own costs and expenses associated with the preparation, due diligence, administration, and closing of all Loan Documents and the Acquisition Transaction, including, without limitation, such parties' legal fees of counsel.  The Borrower will pay the expenses of the Lender in connection with the enforcement of any of the Loan Documents.

**INDEMNIFICATION:**     The Borrower will indemnify and hold harmless the Lender and its affiliates and their respective partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives (each such person, an "Indemnitee") from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Credit Facility, the Loan Documents, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**     State of California

**DISCLAIMER:**     **The Borrower acknowledges and agrees that: (a) the transaction contemplated by this Summary of Terms and Conditions is an arm's length, commercial transaction between the Borrower and the Lender in which the Lender is acting solely as a principal and for its own interest; (b) the Lender is not acting as a municipal advisor or financial advisor to the Borrower; (c) the Lender has no fiduciary duty pursuant to Section 15B of the Securities Exchange Act of 1934 to the Borrower with respect to the transaction contemplated hereby and the discussions, undertakings and procedures leading thereto (irrespective of whether the Lender has provided other services or is currently providing other services to the Borrower on other matters); (d) the only obligations the Lender has to the Borrower with respect**

to the transaction contemplated hereby expressly are set forth in this Summary of Terms and Conditions; and (e) the Lender is not recommending that the Borrower take an action with respect to the transaction contemplated by this Summary of Terms and Conditions, and before taking any action with respect to the contemplated transaction, the Borrower should discuss the information contained herein with its own legal, accounting, tax, financial and other advisors, as it deems appropriate. If the Borrower would like a municipal advisor in this transaction that has legal fiduciary duties to the Borrower, it is free to engage a municipal advisor to serve in that capacity.

**OTHER:**              Each of the parties shall (a) waive its right to a trial by jury and (b) submit to California jurisdiction.

**Exhibit C**

**PSA/Plan Term Sheet**

EXHIBIT C TO NOTICE OF PROPOSED TRANSACTION

**In re Madera Community Hospital**
**Plan Support Agreement and Plan Term Sheet**

This Plan Term Sheet (this "Term Sheet")[1] summarizes the proposed process, transactions, and business terms and conditions upon which the Madera Health and Hospital Joint Powers Authority, a California joint powers authority established pursuant to the California Joint Exercise of Powers Act (the "Authority")[2] between The Regents of the University of California, acting on behalf of the University of California San Francisco, organized and existing pursuant to Article IX, Section 9 of the Constitution of the State of California, ("UCSF Health"), and the County of Madera, organized and existing as a general law county under the general laws of the State of California including Government Code section 23000 *et seq.* (the "County"), would acquire all of the interests in reorganized Madera Community Hospital, a California nonprofit public benefit corporation ("MCH," or the "Debtor"), ("Reorganized MCH") pursuant to an amended chapter 11 plan (the "Amended Plan") in the Debtor's chapter 11 proceedings currently pending in the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court").

The Amended Plan also contemplates that Reorganized MCH will enter into one or more management services agreements (a "MSA") with Adventist Health System/West, a California nonprofit religious corporation or its designee ("Adventist Health") and UCSF Health, pursuant to which Adventist Health (on behalf of the County) and UCSF Health would reopen and operate Reorganized MCH. Based on this Term Sheet, the Authority, UCSF Health, the County, Adventist, the Official Committee of Unsecured Creditors (the "Committee"), and the Debtor (each individually a "Party," and collectively, the "Parties") will negotiate the specific terms of the Amended Plan and other documents and agreements necessary to effectuate the transactions contemplated by this Term Sheet.

| Goals of the Parties | The County, UCSF Health, and Adventist believe the Amended Plan and the transactions contemplated by this Term Sheet will: |
|---|---|
| | • Stabilize the availability of community hospital services to all residents of Madera County and surrounding areas regardless of payor or funding source, and increase access, improve outcomes and reduce health disparities in Madera County. |
| | • Support access to specialists, tertiary and quaternary care, and advanced clinical trials (e.g., through transfer agreements and establishment of telehealth diagnostic and consultative services). |
| | • Facilitate and support development and implementation of disaster and emergency protocols (e.g., participation in any UCSF Health and systemwide disaster and emergency planning; access to resources). |
| | • Support workforce planning and development, and deploy resources to address critical gaps or shortages (e.g., medical, nursing, and allied health programs offered by UCSF Health or UC Merced). |

---

[1]	Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Committee Plan (as defined herein).

[2]	The Joint Powers Authority Agreement establishing the Authority is filed contemporaneously herewith as Exhibit A of the Exhibits to Notice of Proposed Alternative Transaction.

| | |
|---|---|
| | • Communicate and facilitate adoption of evidence-based clinical protocols and best practices; coordinate patient safety and quality improvement initiatives. |
| **Plan Support Agreement; Obligations of the Parties** | The Parties shall enter into a plan support agreement (the "Plan Support Agreement") to effectuate the transactions set forth herein through an Amended Plan to be filed by the Committee. The Parties shall promptly submit a motion with the Bankruptcy Court seeking approval of the Plan Support Agreement.<br><br>**Obligations upon Bankruptcy Court Approval**: Upon the entry of a final order approving the Plan Support Agreement (the "PSA Approval Order"), the Parties shall have the following obligations, respectively:<br><br>• The Authority shall be obligated to fund a deposit in an interest bearing account in the amount of $2,500,000, of which $500,000 shall be nonrefundable;<br>• The Authority shall be obligated to deposit an additional $1,000,000 into an escrow account for the payment of all interest and related expenses associated with the allowed secured claim asserted by Saint Agnes Medical Center;<br>• The Committee shall be obligated to file the Amended Plan no later than seven days after approval entry of the PSA Approval Order.<br>• The Committee and the Debtor shall be obligated to take all actions necessary to obtain an order of the Bankruptcy Court confirming the Amended Plan.<br><br>The obligations of the Parties under the Plan Support Agreement are subject to, and expressly conditioned upon, obtaining the PSA Approval Order. |
| **Termination of Plan Support Agreement** | **Termination by the Authority**: The Authority may terminate the Plan Support Agreement upon the occurrence of any of the following events:<br><br>• The material breach by either the Debtor or the Committee of any of the representations, warranties, or covenants of the Debtor or the Committee, as applicable, as set forth in the Plan Support Agreement that remains uncured for three (3) business days after the Authority delivers written notice of such breach to the breaching Party;<br>• The issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that: (a) denies confirmation of the Amended Plan; (b) prevents the occurrence of the Amended Plan Effective Date; and (c) remains in effect for ten (10) business days after the Authority delivers written notice of such issuance to the Debtor and the Committee;<br>• The entry of a final order of the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion or application by the |

Debtor or the Committee seeking an order (without prior written consent of the Authority): (a) converting the Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code; (b) appointing a trustee, receiver, or an examiner in the Debtor's bankruptcy case; (c) dismissing the Debtor's bankruptcy case; or (d) seeking approval of an alternative plan that is not in material conformance with the terms of the Plan Support Agreement;

- The Debtor's board of directors enters a resolution approving the Debtor's consummation of an alternative restructuring transaction to the transactions contemplated herein; or
- The Department of Health Care Access and Information has not committed to the allocation of $50,000,000 in loan funding from the Distressed Hospital Loan Program to the Debtor or Reorganized MCH by April 15, 2024.

**Termination by the Debtor**: The Debtor may terminate the Plan Support Agreement upon the occurrence of any of the following events:

- The material breach by the Authority of any of the representations, warranties, or covenants of the Authority as set forth in the Plan Support Agreement that remains uncured for three (3) business days after receipt by counsel to the Authority of a notice of such breach;
- The Debtor determines in the exercise of its fiduciary duties and based on advice of counsel to pursue a different restructuring transaction or a liquidation.

**Termination by the Committee**: The Committee may terminate the Plan Support Agreement upon the occurrence of any of the following events:

- The material breach by the Authority of any of the representations, warranties, or covenants of the Authority as set forth in the Plan Support Agreement that remains uncured for three (3) business days after receipt by counsel to the Authority of a notice of such breach;
- The Committee determines in the exercise of its fiduciary duties and based on advice of counsel to pursue a different restructuring transaction or a liquidation.

**Mutual Termination**: The Plan Support Agreement, and the obligations of all Parties thereunder, may be terminated by mutual written agreement among the Parties.

**Automatic Termination**: The Plan Support Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Amended Plan Effective Date.

| **Financial Capability of the Authority; Deposit** | The Authority shall be funded with an aggregate contribution of $35 million, which shall be advanced in the form of loans from UCSF Health and Adventist Health, each such loan in the amount of $17,500,000. UCSF Health and Adventist Health have issued commitment letters to the Authority for these loans, which are filed contemporaneously herewith as Exhibit B of the Exhibits to Notice of Alternative Transaction (the "Financing").

Within three (3) business days of the date the PSA Approval Order becomes a final order (the "PSA Approval Date"), the Authority shall deposit $2,500,000 into an account designated by the County for the benefit of the Authority (the "Good Faith Deposit"). In the event that the Authority fails to consummate the transactions contemplated herein after the PSA Approval Date, $500,000 shall be retained by the Debtor's bankruptcy estate (the "Estate") and the remainder shall be returned to the Authority. If the Amended Plan is not confirmed or otherwise does not become effective on or before July 1, 2024, the Good Faith Deposit shall be refunded to the Authority, less any amounts disbursed to pay Interim Expenses (as defined below) between the PSA Approval Date and June 1, 2024.

Within three (3) business days of the PSA Approval Date, the Authority shall deposit an additional $1,000,000 into an escrow account (the "Saint Agnes Escrow") for the payment of all interest and related expenses associated with the allowed secured claim (the "Saint Agnes Claim") asserted by Saint Agnes Medical Center ("Saint Agnes") against the Debtor until: (a) the Plan Support Agreement is terminated; (b) the Saint Agnes Claim has been paid in full; or (c) the Amended Plan Effective Date. |
| **Pre-Effective Date Funding** | The County shall continue to fund the operating expenses of the Hospital, at the current rate of approximately $125,000 per week, on same terms and conditions as the existing cash collateral orders through May 3, 2024.

From May 3, 2024 to the date on which the Bankruptcy Court issues a final order approving the Amended Plan (the "Amended Plan Effective Date") (the period between the PSA Approval Date and Amended Plan Effective Date is referred to as the "Transition Period"), the Authority shall provide funding to the Debtor in the form of disbursements from the Good Faith Deposit sufficient for the Debtor to pay all of its expenses associated with the Hospital's operations during the Transition Period (the "Interim Expenses"), provided, that the Authority's obligation to fund the Interim Expenses: (a) shall not apply to expenses accruing after termination of the Plan Support Agreement; and (b) shall terminate upon the full depletion of the Good Faith Deposit if such depletion occurs prior to the Amended Plan Effective Date.

During the Transition Period, on or before the tenth (10th) business day of each calendar month, the Authority shall deliver to the Committee a |

| | |
|---|---|
| | written report detailing (a) all Interim Expenses that remain due and unpaid as of the first day of such calendar month that are not subject to a bona fide dispute and (b) all Interim Expenses that remain due and unpaid as of the first day of such calendar month due to a bona fide dispute. |
| **Means for Implementation of the Amended Plan** | The Debtor will amend and restate its articles of incorporation and bylaws ("Reorganized MCH Documents") to provide for the issuance of a membership interest in MCH to the Authority and such other changes requested by the Authority related to the control and operation of Reorganized MCH. |
| | The Authority will acquire the sole membership in the Reorganized MCH for the purpose of operating the Hospital and related assets, and to apply for or reactivate, as applicable, and maintain related licenses, accreditations, permits, and other authorizations. |
| | On the Amended Plan Effective Date, in exchange for the membership interest in Reorganized MCH, the Authority shall contribute a cash payment (the "Authority Contribution") to fund a liquidation trust (the "Liquidation Trust") in the amount equal to the lesser of: (a) $30,000,000, plus the sum of any unused portion of the Good Faith Deposit and the unused portion of the Saint Agnes Escrow (the "Maximum Contribution"); or (b) the amount required to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed SAMC Secured Obligations, as provided in the Committee Plan (as defined below), and Allowed General Unsecured Claims in full plus interest at the rate of 2.0% per annum (the "Maximum Plan Distribution"). The Maximum Contribution shall be funded as follows: (i) $17,500,000 into the Liquidation Trust on the Amended Plan Effective Date; and (ii) the remainder into an interest bearing escrow account to be released in increments over time as necessary to fund the Liquidation Trust up to the lesser of the Maximum Plan Distribution and the funds held in the escrow account. |
| | The Liquidation Trust also shall be funded with the Estate Personal Assets, as such term is defined in the *First Amended Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors* [Docket No. 1355] (the "Committee Plan"). The Estate Personal Assets shall not be property of Reorganized MCH as of the Amended Plan Effective Date. |
| | Immediately upon the Amended Plan Effective Date, the Liquidation Trust Agreement shall provide that the Liquidation Trustee shall be permitted to use the first $17,500,000 of the Authority Contribution for the purpose of making distributions under the Amended Plan. The Liquidation Trustee shall be permitted to use the remainder of the Authority Contribution (up to the Maximum Plan Distribution) for the purpose of making distributions under the Liquidation Trust only after the Liquidation Trustee provides |

| | |
|---|---|
| | written notice to the Authority that the following events have occurred: (a) the first $17,500,000 of the Authority Contribution has been distributed in satisfaction of Allowed General Unsecured Claims; and (b) all Estate Personal Assets have been monetized and the proceeds have been distributed in accordance with the Amended Plan and the Liquidation Trust Agreement. |
| | Any unused portion of the Authority Contribution and the Liquidation Trust, and all accrued interest in any escrow account, shall be refunded to the Authority. |
| **Board of Directors of Reorganized MCH** | Reorganized MCH shall be governed by a board of directors (the "MCH Board") composed of seven (7) members, of which: one (1) representative shall be an individual employed by or elected to represent the County; three (3) representatives shall be individuals nominated and appointed by Adventist; and three (3) representatives shall be individuals nominated and appointed by UCSF Health. |
| **Liquidation Trust** | The Liquidation Trustee shall be selected by the Authority in consultation with the Committee and Adventist. The Authority shall have the right to designate one (1) of three (3) members of a committee (the "Liquidation Trust Oversight Committee") formed by the Bankruptcy Court to oversee the Liquidation Trust and consult with the Liquidation Trustee in connection with the implementation of the Amended Plan. |
| | Settlement of (a) any disputed claim asserted against the Estate where the amount in dispute exceeds $100,000 and/or (b) any claim held by the Liquidation Trust that seeks recovery of more than $500,000 shall require either (a) the Authority's consent (not to be unreasonably withheld) or (b) an order of the Bankruptcy Court authorizing such settlement. |
| **Treatment of Classified Claims** | Classified claims against the Estate shall be administered in the following manner: |

| Class | Status | Treatment |
|---|---|---|
| Class 1 – Other Priority Claims | Unimpaired | Each holder of an allowed Other Priority Claim will receive in full satisfaction, settlement, discharge, and release of such allowed Other Priority Claim, at the election of the Liquidation Trustee: |
| | | (a) cash equal to the amount of such allowed Other Priority Claim; |

| | | | |
|---|---|---|---|
| | | | (b) such other less favorable treatment as to which the Liquidation Trustee and the holder of such allowed Other Priority Claim will have agreed in writing; or<br>(c) such other treatment such that it will not be impaired. |
| | Class 2 – Other Secured Claims | Unimpaired | Each holder of an allowed Other Secured Claim will receive in full satisfaction, settlement, discharge, and release of such allowed Other Secured Claim, at the election of the Liquidation Trustee:<br><br>(a) cash equal to the amount of such allowed Other Secured Claim;<br>(b) return of the collateral securing such allowed Other Secured Claim;<br>(c) such other less favorable treatment as to which the Liquidation Trustee and the holder of such allowed Other Secured Claim will have agreed upon in writing;<br>(d) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement<br>(e) such other treatment such that it will not be impaired. |
| | Class 3 – SAMC Secured Obligations | Impaired | On the Amended Plan Effective Date, and in exchange for a waiver and release of any and all claims or Causes of Action asserted or assertable against SAMC by the Debtor, the Estate, the Committee, the Liquidation Trust or the Liquidation Trustee, the SAMC |

| | | | Secured Obligations shall receive a distribution in the amount (the "SAMC Distribution Amount") equal to the sum of: (a) $2,230,546, plus (b) any interest, fees and expenses, accrued between January 2, 2024 and the Amended Plan Effective Date, that remain due and owing as of the Amended Plan Effective Date. |
| | Class 4 – General Unsecured Claims | Impaired | Each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement discharge, and release of such Allowed General Unsecured Claim its pro rata share of the Liquidation Trust assets. The Liquidation Trust assets shall initially consist of, inter alia: <br><br>(a) any Cash on Hand as of the Amended Plan Effective Date (including the Authority Contribution); <br>(b) any unused portion of the Good Faith Deposit as of the Amended Plan Effective Date; <br>(c) the Estate Personal Assets; <br>(d) any Excess Professional Fee Trust Amount; <br>(e) the D&O Liability Insurance Policies; and <br>(f) the Retained Causes of Action (including, but not limited to, Tort Claims and D&O Claims); and (vi) the proceeds of the foregoing. |

All other non-classified claims against the Estate, including Administrative Expense Claims, Professional Fee Claims, and Priority

| | |
|---|---|
| | Tax Claims shall be administered in the same manner as set forth in the Committee Plan. |
| **Management Services Agreements** | Upon the Amended Plan Effective Date, Adventist Health, UCSF Health, and Reorganized MCH will enter into one or more MSAs.  Adventist Health has provided the Authority with a letter of intent for such an MSA, a copy of which is filed contemporaneously herewith as Exhibit D of the Exhibits to Notice of Alternative Transaction. |
| **Regulatory Processes** | In coordination with the Authority, UCSF Health, and the County, after the Amended Plan Effective Date, Adventist Health and UCSF Health will submit an application for CDPH's review and approval for the following (1) to identify the joint powers authority and its related members as new indirect owners of Reorganized MCH, and (2) to identify Adventist Health (on behalf of the County) and UCSF Health for the management and operation of Reorganized MCH upon the terms and conditions in the MSA(s).  As part of its management and operation obligations, Adventist Health and UCSF Health will apply for and obtain all other necessary local, state and federal approvals to reestablish general acute hospital services at Reorganized MCH.  In an effort to further facilitate prompt and efficient reopening and availability of hospital services to the communities served by Reorganized MCH, Adventist Health, UCSF Health, and the Authority would seek to continue Reorganized MCH's participation in Medicare and Medi-Cal through its existing provider agreements. <br><br> The Authority shall negotiate in good faith with the California Attorney General (the "AG") regarding mutually agreeable conditions to the transactions contemplated herein. |
| **Executory Contracts/Unexpired Leases** | Certain of the Debtor's executory contracts and unexpired leases shall be assumed by the Reorganized MCH as provided for in the Amended Plan.  Those executory contracts and unexpired leases that are not rejected, assumed, assumed and assigned, or the subject of a motion filed by the Debtor prior to the Amended Plan Effective Date to assume, assume and assign, or reject such executory contracts and unexpired leases on which the Bankruptcy Court has not ruled, will be deemed rejected unless expressly assumed under the Plan. <br><br> The Amended Plan shall provide that the Authority shall have the sole right to determine which of the Debtor's executory contracts and unexpired leases are assumed pursuant to the Amended Plan (the "Assumed Contracts").  The Authority shall pay all cure costs associated with the assumption of the Assumed Contracts.  The Authority's obligation to pay such cure costs shall be separate and apart from, and in addition to, the Authority Contribution. |

| Transaction Documents; Expenses | The Parties will negotiate the initial drafts of the Amended Plan and other documents and agreements necessary to effectuate the transactions contemplated by this Term Sheet (the "Transaction Documents"). The Transaction Documents shall include a membership interest agreement (the "Membership Agreement"), which shall contain customary terms and conditions for transactions of this type. |
|---|---|
| | Each Party will bear its own cost and expenses in negotiating and finalizing the Transaction Documents. |
| **Conditions Precedent to the Amended Plan Effective Date** | The following shall be conditions precedent to the occurrence of the Amended Plan Effective Date: |
| | • The Plan Support Agreement shall not have been terminated and shall be in full force and effect; |
| | • The Bankruptcy Court shall have entered the PSA Approval Order, and such order shall not have been reversed, stayed, modified or vacated on appeal; |
| | • The Bankruptcy Court shall have entered an order confirming the Amended Plan (the "Confirmation Order") in form and substance and materially consistent with the Plan Support Agreement and acceptable to the Authority, and the Confirmation Order shall be in full force and effect and not have been reversed, stayed, modified, or vacated on appeal; |
| | • The Department of Health Care Access and Information shall have committed to the allocation of $50,000,000 in loan funding from the Distressed Hospital Loan Program to the Reorganized MCH. |
| | • All actions, documents, and agreements necessary to implement and consummate the Amended Plan shall have been effected and executed. |
| | • The Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Amended Plan. |

**<u>Exhibit D</u>**

**MSA LOI**



February 12, 2024

Madera Health and Hospital Joint Powers Authority

Attn: County of Madera

Re: Management Services Arrangement - Madera Community Hospital

Ladies and Gentlemen:

We understand that Madera Health and Hospital Joint Powers Authority ("**Authority**") is being formed by The Regents of the University of California, on behalf of its San Francisco campus and academic medical center ("**UCSF Health**") organized and existing pursuant to Article IX, Section 9 of the Constitution of the State of California, and the County of Madera ("**County**") organized and existing as a general law county under the general laws of the state of California including Government Code section 23000 et seq. for the purpose of entering into a transaction to acquire sole control of Madera Community Hospital, a California nonprofit public benefit corporation ("**MCH**" or the "**Hospital**") through a plan of reorganization in MCH's pending bankruptcy proceeding (the "**Proposed Transaction**.")

This letter of intent (this "**LOI**") is provided to the Authority to outline the terms and conditions for Adventist Health System/West and its affiliates (collectively, "**Adventist Health**") to provide certain facility, operations, administrative, and related services ("**Services**") to the Hospital as well as other health care providers or suppliers owned or controlled by the Hospital ("**Healthcare Operations**"), on behalf of the Authority, in connection with the reorganization and reopening of the Hospital subject to the terms and conditions of a Management Services Agreement. The MCH entity after being restructured through the bankruptcy proceeding shall be referred to as the "**Reorganized MCH**."

This LOI sets forth some, but not all, of the material terms and conditions upon which Adventist Health, the Authority and/or Reorganized MCH (each a "**Party**" and collectively, the "**Parties**") propose to enter and perform the Proposed Transaction. Except for the provisions of Sections 4 *[Notices]*, 5 *[No Violation]*, 6 *[Expenses]*, 7 *[Termination]*, 8 *[Governing Law]*, and 9 *[Entire Agreement]* hereof (the "**Binding Provisions**"), this LOI is not intended to create a binding agreement with respect to the Proposed Transaction on the terms expressed herein or on any other terms, or to create any other legal obligation or rights for any Party hereto.

Adventist Health is comprised of nonprofit corporations that constitute an integrated health system serving communities in California, Hawaii, Oregon and Washington.

1. <u>Services</u>. Subject to closing of the Proposed Transaction, including satisfaction of the conditions thereof, Adventist Health would provide the Services, on the terms and conditions set forth in **Exhibit A** hereto (the "**Term Sheet**").

2. <u>Further Conditions</u>. As is customary of transactions of this type, Adventist Health's obligations would be conditioned upon: (a) negotiation, execution and delivery of definitive agreements as may be necessary or appropriate to document the foregoing Services arrangement (including the accompanying exhibits and schedules and related ancillary agreements thereto) that are normal and customary for transactions of this type (the "**Management Definitive Agreements**") in a form acceptable to the Parties, which would include, among other things, representations, warranties, covenants, conditions, insurance, compliance provisions and indemnities that recognize the structure of the Authority, the reorganized MCH; negotiation and execution and delivery of definitive agreements that may be necessary to document the Funding Commitment set forth in the Term Sheet and a parallel funding commitment on substantially the

*Madera Health and Hospital Joint Powers Authority*
February 12, 2024
Page 2

same terms and conditions by UCSF Health in support of MCH that are normal and customary for transactions of this type (the "**Funding Definitive Agreements**" and with the Management Definitive Agreements, the "**Definitive Agreements**"); (c) the adoption of amendments to the Hospital's article of incorporation and bylaws reasonably satisfactory to Adventist Health, including amendments that provide for changes to the Hospital's governance consistent with the Term Sheet; (d) the receipt of all material approvals under the Bankruptcy Proceeding and of governmental agencies; (e) the receipt of all required and material third party consents and approvals, including those with respect to any applicable licenses or permits, which can be obtained prior to the effective date of the Management Definitive Agreements, and (f) such other conditions precedent to closing as mutually agreed upon by the Parties and set forth in the Definitive Agreements. No Party will have any obligation to undertake any transaction with the other Party or to execute the Definitive Agreements unless and until the terms thereof are acceptable to that Party, as determined in that Party's sole discretion.  The Definitive Agreements and the Proposed Transaction are subject to approval of the Party's respective governing boards.

3. <u>Counterparts</u>.  This Letter of Intent may be executed in one or more counterparts, each of which will be deemed an original and all of which taken together will be deemed to constitute one and the same instrument.  The facsimile or electronic signatures will be deemed to have the same legal effect as the original signature.

4. <u>Notices</u>.  All notices required or permitted under this Agreement shall be in writing and shall be delivered either: (a) by overnight delivery using a nationally recognized overnight courier (e.g., Federal Express, United Parcel Service, or any other similar service), in which case notice shall be deemed delivered one business day after deposit with such courier; (b) by personal delivery, in which case notice shall be deemed delivered upon receipt; or (c) by email or electronic transmission, in which case notice shall be deemed delivered upon confirmation of transmission. In each case, notice shall be delivered or sent to the address or email provided in this Section 5, or such other address or email as provided by a Party, from time to time, pursuant to this Section 5.

         If to the Authority:          The County of Madera
                                                     Board of Supervisors
                                                     ATTN: Chief Clerk
                                                     200 West 4th Street
                                                     Madera, CA 93637

         With a copy to:          Madera County
                                                       ATTN: County Administrative Officer
                                                     200 West 4th Street
                                                     Madera, CA 93637

                                                     And:

                                                     Office of the County Counsel
                                                     c/o Regina A. Garza, Esq.
                                                     Lozano Smith
                                                     7404 N. Spalding Ave.
                                                     Fresno, CA 93720

*Madera Health and Hospital Joint Powers Authority*
February 12, 2024
Page 3

|  | If to Adventist Health: | Adventist Health System/West |
|---|---|---|

If to Adventist Health:

Adventist Health System/West
1 Adventist Health Way
Roseville, CA 95661
Attn: Chief Executive Officer
Email: HeinriK@ah.org

With a copy to:

Adventist Health System/West
1 Adventist Health Way
Roseville, CA 95661
Attn: Chief Legal Officer
Email: JobeMS@ah.org

5. <u>No Violation</u>. Each Party represents and warrants to the other Party during the term of this Letter of Intent that (a) the Party is not currently bound under any binding or enforceable contract or agreement with any third party that would materially interfere with the Proposed Transaction; (b) this Letter of Intent and the Proposed Transaction will not violate any contract, agreement or commitment currently binding the Party; and (c) the Party is fully authorized to enter into this Letter of Intent. Adventist Health has prepared and delivered this Letter of Intent and Term Sheet in reliance on such representations and warranties.

6. <u>Expenses</u>. Each Party shall bear its respective legal, accounting, broker, financial advising and other expenses and costs in connection with the Proposed Transaction, in each case whether or not the Proposed Transaction contemplated by this Letter of Intent are consummated.

7. <u>Termination</u>. This Letter of Intent may be terminated by mutual written agreement of the Parties at any time. Upon termination of this Letter of Intent for any reason, the Parties shall have no further obligations except the other commitments contained in the Binding Provisions of this Letter of Intent, which will survive termination.

8. <u>Governing Law</u>. This Letter of Intent shall be governed by and construed and enforced in accordance with the laws of the State of California, without regard to conflict of laws principles.

9. <u>Entire Agreement</u>. This Letter of Intent the Madera Health and Hospital Joint Powers Authority Joint Exercise of Powers Agreement and the Commitment Letter of even date herewith contain the entire understanding between the Parties with respect to the subject matter of this Letter of Intent, and supersedes all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties. This Section 10 shall be deemed a "merger" clause, and this Letter of Intent (together with the Term Sheet and attachments) is intended as a complete integration of the Parties' agreement. This Letter of Intent may be amended only by a written instrument executed by each Party. This Letter of Intent cannot be assigned by either Party without the prior written consent of the other Party.

**SIGNATURES ON NEXT PAGE**

NAI-1539311386v6

*Madera Health and Hospital Joint Powers Authority*
February 12, 2024
Page 4

ADVENTIST HEALTH SYSTEM/WEST

By: _Kerry L. Heinrich_____

Name: Kerry L. Heinrich

Title: Chief Executive Officer

Date: __02/12/2024_____

**AGREED AND ACKNOWLEDGED:**

**THE COUNTY OF MADERA**
**On Behalf of the Madera Health and Hospital Joint Powers Authority**

By: _____

Title: _____

Date: _____

*Madera Health and Hospital Joint Powers Authority*
February 12, 2024
Page 5

|  | **Term Sheet** |
|---|---|
| **MSA Scope of Services** | Adventist Health, or an affiliate, will provide management and personnel to support the Healthcare Operations pursuant to a mutually acceptable Management Services Agreement ("**MSA**").<br><br>Following the closing of the Proposed Transaction and prior to the effective date of re-licensure and reopening of the Hospital, Adventist Health will provide the Authority and/or the Hospital with management and personnel to support the reopening efforts as described more fully in the MSA provided that such services are included in the Management Fee (defined below) or that Adventist Health is otherwise reimbursed for its expenses and fees incurred as part of that work.<br><br>The parties also contemplate that UCSF Health will enter into a management services agreement with MCH, pursuant to which UCSF Health will provide certain services to support the reopening efforts at MCH and the ongoing operation of the Hospital post-reopening related to quality oversight, physician recruitment, service line development and branding. The management services agreement with UCSF Health shall include fair market value compensation for the services provided. |
| **Management Fee** | Adventist Health would be paid by MCH a management fee, to include Adventist Health's direct and indirect costs (e.g., HR support for the personnel working centrally to administer Healthcare Operations, such as finance, IT, revenue cycle) to provide the Services ("**Management Fee**"), which Management Fee shall be fair market value as determined by a third-party appraiser mutually acceptable to the Parties.<br><br>The Management Fee shall include a variable component that provides for Adventist Health to share in the results of budgetary and operational performance. |
| **Initial Term** | 5 year initial term |
| **Termination** | Upon a material change in the JPA, the Authority's or Hospital's governing documents that materially alter Adventist Health's role in governance.<br><br>Other customary termination rights. |

*Madera Health and Hospital Joint Powers Authority*
February 12, 2024
Page 6

| | |
|---|---|
| **Governance** | The MSA shall provide that Adventist Health will be selected as the "Operator" of the Hospital with joint exercise of management authority and ultimate control of the Hospital as provided for in the Authority's Joint Exercise of Powers Agreement ("**JPA**") and that it shall have the right to nominate 3 individuals to sit on the Authority's Board of Directors (and any replacements).<br><br>The Hospital's governing documents shall be amended to provide for comparable representation on the Hospital's Board of Directors. |
| **Purchase Option** | Upon a Triggering Event, Adventist Health will have the option (i) to purchase the assets comprising the Healthcare Operations pursuant to an Asset Purchase Agreement(s) with MCH and/or the Authority or (ii) to enter into a membership substitution transaction with respect to the corporate membership of MCH.<br><br>The Asset Purchase Agreement(s) shall include fair market and commercially reasonable terms (confirmed by a third-party appraiser mutually acceptable to the Parties); provided that Adventist Health would be credited for its contributions to the Reorganized MCH. |
| **Funding Commitment** | The commitment whereby Adventist Health commits to provide a $17,500,000 credit facility to the Authority as set forth in the Adventist Health Commitment Letter dated February 12, 2024. |

## <u>Exhibit E</u>

**Stakeholder Letters of Support**



February 11, 2024

Suresh Gunasekaran             Kerry Heinrich
President and CEO                President and CEO
UCSF Health, Box 0296         Adventist Health
1800 Owens Street                 ONE Adventist Health Way
San Francisco, CA 94143       Roseville, CA 95661

Re: Support for Partnership to Reopen Madera Community Hospital

Dear Mr. Gunasekaran and Mr. Heinrich:

On behalf of the members of the California Association of Public Hospitals and Health Systems (CAPH) and the millions of patients they serve, I am writing to express our strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH). The three entities would create a high-quality community hospital that restores health care services in Madera County.

California's 21 public health care systems are the core of the state's health care safety net, delivering high-quality care to more than 3.7 million patients annually, regardless of ability to pay or insurance status. Public health care systems include county-operated and -affiliated facilities and the five University of California medical centers. Statewide, public health care systems employ over 85,000 workers and provide nearly half of all hospital care to uninsured persons and serve 40 percent of the Medi-Cal population in their communities.

Last year's MCH closure devastated the Madera community, leaving thousands of residents without a local hospital. This initiative represents a pivotal opportunity to restore critical health care services to over 160,000 patients impacted by the closure of MCH. Access to quality, local health care is essential for all Californians, especially those in Madera County and the San Joaquin Valley, a medically underserved area. The innovative partnership model outlined by UCSF Health and Adventist Health demonstrates a commitment to maintaining local access to high-quality care while addressing the unique health care needs of Madera County and the broader Central Valley, which include higher incidences of chronic health conditions, and lack of reliable transportation and language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high-quality care. The nearest hospitals in Fresno are a 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies.

We at CAPH are confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable MCH to reopen with improved operational efficiency and patient experience. Partnering with Madera County to align with the community's health care needs, both organizations are committed to restoring life-saving critical care services in Madera County and building a safe, sustainable, and high-quality care infrastructure that the region can rely on for decades to come.

We fully support the efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. CAPH commends the efforts of all parties involved and stands ready to support the development and implementation of this transformative health care model. We appreciate your commitment to improving health care access in Madera County and the San Joaquin Valley.

Sincerely,

Erica B. Murray
President and CEO
California Association of Public Hospitals and Health Systems

# CCEMSA

Fresno
Kings
Madera
Tulare

**Central California Emergency Medical Services Agency**

A Division of Fresno County
Department of Public Health

February 12, 2024

Suresh Gunasekaran
President and CEO
UCSF Health, Box 0296
1800 Owens Street
San Francisco, CA 94143

Kerry Heinrich
President and CEO
Adventist Health
ONE Adventist Health Way
Roseville, CA 95661

Dear Mr. Gunasekaran and Mr. Heinrich:

We write to offer our strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH). The three entities would come together to create a high-quality community hospital that restores healthcare services in Madera County.

Last year's closure of MCH was devastating for our community, leaving over 100,000 residents without a local hospital. Access to quality, local health care is essential for all Californians, including those in Madera County and the San Joaquin Valley, which is a medically underserved area. Our diverse patient population lives with higher incidences of chronic health conditions, and many lack reliable transportation or experience language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high quality care. The nearest hospitals in Fresno are, at a minimum, 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies.

We are confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital, and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable the MCH to reopen with improved operational efficiency and patient experience. Partnering with Madera County to align with the health care needs of the community, both organizations are committed to restoring life-saving critical care services in Madera County and building a safe, sustainable and high-quality care infrastructure that the region can rely on for decades to come.

The Local Emergency Medical Services Agency for Fresno, Kings, Madera, and Tulare Counties
1221 Fulton Mall/ PO Box 11867 / Fresno, California, 93775 / Phone (559) 600-3387 / FAX (559) 600-7691
After Hours Phone (559) 600-7838 E-Mail: ccemsa@co.fresno.ca.us Website: www.ccemsa.org
Equal Opportunity Employer – Affirmative Action– Disabled Employer

Suresh Gunasekaran
Kerry Heinrich
February 12, 2024
Page 2

We fully support the efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. Thank you for your commitment to improving healthcare access in Madera County and the San Joaquin Valley.

If you have any questions, please do not hesitate to call me at (559) 600-3387.

Sincerely,

Daniel J. Lynch
EMS Director



February 9, 2024

Suresh Gunasekaran                    Kerry Heinrich
President and CEO                     President and CEO
UCSF Health, Box 0296                 Adventist Health
1800 Owens Street                     ONE Adventist Health Way
San Francisco, CA 94143               Roseville, CA 95661

Dear Mr. Gunasekaran and Mr. Heinrich:

I write to offer my strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH). The three entities would come together to create a high-quality community hospital that restores healthcare services in Madera County.

Last year's closure of MCH was devastating for our community, leaving over 100,000 residents without a local hospital. Access to quality, local health care is essential for all Californians, including those in Madera County and the San Joaquin Valley, which is a medically underserved area. Our diverse patient population lives with higher incidences of chronic health conditions, and many lack reliable transportation or experience language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high quality care. The nearest hospitals in Fresno are, at a minimum, a 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies.

I am confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable the MCH to reopen with improved operational efficiency and patient experience. Partnering with Madera County to align with the health care needs of the community, both organizations are committed to restoring life-saving critical care services in Madera County and building a safe, sustainable, and high-quality care infrastructure that the region can rely on for decades to come.

I fully support the efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. Thank you for your commitment to improving healthcare access in Madera County and the San Joaquin Valley.

Sincerely,
Santos Garcia Mayor City of Madera
559-708-8484
sgarcia@madera.gov
405 West Fourth Street
Madera, CA. 93637

# CALIFORNIA MEDICAL ASSOCIATION

February 12, 2024

Suresh Gunasekaran                    Kerry Heinrich
President and CEO                     President and CEO
UCSF Health, Box 0296                 Adventist Health
1800 Owens Street                     ONE Adventist Health Way
San Francisco, CA 94143               Roseville, CA 95661

Dear Mr. Gunasekaran and Mr. Heinrich:

On behalf of our nearly 50,000 physician and medical student members, the California Medical Association writes to offer our strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH). These three entities coming together to create a high-quality community hospital that restores healthcare services in Madera County is a very welcome development.

Last year's closure of MCH was devastating for this Central Valley community, leaving over 100,000 residents without a local hospital.  Access to quality, local health care is essential for all Californians, including those in Madera County and the San Joaquin Valley, which is a medically underserved area.  The diverse patient population in this region lives with higher incidences of chronic health conditions, and many lack reliable transportation or experience language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high-quality care. The nearest hospitals in Fresno are a 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies.

We are confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable the MCH to reopen with improved operational efficiency and patient experience.  Partnering with Madera County to align with the health care needs of the community, we understand both organizations are committed to restoring life-saving critical care

services in Madera County and building a safe, sustainable, and high-quality care infrastructure that the region can rely on for decades to come.

We fully support the joint efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. Thank you for your commitment to improving healthcare access in Madera County and the San Joaquin Valley.

Sincerely,

Tanya W. Spirtos, M.D.
President
California Medical Association





STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0115

February 9, 2024

Suresh Gunasekaran                  Kerry Heinrich
President and CEO                   President and CEO
UCSF Health, Box 0296               Adventist Health
1800 Owens Street                   ONE Adventist Health Way
San Francisco, CA 94143             Roseville, CA 95661

Dear Mr. Gunasekaran and Mr. Heinrich:

We write to offer our strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH). The three entities would come together to create a high-quality community hospital that restores healthcare services in Madera County.

Last year's closure of MCH was devastating for our community, leaving over 100,000 residents without a local hospital. Access to quality, local health care is essential for all Californians, including those in Madera County and the San Joaquin Valley, which is a medically underserved area. Our diverse patient population lives with higher incidences of chronic health conditions, and many lack reliable transportation or experience language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high quality care. The nearest hospitals in Fresno are, at a minimum, 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies.

We are confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital, and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable the MCH to reopen with improved operational efficiency and patient experience. Partnering with Madera County to align with the health care needs of the community, both organizations are committed to restoring life-saving critical care services in Madera County and building a safe, sustainable and high-quality care infrastructure that the region can rely on for decades to come.

We fully support the efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. Thank you for your commitment to improving healthcare access in Madera County and the San Joaquin Valley.

STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0115

# California Legislature

Sincerely,

_____
Anna M. Caballero
Senator, 14th District

_____
Marie Alvarado-Gil
Senator, 4th District

_____
Esmeralda Soria
Assemblywoman, 27th District

_____
Dr. Joaquin Arambula
Assemblymember, 31st District



February 9, 2024


Suresh Gunasekaran              Kerry Heinrich
President and CEO               President and CEO
UCSF Health, Box 0296          Adventist Health
1800 Owens Street               ONE Adventist Health Way
San Francisco, CA 94143        Roseville, CA 95661

Dear Mr. Gunasekaran and Mr. Heinrich:

We write to offer our strong support for the partnership between UCSF Health, Adventist Health, and Madera County to reopen and operate the Madera Community Hospital (MCH), creating a high-quality community hospital that will restore much-needed healthcare services in Madera County.

Last year's closure of MCH was devastating for our community, leaving over 100,000 residents without a local hospital. Access to quality, local health care is essential for all Californians, including those in Madera County and the San Joaquin Valley, which is a medically underserved area. Our diverse patient population lives with higher incidences of chronic health conditions, and many lack reliable transportation or experience language barriers.

The closure of MCH has challenged the ability of surrounding hospitals to deliver high quality care. The nearest hospitals in Fresno are, at a minimum, a 30-minute drive away. Minutes matter when it comes to treating life-threatening conditions such as cardiac arrest, stroke, and high-risk pregnancies. Valley Children's Hospital experienced a significant increase in adult patients accessing our emergency room, challenging a service line already operating at or near capacity and intended to care for our most vulnerable and youngest patients from across our 12-County service area.

We are confident that UCSF Health's experience operating an extensive academic health system will bring much-needed expertise for the clinical oversight of the hospital and will enable MCH to reopen with improved quality and safety standards aligned with UCSF Health's nationally ranked care standards. Adventist Health's expertise in managing rural and community hospitals will enable the MCH to reopen with improved operational efficiency and patient experience. Partnering with Madera County to align with the health care needs of the community, both organizations are committed to restoring life-saving critical care services in Madera County and building a safe, sustainable and high-quality care infrastructure that the region can rely on for decades to come.

## Office of the President
**Valley Children's**  |  HOSPITAL  |  MEDICAL GROUP  |  HOME CARE  |  FOUNDATION

We fully support the efforts of UCSF Health and Adventist Health to create a sustainable model that keeps health care local and in a vibrant medical center that the Madera community needs and deserves. You have the full support of Valley Children's Healthcare in your efforts.

Thank you for your commitment to improving healthcare access in Madera County and the San Joaquin Valley.

Sincerely,

Todd A. Suntrapak
President & Chief Executive Officer