1  Patience Milrod #77466
   985 North Van Ness Avenue
2  Fresno, California 93728
   Telephone: (559) 246-7239
3  Email: pm@patiencemilrod.com

4  Attorney for Madera Coalition for Community Justice

5

6

7              **UNITED STATES BANKRUPTCY COURT**

8              **EASTERN DISTRICT OF CALIFORNIA**

9                    **FRESNO DIVISION**

10  In re:                              Case No.:  23-10457

11  MADERA COMMUNITY HOSPITAL,          Chapter 11

12         Debtor in Possession.        DCN:  PSJ-025

13  Tax ID#:  23-6429117               **OBJECTIONS TO CONFIRMATION OF**
    Address:  1250 E. Almond Avenue    **SECOND AMENDED CHAPTER 11**
14            Madera, California 93637  **PLAN OF LIQUIDATION PROPOSED**
                                        **BY THE OFFICIAL COMMITTEE OF**
15                                      **UNSECURED CREDITORS**

16                                      Hearing Date:     April 16, 2024
                                        Time:             9:30 a.m.
17                                      Place:            2500 Tulare Street
                                                          Courtroom 13
18                                                        Fresno, California  93721

                                        Judge:  Hon. René Lastreto II
19

20         Comes now Madera Coalition for Community Justice (MCCJ) and submits the

21  following Objections to Confirmation of the Creditor Committee's Second Amended Chapter

22  11 Plan of Liquidation.  Supporting and documenting the Objections that follow are a Request

23  for Judicial Notice, and Exhibits, filed and served herewith.

24  ///

**PRELIMINARY STATEMENT**

Resurrection of Madera Community Hospital is a critical community priority for Maderans—but only with a new operator that meets Maderans' most pressing needs.  Based on its record, American Advanced Management's proposed Plan to reopen MCH is unlikely—either soon or over the long term, or successfully—to provide the most essential basic services of a safety-net hospital such as MCH.

MCCJ objects to the Plan on the grounds that it is not proposed in good faith, per §1129(a)(3):  while casting itself as a successor to MCH, it does not commit to provide adequate services to an adequate number of patients; AAM's track record and business practices raise serious questions about its intent in fact to meet community needs.  Moreover, AAM's true solvency is untested; the apparently frequency with which it has failed to pay taxes timely and to meet financial obligations short of litigation, give rise to legitimate concerns that if confirmed the Plan would put MCH at risk for liquidation or the need for further financial reorganization (§1129(a)(11)).  Moreover, the Plan is incomplete, as it fails to require consideration of the UCSF/Adventist proposal as an alternative to liquidation if the AAM bid fails for some reason.

Finally, given that publicly available data[1] raise serious doubts about AAM's capacity, and even intent, to operate a true safety-net hospital in Madera, if AAM's Plan is to be approved, the approval must include imposition of significant new conditions.

///

///

---

[1] Data cited herein are from multiple public sources, and supported by a Request for Judicial Notice, filed and served herewith.  Data sources include:  federal and state court records, California Department of Health Care Access and Information (HCAI), and California Department of Public Health (CDPH). HCAI data is submitted by each hospital under penalty of perjury.

**GROUNDS FOR OBJECTIONS**

**1.  The Plan fails to comply with 11 U.S.C. § 1129(a)(3).**

The proponents of the Plan insist that its purpose is to allow reopening of MCH "to enable the Hospital to continue serving its community and its mission"[2] and to "continue serving its community and its underserved population."[3]  However, AAM's Plan does not actually *commit as a condition of Plan confirmation* to operating Madera Community Hospital as the safety-net facility so essential to Madera's underserved population.  The Attorney General's Conditions, and attached AAM Turnaround Plan, provide the only available insight into what MCH might look like as an operating hospital.  But the gaps in service are deep and wide: Emergency Department, labor and delivery, General Surgery, laboratory, medical imaging— either not proposed at all (labor and delivery), or conditioned on whether AAM in its sole discretion determines MCH will be "sustainable" if offering them, or if offering them at an adequate level or to a degree that meets the needs of Maderans generally.[4]

Importantly, the Attorney General's "conditions" identifying services to be rendered do not impose *requirements*, but are themselves conditioned on two things:  AAM's exercise of "Commercially Reasonable efforts," and AAM's determination in its sole discretion whether or

---

[2] Docket No. 1298, Motion for Order Authorizing Debtor to Enter into a Master Transition Agreement and a Management Services Agreement with American Advanced Management, Inc., at p. 2, ¶ 1.

[3] *Id*. at p. 28, ¶ 31.

[4] "The Entities shall use Commercially Reasonable *efforts* to meet the following growth targets to introduce, maintain, and grow capabilities and capacities to furnish the following services at the Madera Campus within five (5) years from the Closing Date, provided that final determinations regarding specific services or service lines available at the Madera Campus shall be made by AAM *in its sole discretion*, and may be affected by demand for services in the Madera community and license requirements that may impact the nature of services that may be offered at the Madera Campus."  Docket No. 1415, Attorney General's Conditions, Condition VII, p. 4 (PDF 12 of 151) [emphasis added].  Among the listed services which AAM may—or may not—eventually provide are "Basic, Level-3 emergency department, … Inpatient and outpatient surgical services, … Laboratory, medical imaging, … specialty clinic services including prenatal care, surgical specialties, asthma care, and behavioral health services."  *Id*.

not to provide the services described. As a result, based on the Plan and AAM's other filings in this matter, it is an egregious misrepresentation to describe the "reopened" hospital as a community-serving medical facility that will step into MCH's role—absent firm and enforceable commitments by AAM, or imposition of new and enforceable conditions by the Court. To assert that this Plan will "reopen" MCH as a safety-net hospital, when the proposal in fact commits to no more than a stripped-down facility offering few of the essential services needed and serving a much-reduced patient population, amounts to a bait and switch scheme rather than a good faith proposal within the meaning of 11 U.S.C. § 1129(a)(3).

First, however, it is important to note that AAM explicitly acknowledges that *it cannot make this project work at all* unless it can reopen the Rural Health Clinic that had been located on the MCH campus. AAM also admits that "the location on the hospital campus in Madera would not currently qualify as a new clinic site."[5] AAM hopes the site can be "grandfathered" into regulatory compliance, relying on having obtained such waivers in other takeovers, and on some "preparatory communications" between CEO Paolinelli and CMS,[6] but such a hope is at this point only speculative.

**Proposed condition of Confirmation:** Prior to judicial confirmation of the Plan, AAM must supply the Court with at least provisional CMS approval of its waiver request permitting operation of the clinic on the MCH campus.

### a. Labor and delivery

Of MCH's 106 beds, 23 were perinatal, and there were an additional 21 newborn nursery bassinets. HCAI utilization data show 700-800 births per year, with a relatively high incidence

---

[5] Docket No. 1415, AAM Madera Community Hospital Turnaround Plan, p. 1 (PDF 143).
[6] *Id*. at p. 2 (PDF 144).

of c-section deliveries and low-birth-weight babies.[7]  HCAI patient discharge data for MCH from 2020-2022 show 26% to 29% were perinatal patients.  No labor and delivery services are available at any of AAM's eight California hospitals.[8]

Although perinatal care was a key function of MCH, and clearly essential to the community at large, neither AAM's Turnaround Plan nor the Attorney General's Conditions require, or even propose, that AAM provide labor and delivery service.  The Turnaround Plan notes that MCH's labor and delivery program was a money-loser ($4.5 million annually), and proposes that a Rural Health Clinic on-site at the MCH campus[9] will pick up some of the slack by offering prenatal care.[10]  The Attorney General expects AAM to try to ensure that emergency department staff "can address specific emergency services needed by women,"[11] unaccountably without touching on the question of patients presenting in labor at the emergency department.

**Proposed condition of Confirmation:**  As of the date of opening, and for a minimum of five years from that date, MCH must provide labor and delivery service, as well as prenatal and well-baby care.

**b.  Emergency Department**

Until 2022, MCH's annual Emergency Department volume averaged 30,000 patient visits; of these between 2,000 and 3,000 per year required admittance to the hospital.[12]  MCH

---

[7] Please see MCCJ's Exhibits to Request for Judicial Notice filed and served herewith:  HCAI Annual Utilization Reports for Madera Community Hospital, 2019-2023 (Exhibits 2.A.1-4).  The pertinent data appears in each report at Page 5 (1) – Surgery and Related Services, lines 20-22.

[8]  Please see MCCJ's Exhibits to RJN filed and served herewith:  to compare hospitals' data, please refer to fn. 7, and for each AAM-affiliated hospital, please see Exhibits 2.B.1-7, reflecting the number of live births for each facility.

[9] This is true only if CMS grants permission to reopen the clinic on the MCH campus.

[10]  Docket No. 1415, AAM Turnaround Plan at p. 5 (PDF 147).

[11] *Id.,* Attorney General's Conditions, at p. 4, fn. 3 (PDF 12).

[12]  *Please see,* MCCJ's Exhibits to RJN referenced at fn. 7.  The data reflecting the number of Emergency Department visits and admits from the ED each year appear at Pages 4 (1), lines 21-30, of each report.

1    was licensed to provide Basic Emergency Services, which requires that a physician be on site

2    24/7, and that a surgeon be available on call. [13]

3            The Attorney General's Conditions[14] suggest that MCH should have a Basic, Level 3

4    Emergency Department that qualifies for licensure under California Code of Regulations, Title

5    22, § 70411.  However, this "condition" requires only that AAM use Commercially Reasonable

6    efforts to provide Emergency Services (one of MCH's "growth targets"), allowing AAM in its

7    sole discretion to decide whether or not to provide emergency services, and whether the services

8    will be provided at Basic or Standby level.[15]  Moreover, AAM does not include in its

9    Turnaround Plan any application to California Department of Public Health to extend or renew

10   MCH's permit to operate a Basic Level Emergency Department.[16]

11           A potentially bigger problem is that AAM is apparently entirely without experience

12   operating a §70411-compliant Basic Level Emergency Department.  None of AAM's eight

13   hospitals has an emergency department licensed to provide Basic Emergency Medical Service.

14   Of AAM's eight[17] facilities, four are Long Term Acute Care specialty hospitals, with no

15

16   [13] California Code of Regulations, Title 22, § 70411, provides:  "Basic Emergency Medical Service,
     Physician on Duty, Definition.  Basic emergency medical service, physician on duty, means the provision
17   of emergency medical care in a specifically designated area of the hospital which is staffed and equipped
     at all times to provide prompt care for any patient presenting with urgent medical problems."

18   [14] Docket No. 1415, Attorney General's Conditions, Condition VII, p. 4 (PDF 12).

19   [15] California Code of Regulations, Title 22, § 70649, provides:  "Standby Emergency Medical Service,
     Physician on Call, Definition.  Standby emergency medical service, physician on call, means the
     provision of emergency medical care in a specifically designated area of the hospital which is equipped
20   and maintained at all times to receive patients with urgent medical problems and capable of providing
     physician service within a reasonable time."

21   [16] Docket No. 1415, AAM Turnaround Plan, p. 2 (PDF 144).

22   [17] This count includes three hospitals AAM claims to have added to its hospital system in 2023 – the
     Kentfield-Marin, Kentfield-San Francisco, and Orchard Hospital facilities.  However, AAM
23   affiliation/ownership information does not appear in the CDPH's Facility License, Management, or
     Owner/Operator data records for those hospitals.  Please see MCCJ's Exhibits to RJN filed and served
     herewith, Exhibits 3.A-C, CDPH records for these facilities, last accessed online February 26, 2024.
24   Ownership/management information appears toward the bottom of the first/top of the second page of each
     of these reports.

emergency rooms.  Among AAM's remaining four hospitals, each provides only Standby

Emergency Medical Service[18], within the meaning of CCR Title 22, § 70649.

**Proposed condition of Confirmation:**  As of the date of opening, MCH must have

secured approval from CDPH to extend MCH's permit to provide Basic Emergency Medical

Service within the meaning of CCR § 70411, and for a minimum of five years must operate its

Emergency Department consistently with the requirements of that permit.

### c.  Surgery

MCH had six operating rooms, providing both inpatient and outpatient surgical services

to 4,000 to 5,000 patients per year (2019-2022)[19].  To provide emergency and inpatient surgical

services is an essential function of a safety-net hospital.

However, the Attorney General's Conditions require only that AAM use

Commercially Reasonable efforts, and exercise its sole discretion whether, to "bring

surgical, diagnostic and service capacity and surgery suites online at the Madera Campus

consistent with patient demand and need."[20]  On pages 5 and 6 of the Turnaround Plan,

AAM offers an "8 Year Service Line Growth Strategy," listing General Surgery among

the "longer term strategies" to be implemented "[a]fter the facility has successfully been

---

[18]  Please see MCCJ's Exhibits to RJN filed and served herewith, HCAI Annual Utilization Reports for Madera Community Hospital, 2019-2023 (Exhibits 2.A.1-4), and for each AAM-affiliated hospital please see Exhibits 2.B.1-7, reflecting the Licensed Emergency Department Level which HCAI compiled from CDPH data.  This information appears at Page 4 (1)-Emergency Dept Services (EDS), line 2, of each report.  If the facility has an Emergency Department, line 2 will show Basic or Standby; a blank indicates no Emergency Department.

[19]  Please see MCCJ's Exhibits to RJN filed and served herewith, HCAI Annual Utilization Reports for Madera Community Hospital (2019-2023), Exhibits 2.A.1-4.  Data showing the number of surgeries, both inpatient and outpatient, each year, appear at Page 5 (1)-Surgery and Related Services, lines 1-2, in each report.

[20] Docket No. 1415, Attorney General's Conditions, Condition VII, p. 4 (PDF 12).

reopened and stabilized (we believe this will take 2-3 year [sic]).”[21]  Even then,

implementation would depend on whether the additional services “make sense and meet a

community need,” and at full capacity would serve only 1200 cases per year—a fraction

of the established need.[22]

Any optimism about the likelihood that Madera’s only hospital will offer surgical

services under the aegis of AAM is considerably dimmed with an examination of AAM’s

practices, experience, and apparent business model.  AAM’s eight hospitals provide no inpatient

surgical services:  six AAM hospitals have no operating rooms and provide no surgical services

at all; the other two provide limited, outpatient-only surgical services[23].

**Proposed condition of Confirmation:**  As of the date of opening, MCH must reopen its

six surgical suites, providing both inpatient and outpatient surgeries for a minimum of five years

from the date of opening.

### d.  Service to low-income patients

Due to the poverty of the patient populations it serves, MCH’s payor mix has long

skewed heavily to Medi-Cal and Medicare reimbursement for health care services.  In a Report

Prepared for the Office of the Attorney General during the time St. Agnes was proposing to

acquire MCH, USC professor Dr. Glenn Melnick reported that, “In 2020, approximately one-

third (31 percent) of MCH’s total charges are for Medicare patients and charges for Medi-Cal

patients account for 50 percent.  The Hospital participated in the Medicare and Medi-Cal

---

[21] Docket No. 1415, AAM Turnaround Plan at pp. 5-6 (PDF 145-146).

[22] See HCAI Annual Utilization Reports referenced in fn. 19.

[23] Please see MCCJ’s Exhibits to RJN filed and served herewith:  HCAI Annual Utilization Reports for Madera Community Hospital, 2019-2023 (Exhibits 2.A.1-4); for each AAM-affiliated hospital please see Exhibits 2.B.1-7.  Data reflecting the number of operating rooms appear at Page 5 (1)-Surgery and Related Services, lines 7-10, in each report; the number of inpatient and outpatient surgeries performed each year also appear on Page 5 (1), lines 1-2.

programs through both fee-for-service contracts as well as managed care contracts."[24]

The Attorney General's Conditions do require that AAM maintain participation in Medicare and Medi-Cal programs (Condition XI), provide charity care at MCH (Condition XII), and take affirmative steps to ensure indigent patients are informed of MCH's Financial Assistance policy so they can apply for charity care when appropriate (Condition XIII).[25]

However, AAM has minimal experience serving low-income populations: HCAI data show most AAM facilities with extremely low Medi-Cal discharges and Medi-Cal revenues Most AAM facilities have limited, if any, Managed Care revenue from serving patients in managed care plans.[26]

**Proposed condition of Confirmation:** Prior to judicial confirmation of the Plan, AAM must provide documentation of the steps it has taken at MCH to ensure it can manage and meet the unique demands of Medi-Cal fee-for-service and managed care reimbursement mechanisms, in order to ensure that MCH will be ready, willing and able to serve low-income populations.

**e.   Ethical concerns**

A due-diligence review of Dr. Singh's and AAM's business practices leads the researcher directly into a truly confounding number of allegations of dishonesty, fraud, perjury, and maladministration. MCCJ will spare the Court anything like a full review of the litigation and regulatory disciplinary action that appear in the public record. But the bare quantity of Dr.

---

[24] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 7, "Assessment of the Effects of the Proposed Acquisition of Madera Community Hospital by St. Agnes Medical Center. Prepared for the Office of the Attorney General. Version 7.7.2022." by Glenn Melnick, Ph.D., July 7, 2022, at PDF p. 342 (p. 70 of the Report).

[25] Docket No. 1415, Attorney General's Conditions, pp. 6-7 (PDF 14-15).

[26] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 2.C.1-8, HCAI pivot tables showing HCAI hospital annual financial data file for Madera Community Hospital and the 5 AAM-affiliated hospitals for 2022, detailing by payor group Gross Revenues, Net Revenues, Discharges, Patient Days, and Outpatient Visits.

1   Singh's legal entanglements reveals a troubling pattern of bad faith business dealings, and

2   failures to comply with tax and regulatory responsibilities. Final judicial rulings on the issues

3   are few, since most cases were settled before a definitive determination on their merits.

4   Therefore, this submittal limits to four the examples of AAM conduct that give rise to doubts

5   about the good faith with which the proffered Plan to "reopen" MCH is proposed.

6          (i)     **In re: Sonoma West Medical Center, Inc., Bankr. N.D.Cal., Ch. 7, No. 18-
                   10665; Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma
7                  West Medical Center v. Sonoma Specialty Hospital, LLC, et al, A.P. No. 19-
                   1030.**

8                  On September 8, 2018, Dr. Singh, through his American Advanced Management

9   Group (AAMG), entered into an agreement with Palm Drive Healthcare District to

10  provide hospital management services to bankruptcy Debtor Sonoma West Medical

11  Center. In August of 2019, Debtor's Trustee commenced an adversary proceeding

12  against Singh, AAMG, and subsidiary Sonoma Specialty Hospital, LLC (SSH)[27], seeking

13  turnover of property of the estate, an accounting for receivables collected and used since

14  September 9, 2018, and damages for conversion of property of the estate.

15                 After a four-day trial on the question of ownership, the Bankruptcy Court held

16  that the Debtor's Trustee, and not SSH, was the owner of receivables that accrued prior to

17  the date AAMG/SSH assumed management of the facility but that were received

18  afterwards. The Court emphatically rejected (as "ridiculous") SSH's claim that it had

19  rights to the receivables, but no responsibility to pay debts created in rendering those

20  services.[28]

---

[27] According to the California Department of Public Health, SSH is wholly owned by Dr. Singh, who is likewise the principal of AAMI. Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 3.D; ownership/management information is at the bottom of the first page.

[28] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 4.A, Memorandum Decision Following Trial on Threshold Issue, filed February 23, 2021, at Exhibit pp. 150-151.

Eight months later—after another trial, this time to determine damages—the Bankruptcy Court ruled that the Debtor's Trustee was entitled to retrieve the funds SSH had "wrongfully appropriated."[29]  Among the Court's findings of fact:  SSH began using the Debtor's DDA bank account without the Trustee's knowledge or consent[30]; SSH falsely claimed to be the owner of "most of the money in this account"[31]; and SSH untruthfully informed the Trustee that SSH had no way to differentiate between funds received prior to transfer of management to SSH and those received after[32].

The Court repudiated SSH's arguments as "without merit"[33] and ruled for the Debtor's Trustee on all claims.  The judgment ordered recovery to Debtor's Trustee of $2,581,222.80 and dismissed defendants' counterclaim in its entirety and with prejudice.[34]  The Court issued an Amended Judgment pursuant to the parties' settlement agreement after an installment payment had been made, awarding a somewhat reduced amount of $1,150,000.[35]

**(ii)    Michelle Baass, Director of the California Department of Health Care Services, vs. Sonoma Specialty Hospital, LLC; American Advanced Management Group, Inc.; and Gurpreet Singh, Case No. SCV-270916, Sonoma County Superior Court**

SSH eventually converted to a private hospital, in April of 2019, and at that point became ineligible for PRIME funding, a publicly-funded incentive program for public

---

[29] *Id.*, Exhibit 4.B, Memorandum Decision Regarding Plaintiff's Damages, filed October 22, 2021, at Exhibit p. 161.

[30] *Id.*, Exhibit p. 164.  The purpose of a "DDA Account" is for deposit of funds from the U.S. Center for Medicare and Medicaid Services.

[31] *Id.*, p. Exhibit p. 165.

[32] *Id.*, p. Exhibit p. 167.

[33] *Id.*, Exhibit pp. 172, 176, 177, 185.

[34] *Id.*, Exhibit 4.C, Judgment, filed October 27, 2021, at p. 192.

[35] *Id.*, Exhibit 4.D, Amended Judgment, filed November 30, 2021, at p. 196.

hospitals providing care to Medi-Cal patients.  According to the complaint filed in May of 2022 by California Department of Health Care Services (DHCS), SSH "failed to timely notify DHCS of its conversion and breached its Medi-Cal provider agreement by improperly accepting federal program funds and by subsequently refusing to remit the amount it was overpaid."[36]  DHCS sought recoupment of $270,000.

On February 23, 2024, the Superior Court granted DHCS's motion for summary judgment, noting "the parties do not disagree on the facts," and rejecting the Singh parties' arguments claiming SSH's eligibility for PRIME dollars continued even after the date of the change of ownership that converted SSH to a private hospital.[37]

**(iii)　In the Matter of the Accusation Against Advanced College; Jusrand LLC – Gurpreet Singh, Owner; Before the California Department of Consumer Affairs for the Bureau for Private Postsecondary Education, Case No. BPPE22-023**

Beginning in July of 1999, Dr. Singh began operating Advanced College (Advanced), a private for-profit vocational nursing school, which eventually had three campuses, in Salida, Stockton, and South Gate in Southern California.[38]  On December 22, 2021, the Bureau for Private Postsecondary Education (BPPE) received notice from the United States Department of Education that the DOE had denied Advanced's application for continued participation in federal student financial assistance programs. The DOE determination was based on multiple grounds, including failure to make timely refunds to students, submission of false information to DOE investigators, and failures to

---

[36] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 5.A, Complaint for Recoupment, Breach of Contract, declaratory Relief, and Unjust Enrichment, filed May 31, 2022.

[37] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 5.B, Minute order adopting tentative ruling granting plaintiff DHCS's motion for summary judgment, filed February 23, 2024.

[38] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 6, Default Decision and Order, dated January 20, 2023, Exhibit p. 236, ¶ 2.

demonstrate financial responsibility and administrative capacity.[39]

Almost a full year later, on December 8, 2022, after its own investigation, BPPE itself issued a Notice and Emergency Decision to shut down Advanced's operations effective December 19.  Dr. Singh did not seek administrative review of the sudden closure.

On December 19, 2022, the BPPE filed an Accusation[40], seeking revocation or suspension of Advanced's Approval to Operate, and an order that Advanced pay the BPPE reasonable costs of investigation and enforcement.  Dr. Singh never responded to the Accusation, though he was served the same day the Accusation was filed.

On January 20, 2023, the BPPE found Dr. Singh to be in default, and "based on the relevant evidence contained in the Default Decision Investigatory Evidence Packet in this matter, finds that the charges and allegations in Accusation Number BPPE22-023, are separately and severally, found to be true and correct by clear and convincing evidence."[41]  The BPPE assessed costs of investigation and enforcement against Dr. Singh, in the amount of $32,569.75.[42]

BPPE's investigation, detailed in the Accusation (Exhibit A to the Default Decision and Order), revealed falsification of documents, including overcharges for fees; charges for uniforms, books, services, and supplies that were never provided; falsification of applicant test scores; and falsification of records of attendance, falsely showing that students had completed rotations when they had not.[43]

---

[39] *Id.*, Exhibit A—Accusation Number BPPE22-023, Exhibit p. 257, ¶ 38.

[40] *Id.*, Exhibit A—Accusation, Exhibit pp. 241-272.

[41] *Id.*, Default Decision and Order, Exhibit p. 237, ¶ 8.

[42] *Id.*, ¶ 9.

[43] *Id.*, Exhibit A—Accusation, Exhibit pp. 259-262, *passim.*

Of particular relevance to AAM's viability as an operator of Madera Community Hospital, BPPE found that bank statements and operational expense reports showed Advanced was likely to be insolvent within six months, and was regularly failing to meet financial responsibilities such as payment of vendors, timely payroll disbursements, and making refunds when due, or at all.[44]

The school on every level was a failure—administratively, financially, and educationally. The BPPE findings point to cynical fraud: a money-extraction machine masquerading as a school, but a school that failed to provide instructors, materials, or equipment.[45] Advanced knowingly sucked in the unqualified and the ineligible, students who failed basic entrance examinations and who could not participate in externships because they would not pass background checks needed for employment.[46] Advanced took their tuition money, and gave them little or nothing of value.

MCCJ is alarmed to consider that Dr. Singh, Advanced's owner and operator, proposes now to operate and perhaps own Madera Community Hospital. Putting the most charitable construction on it, Dr. Singh was incompetent to run Advanced—to protect these vulnerable students' investments in their future by ensuring that Advanced met the many standards, requirements, and regulatory strictures imposed on a vocational nursing school. A full service general acute hospital is much more complicated to run, and failures are often literally fatal. An incompetent should not be allowed control of MCH.

But this does not seem to be a case of negligent incompetence: Dr. Singh had a

---

[44] *Id.*, Exhibit pp. 262-263.

[45] *Id.*, Exhibit pp. 263-266.

[46] *Id.*, Exhibit pp. 266-272.

full year between the federal DOE termination of Advanced's participation in student

loan programs and the BPPE emergency order shutting Advanced College down entirely.

The BPPE investigation uncovered the same failures as the DOE investigation had done.

Dr. Singh had apparently done nothing in the interim to correct the problems in the

intervening year—which suggests either a willingness to tolerate his institution's abysmal

failures, or an unscrupulous desire to extract maximum dollars from unsuspecting

students.  This cannot be the ethos under which MCH is operated in future.

**Proposed conditions of Confirmation:**  MCCJ respectfully requests that this Court

maintain jurisdiction over this case for at least five years after Confirmation of a Plan, requiring:

1)       a report every six months comprising an audited accounting, verified and

approved by the Attorney General and the California Treasurer's Health Facilities Financing

Authority, for:

 • all funding MCH receives from the Distressed Hospitals Fund, documenting that every

dollar of the funding is spent for the direct benefit of MCH;

• all funding MCH receives through any and all sources of supplemental Medi-Cal

payment, including but not limited to Disproportionate Share Hospital or Medi-Cal Hospital

Quality Assurance Fund programs, to document that all such funding is expended at and for

MCH directly to improve access to and quality of medical care for vulnerable Madera residents.

2)       an annual review by the California Department of Public Health of MCH's

operations and cash flow, so as to satisfy itself that AAM is operating MCH in a competent and

ethical manner.

## 2.  The Plan fails to comply with 11 U.S.C. § 1129(a)(11).

The throughline in MCCJ's Objections raised in Section 1, *supra*, is AAM's single-

minded commitment to maximizing profit, even at the expense of compliance with regulatory

constraints, and/or the competent and professional provision of the services its businesses are legally and morally obligated to supply. At every turn, AAM appears to choose the cheaper and more profitable business model, without regard to the impact on the populations it claims to serve. As criminal court sentencing judges are well aware, the best predictor of future conduct is past behavior: based on AAM's preferred business model and ethically questionable business practices, MCCJ anticipates that Confirmation of the proposed Plan is very likely to be followed by liquidation, or the need for further financial reorganization, of MCH or of AAM if it assumes ownership of MCH.

**MCCJ bases this Objection on the following facts:**

- **Dozens of red flags, in the form of many tax liens, and dozens of lawsuits against Dr. Singh and his many businesses seeking payment of past-due amounts or alleging fraud, breach of contract, and Labor Code violations, among other claims**

Even in the very few instances enumerated in Section 1.e. of these Objections, *supra*, AAM conducted itself, and took legal positions, incompatible with pertinent regulations and basic contract law. Such repeated and apparently irrational refusals to loosen their grasp of money to which they had no plausible claim, together with the BPPE finding that Advanced College was on the brink of insolvency, leads a reasonably attentive observer to wonder whether AAM is actually able to invest the resources it claims it has at its disposal for reopening and operating Madera Community Hospital.

Additional urgent questions are raised by the Notices of Federal Tax Liens collected at Exhibit 8[47] of the Request for Judicial Notice. First, MCCJ wishes to make clear that it does not assume these tax liens are still pending—they very well may have been cleared by now, but that is not our point. Our concern is that federal Internal Revenue Service enforcement was

---

[47] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 8, pp. 424-434.

necessary at all.  Wrongfully unpaid obligations included federal income tax (Internal Revenue Code § 1040)[48], taxes withheld from employees' paychecks (deductions for income taxes, Social Security, or Medicare) (IRC § 941)[49], and the employer's portion of Social Security or Medicare tax (IRC § 940)[50].  In addition, there are recorded tax liens for a total of $148,843.67 in IRS penalties[51] based on a finding of willful failure to collect tax, to account for and pay tax, or to "attempt in any manner to evade or defeat tax or the payment thereof."  (Internal Revenue Code, § 6672.)  The total liens assessed—and these are just the ones we found Monday afternoon in the Stanislaus County Clerk-Recorder's office—totaled $4,102,105.97 over the period they were recorded, from September 7, 2018 to January 19, 2023.

The number and quantity of these liens signals either a business owner who is unable to manage acquisitions, operations, and cash flow so as to meet his financial responsibilities, or a business owner who prefers to exploit the present value of his cash, and can absorb almost $150,000 in IRS penalties as a mere cost of doing business.  Neither of these business models is appropriate for the operator of a health care facility such as Madera residents need MCH to be.

Similarly, the sheer volume of cases collected at Exhibit 9[52]—again, uncovered in a very short time frame and without access to special databases or investigators—alarms the reasonable observer.  As with the tax liens, MCCJ does not assume that Dr. Singh and his businesses were in fact liable for all the sums they were sued for.  As noted earlier, most cases seemed to settle, though often rather late in the process.  So it may be that his method is to force his creditors to invest additional sums in lawyers to retrieve amounts owed, while he makes use of the cash he

---

[48] *Id*., at 429-430.

[49] *Id*., at 434.

[50] *Id*.

[51] *Id*., at 431-432.

[52] Please see MCCJ's Exhibits to RJN filed and served herewith, Exhibit 9, pp. 435-440.

would otherwise have had to pay them.  Or it may be that cash flow is so tight, and so uncertain, that Dr. Singh cannot manage to operate his many businesses and also avoid lawsuits involving them.

Either way, this cavalier mode of doing business is not promising for MCH's financial stability and the quality of its care, such that confirmation of the plan is likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan.

- **AAM's demonstrated lack of experience, interest, or capacity to operate a full-service hospital serving a low-income and MediCal-dependent population requiring medical services which may not be profitable, such as labor and delivery, a 24/7 physician-staffed Emergency Department, and inpatient surgical service**

AAM's disinclination to provide the essential services at the very core of a safety net hospital's mission is apparent from a cursory examination of AAM's current holdings:  none provide labor and delivery service, none provide Basic Emergency Department service, none provide inpatient surgery, and only two have Medi-Cal managed care contracts or provide significant levels even of fee-for-service care to Medi-Cal patients.

The Plan now before this Court for Confirmation does not in fact commit AAM to provide these services to this population; AAM's evident lack of interest, let alone enthusiasm, for serving low-income patients, together with its demonstrated ruthless dedication to maximizing its profits, do not bode well for Maderans unable to cough up private insurance-level payments for medical care.

- **AAM's demonstrated lack of experience, interest, or capacity to handle intricacies of Medi-Cal billing and reimbursement**

As AAM has added health care facilities to its portfolio, often out of bankruptcy, it has tended to convert them to operations with high levels of Medicare and/or private insurance reimbursement.  As a result, AAM's experience with Medi-Cal billing has been limited, resulting

in expensive operational and administrative blunders.

For example, the entanglements AAM experienced with DHCS and Trustee Timothy Hoffman could, if we were generous-minded, be attributable to the ignorance an aggressively for-profit entity might suffer when confronted with the dizzyingly numerous requirements of programs that reimburse medical care from public funds. Such ignorance is an indicator of incompetence, but not necessarily of bad faith.

In these two instances however, both DHCS and Trustee Hoffman provided Dr. Singh and his wholly-owned subsidiaries AAMG and SSH plenty of notice of their concerns and the legal bases for their positions. We can justifiably infer a lack of interest in observing regulatory strictures from Dr. Singh's choice to litigate to retain control of funds to which his businesses absolutely and clearly had no legal right.

MCH has landed itself in bankruptcy court because it was inept in its attempts to navigate the complexities of negotiations with insurers, and the requirements of Medi-Cal, Medi-Cal managed care, and the attendant reimbursement and supplement programs. AAM appears to be even less experienced, and less interested, in learning these skills so essential to successful operation of a safety net hospital in Madera.

**Proposed condition of Confirmation:** MCCJ respectfully requests that prior to confirming the proposed Plan this Court require AAM to demonstrate to the satisfaction of the Attorney General, HCAI, and CHFFA that AAM has adequate resources to dedicate to MCH, *as well as* to its other businesses and medical care facilities.

**3. The Plan is incomplete, because it fails to explicitly identify the UCSF/Adventist bid as a potential liquidation option.**

Both the Second Amended Chapter 11 Liquidation Plan[53] and the Third Amended Disclosure Statement[54] provide for a pivot to a Liquidation Transaction if the MTA is terminated and/or the Committee in its sole discretion determines that liquidation is in the best interests of the Creditors. As Counsel for Madera County pointed out during the February 27 hearing, there is another option: the proposal proffered by UCSF and Adventist Health. The Plan is incomplete, in that it does not acknowledge that option, and does not require that the Committee give it fair consideration.

**Proposed condition of Confirmation:** MCCJ respectfully requests that prior to Confirmation the Plan be amended to incorporate explicit reference to the UCSF/Adventist proposal, and to require reasonable and fair consideration of that proposal prior to any pivot to liquidation.

**4. Madera Coalition for Community Justice is an interested party in these proceedings.**

MCCJ is an interested party in these proceedings in its role as representative of Madera County residents' intense concern about the fate of their hospital. Those residents must ask: who is responsible for the due diligence here? We do not expect the Creditors' Committee to look AAM's gift horse in the mouth. That is not their job, and we understand and respect that their first responsibility is to recoup what MCH has owed them all for so long.

We also understand that our standing to raise these issues is not indisputable. But we point out respectfully that whether or not MCCJ itself has standing to say so, the Court must make an evidence-based determination that the provisions of § 1129 have been met.[55] Section

---

53 Docket No. 1507, Redline Second Amended Chapter 11 Liquidation Plan, at p. 30 (PDF 37).

54 Docket No. 1506, Redline Third Amended Disclosure Statement, at p. 35 (PDF 50).

55 *See, e.g.*, *Big Shanty Land Corp. v. Comer Properties, Inc.*, N.D.Ga.1985, 61 B.R. 272. [Even if unsuccessful bidder did not have standing to object to proposed reorganization plan, bankruptcy court had independent duty to subject it to Chapter 11 safeguards, and determine if plan was submitted in good faith.]

1129's requirement that a Liquidation Plan be proffered in good faith requires evidence of a Plan's feasibility, and that the Plan proponent is not "dishonest in any way."  *See, e.g.*, *In re Koelbl* (2d Cir. 1984) 751 F.2d 137, 139.  At this point, the record is devoid of the evidence of solvency and financial solidity that would support a finding that the AAM Plan is feasible, and MCCJ has proffered evidence of dishonesty that is worthy of evidentiary testing in a hearing.

Finally, we must say to this Court:  we fervently hope it will not be the case that MCH will be turned over to AAM without regard to the quality of stewardship AAM is likely to provide for Madera's one hospital and the health of the Madera community.  We request that the Court scrutinize carefully AAM's representations, and subject them to evidentiary proof, before making this enormously consequential decision.  If the Court does determine to confirm the Plan, MCCJ requests that it impose enforceable conditions upon AAM in order to protect the interests of Madera's population.

DATED:                          Respectfully submitted,

   /s/ Patience Milrod
Patience Milrod
Attorney for
Madera Coalition for Community Justice