Patience Milrod #77466
985 North Van Ness Avenue
Fresno, California 93728
Telephone: (559) 246-7239
Email: pm@patiencemilrod.com

Attorney for Madera Coalition for Community Justice

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re: | ) | Case No.:   23-10457 |
| MADERA COMMUNITY HOSPITAL, | ) | |
| | ) | Chapter 11 |
| Debtor in Possession. | ) | |
| | ) | DC No,:  PSJ-025 |
| Tax ID#:   23-6429117 | ) | |
| Address:   1250 E. Almond Avenue | ) | EXHIBITS TO REQUEST FOR JUDICIAL NOTICE |
|                Madera, California 93637 | ) | IN SUPPORT OF MADERA COALITION FOR |
| | ) | COMMUNITY JUSTICE'S OBJECTIONS TO |
| | ) | CONFIRMATION OF SECOND AMENDED |
| | ) | CHAPTER 11 PLAN OF LIQUIDATION |
| | ) | |
| | ) | Hearing Date:    April 16, 2024 |
| | ) | Time:                 9:30 a.m. |
| | ) | Judge:               Hon. René Lastreto II |

**Exhibits to MCCJ Request for Judicial Notice
Volume 2 of 3 (pp. 137 - 272)**

**MCCJ Request for Judicial Notice**

**4.** **Bankruptcy court records regarding** *In re:  Sonoma West Medical Center, Inc.*, **Bankr. N.D.Cal., Ch. 7, No. 18-10665;** *Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma West Medical Center v. Sonoma Specialty Hospital, LLC, et al.*, **A.P. No. 19-1030.**

    **A.** **Memorandum Decision Following Trial on Threshold Issue, filed February 23, 2021**



The following constitutes the Memorandum Decision of
the Court.  Signed: February 23, 2021

_____
**Roger L. Efremsky**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE | Case No. 18-10665 RLE |
| SONOMA WEST MEDICAL CENTER, INC. | |
| Debtor, | Chapter 7 |
| _____ | |
| TIMOTHY W. HOFFMAN, Trustee in Bankruptcy of the Estate of SONOMA WEST MEDICAL CENTER, INC., | AP NO. 19-01030 |
| Plaintiff, | |
| SONOMA SPECIALTY HOSPITAL, LLC, AMERICAN ADVANCED MANAGEMENT GROUP, INC., GURPREET SINGH, | |
| Defendants. | |

## MEMORANDUM DECISION FOLLOWING TRIAL ON THRESHOLD ISSUE

Before the court for decision is what has been described as the "Threshold Issue";

specifically, who owns the accounts receivable generated when the Debtor Sonoma West

Medical Center (the "Debtor") operated Palm Drive Hospital (the "Hospital") up to and through

September 8, 2018 (the "Pre-September 9, 2018 Receivables").  While there was much

testimony and evidence presented during the course of the four-day trial, the court only need look to two unambiguous contracts to determine that the Pre-September 9, 2018 Receivables are owned by Debtor.

### A.     *Procedural History*

For purposes of this Memorandum Decision, the relevant procedural history is as follows:

1.      On August 20, 2019, Timothy W. Hoffman, Trustee of the Bankruptcy Estate of Sonoma West Medical Center (the "Plaintiff") filed the above-entitled complaint commencing this adversary proceeding (the "Complaint").  Docket #1.  The Complaint names Sonoma Specialty Hospital, LLC ("SSH"), Gurpreet Singh ("Singh"), and American Advanced Management Group, Inc. ("AAMG") as defendants (collectively, "Defendants").  The Complaint is based on Bankruptcy Code §542 and states three related and interdependent claims for relief: (1) turnover of property of the estate (i.e., the Pre-September 9, 2018 Receivables); (2) an accounting for the Pre-September 9, 2018 Receivables collected and used by Defendants; and (3) damages for conversion of property of the estate.

2.      On October 9, 2019, Defendants filed their Answer (the "Answer") and SSH and AAMG filed Counterclaims (the "Counterclaimants" and the "Counterclaims").  Docket #9. The Answer contains one affirmative defense that the Pre-September 9, 2018 Receivables are not property of the estate.  The remaining five affirmative defenses (which are identical to the allegations in the five Counterclaims) are all based on the premise that the Pre-September 9, 2018 Receivables are not property of the estate.

3.      On October 14, 2019, Plaintiff filed his Answer to the Counterclaims.  Docket #10.

    4.      On October 25, 2019, Defendants filed a Motion for Withdrawal of Reference. Docket #25. Defendants asserted that withdrawal of the reference was appropriate because all but one claim (i.e., the turnover cause of action) involve non-core issues on which SSH, Singh and AAMG are entitled to a jury trial.

    5.      On December 20, 2019, Plaintiff filed a Stipulation for Dismissal of Complaint as to AAMG and Singh. Docket #43. As a result of the Stipulation, SSH was the only remaining Defendant and SSH and AAMG remained as Counterclaimants (collectively, "SSH/AAMG").

    6.      On January 16, 2020, this court issued a Recommendation Regarding Motion to Withdraw Reference (the "Recommendation"). Docket #47. The Recommendation recognized that permissive withdrawal was appropriate but recommended to the District Court that the bankruptcy court be permitted to resolve the Threshold Issue.

    7.      On June 22, 2020, the Honorable Jeffrey S. White issued an Order Denying Motion for Withdrawal of Reference Without Prejudice to Renewal. In addition to denying the Motion for Withdrawal of Reference without prejudice, Judge White adopted the bankruptcy court's recommendation that the bankruptcy court resolve the Threshold Issue.[1] Docket #63.

/ / / /

---

[1] Defendants subsequently sought leave to file a Motion for Reconsideration, which was granted by the District Court. On August 5, 2020, the District Court entered an order denying the Motion for Reconsideration. The District Court noted that Defendants "do not ask the Court to reverse its prior decision and grant the motion to withdraw the reference. Instead, they seek 'clarification' about whether the Bankruptcy Court can proceed by a Zoom trial and whether it can proceed without resolving the question of whether they are entitled to a jury trial on the claims, counterclaims, and the Threshold issue." The District Court went on to find that: (1) the arguments regarding the appropriateness of a Zoom trial were not the proper subject for a motion for reconsideration; and (2) this court had, in fact, engaged in an analysis of whether Defendants had a right to a jury trial and had concluded they did not. Docket #86.

0140
Exhibits to MCCJ Request for Judicial Notice
Case: 19-01030    Doc# 140    Filed: 02/23/21    Entered: 02/23/21 17:01:30    Page 3 of 21

8.      A trial was held on the Threshold Issue over a four-day period from August 18, 2020, through August 21, 2020.  Post-trial briefs were filed on September 24, 2020.  The Threshold Issue is now ripe for determination.

**B.      *Factual History***

The facts underlying the current dispute are well-known to the parties and will not be repeated in detail here.  For purposes of this Memorandum Decision, the relevant facts are as follows:

**1.      *The Management and Staffing Services Agreement***

On March 18, 2015, Debtor entered into a Management and Staffing Services Agreement (the "MSSA") with the Palm Drive Healthcare District (the "District").  The MSSA authorized Debtor to operate the Hospital on behalf of the District.  Pl. Exh. 1, p. 4 ¶2.1.  The MSSA provided that for operating the Hospital, Debtor would be entitled to compensation consisting of: (1) an annual subsidy of $1 million from tax revenues collected by the District; and (2) a management fee, consisting of "pass through reimbursement from Hospital Revenue of all of [Debtor's] direct and reasonable costs necessary to the provision of its management services . . . under this Agreement" (the "MSSA Management Fee").  Pl. Exh. 1, pp. 9-10, ¶¶5.1 and 5.4.

The MSSA further defined "Hospital Revenue" (from which the MSSA Management Fee would be paid) to mean and include:

> (a) all gross revenue from the provision of any and all hospital **services provided on or after the Commencement and during the term of the arrangement, determined on an accrual basis** in accordance with GAAP consistently applied; (b) any and all disproportionate share payments or credits from Medicare or Medicaid; (c) any and all quality assurance and supplemental Medi-Cal payments made by the California Department of Health Care Services to [the] District or [Debtor] after the Commencement Date. . . . and (h) any all [sic] revenue of any other type or any other source related to the operation of the Hospital on and after the Commencement Date.

Pl. Exh. 1, p. 9, ¶5.2 (emphasis added).

The MSSA required Debtor to "assure that all Hospital Expenses incurred in connection with the operation of the Hospital **on or after the Commencement Date and during the term of the Agreement are paid**. . . from Hospital Revenue to the extent it is available to cover Hospital Expenses[.]"  Pl. Exh. 1, p. 9, ¶5.3 (emphasis added).

Section 8.1 provided that Debtor would operate the Hospital under the MSSA commencing on March 18, 2015 and continuing "for a period of five (5) years, unless sooner terminated as provided herein."  Pl. Exh. 1, p. 12, ¶8.1.

Section 8.2 provided that both the District and Debtor had the ability to terminate the MSSA for "cause."  Pl. Exh. 1, p. 12, ¶8.2.  The defined instances of "cause" ranged from a simple default to intentional fraudulent acts.  Pl. Exh. 1, p. 12-13, ¶¶8.2.1 - 8.2.2.   The MSSA also contained an integration clause which provided that the MSSA was the entire agreement and that no amendments, changes or additions shall be binding unless made in writing and signed by the parties.  Pl. Exh. 1, p. 17, ¶12.5.

Debtor commenced operation of the Hospital pursuant to the MSSA sometime in the Fall of 2015.  Plaintiff's Post-Trial Brief, Docket #138, p. 8, line 1.

By the Summer of 2018, the District and Debtor had concluded that it was financially impossible for Debtor to continue to operate the Hospital.  Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 10-11; Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 5, lines 9-11.  Thus, the District withheld the $1 million subsidy due to Debtor to cover operating losses and terminated the MSSA pursuant to Section 8.2.1, citing Debtor's "inability to meet its financial obligations to operate the [H]ospital" (the "Termination Letter").  Def. Exh. L; Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 11-13.

Debtor operated the Hospital continuously from the Fall of 2015 until 11:59 p.m. on September 8, 2018 ("Termination").  Plaintiff's Post-Trial Brief, Docket #138, p. 8, lines 1-3**.** Upon Termination, Debtor had several million dollars in accrued and outstanding accounts receivable for services rendered prior to 11:59 p.m. on September 8, 2018.  Id. at p. 8, lines 3-4. In addition, Debtor had several million dollars in accrued and outstanding accounts payable to numerous creditors who had provided goods and services to Debtor and Debtor's patients prior to September 8, 2018 at 11:59 p.m.  Id. at p. 8, lines 5-7.

### 2.    *The Management Services Agreement*

On or about August 26, 2018, the District entered into a Management Services Agreement (the "MSA") with AAMG. Pl. Exh. 33, p. 1.  The MSA specifically anticipated that AAMG would promptly convert the Hospital to a Long-Term Acute Care Hospital[2] and gave AAMG the authority to take the steps to accomplish that goal.  Pl. Exh. 33, p. 1, Introduction; p. 2, ¶2.2.  The MSA stated that this conversion was necessary for the Hospital's survival.  Pl. Exh. 33, p. 1, Introduction.  The MSA further provided that the MSA was intended to be a bridge to AAMG ultimately entering into an agreement with the District to acquire all or part of the assets of the Hospital.  Pl. Exh. 33, p. 1, Introduction; p. 6, ¶5.2; p. 8, ¶11.

The MSA provided that for operating the Hospital, AAMG would be entitled to a Management Fee consisting of: (1) a fixed amount of $100,000 per month; and (2) the commercially reasonable, and industry standard, fees, costs and expenses incurred by AAMG

---

[2] See Pl. Exh. 3, p. 2 at ¶2.2(d) (AAMG shall "file for the change of licensure immediately following the Effective Date and assist the District in attaining the change of ownership as quickly as possible.")

in the course of performing its services under the MSA (the "MSA Management Fee").  Pl.

Exh. 33, p. 6, ¶4.2.

> Of particular note, the MSA provided,

> The revenues, accounts receivable and all other government payments from all such billings **shall be property of the District.**  Those revenues, accounts receivable and other government payments shall be used to pay the Management Fee of AAMG incurred **in performing its obligations under this Agreement[.]**

Pl. Exh. 33, p. 3, ¶2.6(a) (emphasis added).

While Debtor was not a party to the MSA, the MSA did provide that "[a]ll hospital

debts, contracted engagements, and legal obligations entered into prior to the Effective Date

will remain the sole responsibility of [Debtor, and] debts incurred on behalf of the Hospital by

AAMG following the Effective Date will be the responsibility of AAMG."  Pl. Exh. 33, p. 2,

¶2.5.  The MSA had an integration clause which confirmed that the MSA was the entire

agreement and that no changes or additions to the MSA shall be recognized unless made in

writing and signed by the parties.  Pl. Exh. 33, p. 10, ¶20.

Concurrently with the negotiations of the MSA, AAMG formed Defendant SSH, and

subsequently assigned all its rights and liabilities under the MSA to SSH.  Plaintiff's Post-Trial

Brief, Docket #138, p. 9, lines 14-16.  SSH took over operation of the Hospital under the MSA

on September 9, 2018, at 12:00 a.m.  Id. at p. 9, lines 17-18.

### 3.    The Pre-September 9, 2018 Receivables

While there is much dispute regarding the ownership of, and the rights to use, the Pre-

September 9, 2018 Receivables following the transfer of the Hospital management from Debtor

to SSH, the court believes it is uncontroverted that SSH collected an unknown number of Pre-

September 9, 2018 Receivables and used the funds from those receivables in its operation of

the Hospital.

### 4.     *The Parties' Arguments*

Stripped of all the hyperbole, SSH/AAMG's basic argument is that SSH was entitled to use the funds from collection of the Pre-September 9, 2018 Receivables because:

1/ The MSSA was terminated "for cause" and, as a result, Debtor was divested of any further rights to the Pre-September 9, 2018 Receivables;

2/ Once the MSSA was terminated "for cause," the MSA became the "only operative agreement," and the MSA permitted SSH to utilize the accounts receivable without distinguishing between pre- and post-September 9, 2018 receivables; and

3/ In any event, Debtor did not prove it's ownership to the Pre-September 9, 2018 Receivables had accrued because Debtor failed to establish the provision of management services (including the billing, collecting and paying vendors) that would give rise to an accrual and provided no countervailing evidence to the District's termination of the MSSA "for cause."

Plaintiff's basic argument is that the Pre-September 9, 2018 Receivables are owned by Debtor because:

1/ The MSSA's provision for Hospital Revenue to be determined on an accrual basis means that Debtor's ownership right in the Pre-September 9, 2018 Receivables vested when Debtor performed the services that gave rise to the Pre-September 9, 2018 Receivables; and

2/ There is no provision in the MSSA that divests Debtor of the accrued rights to the Pre-September 9, 2018 Receivables in the event of termination or otherwise.

### C.     *Contract Interpretation*

The parties agree that the starting point for the court's analysis is the language of the relevant contracts themselves.

The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties at the time the contract is formed.  Waller v. Truck Ins. Exch., Inc., 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995), as modified on denial of reh'g (Oct. 26, 1995) (citing Cal. Civ. Code §1636).  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  Id. at 17 (citing Cal. Civ. Code §1639).   "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'"  Id. (citing Cal. Civ. Code §1644 and §1638) (other citations omitted).  Language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.  Id. at 18 (citation omitted).  Courts will not strain to create an ambiguity where none exists.  Id. (citation omitted).  "Nor is '[t]he language of a contract . . . made ambiguous simply because the parties urge different interpretations."  Int'l. Bhd. of Teamsters v. NASA Servs., Inc., 957 F.3d 1038, 1044 (9th Cir. 2020) (citation omitted).

Where ambiguity does exist, extrinsic evidence may be received to clarify the intent of the parties.  Molybdenum Corp. of America v. Kasey, 176 Cal.App.2d 357, 363, 1 Cal.Rptr. 400 (Cal. Dist. Ct. App.1959) (citation omitted).  "It is also well established, however, that if upon a reading of the whole contract the portion of the contract under attack is clear and explicit no extrinsic evidence will be received to vary its plain terms."  Id. (citation omitted); see also, Universal Sales Corp., Ltd. v. Cal. Press Mfg. Co., 20 Cal.2d 751, 760, 128 P.2d 665 (1942) ("The fundamental canon of construction which is applicable to contracts generally is the ascertainment of the intention of the parties (Civ. Code §1636), and in accordance with

section 1638 of the Civil Code, the language of the agreement, if clear and explicit and not conducive to an absurd result, must govern its interpretation."); <u>Spitser v. Kentwood Home Guardians</u>, 24 Cal.App.3d 215, 220, 100 Cal.Rptr. 798 (Cal. Ct. App. 1972) ("When the language is clear and explicit, does not involve an absurdity (Civ. Code §1638) and no ambiguity is shown, evidence of conduct is irrelevant. In other words, evidence to clarify an ambiguity is not needed when no ambiguity is shown to exist.").

Here, both Plaintiff and SSH/AAMG agree that the relevant contracts are unambiguous and therefore, extrinsic evidence is not required to resolve the Threshold Issue.[3] The court agrees.[4] Thus, the next question is what are the "relevant contracts"?

### 1. The "Relevant Contracts"

Plaintiff and SSH/AAMG agree the MSSA and MSA are contracts to be interpreted by this court. SSH/AAMG also urges the court to consider the Termination Letter[5] and the post-bankruptcy Medical Receivables Collection Agreement.[6] The court finds that to the extent the Termination Letter and the post-bankruptcy Medical Receivables Collection Agreement are "contracts," they are irrelevant to the question at hand and therefore declines to consider them.

---

[3] Plaintiff argues in the alternative - the contracts are unambiguous and no extrinsic evidence is necessary, but if the contracts are ambiguous, extrinsic evidence requires a finding in Plaintiff's favor. SSH/AAMG, on the other hand, take a very strict position that the contracts are unambiguous and no extrinsic evidence is appropriate. In support of its position, SSH/AAMG asserted a running objection to the admission of all extrinsic evidence presented at trial.

[4] As a result, the court sustains SSH/AAMG's running objection to the admission of extrinsic evidence.

[5] Def. Exh. L.

[6] Def. Exh. D. SSH/AAMG's actual position on the appropriateness of the court's consideration of the Medical Receivables Collection Agreement is inconsistent. First, they argue that it should be considered. <u>See</u> Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 12, lines 11-17. In the very next paragraph, however, they argue that the Medical Receivables Collection Agreement should not be considered. <u>Id.</u> at p. 12, lines 18-22. The court's determination that the Medical Receivables Collection Agreement is irrelevant makes analysis of these inconsistencies unnecessary.

0147
Exhibits to MCCJ Request for Judicial Notice
Case: 19-01030    Doc# 140    Filed: 02/23/21    Entered: 02/23/21 17:01:30    Page 10 of 21

California Civil Code defines a contract as "an agreement to do or not to do a certain thing," and which creates an obligation.  Cal. Civ. Code §1549 (West 2021); <u>H. Liebes & Co. v. Klengenberg</u>, 23 F.2d 611, 612 (9th Cir. 1928).  Under California law, the essential elements of a contract are: (1) parties capable of contracting; (2) the parties' consent; (3) a lawful object; and (4) sufficient consideration.  Cal. Civ. Code §1550 (West 2021).

The Termination Letter is not a contract.  It is not an agreement, it does not create an obligation, there are no contracting parties and there is no consideration.  The Termination Letter is simply a notice to Debtor of the termination of the MSSA and the District's intent to enter into the MSA.  To the extent that SSH/AAMG relies on the Termination Letter to support the contention that the MSSA was terminated "for cause," it is unnecessary, because, as noted below, the terms of the MSSA itself are conclusive on this point.  Thus, the court will not consider it.

The Medical Receivables Collection Agreement is, in a vacuum, a contract.  In the context of this inquiry, however, it is nothing more than an unconsummated and nonbinding agreement between Plaintiff and SSH regarding their respective interpretations of their obligations and rights under the MSSA and the MSA on a going-forward basis.  Because the MSSA and the MSA are unambiguous, the Medical Receivables Collection Agreement is unnecessary to the court's inquiry.  Thus, the court will not consider it.

For the foregoing reasons, the court's analysis and interpretation of the "relevant contracts" will only include the MSSA and the MSA.

### 2.    *The MSSA*

The MSSA unambiguously vests ownership of the Pre-September 9, 2018 Receivables with Debtor.

Section 5.1 of the MSSA provides that in "consideration of the management services provided by [Debtor, Debtor] shall receive pass through reimbursement from Hospital Revenue of all of its direct and reasonable costs necessary to the provision of its management services to the Hospital under this Agreement." Pl. Exh. 1, ¶5.1. "Hospital Revenue" is then defined as: (a) all gross revenue from the provision of **any and all hospital services provided** on or after the Commencement and **during the term of the arrangement, determined on an accrual basis in accordance with GAAP** consistently applied; [and] (h) all revenue of any other type or any other source related to the operation of the Hospital on and after the Commencement Date. Pl. Exh. 1, ¶5.2 (emphasis added).

It is undisputed that the Pre-September 9, 2018 Receivables were necessarily for "services provided" by Debtor "during the term" of the MSSA. Thus, the next question is what "determined on an accrual basis in accordance with GAAP" means.

The accrual basis of accounting is in accordance with GAAP. Raj Gnanarajah, *Cash Versus Accrual Basis of Accounting: An Introduction*, Congressional Research Service, R43811, December 12, 2014 at p. 3. Under accrual basis of accounting, "revenue is recorded when it is earned, and expenses are reported when they are incurred. In other words, under accrual accounting, revenue and expenses are recognized regardless of when payment is actually made or received." Id. at p. 1. For purposes of the Pre-September 9, 2018 Receivables, "from an asset perspective, an accrual is recorded when a service has been performed or a product has been delivered. . . but the payment has not yet been received." Id. at p. 3; see also, Nat'l. Med. Enters. v. Bowen, 851 F.2d 291, 292 (9th Cir. 1988) ("When hospitals report their cost data they must use the accrual basis of accounting. 42 C.F.R. §413.24(a). 'Under the accrual basis of accounting, revenue is reported in the period when it is

earned, regardless of when it is collected, and expenses are reported in the period in which they are incurred, regardless of when they are paid.'").  Thus, under the clear and unambiguous language of the MSSA, any receivables for services provided during the term of the MSSA (i.e., pre-September 9, 2018) are owned by Debtor.

The court's determination that Debtor owns the Pre-September 9, 2018 Receivables is also supported by paragraph 5.3 of the MSSA and paragraph 2.5 of the MSA.

Paragraph 5.3 of the MSSA provides that Debtor "will assure that all Hospital Expenses *incurred* in connection with the operation of the Hospital *on or after the Commencement date and during the term of the Agreement* are paid. . .*from Hospital Revenue*."  Pl. Exh. 1, p. 9, ¶5.3.  Similarly, paragraph 2.5 of the MSA provides that "All hospital debts. . . *entered into prior to the Effective Date* will remain the sole responsibility of [Debtor]. … No debt *incurred prior to the Effective Date* will be assumed by AAMG."  Pl. Exh. 33, p. 2. ¶2.5.  Under both the MSSA and MSA, even if services or goods were provided to Debtor on the very last day (i.e., September 8, 2018), and Debtor was not billed or invoiced until after September 8, 2018, Debtor would still be responsible for those expenses.  Both of these paragraphs are consistent with the concept of accrual accounting, consistent with the Hospital Revenue being determined on an accrual basis and support the court's determination that Debtor owns the Pre-September 9, 2018 Receivables.

The court also notes that the effect of interpreting the MSSA to find that SSH was entitled to use the Pre-September 9, 2018 Receivables would be twofold.  First, it would saddle Debtor with all the debts incurred up to and through September 8, 2018, while preventing Debtor from collecting the receivables for the services that created the debt.  Second, it would effectively leave Debtor's creditors in a no-man's land where Debtor could not pay its debts

because access to receivables for the services that created the debts were cut off, while relieving SSH of any requirement to use those receivables to pay the debts. It is patently ridiculous that the District would have granted SSH the rights to use the receivables for services rendered by Debtor, while at the same time providing that SSH did not have to use those receivables to pay any of the debts created by those services. The court declines to interpret the MSSA so punitively; especially when doing so requires the court to read the MSSA in a manner that is inconsistent with its plain language. See Molybdenum Corp. of America v. Kasey, 176 Cal.App.2d at 364 (citation omitted) ("Where a contract is susceptible of two interpretations, one of which is reasonable and fair, and the other is unreasonable and unfair, the latter interpretation must be rejected and the first accepted.").

### 3.   *The MSA*

The plain language of the MSA similarly does not support SSH/AAMG's position that it was entitled to use the Pre-September 9, 2018 Receivables.

Section 4.2 of the MSA provides,

> AAMG's compensation for the services rendered pursuant to [the MSA] shall be a fixed amount of $100,000 per month plus the commercially reasonable, and industry standard, fees, costs and expenses incurred by AAMG in the course of performing its services under this Agreement ("Management Fee").

Pl. Exh. 33 at p. 6, ¶4.2.

SSH/AAMG relies on Section 2.6 for the proposition that the District gave SSH the right to use the Pre-September 9, 2018 Receivables to pay the Management Fee. Section 2.6 says no such thing. The first sentence of section 2.6 simply relegates SSH to the role of billing

agent.[7] The next sentence specifically states that "[t]he revenues, accounts receivables and all other government payments from all such billings ***shall be property of the District***."  Pl. Exh. 33 at p. 6, ¶4.2(a) (emphasis added).  The final sentence of section 2.6 provides, "Those revenues, accounts receivable and other government payments shall be used to pay the Management Fee of AAMG incurred in performing its obligations under this Agreement in accordance with section 4 below."  SSH/AAMG argues that section 2.6 makes no distinction between pre- or post-September 9, 2018 accounts receivable, thus SSH was entitled to use all the receivables.  Once again, in a vacuum, this may be true.  But it ignores entirely the MSSA and the fact that the District could not assign the rights to use the Pre-September 9, 2018 Receivables to SSH because Debtor already owned them.

### 4.       Termination of the MSSA did Not Terminate Rights Already Accrued under the MSSA

SSH/AAMG, in an apparent attempt to avoid the plain language of the MSSA and the lack of any helpful plain language in the MSA, next advances the novel argument that even if there were accrual of the Pre-September 9, 2018 Receivables, once the MSSA was terminated, the MSA became the "only operative agreement," and any rights and obligations associated with the MSSA (including the accrued rights to the Pre-September 9, 2018 Receivables) were also terminated.  This argument is also without merit.

As an initial matter, SSH/AAMG repeatedly asserts that the MSSA was terminated "for cause," in an apparent attempt to imply that Debtor's malfeasance caused the termination and,

---

[7] "AAMG shall serve as the billing and collection agent of the Hospital for all Services and supplies provided by Hospital to the patients of the Hospital."  Pl. Exh. 33, p. 3, ¶2.6(a).

as a result, Debtor should be punished with divestiture of its ownership of the accrued Pre-September 9, 2018 Receivables. This argument is unpersuasive.

The MSSA provided for termination in three different ways: (1) termination by expiration of the agreement; (2) termination upon transfer of the Hospital License to Debtor; or (3) termination for "cause." Pl. Exh. 1, pp. 12-13, ¶8.2-8.3. When the MSSA terminated, it had not expired, nor had the Hospital License been transferred to Debtor. Thus, the MSSA was necessarily terminated "for cause." While SSH/AAMG's use of the term "for cause" is intended to be inflammatory, in the context of the MSSA, it is rather unextraordinary. Specifically, section 8.2 provides that either the District or the Debtor could terminate the MSSA "for cause." Pl. Exh. 1, p. 12, ¶ 5.2. Review of the section further reveals that the instances of cause ranged from simple inability to perform, to fraud. Id. Thus, the fact that the MSSA was terminated "for cause," in and of itself, is of little import.

In addition, SSH/AAMG's pejorative use of the term "for cause" and the related implication that Debtor's malfeasance was to blame for the termination of the MSSA also ignores the fact that the Hospital, operating as an acute care hospital, had struggled to be profitable for years. Palm Drive Health Care District filed bankruptcies in 2007 and 2014 while running the Hospital. See, In re Palm Drive Healthcare District, Bankruptcy Case No. 07-103880-AJ and In re Palm Drive Health Care District, Bankruptcy Case No. 14-10510-CN. Debtor then unsuccessfully attempted to bring the Hospital to profitability, ultimately filing the underlying bankruptcy in 2018. Importantly, in apparent recognition that the Hospital would never be sustainable as an acute care hospital, SSH was brought in, not to run the Hospital as-is, but to turn the facility into a Long-Term Acute Care Hospital, and to do so as quickly as possible, See Pl. Exh. 33, p. 1 ("WHEREAS, THE DISTRICT recognizes that a reorganization

of services offered in the Hospital is ***necessary for its ongoing survival***) (emphasis added); ("WHEREAS, AAMG. . . is willing to provide its experience, skills and staff to facilitate the hospital's reorganization, reclassification, and subsequent management pending a transfer of ownership for the hospital's license, and assets to AAMG."); ("WHEREAS, AAMG wishes to convert the Hospital's federal status to that of a Long-term Acute Care Hospital[.]"); and p. 2, ¶2.2(d) ("AAMG [to] file for the change of licensure immediately following the Effective Date and assist the District in attaining the change of ownership ***as quickly as possible***.") (emphasis added). As a result, SSH/AAMG's insistence that termination of the MSSA "for cause" equates to Debtor malfeasance and should result in termination of Debtor's accrued rights to ownership of the Pre-September 9, 2018 Receivables under the MSSA is unavailing.

Assuming for the sake of argument that Defendants were correct, and Debtor's malfeasance caused the termination of the MSSA, there is still no basis to find that Debtor was divested of its accrued ownership rights to the Pre-September 9, 2018 Receivables.

First and most importantly, the MSSA contains no provision that explicitly or implicitly provides that Debtor would be divested of its rights to accrued receivables upon termination of the MSSA for cause or otherwise. If the District had intended to divest Debtor of the rights to accrued receivables in the event of a termination "for cause" or in any other specified event, it certainly could have (and presumably would have) said so in the MSSA itself. It did not. As the MSSA contains an integration clause, and the MSSA was never amended, there is no basis to infer such a provision.

Second, California law does not support SSH/AAMG's argument. California Civil Code section 3300 provides, "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment

proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code §3300 (West 2021); see also, Maxwell v. Dolezal, 231 Cal.App.4th 93, 97-98, 179 Cal.Rptr.3d 807 (Cal. Ct. App. 2014) (to establish a cause of action for breach of contract, plaintiff must plead and prove: (1) existence of a contract; (2) plaintiff's performance or non-performance; (3) defendant's breach; and (4) resulting damages to the plaintiff); Bramalea California, Inc. v. Reliable Interiors, Inc., 119 Cal.App.4th 468, 473, 14 Cal.Rptr.3rd 302 (Cal. Ct. App. 2004) (a breach of contract is not actionable without damages). Thus, under California law, upon breach and termination of the MSSA, the District would simply have a claim for damages against Debtor. The District would then have to file a lawsuit against Debtor and obtain a judgment based on actual harm sustained. The District obtained no such judgment.[8] Even if the District had obtained a judgment, there is nothing in the MSA to support the next required logical step - that the judgment became SSH's to enforce or that the Pre-September 9, 2018 Receivables became SSH's to use. There is also nothing in the MSA that granted SSH the standing to pursue the District's rights under the MSSA in the event the District elected not to.

Finally, SSH/AAMG asserts that under contract law, termination of a contract discharges any executory obligations. Defendant's and Counterclaimants' Post-Trial Brief, Docket #139, p. 17, lines 19-25. The court agrees with SSH/AAMG's recitation of the law on

---

[8] That the District did not obtain a judgment against Debtor also undercuts SSH/AAMG's contention that the Pre-September 9, 2018 Receivables did not "accrue" because Debtor failed to provide the "management services" required under the MSSA (including billing and collecting and paying vendors). Surely if Debtor had materially breached the MSSA sufficient to disallow payment, the District would have pursued its rights against Debtor. The fact that it did not speaks volumes. In any event, SSH/AAMG's simply saying that Debtor did not provide "management services" is not sufficient to make it so.

this limited point.  SSH/AAMG then goes on to assert that Debtor's ownership rights to the Pre-September 9, 2018 Receivables are executory and therefore discharged because: (1) there was no evidence that Debtor had provided sufficient management services prior to termination; and (2) there were no services to provide once the MSSA was terminated.  Id. at 17-18.  The latter point is not in dispute as Debtor does not seek any receivables that post-date September 8, 2018.  As stated previously, however, SSH/AAMG is simply wrong on the former point. Under the plain language of the MSSA and principles of accrual accounting, the Pre-September 9, 2018 Receivables accrued when the services were performed.  Thus, the fact that the Pre-September 9, 2018 Receivables were for services provided by Debtor during the term of the MSSA is conclusive on the issue of when they accrued.  Further, the sufficiency of Debtor's services is not for SSH/AAMG to determine.  It was squarely and solely in the District's purview to pursue Debtor for any perceived deficiencies in its performance under the MSSA.  It did not.

Thus, the actual legal question is: what is the effect of contract termination on obligations that have already accrued?  The answer to that question lies in the very same legal authorities cited by SSH/AAMG and is the exact opposite of the answer asserted by SSH/AAMG.

In Grant v. Aerodraulics Co., 91 Cal.App.2nd 68, 204 P.2d 683 (Cal. Dist. Ct. App. 1949), a dispute arose out of a licensing agreement that gave the defendant licensee the option to terminate the agreement in certain events.  Id. at 70.  Defendant terminated the agreement and plaintiff sued.  Id.  The lower court cancelled the contract and awarded plaintiff $7,000 in accrued and unpaid royalties.  Defendant appealed the monetary award.  Id.  The appellate court analyzed the cancellation provisions of the contract to determine if they were intended to

operate retrospectively, thereby relieving defendant of the obligation to pay the accrued

royalties.  Id. at 72.  The court stated,

> [W]e nevertheless cannot give a construction to paragraph 13 which would allow the defendant to escape liability for a minimum royalty that had already accrued.  The words "terminate," "revoke" and "cancel," as used in the context of paragraph 13 in reference to the written agreement, all have the same meaning, namely the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distinguished from the word "rescind," which appears nowhere in the paragraph, and which conveys a retroactive effect, meaning to restore the parties to their former position (citations omitted). According to the settled rule of construction **"the exercise of an option to terminate prevents liability for further transactions but does not affect obligations which have already accrued."**

Id. at 72-73 (citations omitted) (emphasis added).

Similarly, Witkin states, "On 'termination' all obligations which are still executory on

both sides are discharged **but any right based on prior. . . performance survives.**"  1 Witkin,

Summary of California Law (11th), Contracts §955.

Applying these authorities, it is incontrovertible that Debtor's ownership rights to the

Pre-September 9, 2018 Receivables, which accrued when the services were performed (i.e.,

pre-September 9, 2018), survived termination of the MSSA.

**D.      Conclusion**

For all of the above reasons, the court finds that the Pre-September 9, 2018 Receivables

accrued during the term of the MSSA and therefore, are owned by Debtor.  A separate order

shall issue.

*** END OF MEMORANDUM DECISION ***

## **Court Service List**

No Court Service Required

0158
Exhibits to MCCJ Request for Judicial Notice
Case: 19-01030    Doc# 140    Filed: 02/23/21    Entered: 02/23/21 17:01:30    Page 21 of 21

**MCCJ Request for Judicial Notice**

**4. Bankruptcy court records regarding *In re: Sonoma West Medical Center, Inc.*, Bankr. N.D.Cal., Ch. 7, No. 18-10665; *Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma West Medical Center v. Sonoma Specialty Hospital, LLC, et al.*, A.P. No. 19-1030.**

**B. Memorandum Decision Regarding Plaintiff's Damages, filed October 22, 2021**

Entered on Docket
October 22, 2021
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes the Memorandum Decision of
the Court.  Signed: October 22, 2021

Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE

SONOMA WEST MEDICAL CENTER, INC.,          Case No. 18-10665 RLE

      Debtor.                              Chapter 7

_____

TIMOTHY W. HOFFMAN, Trustee,              Adversary Proceeding

      Plaintiff,                            No. 19-1030

v.

SONOMA SPECIALTY HOSPITAL, LLC,

      Defendant.

_____

**MEMORANDUM DECISION REGARDING PLAINTIFF'S DAMAGES**

**I. Introduction**

    The court bifurcated the issues in this case in order to
first hold a trial on the Threshold Issue - ownership of the pre-

-1-

September 9, 2018 receivables (the "Receivables"). In August 2020, the court held a four-day trial on the Threshold Issue. In February 2021, the court issued its decision on the Threshold Issue in which it concluded that the Receivables were property of the Debtor's estate (the "Decision"). AP Dkt. No. 140.

The court now rules on the remaining issue in this Adversary Proceeding: the amount Defendant owes to Plaintiff, the Trustee, for the Receivables Defendant wrongfully appropriated.

These are the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. For the reasons explained below, the court now finds and concludes that Defendant owes Plaintiff $2,134,576 for the Receivables, plus pre-judgment interest and costs.

## II. Jurisdiction

The court has jurisdiction under 28 U.S.C. §1334 and the District Court's General Order 24. Under 28 U.S.C. §157(b)(1), bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, and may enter appropriate orders and judgments subject to review under 28 U.S.C. §158.

The Complaint alleges three claims for relief: turnover, accounting, and conversion. It alleges the Adversary Proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A) (administration of the estate), (E) (orders to turn over property of the estate), and (O) (other proceedings affecting the liquidation of assets of the estate). AP Dkt. No. 1, ¶4. The Answer admits the Complaint's turnover claim is core under

§157(b)(2)(E). AP Dkt. No. 9, ¶4.

The court finds that the gravamen of the accounting and conversion claims is the same as the turnover claim such that they may also be construed as core under §157(b)(2)(E). If they are not construed as core, the accounting and conversion claims fit within §157(b)(2)(C) as counterclaims by the estate against parties filing claims against the estate because Defendant filed a request for payment of an administrative expense claim (the "Request") arising from the same facts alleged in the Complaint. Main Case Dkt. Nos. 63-66. When the Trustee opposed the Request, Defendant responded that the Trustee's opposition should be viewed as a counterclaim by the Trustee. Main Case Dkt. No. 80.

Based on the foregoing, the court finds that this entire Adversary Proceeding is either a core proceeding under 28 U.S.C. §157(b)(2)(C), as a counterclaim by the estate against persons filing claims against the estate, or as a request for turnover under §157(b)(2)(E). As such, this court may enter a final judgment in this Adversary Proceeding.

In the alternative, if the accounting and conversion claims are not deemed core under §157(b)(2)(C) or (E), by filing the Request, Defendant consented to this court entering a final judgment. See Wellness Int'l Network v. Sharif, 575 U.S. 665 (2015) (bankruptcy courts may hear and determine non-core proceedings and enter appropriate orders and judgments with the consent of all parties).

If the District Court disagrees with this interpretation, these are the court's proposed findings of fact and conclusions of law and recommendation to the District Court under §157(c)(1).

-3-

**III. Background**

The parties are familiar with the background in this case and certain facts are repeated here only to provide context. The court incorporates by reference the Decision and the Memorandum Decision dismissing Defendant's Counterclaim. AP Dkt. Nos. 140 and 218. To the extent necessary, the court also takes judicial notice of certain documents filed in connection with the trial on the Threshold Issue.

**A. The Parties' Relationships with the District**

The Palm Drive Healthcare District (the "District"), a debtor in chapter 9 case no. 14-10510, owned what was known as the Palm Drive Hospital in Sebastopol, California (the "Hospital"). In 2015, the Debtor began to operate the Hospital pursuant to the terms of the Management and Staffing Services Agreement with the District (the "MSSA"). Pl. Ex. 1. The District terminated the MSSA as of midnight on September 8, 2018. At that point, Defendant Sonoma Specialty Hospital took over operation of the Hospital pursuant to the terms of its agreement with the District, the Management Services Agreement (the "MSA"). Def. Ex. C.

The MSA made Defendant the agent for the District in billing and collecting receivables generated during Defendant's operation of the Hospital but the District retained ownership of them. MSA ¶2.6. Defendant, through its parent American Advanced Management Group ("AAMG"), had an option to purchase the Hospital which it later exercised. Ch. 9 Dkt. No. 481, Disclosure Statement, p. 33. At the end of 2019 it consummated the purchase with an effective date of April 2019. MSA ¶11; Def. Ex. LL, term sheet for sale of

*Damages*                    -4-

Hospital; AP Dkt. No. 90, Gia Smith Dec., ¶3; AP Dkt. No. 93, Salas Dec., ¶7, Ex. X, Defendant's business plan.

On September 26, 2018, Debtor filed this chapter 7 case as a skeletal filing. That is, it was filed without the required schedules and statement of financial affairs. Upon his appointment as Trustee, Timothy Hoffman began investigating Debtor's assets and liabilities as he is duty-bound to do by Bankruptcy Code §704. Over the course of the next few weeks, he learned that Debtor's assets included certain inventory and equipment at the Hospital and certain accrued Receivables. Hoffman Trial Testimony, Day 1, p. 23-36.

**B. Bank Accounts and Tentative Agreement**

During the time period that the Debtor operated the Hospital, it had an account at Regions Bank for the deposit of its funds from the U.S. Center for Medicare and Medicaid Services (the "DDA Account"). These accounts are highly regulated and take time to obtain. When Defendant took over operating the Hospital, it had not yet obtained its own such account. Because of this, Defendant began using Debtor's DDA Account without the Trustee's knowledge or consent. Sometime in October 2018, Regions Bank froze the DDA Account due to its concern over Defendant's use of it. Hoffman Trial Testimony, Day 1, p. 27-31; p. 36-37.

At an initial meeting on October 18, 2018 with Gia Smith, then CEO of both Defendant and the Hospital, and representatives of the District, the Trustee learned that Defendant was depositing its funds into the DDA Account. At this meeting, Defendant - through Gia Smith - claimed it had an immediate need to access co-mingled funds in this DDA Account to meet its

*Damages*                        -5-

payroll. Hoffman Trial Testimony, Day 1, p. 27-28. The Trustee testified that both Defendant and the District told him that most of the money in this account belonged to Defendant.[1] Hoffman Trial Testimony, Day 1, p. 27.

At the time of this initial meeting, the Trustee did not have bank statements or any way to verify the accuracy of these representations. As a result, based on their representations, he agreed that Defendant could make use of the funds in the DDA Account which he later learned was approximately $325,000. Hoffman Trial Testimony, Day 1, p. 44. Following this meeting, the District transferred $150,000 to the Trustee - the amount the District and the Defendant said was the estate's money. Hoffman Trial Testimony, Day 1, p. 29.

The Trustee also testified that he was not making a gift of these funds to Defendant as this would have been illegal. Hoffman Trial Testimony, Day 1, p. 29. Gia Smith agreed the use of these funds was not a gift and she was never told Defendant could keep these funds. Smith Trial Testimony, Day 2, p. 45. At this October meeting, Gia Smith also proposed that Defendant collect the Receivables in exchange for a fee.

---

[1] Gia Smith denied saying this but admitted that these funds were generated from services provided by the Debtor while it ran the Hospital. She also testified that *all* funds "belonged to the District" and that "Sonoma West would be the District." Smith Trial Testimony, Day 2, p. 34:22-25. To be clear, Sonoma West was the Debtor and *not* the District. The witness appeared to be intentionally conflating the names of the entities to fuel Defendant's claim to the Receivables despite the fact that under the MSSA, the Debtor owned them, not the District. The court found Gia Smith's testimony of dubious credibility and gives it little weight.

*Damages*                    -6-

Because the Trustee had no ability to undertake collection himself, he tentatively agreed to this idea through which Defendant would do the collecting, provide periodic accountings, and turnover collected money to the Trustee, retaining 60% - 70% of what it collected as its fee. Hoffman Trial Testimony, Day 1, p. 30.

The Trustee's counsel then sent a draft of a medical receivables collection agreement (the "MRCA") to Defendant. Def Ex. D. This agreement was never consummated, due to Defendant's lengthy delay in signing and returning it, and Defendant's failure to undertake the reporting and payment obligations it had ostensibly agreed to. Hoffman Trial Testimony, Day 1, p. 67:10-19.

**C. Fall 2018 to Spring 2019**

From the Fall of 2018 until February 2019, Gia Smith told the Trustee that it was impossible to differentiate between the Receivables generated by the Debtor before September 9 and those generated during Defendant's operation of the Hospital due to the record keeping of third party billing and coding service provider, TruBridge, LLC/Computer Programs and Systems, Inc. ("TruBridge"). Hoffman Trial Testimony, Day 1, p. 67:10-19. Because the Trustee had no access to the relevant business records, he necessarily accepted this description of the state of the records. Hoffman Trial Testimony, Day 1, p. 30. However, he also began to suspect that the situation was not as Defendant's representatives had described.

In February 2019, the Trustee obtained a Bankruptcy Rule 2004 Exam Order regarding TruBridge. Main Case Dkt. No. 35.

*Damages*                    -7-

Through this discovery, the Trustee learned that Gia Smith's representation regarding the inability to differentiate between pre-September 9 and post-September 9 receivables was patently untrue. "[W]e found out from TruBridge that we weren't being told the truth." Hoffman Trial Testimony, Day 1, p. 67.

In April 2019, at the request of Regions Bank, the Trustee sought an order compelling turnover of the funds in the Regions Bank account. Over Defendant's objection, the Trustee obtained an order compelling Regions Bank to turnover all funds in the DDA Account. Main Case Dkt. No. 50. The Trustee then received $322,228 from Regions Bank and has held this pending resolution of the dispute over ownership of the Receivables.

**D. The Trustee's Settlement with the District**

On May 6, 2019, the Trustee filed a request for payment of a $4.8 million administrative claim in the District's Chapter 9 case based on certain provisions of the MSSA. Ch. 9 Dkt. No. 503; Pl. Ex. 60. The $4.8 million total in the administrative claim was made up of $1 million for a tax reimbursement; $1.135 million in furniture, fixtures and equipment at the Hospital; $614,056 in inventory located at the Hospital; and $2.1 million in Receivables.

The District objected to the allowance of this administrative claim. In May 2019, the Trustee and the District reached a compromise settling their dispute (the "Ch. 9 Settlement" and the "Ch. 9 Settlement Agreement"). Pl. Ex. 25. The Ch. 9 Settlement was approved and made part of the Chapter 9 confirmation order entered in June 2019. Ch. 9 Dkt. No. 544; Def. Ex. K.

*Damages*                    -8-

The Ch. 9 Settlement called for the payment by the District of $500,000, and specifically excluded from its scope any issues regarding the ownership of the Receivables.

Recital G of the Ch. 9 Settlement Agreement provided:

> The [T]rustee contends that certain sums and/or property are due the [Debtor's] estate from the [D]istrict pursuant to the MSSA, and that [Defendant] has misappropriated accounts receivable belonging to the [Debtor's] estate in an amount not less than $2,445,166 and that the [D]istrict is jointly and severally liable for any claims held by the [Debtor's] estate against [Defendant]. The [D]istrict denies the allegations of the chapter 9 administrative claim, asserts various affirmative defenses, and denies it has any liability to the [Debtor's] estate whatsoever.

Pl. Ex. 25, p. 2.

The Ch. 9 Settlement Agreement also provided for mutual general releases as between the District and the Trustee. It then specifically provided that this $500,000 payment excluded both Defendant and the Receivables from this release. It defined Defendant as one of the "excluded parties" with respect to the mutual release between the District and the Trustee and stated as follows:

> The [T]rustee shall have the exclusive right to assert, commence, prosecute and recover any and all claims against the excluded parties arising out of the alleged use and/or misappropriation of the [Debtor's] accounts receivable.

Pl. Ex. 25, p. 4.

In July 2019, the Trustee filed his motion pursuant to Bankruptcy Rule 9019 to obtain this court's approval of the Ch. 9 Settlement. Main Case Dkt. No. 59. The court entered its order approving the Ch. 9 Settlement on August 20, 2019. Main Case Dkt. No. 72.

//

*Damages*                              -9-

**E. Defendant's Administrative Expense Claim Request**

While approval of the Ch. 9 Settlement was pending in this court, on August 7, 2019, Defendant filed its Request. The Request was based, *inter alia*, on Defendant's theory that the Trustee had tortiously interfered with the collection of *Defendant's* receivables and therefore Defendant should be compensated based on a "quantum meruit or benefit basis" measured by the MRCA's 60% - 70% of the Receivables. Main Case Dkt. Nos. 63-66.

Defendant's reply to the Trustee's opposition to the Request argued that the Trustee's opposition should be treated as a counterclaim and that the Trustee should dismiss the Complaint. Main Case Dkt. No. 80. Because the factual and legal issues raised by the Complaint and the Request overlapped, the court denied the Request and adopted Defendant's suggestion that *all* of the issues be resolved in the context of the Adversary Proceeding.

**F. The Adversary Proceeding**

The Complaint states three claims for relief. AP Dkt. No. 1. The first claim is based on Bankruptcy Code §541(a) and §542 and seeks turnover of the Receivables as property of the estate.[2] The

---

[2] Under §541(a)(1), the commencement of a case creates an estate comprised of all legal or equitable interests of the debtor in property. Pursuant to §542(a), an entity in possession of property that the trustee may use, shall deliver it to the trustee, and *account* for it. Section 542(b) provides that an entity that owes a debt that is property of the estate shall pay such debt to the trustee, except to the extent that such debt may be offset under §553 against a claim against the debtor.

*Damages*                    -10-

second claim alleges that because Defendant used the Debtor's DDA Account, funds belonging to the estate were co-mingled with Defendant's funds thus giving rise to the right to an interlocutory judgment for an accounting and a final money judgment according to proof. The third claim alleges that Defendant is liable to Plaintiff for damages arising from its conversion of property of the estate.

The Answer generally denies the key allegations of the Complaint, and asserts that Defendant - through its relationship with the District - owned or had the exclusive right to use the Receivables. AP Dkt. No. 9, ¶24 (Receivables are owned by Defendant); ¶37 (Defendant had and has all right, title, and interest in Receivables). The affirmative defenses focus on allegations that the Trustee's fraud - in claiming to own the Receivables - or gross negligence, defeat his right to relief. Defendant also filed a Counterclaim which essentially restated the allegations of the affirmative defenses.

For purposes of the present ruling, the court notes that neither the Answer nor the Counterclaim assert any affirmative defenses or claims based on setoff, recoupment, payment, waiver, quantum meruit, or estoppel; nor do they raise in any manner any other theory that would serve to mitigate, reduce or eliminate Plaintiff's damages. Finally, Defendant did not articulate a defense based on the Trustee having unclean hands.

**G. The First Phase of the Trial**

The court held a four-day trial to determine the Threshold Issue. In the Decision, the court concluded that the Receivables are property of the Trustee's estate based on the language of the

*Damages*                    -11-

MSSA and the accrual accounting principles explained in the Decision. AP Dkt. No. 140.

**H. The Damages Phase of the Trial**

This phase of the trial focused on the amount of Plaintiff's damages arising from Defendant's refusal to return the Receivables. Plaintiff's expert witness Austin Wade examined relevant bank statements, Defendant's own records, and TruBridge documents and concluded that $1,769,286 was the principal amount of the Receivables collected and withheld by Defendant. Pl. Ex. 58, Wade Report. He added to this (1) the $325,263 in the Regions Bank DDA Account as of September 9, 2018; (2) the $40,027 in the Exchange Bank account as of September 9, 2018; and (3) $14,922 subsequently collected by Defendant. He then deducted the $150,000 paid to the Trustee in November 2018 and the $322,229 turned over by Regions Bank in response to the turnover order, for a total of $2,134,576. Pl. Ex. 58. Plaintiff also claims pre-judgment interest at 7% and costs. Pl. Ex. 59, Wade interest calculation.

Defendant concedes that $1,769,286 is the starting point for the calculation of Plaintiff's damages. AP Dkt. No. 243, Defendant's Post-Trial Brief. However, Defendant argues that (1) the funds in the two bank accounts should not be added; (2) it is entitled to a $500,000 credit for the Ch. 9 Settlement; (3) it is entitled to a reduction of some $554,545 based on its billing and collection costs under various theories; and (4) Plaintiff is not entitled to pre-judgment interest. Plaintiff disputes each of these points. AP Dkt. No. 242, Plaintiff's Post-Trial Brief.

*Damages*                    -12-

**IV. Discussion**

    **A. Plaintiff has Viable Claims for Relief**

    Defendant's Post-Trial Brief argues that Plaintiff has no viable claims to pursue and thus cannot recover damages. AP Dkt. No. 243, p. 13-15. These arguments have no merit.[3]

    First, Defendant argues the accounting claim fails because accounting is a remedy not a claim and may only be used where a legal action demanding a fixed sum is impracticable, citing _Civic Western Corp. v. Zila Industries, Inc._, 66 Cal. App.3d 1 (1977). _Civic Western_ does not support Defendant's argument. It merely provides a definition of when an accounting cause of action may be appropriate under California law and concludes that the accounting cause of action in that case was appropriate because of the complicated commercial relationship of the parties. _Id_. at 14. Also, Bankruptcy Code §542(a) specifically provides that a party in possession of property of the estate "shall deliver" and "account for" such property or it value.

    As the Trustee's testimony explained, the records regarding the Receivables were in the hands of Defendant and the District; Plaintiff could not initially demand a fixed sum and necessarily had to seek an accounting. Defendant's Answer also stated that a "precise accounting" could not be obtained. AP Dkt. No. 9, ¶27.

    Second, Defendant argues the conversion claim fails because the Trustee obtained a writ of attachment, thereby electing

---

    [3] These arguments are reminiscent of those Defendant raised in its opposition to the issuance of the writ of attachment. AP Dkt. No. 175. They were rejected then, and for different but related reasons, should not be revived now.

_Damages_                    -13-

remedies and waiving the tort claim of conversion, citing <u>Baker</u>
<u>v. Superior Court</u>, 150 Cal. App.3d 140 (1983). As <u>Baker</u> explains,
this waiver doctrine is disfavored. <u>Baker</u>, at 145. Furthermore,
the doctrine is essentially a form of equitable estoppel and
involves situations where a party chooses one path, and by doing
so causes substantial prejudice to the other party. <u>Glendale Fed.</u>
<u>Sav. & Loan Assn. v. Marina View Heights Dev. Co.</u>, 66 Cal.App.3d
101, 137 (1977). There is no evidence before this court that
issuance of Plaintiff's writ of attachment has caused prejudice
to Defendant and, viewing the entire record in this case, there
is no basis to impose any sort of estoppel. In addition,
Plaintiff has stated he is not seeking punitive damages and is
thus not seeking concurrent but inconsistent remedies based on
the same set of facts. AP Dkt. No. 181, p. 3.

Defendant also argues that conversion requires wrongful acts
and there were none because the Trustee *allowed* Defendant to use
estate assets for the *benefit* of the District and not for
Defendant's own benefit. This argument strains credulity for
several reasons but two stand out: First, Plaintiff allowed
Defendant access to the DDA Account in October 2018 based on the
representations of Defendant and the District that the funds in
it were primarily Defendant's. Once the facts were clear, the
Trustee demanded turnover of the Receivables, including the funds
in the DDA Account. Even Defendant's own witness reluctantly
admitted Defendant was never told it could keep the Receivables
and they were not a gift. Smith Trial Testimony, Day 2, p. 45.

Second, the argument that the Receivables were used for the

*Damages*

-14-

*benefit* of the Hospital so there was no wrongful act is equally fallacious. Defendant leased the Hospital from the District, and had agreed to purchase it. In September 2018, Defendant started the process of changing the Hospital's licensing which it knew would take at least six months. Defendant's business plan projected losses for the first year of its operation. AP Dkt. No. 9, Answer, ¶18. Defendant completed its purchase in December 2019 with an effective date of April 2019. AP Dkt. No. 90, Smith Dec., ¶3; Ch. 9 Dkt. No. 481, Disclosure Statement, p. 33. To claim a benefit redounded to anyone but itself from its misappropriation of the Receivables is nonsense.

Finally, Defendant argues that the turnover claim fails because turnover is not appropriate when property's ownership is in dispute as it was here, citing U.S. v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991). As such, Defendant contends - in a head-spinning bit of circular reasoning - that the turnover claim is really a conversion claim which has been waived due to the issuance of the writ of attachment. The fact that the court has now ruled that Plaintiff owns the Receivables sinks this argument from the start. In addition, it is misguided and conceptually flawed.

There is language in many cases stating generally that turnover is not to be used when ownership is disputed. See, In re Gurga, 176 B.R. 196, 199-200 (9th Cir. BAP 1994) (stating turnover involves the return of undisputed funds; chapter 11 debtor's complaint for breach of contract, conversion, accounting, and turnover stated non-core claims subject to

*Damages*                    -15-

arbitration).

In *In re Process America, Inc.*, 588 B.R. 82 (Bankr. C.D. Cal. 2018), the court considered the argument that use of turnover is limited in this way and pointed out there is a split of authority among the Circuits about this disputed ownership issue. The court viewed <u>Gurga</u> as fundamentally a case regarding jurisdiction. The court found persuasive <u>In re Commercial Financial Services, Inc.</u>, 251 B.R. 414, 423 (Bankr. N.D. Okla. 2000) and concluded that turnover of disputed funds may be ordered where a creditor has filed a proof of claim and subjected itself to the jurisdiction of the bankruptcy court to adjust its rights. <u>Process America</u>, at 101.

The court finds the reasoning of <u>Process America</u> persuasive. In this case, by filing the Request, Defendant subjected itself to the jurisdiction of this court. Main Case Dkt. Nos. 63-66. Plaintiff's claim for turnover is not a breach of contract claim masquerading as a turnover claim which may, in the abstract, have raised jurisdictional issues.

For all of these reasons, Plaintiff has viable claims for relief in the Adversary Proceeding.

**B. Bank Balances on September 9, 2018**

As of September 9, 2018, there was $325,263 in the Regions Bank DDA Account and $40,027 in the Exchange Bank account. Pl. Ex. 58, Wade Report. Defendant contends that the Trustee is not entitled to add to his damages the $325,263 in the Regions Bank DDA Account because the Trustee *allowed* Defendant to use this money when it gave Gia Smith "unconditional access" to it.

*Damages*                                    -16-

Defendant also argues that the Trustee is not entitled to add the $40,027 in the Exchange Bank account because it did not have access to this account which was in the District's name. AP. Dkt. No. 243, Def. Post-Trial Brief, p. 27-28.

These arguments have no merit. In October 2018, a representative of the District and Gia Smith told the Trustee that the bulk of the funds in the DDA Account belonged to Defendant. Based on this representation - which he had no way to confirm and at that point no reason to doubt - and Defendant's claimed emergency need to use the money in this account, he agreed Defendant could *use* funds in the DDA Account. He did so believing the funds were Defendant's own and only $150,000 in this account was property of the estate.

As it turned out, this was not the case. The entirety of the $325,263 in the DDA Account on September 9, 2018 was generated during Debtor's operation of the Hospital and is clearly property of the Trustee's estate. The Trustee made no gift of this to Defendant and never told Defendant it could keep this money. Gia Smith reluctantly confirmed this. Smith Trial Testimony, Day 2, p. 45:2-16.

Defendant also argues that it lacked access to the Exchange Bank account and that the funds in it were not property of the estate because the account was in the District's name. However, Gia Smith testified that if Defendant needed funds from this account all she needed to do was ask the District to send a check. Smith Trial Testimony, Day 2, p. 53:25-54:11. This negates the contention that Defendant lacked access to this account. The

*Damages*                                    –17–

1   fact that the account was in the District's name does not mean

2   the funds in the account as of September 9, 2018 are not property

3   of the estate and they were in fact the Debtor's funds accrued

4   while Debtor ran the Hospital.

5       **C. Credit for the $500,000 Settlement with the District**

6       Defendant argues that it is entitled to a $500,000 credit

7   against the Trustee's damages for the Ch. 9 Settlement paid by

8   the District because, in its purchase of the Hospital, Defendant

9   credited the District for this payment. AP Dkt. No. 243, Def.

10  Post-Trial Brief, p. 26-27; Def. Ex. LL, term sheet for sale of

11  Hospital, ¶6. This argument also has no merit.

12      The Ch. 9 Settlement Agreement between the District and the

13  Trustee provided that (1) the Receivables were excluded from the

14  $500,000 allowed administrative claim; (2) Defendant was excluded

15  from the mutual general release; and (3) the Trustee was given

16  the exclusive right to pursue collection of the Receivables from

17  Defendant. In short, the District's $500,000 payment was for the

18  other elements in the Trustee's administrative claim: the

19  inventory; the furniture, fixtures, and equipment; and the tax

20  revenue payment. It did not include the Receivables.

21      Not deterred by what is straightforward and obvious,

22  Defendant points to language in recital G in the Ch. 9 Settlement

23  Agreement in which the Trustee contends, and the District denies,

24  that Defendant has "misappropriated accounts receivable belonging

25  to" the estate and that the District "is jointly and severally

26  liable for any claims" held by the estate against Defendant.

27      Based on this disputed contention, Defendant argues that it

28

*Damages*                          -18-

1   is entitled to a credit for this $500,000 under California Code

2   of Civil Procedure §877(a). This section provides:

> where a release ... is given in good faith before verdict or
> judgment to one or more of a number of different tortfeasors
> claimed to be liable for the same wrong, or to one or more
> other co-obligors mutually subject to contribution rights,
> it shall reduce the claims against [other tortfeasors or co-
> obligors] in an amount stipulated by the release.

7       Plaintiff argues in response that §877(a) is inapplicable

8   because the Ch. 9 Settlement excluded the Receivables. The

9   District's payment was for the personal property - retained by

10  Defendant and used in its operation of the Hospital - and tax

11  revenue payment only. The court agrees. The language of the Ch. 9

12  Settlement Agreement is clear. To the extent testimony is

13  relevant on this point, the Trustee confirmed this was his

14  intention in reaching the compromise with the District. Hoffman

15  Trial Testimony, Day 1, p. 34. The court rejects Defendant's

16  strained arguments to the contrary.

17      Plaintiff also argues that the District and the Defendant

18  were not co-obligors mutually subject to contribution rights vis

19  a vis Plaintiff, citing California Civil Code §1432 (except as

20  provided in §877, a party to a joint or joint and several

21  obligation who satisfies more than his share of the claim against

22  all may require a proportionate contribution from all the parties

23  joined with him). Plaintiff contends there was no contractual

24  relationship between Defendant and Debtor, a required predicate

25  here. This argument is not persuasive but it is also irrelevant

26  for the reasons explained above.

27  //

28

*Damages*                              –19–

### D. Billing and Collection Costs as Mitigation of Damages

1. The "Unauthorized Transaction" Theory

Defendant claims that because the Trustee did not seek court approval of the MRCA, he created an "unauthorized transaction" under which he allowed Defendant to engage in billing and collecting the Receivables from Fall 2018 to April 2019. AP Dkt. No. 243, Def. Post-Trial Brief, p. 18.

Defendant claims its billing and collection costs totaled $554,545 and this must reduce Plaintiff's damages. Defendant argues the Trustee "could have mitigated his damages by not allowing" Defendant to use his assets and not waiting until April 2019 to demand Defendant stop. The Trustee "should be viewed as not mitigating his damages at least to the extent of the billing and collection costs." Def. Post-Trial Brief, p. 21:5-13.

Defendant argues the Trustee "solely benefited" from this unauthorized transaction and the value of the benefit must mitigate the Trustee's damages, citing <u>Turpin v. Sortini</u>, 31 Cal. 3d 220 (1982) (wrongful life case, in general, when tortious conduct has caused harm and in so doing has conferred a special benefit to the interest that was harmed, its value may act as mitigation to the extent that this is equitable). Def. Post-Trial Brief, p. 19:22-24.

Defendant posits that if it had not been able to use the funds in the DDA Account and the Receivables, the Hospital would have closed and the collection of the Receivables would have ceased, leaving the Trustee empty-handed, as he surely must have known. Defendant sees this as the "only plausible explanation"

0179
Exhibits to MCCJ Request for Judicial Notice

1  for the Trustee failing to seek court approval of the MRCA. Def.
2  Post-Trial Brief, p. 18-19.

3      In what is possibly a generous interpretation of this
4  argument, Plaintiff suggests this is really a quantum meruit
5  theory, citing Day v. Alta Bates Medical Center, 98 Cal.App.4th
6  243 (2002). AP Dkt. No. 242, Pl. Post-Trial Brief, p. 9. There,
7  the court explained that for a quantum meruit recovery there must
8  be an express or implied request for services from one party and
9  the services must be provided with an intent to benefit that
10 party; ultimately, it is a question of equity. Id. at 248-49.

11     According to Plaintiff, if the MRCA is viewed as such a
12 request for services, this request was conditioned on the
13 Defendant performing the steps outlined for it in the MRCA which
14 it never did. Also, to the extent any services were performed,
15 they were not intended to benefit Plaintiff and did not, in fact,
16 benefit Plaintiff: Defendant consistently stated that the
17 Receivables were its to use as it saw fit. The court agrees with
18 this analysis. Quantum meruit recovery is not appropriate here
19 for these reasons.

20     In addition, the entire record in this Adversary Proceeding,
21 and in the chapter 7 case itself, confirm that it would be
22 inequitable to allow any sort of reduction in the Trustee's
23 damages based on these alleged collection costs under any theory.
24 Defendant first admitted that Plaintiff owned the Receivables.
25 Main Case Dkt. No. 48, acknowledging that Defendant "has
26 collected receivables that date from the Debtor's operation of
27 the hospital, and thus belong to" the bankruptcy estate; AP Dkt.
28

*Damages*                        -21-

No. 36, Ex. 9, Gia Smith email stating "we have no intention to not pay what is owed." The MRCA itself acknowledged that Plaintiff owned the Receivables. Defendant then reversed course, accusing the Trustee of fraud and fraud on the court because he claimed to own the Receivables. For months, Defendant insisted it was impossible to tell whether any Receivables were generated before or after September 9, 2018 but the Trustee's discovery from TruBridge in early 2019 showed this was patently untrue. Equity will not reward this behavior.

Finally, this "unauthorized transaction" argument is confounding and non-sensical. It is hard to address it without going down the same convoluted rabbit-hole Defendant has dug for itself. The court declines the invitation to engage with this fundamentally unsound reasoning. Defendant misappropriated the Receivables and did so consciously and deliberately through its course of obfuscation and dissembling and its strained legal arguments. To suggest these actions redounded to Plaintiff's benefit and that Plaintiff caused his own damages by permitting Defendant to do this is offensive. To suggest - without evidence - that Defendant bestowed a benefit on Plaintiff because the Hospital would have closed if Defendant had not taken the funds in the DDA Account and misappropriated the Receivables is doubly offensive.

Plaintiff also argues this quantum meruit theory - to the extent it is plausible - had to be raised as a compulsory counterclaim pursuant to Fed. R. Civ. P. 13(a) because it arises out of the transaction sued upon and it does not require adding

*Damages*                    -22-

another party over whom the court cannot acquire jurisdiction. AP
Dkt. No. 242, Pl. Post-Trial Brief, p. 11. Bankruptcy Rule 7013
modifies Fed. R. Civ. P. 13(a) and provides that a party sued by
a trustee need not state as a counterclaim any claim that the
party has against the debtor, the debtor's property, or the
estate unless the claim arose *after* the entry of an order for
relief. Defendant's alleged collection costs were incurred after
the Debtor's September 26, 2018 petition date. Accordingly,
Plaintiff's point is well taken and this quantum meruit theory
fails for this additional reason.

### 2. Failure of Proof

In support of its unauthorized transaction theory and its
other mitigation theories, Defendant offered witness Tammie
Thompson, identified as Defendant's Chief Financial Officer, and
Exhibit NN. (Plaintiff's Motion in Limine No. 1 objected to Ex.
NN on the grounds that the documents had not been previously
disclosed and the setoff defense was outside the pleadings. AP
Dkt. No. 228.)

Tammie Thompson testified that between October 2018 and
April 2019, she managed a team of people engaged in billing and
collecting Plaintiff's Receivables as well as Defendant's own
receivables. Thompson Trial Testimony, Day 1, p. 79. She
calculated that Defendant incurred costs of $554,545 based
on employees' salaries plus payments to consultants and
TruBridge. Exhibit NN purportedly documented this total. (The
witness stated other numbers that conflict with this total.
Thompson Trial Testimony, Day 1, p. 82-83, p. 98.) In addition,

*Damages*                                    -23-

her claim that the collection took strenuous and concerted effort by this team is contradicted by the fact that Defendant's CFO reported that Defendant had collected $1.2 million of the $1.7 million in Receivables by the end of December 2018 which casts doubt on the claim that collection took strenuous effort extending through March 2019. Pl. Ex. 58, Wade Report, p. 4.

Tammie Thompson's testimony was vague and inconsistent. It was not credible and is not entitled to any weight. Even her own attorney questioned her credibility at one point, suggesting perhaps the total for her time was "a little too high" in light of the fact that she testified she was the CFO for Defendant and its parent AAMG. Thompson Trial Testimony, Day 1, p. 96.

The court allowed Tammie Thompson to testify regarding the compilation of documents that made up Exhibit NN. However, after hearing argument and admitting into evidence Plaintiff's Rebuttal Exhibit 63, the court excluded Exhibit NN. [4]

The court agrees with Plaintiff that (1) the documents in Exhibit NN came within the scope of this Request; (2) Defendant had not previously produced any of these documents; and (3) the general boilerplate objections stated in Defendant's Response do not supplant the statement that all responsive documents were previously produced. Tammie Thompson admitted that she had only assembled the documents in Exhibit NN on August 4, 2021 - only

---

[4] Exhibit 63 was Plaintiff's Request for Production of Documents, Set No. 3. Plaintiff asked for any and all documents in Defendant's possession pertaining to any pre-September 9, 2018 receivables not previously produced. The Response stated general boilerplate objections to all Requests and as to this particular one stated "all previously produced."

*Damages*                              -24-

days before trial, presumably at Defendant's attorney's request, and well after the close of discovery. Thompson Trial Testimony, Day 1, p. 105.

Because Exhibit NN was excluded and the witness's testimony is not entitled to any weight, Defendant's evidence failed to quantify any amount in support of any of its various mitigation theories.

### 3. Recoupment

Defendant also claims the theory of recoupment supports a reduction in Plaintiff's damages, citing In re TLC Hospitals, Inc., 224 F.3d 1008 (9th Cir. 2000). AP Dkt. No. 243, Def. Post-Trial Brief, p. 21. In TLC Hospitals, the Ninth Circuit explained that under setoff based on Bankruptcy Code §553, mutual debts arising from a single pre-petition transaction or separate pre-petition transactions cancel each other; recoupment, in contrast, is an equitable doctrine and a claim to recoupment must arise from the same transaction or occurrence that gave rise to the liability sought to be enforced by the bankruptcy estate and may involve pre-petition and post-petition events. Id. at 1011. Recoupment may only be used where it is inequitable for the debtor to enjoy the benefits of a transaction without meeting its obligations. Id. at 1014.

Defendant claims the single transaction for purposes of recoupment is the so-called unauthorized transaction based on the MRCA which was never submitted for court approval. While it is not entirely clear, Defendant is apparently asking for recoupment based on the theoretical 60% - 70% of the Receivables as proposed

*Damages*                                    -25-

in the MRCA. There is nothing equitable about this notion and the court finds no merit in this argument. In addition, recoupment - as a concept - addresses situations in which there has been an overpayment and an underpayment. Here, Defendant has made no payment at all.

4. Setoff as an Affirmative Defense

Plaintiff argues that Defendant waived any argument premised on setoff because Defendant failed to plead setoff as an affirmative defense as required by Rule 7008(c) (in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense). AP Dkt. No. 242, Pl. Post-Trial Brief, p. 11; AP Dkt. No. 228, Motion in Limine. An affirmative defense is defined as any matter extraneous to a plaintiff's prima facie case which denies a plaintiff's right to recover even if the allegations in the complaint are true. Marshack v. Orange Comm'l Credit (In re Nat'l Lumber and Supply, Inc.), 184 B.R. 74, 77 (9th Cir. BAP 1995).

Under Rule 7008(c), an affirmative defense is generally waived and excluded from the case if not pled in the answer. In re Bush, 2005 WL 6960185, at *6 (9th Cir. BAP Dec. 15, 2005) (statute of limitations; explaining purpose of Rule is to prevent surprise and prejudice by giving opposing party notice of affirmative defense and time to rebut it).

Defendant argues that setoff is not included in the list of affirmative defenses in Rule 7008(c) so it can be raised at any time, even on the first day of the second phase of a bifurcated trial. AP Dkt. No. 243, Def. Post-Trial Brief, p. 22. The court

*Damages*                    -26-

disagrees. Setoff is a matter of avoidance and is an affirmative defense covered by Rule 7008(c). <u>Slack v. Int'l Union of Operating Engrs.</u>, 83 F.Supp.3d 890, 908 (N.D. Cal. 2015) (noting defendant's argument was in the nature of a set-off argument and as such would be an affirmative defense).

Defendant's suggestion that it timely raised this setoff issue because Exhibit NN was on its exhibit list hardly warrants a response. Because this theory was raised for the first time at trial, Plaintiff was never given an opportunity to do discovery regarding this testimony or the related documents which were never produced, and had no opportunity to rebut it. Defendant never sought to amend its Answer or Counterclaim and there was no pretrial order in this case including setoff as one of the issues the parties agreed to try.

**E. Prejudgment Interest and Costs**

Plaintiff seeks an award of pre-judgment interest under California Civil Code §3287(a) which provides:

> A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day.

In <u>Evanston Ins. Co. v. OEA, Inc.</u>, 566 F.3d 915, 920 (9th Cir. 2009), the Ninth Circuit explained that the vesting requirement is satisfied when the amount is certain not when the liability to pay the amount is determined. Here, the amount of accrued Receivables vesting each month from September 2018 through April 2019 is shown in Exhibit 59.

*Damages*

-27-

1    Defendant argues that Plaintiff is not entitled to interest
2 because the amount of the Receivables was uncertain, citing cases
3 in which court's determined interest under Civil Code §3287(a)
4 was not appropriate for various reasons. <u>Warren v. Kia Motors</u>, 30
5 Cal.App.5th 24 (2018) (uncertain because defendant had no means
6 to calculate damages); <u>Jamison v. Jamison</u>, 164 Cal.App.4th 714
7 (2008) (uncertain because of conflicting evidence regarding value
8 of asset).

9    Defendant's argument misses the point. The amount of the
10 Receivables was not uncertain and the precise dates on which each
11 increment vested is shown in Exhibit 59. As of September 30,
12 2021, the amount of pre-judgment interest was $446,646.80 and it
13 continues to accrue at $415.06 per day.

14    Plaintiff is also entitled to an award of costs and when a
15 bill of costs is filed, it will be reviewed and appropriate costs
16 will be awarded.

17

18 **V. Conclusion**

19    For all the reasons explained above, Plaintiff is entitled
20 to a judgment awarding damages as he requested. Plaintiff does
21 not have unclean hands, has not acted in bad faith, will not
22 receive a windfall, and was not negligent in handling this
23 litigation or the chapter 7 case. Despite its claim to the
24 contrary in its Post-Trial Brief, Defendant never had a "cogent
25 basis to believe" it owned the Receivables and has no valid basis
26 for any of its mitigation theories.

27

28

*Damages*                            -28-

1        The court requests that Plaintiff submit an order conforming

2    to this ruling and a bill of costs. A judgment will be entered in

3    due course.

4

5            * * * * * End of Memorandum Decision * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Damages*                          -29-

1  <u>Court Service List</u>

2  None required.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Damages*

-30-

**MCCJ Request for Judicial Notice**

**4. Bankruptcy court records regarding *In re:  Sonoma West Medical Center, Inc.*, Bankr. N.D.Cal., Ch. 7, No. 18-10665; *Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma West Medical Center v. Sonoma Specialty Hospital, LLC, et al.*, A.P. No. 19-1030.**

**C.  Judgment, filed October 27, 2021**



**Entered on Docket**
**October 27, 2021**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes the order of the Court.
Signed: October 27, 2021

_____
**Roger L. Efremsky**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 18-10665 RLE |
| | (Chapter 7) |
| SONOMA WEST MEDICAL CENTER, INC., | |
| Debtor. | |
| TIMOTHY W. HOFFMAN, Trustee in Bankruptcy of the Estate of Sonoma West Medical Center, | A.P. No. 19-1030- RLE |
| Plaintiff, | **JUDGMENT** |
| v. | |
| SONOMA SPECIALTY HOSPITAL, LLC, etc., et al; | |
| Defendants. | |

      This bifurcated action came on for trial on August 18 - August 21, 2020 (title to subject assets) and August 19 - August 20, 2021 (damages). For each trial appearances were noted on the record. Following consideration of the oral and documentary evidence, the briefs of the parties, and the record for each trial, the Court issued its "Memorandum of Decision Following Trial of Threshold Issue" (Dkt. No. 140) and its "Memorandum of Decision Regarding Plaintiff's Damages" (Dkt. No. 244), respectively.

      Further, prior to the trial of the damages phase, Plaintiff filed a Motion for Partial Summary Judgment to dismiss the Counterclaim of Defendant and Counterclaimants Sonoma

Specialty Hospital, LLC and American Advanced Management Group, Inc.  Following due

consideration of that matter, the Court issues its "Memorandum Decision Granting Motion for

Partial Summary Judgment" (Dkt. No. 218) and "Order Granting Partial Summary Judgment

Dismissing Counterclaim" (Dkt. No. 219).

All claims for relief of the Complaint and Counterclaim having been fully adjudicated as

set forth in the Court's Memorandums of Decision and interlocutory Orders, and good cause

appearing:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED  that Plaintiff shall recover

damages against Defendant Sonoma Specialty Hosptial, LLC for $2,134,576.00 in principal and

$446,646.80 in prejudgment interest for a total award of $2,581,222.80.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Counterclaim of

Defendant and Counterclaimants Sonoma Specialty Hospital, LLC and American Advanced

Management Group, Inc. is dismissed in its entirety with prejudice.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff shall recover

his allowable costs of suit pursuant to the procedure set forth in Federal Rules of Bankruptcy

Procedure, Rule 7054(b)(1).

** END OF ORDER **

COURT SERVICE LIST

None

[6059.judgment.wpd]

**MCCJ Request for Judicial Notice**

**4. Bankruptcy court records regarding *In re:  Sonoma West Medical Center, Inc.*, Bankr. N.D.Cal., Ch. 7, No. 18-10665; *Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma West Medical Center v. Sonoma Specialty Hospital, LLC, et al.*, A.P. No. 19-1030.**

**D.  Amended Judgment, filed November 30, 2021**

**Entered on Docket**
**November 30, 2021**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1  MacCONAGHY & BARNIER, PLC
   JOHN H. MacCONAGHY, SBN 83684
2  JEAN BARNIER, SBN 231683
   645 First St. West, Ste. D
3  Sonoma, CA 95476
   Telephone: (707) 935-3205
4  Email:  macclaw@macbarlaw.com

5  Attorneys for Plaintiff
   TIMOTHY W. HOFFMAN
6

**The following constitutes the order of the Court.**
**Signed: November 30, 2021**

_____
**Roger L. Efremsky**
**U.S. Bankruptcy Judge**

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SANTA ROSA DIVISION

11

12  In re,                                    )  Case No.:   18-10665 RLE
                                              )  (Chapter 7)
13  SONOMA WEST MEDICAL CENTER,               )
                                              )
14              Debtor,                       )  AP No. 19-01030 RLE
                                              )
15  _____ )
                                              )
16  TIMOTHY W. HOFFMAN, Trustee              )  **AMENDED JUDGMENT**
    In Bankruptcy of the Estate of            )
17  SONOMA WEST MEDICAL CENTER,               )
                                              )
18              Plaintiff.                    )
                                              )
19          v.                                )
                                              )
20  SONOMA SPECIALTY HOSPITAL, LLC, et )
    al,                                       )
21                                            )
                                              )
22              Defendants.                   )
                                              )
23  AND RELATED COUNTERCLAIM                  )
                                              )
24  _____ )

25          The Court having entered Judgment in this matter on October 27, 2021, and the Parties

26  thereafter having reached a settlement of their disputes providing for an amendment to this

27  Judgment, and good cause appearing:

28          IT IS HEREBY ORDERED, ADJUDGED, AND DECREED except as specifically set

forth herein, the October 27, 2021 Judgment is vacated and superseded.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that following an installment payment made to Plaintiff pursuant to a Court approved "Settlement Agreement and Mutual General Release" Plaintiff Timothy W. Hoffman, Trustee in Bankruptcy of the Estate of Sonoma Medical Center, Inc. shall have Judgment in the reduced amount of $1,150,000 against Defendant Sonoma Specialty Hospital, LLC.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Counterclaims of Defendant and Counterclaimants Sonoma Specialty Hospital, LLC, and American Advanced Management Group, Inc. is dismissed in their entirety with prejudice.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that each side shall bear its own costs and attorneys' fees up through entry of this Amended Judgment. Plaintiff may recover any reasonable costs and attorneys' fees incurred in enforcing this Amended Judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Execution on this amended Judgment shall be stayed up through and including February 13, 2022.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Parties waive any right of appeal of this Amended Judgment.

** END OF ORDER**

APPROVED AS TO FORM AND CONTENT

MacCONAGHY & BARNIER, PLC

/s/ John H. MacConaghy
By: _____
John H. MacConaghy
Attorneys for Plaintiff

ROPERS MAJESKI, P.C.

/s/ Steven G. Polard
By: _____
Steven G. Polard
Attorneys for Defendant and Counterclaimants
*Sonoma Specialty Hospital, LLC and American Advanced Management, Inc*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COURT SERVICE LIST

None

**AMENDED JUDGMENT**
Exhibits to MCCJ Request for Judicial Notice

**MCCJ Request for Judicial Notice**

5. Sonoma County Superior Court records regarding *Michelle Baass, Director of the California Department of Health Care Services, vs. Sonoma Specialty Hospital, LLC; American Advanced Management Group, Inc.; and Gurpreet Singh*, Case No. SCV-270916

A. Complaint for Recoupment, Breach of Contract, Declaratory Relief, and Unjust Enrichment, filed May 31, 2022

1 ROB BONTA
Attorney General of California
2 CHARLES J. ANTONEN
Supervising Deputy Attorney General
3 ANJANA N. GUNN
Deputy Attorney General
4 State Bar No. 251200
455 Golden Gate Avenue, Suite 11000
5 San Francisco, CA 94102-7004
Telephone: (415) 510-3563
6 Fax: (415) 703-5480
E-mail: Anjana.Gunn@doj.ca.gov
7 *Attorneys for Plaintiff Michelle Baas, Director of the*
*California Department of Health Care Services*
8

**ELECTRONICALLY FILED**
**Superior Court of California**
**County of Sonoma**
**5/31/2022 4:29 PM**
**By: Cyndi Nguyen, Deputy Clerk**

**Exempt from Filing Fees –**
**Gov. Code § 6103**

9 SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 SONOMA COUNTY

11 UNLIMITED CIVIL JURISDICTION

12

13 | | SCV-270916

14 **MICHELLE BAASS, in her capacity as** | Case No.
**Director of the California Department**
15 **Health Care Services,** | **COMPLAINT FOR RECOUPMENT,**
**BREACH OF CONTRACT,**
16 **PLAINTIFF,** | **DECLARATORY RELIEF, AND**
**UNJUST ENRICHMENT**
17 **v.**

18 **SONOMA SPECIALTY HOSPITAL, LLC;**
**AMERICAN ADVANCED**
19 **MANAGEMENT GROUP, INC.;**
**GURPREET SINGH; and DOES 1-5,**
20 **inclusive,**

21 **DEFENDANTS.**

22

23

24      Plaintiff Michelle Baass, Director of the California Department of Health Care Services

25 (DHCS), brings this complaint and request for declaratory relief against defendants Sonoma

26 Specialty Hospital (SSH), American Advanced Management Group (AAMG), and their owner,

27

28

Exhibits to MCCJ Request for Judicial Notice
Complaint

1  Gurpreet Singh, for recoupment, breach of contract, declaratory relief, unjust enrichment, and any

2  and all other relief the Court deems proper.

3                                    **INTRODUCTION**

4          Medicaid is a federally sponsored program that finances health care coverage for millions

5  of Americans. DHCS administers California's Medicaid program, known as Medi-Cal, which

6  includes the Public Hospital Redesign and Incentives in Medi-Cal (PRIME) program available to

7  two types of hospitals: Designated Public Hospitals (DPHs) and District/Municipal Public

8  Hospitals (DMPHs).

9          As its name suggests, the PRIME program encourages participating hospitals to redesign

10  their delivery system in order to increase their ability to successfully perform under a risk-based

11  alternative payment model (APM) in the long term. Initially, hospitals were required to establish

12  and report performance baselines. This activity was followed by target setting and the

13  implementation and ongoing evaluation of quality improvement interventions. Hospitals that

14  reported their performance baselines or later successfully met quality metrics receive a Medicaid

15  payment, a portion of which is federally funded.

16          From July 1, 2016 to March 30, 2019, Defendant SSH participated in PRIME. However,

17  on or about April 1, 2019, SSH converted to a private hospital becoming ineligible to continue in

18  the PRIME program. SSH failed to timely notify DHCS of its conversion and breached its Medi-

19  Cal Provider Agreement by improperly accepting federal program funds and by subsequently

20  refusing to remit the amount it was overpaid. Despite SSH's failure and refusal to refund the

21  payment, DHCS has repaid the federal government using state funds. Because SSH, along with its

22  owner and operator, Gurpreet Singh and American Advanced Management Group, Inc.,

23  respectively, continue to unjustly retain the PRIME payment, plaintiffs bring this action for

24  recoupment, breach of contract, declaratory relief, and unjust enrichment, and seek restitution of

25  the PRIME funds.

26                                       **PARTIES**

27          1.      Plaintiff Michelle Baass is the Director of DHCS, which is the single state agency

28  charged with oversight of Medi-Cal, including the PRIME program. (Welf. & Inst. Code, §§

10740, 14000 et seq.; see also 42 U.S.C. § 1396a(a)(5).) Director Baass is responsible for enforcing the statutory and regulatory provisions governing the PRIME program. As such, Director Baass is both authorized and required to recover any unauthorized overpayments made to providers participating in the Medi-Cal program. (Welf. & Inst. Code, § 14176; 42 C.F.R. § 431.958.)

2. On information and belief, SSH is a limited liability corporation organized under the laws of the State of California, with its principal place of business located at 501 Petaluma Avenue, Sebastopol, in Sonoma County, California. SSH also operates a licensed acute-care hospital located at the same address. On further information and belief, at all relevant times herein, SSH has been wholly owned by defendant Gurpreet Singh.

3. On information and belief, defendant American Advanced Urgent Cares LLC, as successor-in-interest to AAMG ("AAMG"), is a limited liability corporation organized under the laws of the State of California, with its principal place of business located at 700 17th Street, Suite 201D, Modesto, California. AAMG's business address is the same as that of defendant Gurpreet Singh's gastroenterology practice. On further information and belief, at all relevant times herein, AAMG has been wholly owned by defendant Singh.

4. Defendant Gurpreet Singh is a natural person residing in the State of California. Singh holds a physician's license in California. He is the President and owner of both SSH and AAMG. On information and belief, Singh has maintained sole ownership of SSH and AAMG during all relevant times herein.

5. On information and belief, there is a unity of ownership between SSH and AAMG such that a separate corporate personality does not exist and injustice would result if SSH's unlawful retention of federal funds distributed under the PRIME program are treated as those of the corporation alone, rather than also as those of AAMG or defendant Singh.

6. The true names and capacities of defendants Does 1 through 5, inclusive, are unknown to DHCS, which therefore sues these Does by such fictitious names. DHCS will amend this complaint to show the true names and capacities when the same have been ascertained. DHCS is informed and believes, and on that basis alleges, that each of these fictitiously named

1　　Does 1 through 5, inclusive, are legally responsible in some manner for the acts, omissions,

2　　occurrences, and circumstances that form the basis of this lawsuit, and are thereby liable for the

3　　violations asserted therein.

4　　　　　7.　　　On information and belief, at all times mentioned herein, each of the defendants

5　　were agents, servants, employees, or contractors of each of the remaining defendants and were at

6　　all times acting within the course and scope of their authority as such agents, servants, employees,

7　　or contractors and with the permission and consent of their co-defendants.

8　　　　　　　　　　　　　　　　　　　**VENUE**

9　　　　　8.　　　This is an unlimited civil case in that the amount in dispute exceeds $25,000.00.

10　　　　　9.　　　Venue is proper in Sonoma County because SSH's principal place of business is

11　　located at 501 Petaluma Avenue, Sebastopol, in Sonoma County, California. (Code Civ. Proc., §

12　　395.5.)

13　　　　　　　　　　　　　　　　**FACTUAL BACKGROUND**

14　　　　　10.　　Medicaid is a joint federal-state program through which states receive federal

15　　financial participation as reimbursement for the costs of furnishing health care services to

16　　federally-recognized groups of low-income individuals. (42 U.S.C. §§ 1396, et seq.; *Olszewski v.*

17　　*Scripps Health* (2003) 30 Cal.4th 798, 809.) California's Medicaid program is overseen by the

18　　Centers for Medicare and Medicaid Services (CMS) and administered by DHCS. CMS ensures

19　　compliance with all applicable federal laws through review and approval of the terms and

20　　conditions expressed within California's Medicaid State Plan.

21　　　　　11.　　When California significantly changes its Medicaid program, it must either

22　　(1) amend its Medicaid State Plan, the state's contract with the federal government; or (2) receive

23　　an exemption or Medicaid waiver from portions of Title XIX of the Social Security Act by CMS.

24　　　　　12.　　CMS has granted waivers of statutory Medicaid requirements and authorized

25　　expenditures for costs not otherwise matchable for certain types of programs. CMS authorized

26　　PRIME under one such waiver - California's Section 1115 Waiver Medi-Cal 2020 Demonstration

27　　(Number 11-W00193/9).

28

13.     The PRIME Special Terms and Conditions (STCs) set forth conditions and
limitations on the waiver and expenditure authority, and describes in detail the nature, character,
and extent of Federal involvement in the Demonstration and the State's obligations to CMS
during the life of the Demonstration. DHCS has assisted PRIME entities in claiming federal
dollars through the PRIME Program published within the STCs 74-107 and Attachments D, Q
and II.

**A. PRIME INCENTIVE PAYMENT PROGRAM PARAMETERS**

14.     The goal of the PRIME program is to incentivize qualifying publicly-owned
hospitals to implement innovations in healthcare delivery systems and demonstrate corresponding
improvements in health outcomes and access to healthcare services, especially for Medi-Cal
beneficiaries with complex healthcare needs. Each participating PRIME entity must meet
specified metrics established to measure these outcomes to receive federal funds not otherwise
allowable through Medi-Cal.

15.     Eligible PRIME entities consist of only two types: Designated Public Hospital
(DPH) systems and the District/Municipal Public Hospitals (DMPHs). PRIME "[i]ncentive funds
shall be *disbursed solely to eligible* DPH systems or *DMPHs*." (STC 77; STCs Attachment II,
Section III; see also Welf. & Inst. Code, § 14184.50, subd. (a)(1).) DPH systems and DMPHs
qualified for incentive funding are referred to as "participating PRIME entities." (STCs,
Attachment Q and STCs Attachment II).

16.     The STCs provide that participating PRIME entities that complete a report
evidencing having met specified metrics may receive federal funds if the participating PRIME
entity submits an intergovernmental transfer (IGT) of the amount necessary for the nonfederal
share of the applicable incentive payment amounts. (See 42 C.F.R. § 433.51.) Upon the receipt of
the governmental transfer, DHCS draws the federal funding and pays both the non-federal share
and federal shares of the payment to the DPHs or DMPHs as applicable. (STC, Attachment II,
Section VII. F.)

17.     The continued receipt of federal funding is conditioned on California's compliance
with the STC terms and conditions. A copy of the Medi-Cal 2020 Demonstration STC can be

1   accessed at: https://www.dhcs.ca.gov/provgovpart/Documents/Medi-Cal-2020-STCs-CMS-

2   amended-6.7.18_.pdf. In addition to compliance with the STCs and related Attachments, DHCS

3   must comply with the state law requirements pertaining to the PRIME program. (Welf. & Inst.

4   Code, §§ 14184.50-14184.51; see also *id*. at §§ 14184, subd. (b)(5), 14184.10, subd. (m).) The

5   relevant portions of section 14184.50 detailing the PRIME IGT process are set forth in

6   subdivision (f):

7      The nonfederal share of payments under the PRIME program shall consist of
     voluntary intergovernmental transfers of funds provided by designated public
8      hospitals or affiliated governmental agencies or entities, or district and municipal
     public hospitals or affiliated governmental agencies or entities, in accordance with
9      this section.

10   (Welf. & Inst. Code, § 14184.50, subd. (f).)

11      18.     Thus, both the STCs and Welfare and Institutions Code provisions establish that:

12   (1) PRIME eligibility is limited to publicly-owned entities; and (2) payments are made through an

13   IGT of funds.

14      19.     Only public entities are allowed to submit an IGT of funds. (42 C.F.R. § 433.51.)

15   **B. SSH'S CONVERSION FROM PUBLIC TO PRIVATE ENTERPRISE**

16      20.     In 2015, the acute care hospital located at 501 Petaluma Avenue, Sebastopol

17   known as Sonoma West Medical Center (Sonoma West), presently known as SSH, was owned by

18   the Palm Drive Healthcare District (Palm Drive District), a local hospital district established

19   pursuant to Health & Safety Code section 32000 et seq., and related provisions of the

20   Government and Elections Codes. (Health & Saf. Code, § 320000, et seq.) Sonoma West, as a

21   District Municipal Public Hospital (DMPH), qualified as a participating entity under PRIME.

22      21.     As set forth above, only two kinds of healthcare providers are eligible for PRIME

23   funding: Designated Public Hospitals (DPH) systems and District/Municipal Public Hospitals

24   (DMPHs). (Welf. & Inst. Code, § 14184.50, subd. (a)(1).) The latter are further defined as

25   "nondesignated public hospitals, as listed in the [Medi-Cal 2020 Demonstration] Special Terms

26   and Conditions, that have an approved project plan under the PRIME program." (Welf. & Inst.

27   Code, § 14184.50, subd. (b)(3).)

28

Exhibits to MCCJ Request for Judicial Notice
                   Complaint

22.    Sonoma West received PRIME payments by way of an IGT of funds. Between 2016 and 2018, Sonoma West routinely submitted reports on completed metrics and completed IGTs of the non-federal share.

23.    On or about August 26, 2018, Palm Drive District and AAMG executed a management services agreement for AAMG to operate the hospital facility under the new name "Sonoma Specialty Hospital."

24.    DHCS is informed and believes, and on that basis alleges, that on or about September 8, 2018, Palm Drive District terminated Sonoma West's management of the hospital facility. Also on information and belief, SSH assumed control of the hospital's operations on September 9, 2018.

25.    DHCS is informed and believes, and on that basis alleges, that on or about April 18, 2019, SSH and Palm Drive District entered into an agreement to lease the hospital facility.

26.    Changes in hospital ownership are reviewed by CMS and the California Department of Public Health (CDPH) as the relevant regulators for licensees. (42 C.F.R. § 489.18; Health & Saf. Code, § 1272.)

27.    The Health Care Facility Licensing and Certification database on CDPH's website lists SSH as having been operated as a Limited Liability Company since April 1, 2019.

28.    On information and belief, SSH submitted its Change of Ownership Application (also referred to as CHOW) for the hospital facility on or around May 28, 2019. The CHOW indicated that the licensee would be SSH. According to the CHOW, Palm Drive District remained the owner of the property on which the hospital was situated — 501 Petaluma Avenue, Sebastopol, California.

29.    On information and belief, the CHOW further represented that the hospital facility was being operated pursuant to a management agreement with AAMG. A copy of the management agreement was included with the CHOW. DHCS is informed and believes, and on that basis alleges, that the CHOW identified Gurpreet Singh as having a "100%" ownership stake in SSH. CMS identified the effective date of the new ownership as April 1, 2019.

30.     Through its owner Gurpreet Singh, SSH executed a Medi-Cal Provider Agreement

(MPA) with DHCS on or about April 1, 2019. As a condition of participating in any part of

Medi-Cal, SSH agreed to comply with all of the terms and conditions set forth in the MPA

including the following provision:

> Provider agrees *to comply with* all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and *any applicable rules or regulations promulgated by DHCS* pursuant to these Chapters. Provider *further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS.* Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers.

(See Exhibit A, SSH's MPA ¶ 2, italics added).

31.     It is established law that, "the Department's relationship with Medi-Cal providers

is in the nature of a contract, the terms of which include and are limited by the laws and

regulations applicable to the Medi-Cal program." (*Paramount Convalescent Center Inc. v. Dept.

of Health Care Services* (1975) 15 Cal.3d 489; *Cal. Medical Assn. v. Lackner* (1981) 117

Cal.App.3d 552.)

32.     Under the terms of the MPA, SSH further agreed that it would not "engage in

conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or

*the fiscal integrity of the Medi-Cal program*." (*Id.* ¶ 4, italics added.) SSH further agreed to

"promptly repay" amounts owed pursuant to the MPA, including "amounts owed in accordance

with applicable federal and California statues and regulations, and rules and policies of DHCS."

(*Id.* ¶ 23.)

**C. JULY 2019 IGT AND INELIGIBLE RECEIPT OF FUNDS**

33.     By letter sent on or about July 1, 2019, DHCS informed SSH that the IGT for the

PRIME Demonstration Year 14 (January 2018 – December 2018) was due to DHCS by July 10,

2019. SSH responded to DHCS's letter by sending a check to DHCS dated July 2, 2019, for the

amount of $270,075.00. The check indicated that it was for "PUBHOSPINVEST FUND 3172."

The check was signed by Gurpreet Singh.

Exhibits to MCCJ Request for Judicial Notice
Complaint

34.     SSH's July 2, 2019 check triggered DHCS's process of drawing federal funds to match the qualifying non-federal share of the PRIME funds. On or about July 11, 2019, DHCS withdrew $540,000.00 from PRIME Fund 3172.

35.     On or about August 21, 2019, DHCS paid SSH $540,000.00 (Warrant No. 04023336). This amount was intended to reimburse SSH the $270,000 submitted as an IGT and $270,000 in matching federal funds, pursuant to STC, Attachment II, Section VII, F.

36.     DHCS subsequently learned that CMS had approved SSH's CHOW application on or around August 29, 2019. CMS' letter to SSH regarding the CHOW identified the effective date of the new ownership as April 1, 2019.

37.     On or about October 10, 2019, SSH informed DHCS by email that the facility was formally transferring to for-profit status.

38.     Federal regulations require that DHCS refund the federal share within one year of the discovery of an overpayment (42 C.F.R. §§ 433.316, 433.320.) This obligation applies whether or not DHCS is able to recover the overpayment from the provider. (42 C.F.R. § 433.320(a)(3) ["A credit on the Form CMS–64 must be made whether or not the overpayment has been recovered by the State from the provider."].) Having thus discovered the PRIME overpayment, DHCS was obligated to return the FFP to CMS. (42 C.F.R. §§ 433.316, 433.320.)

39.     DHCS notified SSH by letter dated January 15, 2020 that it was terminated from the PRIME program effective April 1, 2019, the date the ownership transfer to Gurpreet Singh was deemed effective and SSH converted to a privately owned hospital. DHCS informed SSH that as a private hospital it was no longer an eligible PRIME entity. Further, as a private hospital SSH was precluded from completing an IGT of funds necessary for the nonfederal share of the applicable incentive payment amount pursuant to federal regulations and state statute. Moreover, SSH should neither have completed the IGT of funds for DY 14 Mid-Year on July 2, 2019, nor received PRIME incentive funds. In fact, SSH would not have received these funds but for its failure to notify DHCS of its conversion to a private hospital. (42 C.F.R. § 433.51; Welf. and Inst. Code, § 14184.50(f).) DHCS advised that it would initiate a recoupment for the $270,000 in FFP

1   that SSH claimed at DY 14 Mid-Year and was otherwise ineligible to receive. DHCS

2   subsequently confirmed that it would begin pursuing recoupment on January 24, 2020.

3      40.    The January 2020 communications from DHCS to SSH initiated the process set

4   forth in 42 C.F.R. section 433.316(c)(1) by putting SSH on notice of the overpayment and for

5   establishing the date of DHCS' discovery for purposes of the determining when DHCS would be

6   required to return the FFP if SSH did not comply with its request.

7      41.    SSH did not respond to this correspondence.

8      42.    DHCS subsequently sent numerous communications to SSH from February 28,

9   2020 through October 20, 2021 for the recoupment of the overpayment to SSH. To date, SSH has

10   not remitted any payment to DHCS.

11   **D. DHCS' AUTHORITY TO RECOUP AND SSH'S UNJUST ENRICHMENT**

12      43.    DHCS is authorized to recoup overpayments received.

13      44.    Pursuant to federal regulations, improper payments are defined as "any payment

14   that should not have been made or that was made in an incorrect amount (including overpayments

15   and underpayments). (42 C.F.R. § 431.958.) Overpayments include unauthorized amounts paid by

16   the Medicaid program whether paid as a result of inaccurate or improper cost reporting, improper

17   claim submission, unacceptable practices, fraud, abuse, or mistake. (Medicaid Program Integrity

18   Manual Ch. 1.) State law authority to recover overpayments is broad. (Welf. and Inst. Code, §§

19   14115.5, 14176, 14177; Cal. Code Regs, tit. 22, § 51458.1.)

20      45.    DHCS sent SSH its repayment-plan options on March 2, 2020 and September 30,

21   2020. DHCS offered SSH a flexible recoupment option to prevent SSH from having to repay the

22   overpayment of $ 270,000 at one time. Between March 2020 and October 2021, DHCS reached

23   out to SSH numerous times and did not receive any payment.

24      46.    DHCS and SSH personnel exchanged email messages in the Fall of 2020 about the

25   PRIME payment, but SSH continued to withhold the FFP without justification and in violation of

26   law.

27   //

28   //

47. On or about July 7, 2021, in performance of its obligations under 42 C.F.R. section 433.320, DHCS returned $270,000.00 through its Quarterly Statement of Expenditures to CMS. DHCS used state funds to repay the FFP of the July 2019 PRIME payment.

48. To date, SSH continues to withhold public funds to which it is not lawfully entitled, and has knowingly failed to reimburse DHCS for those funds, despite repeated demands, in violation of the governing MPA and applicable state and federal law.

**FIRST CAUSE OF ACTION**
**RECOUPMENT OF THE PRIME OVERPAYMENT**
**(ALL DEFENDANTS)**

49. DHCS re-alleges and incorporates by reference each of the paragraphs above as though fully set forth herein.

50. As a participating Medi-Cal provider, SSH agreed to "promptly repay" amounts owed pursuant to the MPA, including "amounts owed in accordance with applicable federal and California statues and regulations, and rules and policies of DHCS." (SSH's MPA ¶ 4.)

51. SSH improperly retained PRIME incentive funds that it would not have received if it had timely notified DHCS of its conversion to a private hospital. (42 C.F.R. § 433.51; Welf. and Inst. Code, § 14184.50(f).)

52. Despite DHCS' numerous attempts to recoup the improper payment, SSH continues to withhold the FFP without justification and in violation of law. As a result, DHCS used state funds to repay the FFP of the July 2019 PRIME payment. (42 C.F.R. §§ 433.316, 433.320.)

53. Under Welfare and Institutions Code section 14176, DHCS may recover a due and payable overpayment made to a provider by means of a repayment agreement executed between such provider and the director, and by any other means available at law. Additionally, California Code of Regulations, title 22, section 51458.1 provides that provides that "[t]he Department shall recover overpayments to providers . . . ." The regulation lists thirteen non-exclusive instances in which DHS may recover overpayments. Relevant here is that payments may be recovered if they are determined to be "[i]n violation of any other Medi–Cal regulation where overpayment has occurred." (Cal. Code Regs., tit. 22, § 51458.1, subd. (a)(13).)

1       54.    DHCS is entitled to repayment from SSH for $270,000. (Welf. and Inst. Code, §

2 14176; Cal. Code Regs., tit. 22, § 51458.1.)

3       55.    No part of the $270,000 in state funds that DHCS paid to CMS have been repaid by

4 SSH.

5 **SECOND CAUSE OF ACTION**

6 **BREACH OF CONTRACT**

7 **(ALL DEFENDANTS)**

8       56.    DHCS re-alleges and incorporates by reference each of the paragraphs above as

9 though fully set forth herein.

10       57.    As a registered Medi-Cal provider, SSH agreed to comply with the terms of the

11 MPA, including but not limited to:

12       •   Complying with all provisions of Chapter 7 of the Welfare & Institutions Code, which

13             includes the PRIME program; and

14       •   Promptly repaying amounts identified by DHCS as being owed "in accordance with

15             applicable federal and California statutes and regulations, and rules and policies of

16             DHCS."

17       58.    SSH violated the terms of the MPA when, without reason or justification, it

18 claimed public funds from the PRIME program when it was not eligible to participate in PRIME

19 in the first instance. (See Welf. & Inst. Code, § 14184.50, subds. (a)(1) and (f).) SSH further

20 violated the MPA when it failed and refused to return the PRIME payment when requested by

21 DHCS. SSH thereby breached its agreement with DHCS.

22       59.    Despite SSH's breach of the terms of the MPA, DHCS dutifully performed its own

23 lawful obligations with regards to SSH, including but not limited to drawing down FFP and

24 paying SSH both the FFP and SSH's July 2019 payment under the provisions of the PRIME

25 Program.

26       60.    Consistent with 42 C.F.R. section 433.320, DHCS could not wait indefinitely for

27 SSH to refund the money it was not eligible to receive, and was obligated to refund CMS in the

28

1   original amount of $270,000.00, despite those funds not being remitted back to DHCS by SSH.

2   DHCS was required to utilize state funds to repay this FFP.

3       61.     SSH's conduct in violation of the MPA thus caused DHCS to experience a loss of

4   state funds in the amount $270,000.00, plus interest.

5                           **THIRD CAUSE OF ACTION**

6                    **DECLARATORY RELIEF (CCP § 1060)**

7                           **(ALL DEFENDANTS)**

8       62.     DHCS re-alleges and incorporates by reference each of the paragraphs above as

9   though fully set forth herein.

10      63.     Code of Civil Procedure section 1060 provides, in relevant part, that: "Any person

11  interested under a written instrument . . . or under a contract, or who desires a declaration of his or

12  her rights or duties with respect to another . . . may, in cases of actual controversy related to the

13  legal rights and duties of the respective parties, bring an original action . . . for a declaration of his

14  or her rights." (Code Civ. Proc. § 1060.) Section 1060 further authorizes such a declaration

15  "either alone or with other relief." (*Ibid*.)

16      64.     An actual controversy exists as to whether SSH's actions in initiating an IGT that

17  did not contain local government funds and refusing to return PRIME funds, which it was

18  ineligible to receive due to SSH's status as a privately-owned hospital, violated the MPA, the

19  STCs, and section 14184.50 of the Welfare & Institutions Code.

20      65.     DHCS has a substantial interest in the resolution of this controversy as it sustained

21  a loss of $270,000.00 in state funds when it was required to reimburse CMS for the same amount

22  because SSH continued to unlawfully hold federal funds for which it was not eligible and which

23  SSH was not entitled to retain.

24      66.     To date, despite repeated demands, SSH has not repaid DHCS the $270,000.00 in

25  state funds that DHCS was forced to repay CMS.

26  //

27  //

28  //

Exhibits to MCCJ Request for Judicial Notice                    Complaint

1

2

3

**FOURTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(ALL DEFENDANTS)**

4    67.    DHCS re-alleges and incorporates by reference each of the paragraphs above as

5 though fully set forth herein.

6    68.    Welfare & Institutions Code section 14184.50, subdivision (f)(2), provides that,

7 upon initiating a PRIME IGT, the "transferring entity shall certify that the transferred funds

8 qualify for federal financial participation pursuant to applicable federal Medicaid laws and the

9 Special Terms and Conditions [for the Medi-Cal 2020 Demonstration], and in the form and

10 manner as required by [DHCS]."

11    69.    SSH abrogated its obligations pursuant to statute and its Medi-Cal Provider

12 Agreement when it initiated the IGT process despite being ineligible to participate in PRIME.

13 (Welf. & Inst. Code, § 14184.50, subd. (f)(2).)

14    70.    Federal regulations require DHCS to repay any overpayment of FFP to CMS

15 within one year from the date the overpayment was discovered. (42 C.F.R. § 433.316(a), (c)(1).)

16 For purposes of this action, the overpayment is the amount paid to SSH despite its being

17 ineligible for such funds under the PRIME program.

18    71.    DHCS has a statutory and contractual right to recover overpayments (Welf. & Inst.

19 Code, § 14176.), and repeatedly asked SSH to return the federal portion of the July 2019 PRIME,

20 to no avail. To date, SSH has failed and refused to return the unauthorized funds.

21    72.    Despite its numerous unsuccessful efforts to recoup the FFP wrongfully held by

22 SSH, DHCS was nonetheless obligated to return $270,000.00 to CMS. (42 C.F.R. § 433.316(b).

23    73.    DHCS used state funds to repay CMS the $270,000.00.

24    74.    SSH has been unjustly enriched by its unlawful retention of the $270,000.00 it was

25 not entitled to receive in the first instance, and by not repaying DHCS as requested, SSH has

26 unjustifiably caused DHCS to expend state funds for the exclusive benefit of SSH.

27    75.    SSH has been unjustly enriched in the amount of $270,000.00.

28

Exhibits to MCCJ Request for Judicial Notice

Complaint

1

2                              **PRAYER FOR RELIEF**

3          WHEREFORE, Plaintiff respectfully prays that the court enter judgment against

4    Defendants as follows:

5          1.        That judgment be entered in favor of Plaintiff and against Defendants.

6          2.        For a declaration, under Code of Civil Procedure section 1060 that SSH violated

7    section 14184.50, Chapter 7 of the Welfare & Institutions Code.

8          3.        For an award of restitution in the amount of $270,000.00 to DHCS.

9          4.        For such other relief as is just and proper, including an award of pre- and post-

10   judgment interest, attorneys' fees, and costs of suit, if available.

11   Dated: May 31, 2022                          Respectfully submitted,

12
                                                  ROB BONTA
                                                  Attorney General of California
13                                                CHARLES J. ANTONEN
                                                  Supervising Deputy Attorney General
14

15

16

17                                                ANJANA N. GUNN
                                                  Deputy Attorney General
18                                                *Attorneys for Plaintiff*
                                                  *Michelle Baas, Director of the California*
19                                                *Department of Health Care Services*

20   SF2021402090
     43242308.docx

21

22

23

24

25

26

27

28

# Exhibit A

Filed 03/19/24 Case 23-10457 Doc 1559

State of California
Health and Human Services Agency

Department of Health Care Services



**MEDI-CAL PROVIDER AGREEMENT**
**(Institutional Provider)**
**(To Accompany Applications for Enrollment)\***

**Do not use staples on this form or any attachments.**

**Type or print clearly in ink. If you must make corrections, please line through, date, and initial in ink.**

**Do not leave any questions, lines, etc. blank. Enter N/A if not applicable to you.**

| | For State Use Only |
|---|---|

Date: 04/01/19

| Legal name of applicant or provider (as listed with the IRS) | Business name (if different than legal name) |
|---|---|
| SONOMA SPECIALTY HOSPITAL, LLC | SONOMA SPECIALTY HOSPITAL |

| Provider number (NPI) | Business Telephone Number |
|---|---|
| 1396205050 | (707) 823-8511 |

| Business address (number, street) | City | State | ZIP code (9-digit) |
|---|---|---|---|
| 501 PETALUMA AVE | SEBASTOPOL | CA | 95472-4281 |
| Mailing address (number, street, P.O. Box number) | City | State | ZIP code (9-digit) |
| 501 PETALUMA AVE | SEBASTOPOL | CA | 95472-4281 |
| Pay-to address (number, street, P.O. Box number) | City | State | ZIP code (9-digit) |
| 501 PETALUMA AVE | SEBASTOPOL | CA | 95472-4281 |
| Previous business address (number, street) | City | State | ZIP code (9-digit) |
| N/A | N/A | NA | |

Taxpayer Identification Number (TIN)\*\*
83-1534467

**EXECUTION OF THIS PROVIDER AGREEMENT BETWEEN AN APPLICANT OR PROVIDER (HEREINAFTER JOINTLY REFERRED TO AS "PROVIDER") AND THE DEPARTMENT OF HEALTH CARE SERVICES (HEREINAFTER "DHCS"), IS MANDATORY FOR PARTICIPATION OR CONTINUED PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM PURSUANT TO 42 UNITED STATES CODE, SECTION 1396a(a)(27), TITLE 42, CODE OF FEDERAL REGULATIONS, SECTION 431.107, WELFARE AND INSTITUTIONS CODE, SECTION 14043.2, AND TITLE 22, CALIFORNIA CODE OF REGULATIONS, SECTION 51000.30(a)(2).**

**AS A CONDITION FOR PARTICIPATION OR CONTINUED PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM, PROVIDER AGREES TO COMPLY WITH ALL OF THE FOLLOWING TERMS AND CONDITIONS, AND WITH ALL OF THE TERMS AND CONDITIONS INCLUDED ON ANY ATTACHMENT(S) HERETO, WHICH IS/ARE INCORPORATED HEREIN BY REFERENCE:** RECEIVED

---

\* Every applicant and provider must execute this Provider Agreement.
\*\* The taxpayer identification number may be a Taxpayer Identification Number (TIN) or a social security number for sole proprietors.

MAY 2 8 2019
Centralized Applications U
Licensing & Certification Pro

State of California                          Department of Health Care Services
Health and Human Services Agency

1. **Term and Termination.** This Agreement will be effective from the date applicant is enrolled as a provider by DHCS, or, from the date provider is approved for continued enrollment. Provider may terminate this Agreement by providing DHCS with written notice of intent to terminate, which termination shall result in Provider's immediate disenrollment and exclusion (without formal hearing under the Administrative Procedure Act) from further participation in the Medi-Cal program, including deactivation of any provider agreement, unless and until such time as Provider is re-enrolled by DHCS in the Medi-Cal Program. DHCS may immediately terminate this Agreement for cause if Provider is suspended/excluded for any of the reasons set forth in Paragraph 25(a) below, which termination will result in Provider's immediate disenrollment and exclusion (without formal hearing under the Administrative Procedures Act) from further participation in the Medi-Cal program.

2. **Compliance With Laws and Regulations.** Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters. Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS. Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers.

3. **National Provider Identifier (NPI).** Provider agrees not to submit any treatment authorization requests (TARs) or claims to DHCS using an NPI unless that NPI is appropriately registered for this provider with the Centers for Medicare and Medicaid Services (CMS) and is in compliance with all NPI requirements established by CMS as of the date the claim is submitted. Provider agrees that submission of an NPI to DHCS as part of an application to use that NPI to obtain payment constitutes an implied representation that the NPI submitted is appropriately registered and in compliance with all CMS requirements at the time of submission. Provider also agrees that any subsequent defect in registration or compliance of the NPI constitutes an "addition or change in the information previously submitted" which must be reported to DHCS under the requirements of Title 22, California Code of Regulations, Section 51000.40 and 51000.52(b).

4. **Forbidden Conduct.** Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

5. **Nondiscrimination.** Provider agrees that it shall not exclude or deny aid, care, service or other benefits available under Medi-Cal or in any other way discriminate against any Medi-Cal patient because of that person's race, color, ancestry, marital status, national origin, gender, age, economic status, physical or mental disability, political or religious affiliation or beliefs in accordance with California and federal laws. In addition, Provider shall not discriminate against Medi-Cal beneficiaries in any manner, including, but not limited to, admission practices, room selection and placement, meals provision and waiting time for surgical procedures. Without exception, Provider shall provide to Medi-Cal patients their specific Medi-Cal benefit Inpatient Services in the same manner as Provider also directly, or indirectly, renders those same services to non-Medi-Cal patients, regardless of payor source.

6. **Scope of Health and Medical Care.** Provider agrees that the health care services it provides may include diagnostic, preventive, corrective, and curative services, goods, supplies, and merchandise essential thereto, provided by qualified personnel for conditions that cause suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity, including employment, or for conditions which may develop into some significant handicap or disability. Provider further agrees such Health care services may be subject to prior authorization to determine medical necessity.          MAY 2 8 2019

State of California　　　　　　　　　　　　　　　　Department of Health Care Services
Health and Human Services Agency

7. **Licensing.** Provider agrees to possess at the time this Agreement becomes effective, and to maintain in good standing throughout the term of this Agreement, valid and unexpired license(s), certificate(s), or other approval(s) to provide health care services, which is appropriate to the services, goods, supplies, and merchandise being provided, if required by the state or locality in which Provider is located, or by the Federal Government. Provider further agrees it shall be automatically suspended as a provider in the Medi-Cal program pursuant to Welfare and Institutions Code, Section 14043.6, if Provider has license(s), certificate(s), or other approval(s) to provide health care services, which are revoked or suspended by a federal, California, or another state's licensing, certification, or approval authority, has otherwise lost that/those license(s), certificate(s), or approval(s), or has surrendered that/those license(s), certificate(s), or approval(s) while a disciplinary hearing on that/those license(s), certificate(s), or approval(s) was pending. Such suspension shall be effective on the date that Provider's license, certificate, or approval was revoked, suspended, lost, or surrendered. Provider further agrees to notify DHCS within ten business days of learning that any restriction has been placed on, or of a suspension of Provider's license, certificate, or other approval to provide health care. Provider further agrees to provide DHCS complete information related to any restriction to, or revocation or loss of, Provider's license, certificate, or other approval to provide health care services.

8. **Record Keeping and Retention.** Provider agrees to make, keep and maintain in a systematic and orderly manner, and have readily retrievable, such records as are necessary to fully disclose the type and extent of all services, goods, supplies, and merchandise provided to Medi-Cal beneficiaries, including, but not limited to, the records described in Section 51476 of Title 22, California Code of Regulations, and the records described in Section 431.107 of Title 42 of the Code of Federal Regulations. Provider further agrees that such records shall be made at or near the time at which the services, goods, supplies, and merchandise are delivered or rendered, and that such records shall be retained by Provider in the form in which they are regularly kept for a period of three years from the date the goods, supplies, or merchandise were delivered or the services rendered or a claim was submitted. Providers using billing agents shall assure that the billing agents maintain and submit documents required.

9. **DHCS, CDPH, AG and Secretary Access to Records; Copies of Records.** Provider agrees to make available, during regular business hours, all pertinent financial records, all records of the requisite insurance coverage, and all records concerning the provision of health care services to Medi-Cal beneficiaries to any duly authorized representative of DHCS, CDPH, the California Attorney General's Medi-Cal Fraud Unit ("AG") or the Health, Education and Welfare Unit, and the Secretary of the United States Centers for Medicare and Medicaid Services (Secretary). Provider further agrees to provide, if requested by any of the above, copies of the records and documentation, and that failure to comply with any request to examine or receive copies of such records shall be grounds for immediate suspension of Provider or its billing agent from participation in the Medi-Cal program. Provider will be reimbursed for reasonable copy costs as determined by DHCS, CDPH, AG or Secretary.

10. **Confidentiality of Beneficiary Information.** Provider agrees that all documents, whether paper, electronic or in any media, that contain protected health information as defined under the Health Information Portability and Accountability Act or personal, confidential information of beneficiaries made or acquired by Provider, shall be confidential and shall not be released without the written consent of the beneficiary or his/her personal representative, or as otherwise authorized by law. Provider agrees to enter into a business associate agreement with any billing agents to assure that they comply with these requirements.

RECEIVED

MAY 2 8 2019

DHCS 9098 (Rev. 7/17)

Centralized Applications Unit
Licensing & Certification Program

State of California
Health and Human Services Agency

Department of Health Care Services

11. **Disclosure of Information to DHCS.** Provider agrees to disclose all information as required in Federal Medicaid laws and regulations and any other information required by DHCS, and to respond to all requests from DHCS for information. Provider further agrees that the failure of Provider to disclose the required information, or the disclosure of false information shall, prior to any hearing, result in the denial of the application for enrollment or shall be grounds for termination of enrollment status or suspension from the Medi-Cal program, which shall include deactivation of all provider numbers used by Provider to obtain reimbursement from the Medi-Cal program. Provider further agrees that all bills or claims for payment to DHCS by Provider shall not be due and owing to Provider for any period(s) for which information was not reported or was reported falsely to DHCS. Provider further agrees to reimburse those Medi-Cal funds received during any period for which information was not reported, or reported falsely, to DHCS.

12. **Background Check.** Provider agrees that DHCS may conduct a background check on Provider for the purpose of verifying the accuracy of the information provided in the application and in order to prevent fraud or abuse. The background check may include, but not be limited to, the following: (1) on-site inspection prior to enrollment; (2) review of medical and business records; and, (3) data searches.

13. **Unannounced Visits By DHCS, AG and Secretary.** Provider agrees that DHCS, AG and/or Secretary may make unannounced visits to Provider, at any of Provider's business locations, before, during or after enrollment, for the purpose of determining whether enrollment, continued enrollment, or certification is warranted, to investigate and prosecute fraud against the Medi-Cal program, to investigate complaints of abuse and neglect of patients in health care facilities receiving payment under the Medi-Cal program, and/or as necessary for the administration of the Medi-Cal program and/or the fulfillment of the AG's powers and duties under Government Code Section 12528. Premises subject to inspection include billing agents, as defined in Welfare and Institutions Code Section 14040.1. Pursuant to Welfare and Institutions Code Section 14043.7(b), such unannounced visits are authorized should the department have reason to believe that the provider will defraud or abuse the Medi-Cal program or lacks the organizational or administrative capacity to provide services under the program. Failure to permit inspection by DHCS, AG or Secretary or any agent, investigator or auditor thereof, shall be grounds for immediate suspension of provider from participation in the Medi-Cal program.

14. **Provider Fraud and Abuse.** Provider agrees that it shall not engage in or commit fraud or abuse. "Fraud" means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person. It includes any act that constitutes fraud under applicable federal or state law. "Abuse" means either: (1) practices that are inconsistent with sound fiscal or business practices and result in unnecessary cost to the Medicare program, the Medi-Cal program, another state's Medicaid program, or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state; (2) practices that are inconsistent with sound medical practices and result in reimbursement by the Medi-Cal program or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state, for services that are unnecessary or for substandard items or services that fail to meet professionally recognized standards for health care.

15. **Investigations of Provider for Fraud or Abuse.** Provider certifies that, at the time this Agreement was signed, it was not under investigation for fraud or abuse pursuant to Subpart A (commencing with Section 455.12) of Part 455 of Title 42 of the Code of Federal Regulations or under investigation for fraud or abuse by any Federal, state or local law enforcement agency, including the Medicaid Investigation units of DHCS and the Office of the Inspector General for the Federal Department of Health and Human Services. Provider further agrees to notify DHCS within ten business days of learning that it is under

Centralized
Licensing & Certification Program

State of California
Health and Human Services Agency

Department of Health Care Services

investigation for fraud or abuse by any such entity. Provider further agrees that it may be subject to temporary suspension pursuant to Welfare and Institutions Code, Section 14043.36(a), which may include temporary deactivation of all provider numbers used by Provider to obtain reimbursement from the Medi-Cal program, if it is discovered that Provider is under investigation as described in that section. Provider further agrees to cooperate with and assist DHCS and any state or federal agency charged with the duty of identifying, investigating, sanctioning, or prosecuting suspected fraud and abuse, although Provider does not waive any timely and properly asserted rights it may have under the 5th Amendment privilege against self-incrimination.

16. **Provider Fraud or Abuse Convictions and/or Civil Fraud or Abuse Liability.** Provider certifies that it and its owners, officers, directors, employees, and agents, have not: (1) been convicted of any felony or misdemeanor involving fraud or abuse in any government program, within the last ten years; or (2) been convicted of any felony or misdemeanor involving the abuse of any patient; or (3) been convicted of any felony or misdemeanor substantially related to the qualifications, functions, or duties of a provider; or (4) entered into a settlement in lieu of conviction for fraud or abuse, within the last ten years; or, (5) been found liable for fraud or abuse in any civil proceeding, within the last ten years. Provider further agrees that DHCS shall not enroll Provider if within the last ten years, Provider has been convicted of any felony, or any misdemeanor involving fraud or abuse in any government program, has entered into a settlement in lieu of conviction for fraud or abuse, or has been found liable for fraud or abuse in any civil proceeding.

17. **Changes to Provider Information.** Provider agrees to keep its application for enrollment in the Medi-Cal program current by informing the California Department of Public Health (CDPH), District Office, in writing on a form or forms to be specified by DHCS, within 35 days of any changes to the information contained in its application for enrollment, its disclosure statement, this Agreement, and/or any attachments to these documents.

18. **Prohibition of Rebate, Refund, or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage, dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage, dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law.

19. **Payment From Other Health Coverage Prerequisite to Claim Submission.** Provider agrees that it shall first seek to obtain payment for services provided to Medi-Cal beneficiaries from any private or public health insurance coverage to which the beneficiary is entitled, where Provider is aware of this coverage and to the extent the coverage extends to these services, prior to submitting a claim to DHCS for the payment of any unpaid balance for these services. In the event that a claim submitted to a private or public health insurer has not been paid within 180 days of billing by Provider, Provider may submit a claim to DHCS but must provide documentation of denial when requested to do so by DHCS. Providers billing for services to beneficiaries who are dual eligible Medicare-Medi-Cal must submit payment denial from Medicare Part A&B with all claims.

20. **Beneficiary Billing.** Provider agrees that it shall not submit claims to or demand or otherwise collect reimbursement from a Medi-Cal beneficiary, or from other persons on behalf of the beneficiary, for any service included in the Medi-Cal program's scope of benefits in addition to a claim submitted to the Medi-Cal program for that service, except to: (1) collect payments due under a contractual or legal entitlement pursuant to Welfare and Institutions Code, Section 14000(b); (2) bill a long-term care patient for the amount of his/her liability; and, (3) collect a co-payment pursuant to Welfare and Institutions Code,

State of California                                      Department of Health Care Services
Health and Human Services Agency

Sections 14134 and 14134.1. Provider further agrees that, in the event that a beneficiary willfully refuses to provide current other health care coverage billing information as described in Section 50763(a)(5) of Title 22, California Code of Regulations, Provider may, upon giving the beneficiary written notice of intent, bill the beneficiary as a private pay patient.

21. **Payment From Medi-Cal Program Shall Constitute Full Payment.** Provider agrees that payment received from DHCS in accordance with Medi-Cal fee structures shall constitute payment in full, except that Provider, after making a full refund to DHCS of any Medi-Cal payments received for services, goods, supplies, or merchandise, may recover all of Provider's fees to the extent that any other contractual entitlement, including, but not limited to, a private group or indemnification insurance program, is obligated to pay the charges for the services, goods, supplies, or merchandise provided to the beneficiary. Providers agree to submit all claims within 60 days of the dates of service but no later than six months to receive full payment. Providers agree to comply with Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5.

22. **Return of Payment for Services Otherwise Covered by the Medi-Cal Program.** Provider agrees that any beneficiary who has paid Provider for health care services, goods, supplies, or merchandise otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a prompt return from Provider of any part of the payment which meets any of the following: (1) was rendered during any period prior to the receipt of the beneficiary's Medi-Cal card, for which the card authorizes payment under Welfare and Institutions Code, Sections 14018 or 14019; (2) was reimbursed to Provider by the Medi-Cal program, following audits and appeals to which Provider is entitled; (3) is not payable by a third party under contractual or other legal entitlement; (4) was not used by the beneficiary to satisfy his/her paid or obligated liability for health care services, goods, supplies, or merchandise, or to establish eligibility.

23. **Compliance With Requirements.** Provider and any billing agent agree that it shall comply with all of the requirements set forth in the Welfare and Institutions Code and its implementing regulations, and the Medi-Cal Provider Manuals, including applicable changes to the Medi-Cal Provider Manuals published by DHCS subsequent to the effective date of this Agreement. Providers and their billing agents agree to comply with Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5. Providers agree to submit all claims within 60 days of the dates of service but no later than six months to receive full payment. Provider and its billing agent also agree to exhaust all administrative remedies with the fiscal intermediary prior to filing a writ of mandate pursuant to Welfare and Institutions Code Section 14104.5. In the event DHCS determines a reimbursement overpayment has been made to Provider or monies are otherwise owed pursuant to this Agreement, Provider agrees to promptly repay the amounts owed in accordance with applicable federal and California statutes and regulations, and rules and policies of DHCS. DHCS may recoup any overpayment from monies otherwise payable to Provider under this Agreement under any provider number of Provider.

24. **Deficit Reduction Act of 2005, Section 6032 Implementation.** To the extent applicable, as a condition of payment for services, goods, supplies and merchandise provided to beneficiaries in the Medical Assistance Program ("Medi-Cal"), providers must comply with the False Claims Act employee training and policy requirements in 1902(a) of the Social Security Act (42 USC 1396a(a)(68)), set forth in that subsection and as the federal Secretary of Health and Human Services may specify.

25. **Provider Suspension; Appeal Rights; Reinstatement.** Provider agrees that it is to be subject to the following suspension actions. Provider further agrees that the suspension of Provider shall include deactivation of all of Provider's provider numbers and shall preclude Provider from submitting claims for payment, either personally or through claims submitted by any individual, clinic, group, corporation, or other association to the Medi-Cal program for any services, supplies, goods, or merchandise that

State of California                                      Department of Health Care Services
Health and Human Services Agency

provider has provided directly or indirectly to a Medi-Cal beneficiary, except for services, supplies, goods, or merchandise provided prior to the suspension.

a. **Automatic Suspensions/Mandatory Exclusions.** The provider shall be automatically suspended under the following circumstances:

   (1) Upon notice from the Secretary of the United States Department of Health and Human Services that Provider has been excluded from participation in the Medicare or Medicaid programs. No administrative appeal of a suspension on this ground shall be available to Provider. (Welfare and Institutions Code, Section 14123(b),(c)).

   (2) If Provider has license(s), certificate(s), or other approval(s) to provide health care services, revoked or suspended by a federal, California, or another state's licensing, certification, or approval authority, has otherwise lost that/those license(s), certificate(s), or approval(s), or has surrendered that/those license(s), certificate(s), or approval(s) while a disciplinary hearing on that license, certificate, or approval was pending. (Welfare and Institutions Code, Section 14043.6).

   (3) If Provider is convicted of any felony or any misdemeanor involving fraud, abuse of the Medi-Cal program or any patient, or otherwise substantially related to the qualifications, functions, or duties of a provider of service. Suspension following conviction is not subject to the proceedings under Welfare and Institutions Code Section 14123(c). However, the director may grant an informal hearing at the request of the provider to determine in the director's sole discretion if the circumstances surrounding the conviction justify rescinding or otherwise modifying the suspension.

b. **Permissive Suspensions/Permissive Exclusions.** The provider may be suspended under the following circumstances:

   (1) Provider violates any of the provisions of Chapter 7 of the Welfare and Institutions Code (commencing with Section 14000 except for Sections 14043-14044), or Chapter 8 (commencing with Section 14200) or any rule or regulations promulgated by DHCS pursuant to those provisions. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14123(a),(c)).

   (2) Provider fails to comply with DHCS's request to examine or receive copies of the books and records pertaining to services rendered to Medi-Cal beneficiaries. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14124.2).

   (3) Provider participating in the Medi-Cal dental program provides services, goods, supplies, or merchandise that are below or less than the standard of acceptable quality, as established by the California Dental Association Guidelines for the Assessment of Clinical Quality and Professional Performance, Copyright 1995, Third Edition, as periodically amended. (Welfare and Institutions Code, Section 14123(f)).

c. **Temporary Suspension.** The provider may be temporarily suspended under the following circumstances:

   (1) Provider fails to disclose all information as required in federal Medicaid regulations or any other information required by DHCS, or discloses false information. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.2(a)).

0221

RECEIVED

MAY 2 8 2019

. Unit

State of California                                     Department of Health Care Services
Health and Human Services Agency

(2) If it is discovered that Provider is under investigation for fraud or abuse. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.36(a)).

(3) Provider fails to remediate discrepancies discovered as a result of an unannounced visit to Provider. Administrative appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.7(c)).

(4) When necessary to protect the public welfare or the interests of the Medi-Cal program. Administrative appeal pursuant to Health and Safety Code, Section 100171. (Welfare and Institutions Code, Section 14123(c)).

(5) Provider submits claims for payment under any provider number from an individual or entity that is suspended, excluded or otherwise ineligible. This includes a provider on the Suspended and Ineligible Provider List or any list published by the Office of the Inspector General or the Department of Health and Human Services. Appeal pursuant to Welfare and Institutions Code, Section 14043.65. (Welfare and Institutions Code, Section 14043.61).

26. **Provider Grievances and Complaints.** A provider who has a grievance or complaint concerning the processing or payment of money alleged to be payable for services provided to eligible Medi-Cal beneficiaries shall comply with and exhaust all administrative remedies and procedures outlined in statute, regulation or the Provider Manual, including the following:

     a. The provider and its billing agent shall comply with and exhaust all administrative remedies provided by the Fiscal Intermediary or Contractor prior to filing a court action.

     b. The provider and its billing agent shall comply with and exhaust all proceeding for claims processing outlined in the Provider Manual including all appeal procedures.

     c. The provider and its billing agent shall submit to the Fiscal Intermediary or Contractor all source documentation to support its claim, including but not limited to the source documentation outlined in California Code of Regulations, Title 22, Section 51476.

     d. The provider and its billing agent shall comply with all timeliness requirements including but not limited to those outlined in Welfare and Institutions Code Section 14115 and California Code of Regulations, Title 22, Section 51008 and 51008.5.

27. **Provider Termination, Imposition of Federal Sanctions, and Appeal Rights for Long Term Care Facilities.** Provider agrees that it is subject to any federal sanctions authorized under the state plan including termination of this provider agreement in accordance with federal law. Provider further agrees that the termination of this provider agreement or imposition of other federal sanctions authorized under the state plan shall include deactivation of all of Provider's provider numbers and shall preclude Provider from submitting claims for payment either personally or through claims submitted by any individual, clinic, group, corporation, or other association to the Medi-Cal program for any services, supplies, goods, or merchandise that provider has provided directly or indirectly to a Medi-Cal beneficiary, except for services, supplies, goods, or merchandise provided prior to the termination or imposition of sanctions.

     a. Skilled Nursing Facility and Intermediate Care Facility Appeal Procedures. SNF and ICF Medi-Cal Providers shall have the appeal rights set forth in Article 1.6 of Chapter 3 of Division 3 of Title 22.

     b. Intermediate Care Facilities-Mental Retardation Appeal Procedures. Intermediate Care Facilities Developmentally Disabled; Intermediate Care Facilities-Developmentally Disabled-Habilitative;

State of California
Health and Human Services Agency

Department of Health Care Services

Intermediate Care Facilities- Developmentally Disabled-Nursing shall have the appeal rights set forth in 42 CFR 431.153 and 431.154.

28. **Liability of Group Providers.** Provider agrees that, if it is a provider group, the group, and each member of the group, are jointly and severally liable for any breach of this Agreement, and that action against any of the providers in the provider group may result in action against all of the members of the provider group.

29. **Legislative and Congressional Changes.** Provider agrees that this Agreement is subject to any future additional requirements, restrictions, limitations, or conditions enacted by the California Legislature or the United States Congress which may affect the provisions, terms, conditions, or funding of this Agreement.

30. **Provider Capacity.** Provider agrees that Provider, and the officers, directors, employees, and agents of Provider, in the performance of this Agreement, shall act in an independent capacity and not as officers or employees or agents of the State of California.

31. **Indemnification.** Provider agrees to indemnify, defend, and save harmless the State of California, its officers, agents, and employees, from any and all claims and losses accruing or resulting to any and all persons, firms, or corporations furnishing or supplying services, materials, or supplies in connection with Provider's performance of this Agreement, and from any and all claims and losses accruing or resulting to any Medi-Cal beneficiary, or to any other person, firm, or corporation who may be injured or damaged by Provider in the performance of this Agreement.

32. **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of California.

33. **Venue.** Venue for all actions, including federal actions, concerning this Agreement, lies in Sacramento County, California, or in any other county in which the California Department of Justice maintains an office.

34. **Titles.** The titles of the provisions of this Agreement are for convenience and reference only and are not to be considered in interpreting this Agreement.

35. **Severability.** If one or more of the provisions of this Agreement shall be invalid, illegal, void, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired. Either party having knowledge of such a provision shall promptly inform the other of the presumed non-applicability of such provision. Should the non-applicable provision go to the heart of this Agreement, the Agreement shall be terminated in a manner commensurate with the interests of both parties.

36. **Assignability.** Provider agrees that it has no property right in or to its status as a Provider in the Medi-Cal program or in or to the provider number(s) assigned to it, and that Provider may not assign its provider number for use as a Medi-Cal provider, or any rights and obligations it has under this Agreement except to the extent purchasing owner is joining this provider agreement with successor joint and several liability.

37. **Waiver.** Any action or inaction by DHCS or any failure of DHCS on any occasion, to enforce any right or provision of this Agreement, shall not be interpreted to be a waiver by DHCS of its rights hereunder and shall not prevent DHCS from enforcing such provision or right on any future occasion. The rights and remedies of DHCS herein are cumulative and are in addition to any other rights or remedies that DHCS may have at law or in equity.

DHCS 9098 (Rev. 7/17)                                        Page 10 of 13

State of California                                    Department of Health Care Services
Health and Human Services Agency

38. **Complete Integration.** This Agreement, including any attachments or documents incorporated herein by express reference, is intended to be a complete integration and there are no prior or contemporaneous different or additional agreements pertaining to the subject matter of this Agreement, unless such additional agreement(s) is between DHCS and the Provider, expressly references or incorporates all or part of this Agreement, and is signed by the Provider.

39. **Amendment.** Any alteration or modification by the applicant or Provider of this Medi-Cal Provider Agreement (DHCS Form 9098) or to any of the terms in its exhibits or attachments, shall automatically and immediately void this agreement upon submission of the signed agreement to the State, unless such agreement is also signed by the State.

40. **Provider Attestation.** Provider agrees that all information it submits on the application form for enrollment, this Agreement, and all attachments or changes to either, is true, accurate, and complete to the best of Provider's knowledge and belief. Provider further agrees to sign the application form for enrollment, this Agreement, and all attachments or changes to either, under penalty of perjury under the laws of the State of California.

RECEIVED

MAY 2 8 2019

Centralized Applications Unit
Licensing & Certification Program

State of California
Health and Human Services Agency

Department of Health Care Services

**The parties agree that this agreement is a legal and binding document and is fully enforceable in a court of competent jurisdiction. The provider signing this agreement warrants that he/she has read this agreement and understands it.**

**I declare under penalty of perjury under the laws of the State of California that the foregoing information is true, accurate, and complete to the best of my knowledge and belief.**

**I declare I am the provider or I have the authority to legally bind the provider, which is an entity and not an individual person.**

1. Printed legal name of provider
   SONOMA SPECIALTY HOSPITAL, LLC

2. Printed name of person signing this declaration on behalf of provider (if an entity or business name is listed in item 1 above)

3. Original signature of provider or representative if this provider is an entity other than an individual person as sole proprietor

   Gurpreet Singh

4. Title of person signing this declaration
   Owner

5. Notary Public (Affix notary seal or stamp in the space below)

RECEIVED

MAY 2 8 2019

Centralized Applications Unit
Licensing & Certification Program

Executed at: _____, _____ on _____
　　　　　　　　　　(City)　　　　　　　　(State)　　　　　(Date)

Applicants and providers licensed pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, the Osteopathic Initiative Act, or the Chiropractic Initiative Act ARE NOT REQUIRED to have this form notarized. If notarization is required, the Certificate of Acknowledgment signed by the Notary Public must be in the form specified in Section 1189 of the Civil Code.

State of California                      Department of Health Care Services
Health and Human Services Agency

---

## 6. Contact Person's Information

☐ Check here if you are the same person identified in item 2. If you checked the box, provide only the e-mail address and telephone number below.

| Contact Person's Name (Last, First, Middle) | | Gender |
| --- | --- | --- |
| Salas Matthew | | ☒ Male    ☐ Female |
| Title/Position | E-mail Address | Telephone Number |
| Administrator / COO | MSalas@sonomaspecialty.org | (707) 823-8511 |

### Privacy Statement
### (Civil Code Section 1798 et seq.)

All information requested on the Application, the disclosure statement, and the provider agreement is mandatory. This information is required by the California Department of Health Care Services and any other California State Departments that are delegated responsibility to administer the Medi-Cal program, by the authority of the Welfare and Institutions Code, Sections 14043 – 14043.75, the California Code of Regulations, Title 22, Sections 51000 – 51451 and the Code of Federal Regulations, Title 42, Part 455. The consequences of not supplying the mandatory information requested are denial of enrollment as a Medi-Cal provider or denial of continued enrollment as a provider and deactivation of all provider numbers used by the provider to obtain reimbursement from the Medi-Cal program. Some or all of this information may also be provided to the California State Controller's Office, the California Department of Justice, the California Department of Consumer Affairs, the California Department of Corporations, the California Franchise Tax Board or other California state or local agencies as appropriate, fiscal intermediaries, managed care plans, the Federal Bureau of Investigation, the Internal Revenue Service, Medicare Fiscal Intermediaries, Centers for Medicare and Medicaid Services, Office of the Inspector General, Medicaid, or as required or permitted by law. For more information or access to records containing your personal information maintained by this agency, contact the Provider Enrollment Division at (916) 323-1945.

RECEIVED

MAY 2 8 2019

Centralized Applications Unit
Licensing & Certification Program

## ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ Stanislaus _____ )

On ___ April 19 2019 ___ before me, _S. Virk_____

(insert name and title of the officer)

personally appeared _____ Gurpreet Singh _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

S. VIRK
COMM. #2242730
Notary Public - California
Stanislaus County
My Comm. Expires May 14, 2022

Signature _____          **(Seal)**

RECEIVED

MAY 2 8 2019

Centralized Applications Unit
Licensing & Certification Program

State of California
Health and Human Services Agency

Department of Health Care Services

## INSTRUCTIONS FOR THE COMPLETION OF THE MEDI-CAL PROVIDER AGREEMENT
### (Institutional Provider)

- **Type or print clearly.**
- **Return original and maintain a copy for your records.**
- **The Legal name and Business name must be consistent throughout the Medi-Cal Provider Agreement and any of its attachments.**
- **DO NOT LEAVE any questions, boxes, lines, etc. blank. Enter N/A if not applicable to you. If this document is incomplete, it will be returned to you.**

**Page 2 (Please enter the date)**

    **Legal name** is the name listed with the Internal Revenue Service (IRS).

    **Business name** is the facility, hospital, agency, or clinic name (name of business/DBA)

    **Provider Number (NPI)** is the ten-digit National Provider Identifier for the business address, as registered with the National Plan and Provider Enumeration System (NPPES).

    **Business telephone number** is the primary business telephone number used at the business address.

    **Business address** is the actual business location including the street name and number, room or suite number or letter, city, state, and nine-digit ZIP code. A post office box or commercial box is not acceptable.

    **Mailing address** is the location at which the applicant or provider wishes to receive general Medi-Cal correspondence. General Medi-Cal correspondence includes bulletin updates and Provider Manual updates.

    **Pay-to address** is the address at which the applicant or provider wishes to receive payment.

    **Previous business address** is the address where the applicant or provider was previously enrolled. If the applicant or provider is not submitting an application for a change of location, enter N/A.

    **Taxpayer Identification Number** is the Taxpayer Identification Number (TIN) issued by the IRS under the name of the applicant or provider.

**Page 12**

    1. **Legal name** is the name listed with the IRS.

    2. **Printed name** of the person signing this agreement.

    3. **Original signature** of the person signing this agreement.

    4. **Title** of the person signing this agreement.

    5. **Notary Public** box is for Certificate of Acknowledgment, signature and seal of Notary Public. (See California Civil Code Section 1189).

RECEIVED

MAY 2 8 2019

Centralized Applications Unit
Licensing & Certification Program

**MCCJ Request for Judicial Notice**

**5. Sonoma County Superior Court records regarding *Michelle Baass, Director of the California Department of Health Care Services, vs. Sonoma Specialty Hospital, LLC; American Advanced Management Group, Inc.; and Gurpreet Singh*, Case No. SCV-270916**

**B. Minute Order Adopting Tentative Ruling Granting Plaintiff DHCS's Motion for Summary Judgment, filed February 23, 2024**



**Superior Court of California, County of Sonoma**

**MINUTE ORDERS**

---

## SCV-270916 - BAASS VS SONOMA SPECIALTY HOSPITAL, LLC

**Date of Hearing:** February 23, 2024
**Time:** 3:00 PM

Summary Judgment
Courtroom 16

Judicial Officer:  Patrick Broderick          Courtroom Clerk:  Elizabeth Maldonado
Court Reporter:  None

### Parties Present

There are no appearances.

### Law and Motion Calendar
Issues: Summary Judgment

There being no timely opposition to the Court's tentative ruling and no request for oral argument, the Court **ADOPTS** its previously published tentative ruling as follows:

This matter is on calendar for the motion of Plaintiff Michelle Baass, Director of the California Department of Health Care Services ("DHCS" or "Plaintiff") for summary judgment of Plaintiff's claim against Defendants Sonoma Specialty Hospital ("SSH"), American Advanced Management Group, and Gurpreet Singh (together "Defendants") on the grounds that they are liable to promptly repay any amounts owed pursuant to SSH's Medi-Cal Provider Agreement (MPA), including amounts owed in accordance with applicable federal and California statutes and regulations, and rules and policies of DHCS governing the California Public Hospital Redesign and Incentives in Medi-Cal (PRIME) Program. **The motion is GRANTED.**

In this action, DHCS challenges Defendants' receipt of federal PRIME Program funds for Demonstration Mid-Year 14 (January 2018 – December 2018). (Plaintiff's Undisputed Material Fact ["UMF"] 1.) Through its owner Gurpreet Singh, SSH executed a MediCal Provider Agreement (MPA) with DHCS on or about April 1, 2019. (UMF 2.) As a condition of participating in any part of Medi-Cal, SSH agreed to comply with all of the terms and conditions set forth in the MPA. (UMF 3.) PRIME incentive funds are solely disbursed to eligible Designated Public Hospital systems and the District/Municipal Public Hospitals. (UMF 4.) The non-federal share of payments under PRIME must be funded by intergovernmental transfers from government operated entities. (UMF 5.) SSH submitted a Change of Ownership Application (also referred to as CHOW) to convert the hospital facility from public to private ownership on or around May 28, 2019. (UMF 6.) SSH was notified that new ownership was approved on July 15, 2019, with an effective date of April 1, 2019. (UMF 7.) The CHOW indicated that the licensee would be SSH. (*Ibid.*) Defendant Gurpreet Singh signed a check from a limited liability company's account in the amount of $270,075.00 payable to DHCS on or about July 2, 2019 intending it to serve as the nonfederal share of a PRIME incentive payment. (UMF 8.) On or about August 21, 2019, SSH received $540,000.00 as a PRIME incentive payment. (UMF 9.) By letter dated January

Exhibits to MCCJ Request for Judicial Notice

15, 2020, DHCS notified SSH of DHCS' intent to recoup the federal PRIME payment. (UMF 10.)

Plaintiff argues that Defendants failed to comply with the terms and conditions of the MPA and violated the laws governing the PRIME program by making an IGT transfer from private funds. It cites IEE Ex. 4, STCs, ¶105(h).

The STCs, ¶105(h) provides: "PRIME Payments Are Not Direct Reimbursement for Expenditures or Payments for Services. Payments from the PRIME Pool are intended to support and reward participating entities for improvements in the delivery system that support the simultaneous pursuit of improving the experience of care, improving the health of populations, and reducing per capita costs of health care, and are unrestricted revenue once disbursed. The payments are not direct reimbursement for expenditures incurred by participating entities in implementing reforms. The payments are not reimbursement for health care services that are recognized under these Special Terms and Conditions or under the State plan. PRIME incentive payments should not be considered patient care revenue and should not be offset against the certified public expenditures incurred by government-operated health care systems and their affiliated government entity providers for health care services, disproportionate share hospital payments or administrative activities as defined under these Special Terms and Conditions and/or under the State plan. The payments do not offset payment amounts otherwise payable to and by MCPs for Medi-Cal beneficiaries, or supplant provider payments from MCPs.

"The non-federal share of payments under PRIME shall be funded by voluntary intergovernmental transfers made by the participating PRIME entities and/or applicable governmental agencies. The funding entity shall certify that the funds transferred qualify for federal financial participation pursuant to 42 C.F.R. part 433 subpart B, and are not derived from impermissible sources such as recycled Medicaid payments, federal money excluded from use as State match, impermissible taxes, and non-bona fide provider-related donations. The State must have permissible sources for the non-federal share of PRIME expenditures, which may include permissible Intergovernmental Transfers (IGTs) from government operated entities and state funds. Sources of non-federal funding shall not include provider taxes or donations impermissible under section 1903(w), impermissible intergovernmental transfers from providers, or federal funds received from federal programs other than Medicaid (unless expressly authorized by federal statute to be used for claiming purposes, and the federal Medicaid funding is credited to the other federal funding source). For this purpose, federal funds do not include PRIME payments, patient care revenue received as payment for services rendered under programs such as the Designated State Health Programs, Medicare, or Medicaid." (IEE Ex. 4, STCs, ¶105(h).)

Plaintiff argues that the non-federal share of payments under PRIME must be funded by an IGT made by an eligible PRIME participant, citing Welf. & Inst. Code, § 14184.50, subd. (f). That section states: "The nonfederal share of payments under the PRIME program shall consist of voluntary intergovernmental transfers of funds provided by designated public hospitals or affiliated governmental agencies or entities, or district and municipal public hospitals or affiliated governmental agencies or entities, in accordance with this section."

The PRIME program is only available to eligible entities, which consist of Designated Public Hospital (DPH) systems and District/Municipal Public Hospitals (DMPHs). (Welf. & Inst. Code, § 14184.50, subd. (a)(1).) PRIME "[i]ncentive funds shall be disbursed solely to eligible DPH systems or DMPHs." (IEE, Ex. 3, STCs 77; STCs Attachment II, Section III; see also Welf. & Inst. Code, § 14184.50, subd. (a)(1).) The non-

Exhibits to MCCJ Request for Judicial Notice

federal share of payments under PRIME must be funded by intergovernmental transfers made by the participating PRIME entities and/or applicable governmental agencies. (Welf. & Inst. Code, § 14184.50, subd. (f).) The funding entity is required to certify that the funds transferred qualify for federal financial participation pursuant to federal requirements and that they are not derived from impermissible sources. (42 C.F.R. part 433.51.) Permissible sources for funding of the non-federal share of IGTs include funds derived from government operated entities. (42 C.F.R. § 433.51; IEE Ex. 3, STCs, ¶105(h).)

Defendants argue that money it received was for reimbursement it applied for and received while SSH was still a DMPH. Therefore, they argue that even if the CHOW is backdated to April 1, 2019, Defendants' receipt of the incentive payment does not violate Welf. & Inst. Code, § 14184.50, subd. (f) and 42 C.F.R. part 433 subpart B's requirement that voluntary intergovernmental transfers be made by the participating PRIME entities and/or applicable governmental agencies. Defendants argue that SSH was entitled to those funds when it applied for them, and the funds were reimbursed for January 2018 – December 2018, which is before the backdated effective date of the change of ownership application.

DHCS is mandated under federal and state laws to recover payments if they are determined to be in violation of any Medi–Cal regulation where an overpayment or improper payment has occurred. (42 C.F.R. §§ 433.316, 433.320; Cal. Code Regs., tit. 22, § 51458.1, subd. (a)(13).) Pursuant to federal regulations, improper payments are defined as "any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments). (42 C.F.R. § 431.958.) Improper payments include unauthorized amounts paid by the Medi-Cal program whether paid as a result of inaccurate or improper cost reporting, improper claim submission, unacceptable practices, fraud, abuse, or mistake. (Medicaid Program Integrity Manual Ch. 1.)

The parties do not disagree on the facts. Defendants made the IGT transfer on July 2, 2019. This was after Defendants submitted a CHOW on May 28, 2019, before the CHOW was approved on July 15, 2019, but after the April 1, 2019 effective date of the approval. Subsequent to the change of ownership, on January 15, 2020, SSH was notified that its participation in PRIME was terminated effective April 1, 2019. (Plaintiff's Exhibit 7.) Despite the technicality that Defendant's CHOW had not been approved by the time of the IGT, the legal effect of the change occurred on April 1, 2019. It was from April 1, 2019 that SSH went from a public hospital to a private hospital and lost its eligibility to participate in PRIME. As a private hospital, SSH was precluded from completing the IGT and this transaction must now be undone as Plaintiff is entitled to recoup the improper payment.

Plaintiff's motion is GRANTED.

Plaintiff's is directed to submit a written order to the court consistent with this ruling and in compliance with California Rules of Court, Rule 3.1312.

**Hearing Events/Documents Filed:**

- Court announces tentative decision
- The Court adopts its previously published tentative ruling

-End of Minute Order-

**Next Hearing(s) - Information current as of February 23, 2024:**

September 06, 2024 8:30 AM                          Broderick, Patrick
Court Trial
Courtroom 16                          0232          *For more information please contact the Clerk's Office at (707)*
                          Exhibits to MCCJ Request for Judicial Notice *521-6500 during official business hours.*

www.sonoma.courts.ca.gov

**MCCJ Request for Judicial Notice**

6. **Before the California Department of Consumer Affairs
   for the Bureau for Private Postsecondary Education,
   *In the Matter of the Accusation Against Advanced College;
   Jusrand LLC – Gurpreet Singh, Owner*, Case No. BPPE22-023**

    A. **Default Decision and Order, dated January 20, 2023 (PDF 1-6),
      and its Exhibit A, Accusation, dated December 19, 2022
      (PDF pp. 7-38).**

1
2
3
4
5
6
7

**BEFORE THE**
**DEPARTMENT OF CONSUMER AFFAIRS**
**FOR THE BUREAU FOR PRIVATE POSTSECONDARY EDUCATION**
**STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Accusation Against: | Case No. BPPE22-023 |
| **ADVANCED COLLEGE; JUSRAND LLC -** **GURPREET SINGH, OWNER** | **DEFAULT DECISION AND ORDER** [Gov. Code, § 11520] |
| Main Location 13180 Paramount Boulevard South Gate, CA 90280 | |
| **Institution Code: 3013171** | |
| Branch Location 5258 Pirrone Court Salida, CA 95368 | |
| School Code: 96110225 | |
| Branch Location 8338 West Lane Stockton, CA 95210 | |
| School Code: 17834722 | |
| Respondent. | |

1

Exhibits to MCCJ Request for Judicial Notice

**FINDINGS OF FACT**

1.      On December 19, 2022, Deborah Cochrane (Complainant), in her official capacity as the Chief of the Bureau for Private Postsecondary Education (Bureau), Department of Consumer Affairs, filed Accusation Number BPPE22-023 against Advanced College; Jusrand LLC - Gurpreet Singh, Owner (Respondent), before the Director of the Department of Consumer Affairs (Director).  (Accusation attached as Exhibit A.)

2.      On July 20, 1999, the Bureau issued Approval to Operate Institution Code 3013171 to Advanced College; Jusrand LLC - Gurpreet Singh, Owner (Respondent).  The Approval to Operate expired on July 29, 2022, and has not been renewed.  The Bureau received a Renewal for Approval to Operate an Accredited Institution application on July 28, 2022.  The status of the application is currently pending.  Respondent's main location is 13180 Paramount Boulevard., South Gate, California 90280.  Respondent's branch locations are 5258 Pirrone Court, Salida, California 95368 (School Code: 96110225), and 8338 West Lane, Stockton, California 95210 (School Code: 17834722).

3.      On December 19, 2022, Respondent was served copies of the Accusation Number BPPE22-023, Statement to Respondent, Request for Discovery, Notice of Defense, and Government Code sections 11507.5, 11507.6, and 11507.7, by certified and first class mail, at Respondent's addresses on file for service, which is required to be reported and maintained with the Bureau.  Respondent's addresses on file for service was, and is:

> Gurpreet Singh
> Agent for Process
> 4140 Dale Road, Suite J-8
> Modesto, CA  95356
>
> Advanced College
> Jusrand, LLC - Gurpreet Singh, Owner
> 13180 Paramount Boulevard
> South Gate, CA  90280

4.      Service of the Accusation was effective as a matter of law under the provisions of Government Code section 11505, subdivision (c), and/or Business and Professions Code section 124.

2

1    5.    Government Code section 11506, subdivision (c), states, in pertinent part:

2         (c)  The respondent shall be entitled to a hearing on the merits if the respondent
     files a notice of defense . . .  and the notice shall be deemed a specific denial of all
3    parts of the accusation ...  not expressly admitted.  Failure to file a notice of defense
     . . .  shall constitute a waiver of respondent's right to a hearing, but the agency in its
4    discretion may nevertheless grant a hearing.

5    6.    The Bureau takes official notice of its records and the fact that Respondent failed to

6    file a Notice of Defense within 15 days after service of the Accusation, and therefore waived the

7    right to a hearing on the merits of Accusation Number BPPE22-023.

8    7.    Government Code section 11520, subdivision (a), states, in pertinent part:

9         (a)  If the respondent either fails to file a notice of defense ...   or to appear at
     the hearing, the agency may take action based upon the respondent's express
10   admissions or upon other evidence and affidavits may be used as evidence without
     any notice to respondent . . . .

11

12   8.    Pursuant to its authority under Government Code section 11520, the Director finds

13   Respondent is in default.  The Director will take action without further hearing and, based on the

14   relevant evidence contained in the Default Decision Investigatory Evidence Packet in this matter,

15   finds that the charges and allegations in Accusation Number BPPE22-023, are separately and

16   severally, found to be true and correct by clear and convincing evidence.

17   9.    The Director finds that the actual costs for Investigation and Enforcement are

18   $32,569.75 as of January 18, 2023.

19                        **DETERMINATION OF ISSUES**

20   1.    Based on the foregoing findings of fact, Respondent Advanced College; Jusrand LLC

21   - Gurpreet  Singh, Owner,  has subjected  Approval  to Operate  Institution Code 3013171  to

22   discipline.

23   2.    The agency has jurisdiction to adjudicate this case by default.

24   ////

25   ////

26   ////

27   ////

28   ////

                                3

3.     The Director of the Department of Consumer Affairs is authorized to revoke Respondent's Approval to Operate under California Education Code section 94937, based upon the following violations alleged in the Accusation which are supported by the evidence contained in the Default Decision Investigatory Evidence Packet in this case:

     a.     California Education Code section 94897, subdivisions (j), (k), and (m) (Prohibited Business Practices);

     b.     California Education Code section 94934.5, subdivision (a) (Notice of Investigation of Institution);

     c.     California Code of Regulations, title 5, section 71745, subdivision (a) (Financial Resources);

     d.     California Education Code section 94898, subdivision (a) (Merging Classes, Converting Method of Delivery, Changing Locations);

     e.     California Code of Regulations, title 5, section 71710, subdivisions (a), (b), (c), and (f), California Code of Regulations, title 5, section 71715, subdivisions (a), (b), (c), (d), (d)(3), (d)(4), (d)(5), and (d)(6), and California Code of Regulations, title 5, section 71720, subdivision (a)(l) (Educational Program, Instruction, and Faculty);

     f.     California Code of Regulations, title 5, section 71716, subdivision (a) (Distance Educational Programs - Specific Provisions for Instruction Not in Real Time);

     g.     California Code of Regulations, title 5, section 71735, subdivision (a) (Facilities and Equipment);

     h.     California Education Code section 94905, subdivision (a), and California Code of Regulations, title 5, section 71770, subdivision (a) (Professions Requiring Licensure, Internships, and Admissions Standards and Transferred Credits Policy);

     I.     California Code of Regulations, title 5, section 71730, subdivisions (a), (c), (d), and (f) (Administration);

////

////

////

4

1　　　J.　　California Education Code section 94899.5, subdivision (b), section 94919,

2　　　　　　subdivisions (a) and (c), and California Code of Regulations, title 5, section 71750,

3　　　　　　subdivisions (a), (b), (c)(l), (c)(2), (e), and (t) (Collection of Tuition, Institution

4　　　　　　Participating in Federal Student Financial Aid Programs, and Withdrawals and

5　　　　　　Refunds);

6　　　k.　　California Education Code section 94900, subdivisions (a), (b)(l), (b)(2), (b)(3),

7　　　　　　section 94902, subdivision (a), 94911, subdivisions (a) and (c), California Code of

8　　　　　　Regulations, title 5, section 71800, subdivisions (b) and (d), California Code of

9　　　　　　Regulations, title 5, section 71920, subdivisions (a), (b)(4), (b)(5)(A-E), and (b)(l0),

10　　　　　 and California Code of Regulations, title 5, section 76120, subdivision (a) (Required

11　　　　　 Student Records, General Enrollment Requirements, Minimum Requirements for

12　　　　　 Enrollment Agreements, Enrollment Agreement, Student Records, and Amount of

13　　　　　 STRF Assessment);

14　　　l.　　California Education Code section 94900.5, subdivisions (b) and (c) (Required

15　　　　　　Institutional Records);

16　　　m.　　California Code of Regulations, title 5, section 71930, subdivisions (a), (b)(l) and (e)

17　　　　　　(Maintenance of Records);

18　　　n.　　California Code of Regulations, title 5, section 76130, subdivisions (a)-(e) (Collection

19　　　　　　and Submission of STRF Assessments); and

20　　　o.　　California Code of Regulations, title 5, section 74006, subdivisions (a) and (b)

21　　　　　　(Annual Fees).

22　////

23　////

24　////

25　////

26　////

27　////

28　////

5

**ORDER**

IT IS SO ORDERED that Approval to Operate Institution Code 3013171, issued to

Advanced College; Jusrand LLC - Gurpreet Singh, Owner, is revoked.

Pursuant to Government Code section 11520, subdivision (c), Respondent may serve a

written motion requesting that the Decision be vacated and stating the grounds relied on within

seven (7) days after service of the Decision on Respondent.  The agency in its discretion may

vacate the Decision and grant a hearing on a showing of good cause, as defined in the statute.

This Decision shall become effective on <u>February 26, 2023.</u>

It is so ORDERED     <u>January 20, 2023.</u>

<u>" Original Signature on File"</u>
RYAN MARCROFT
DEPUTY DIRECTOR
LEGAL AFFAIRS DIVISION
DEPARTMENT OF CONSUMER AFFAIRS

65669628.DOCX
DOJ Matter ID:LA2022604242

Attachment: Exhibit A - Accusation

6

# Exhibit A

Accusation

1  ROB BONTA
   Attorney General of California
2  KIM KASRELIOVICH
   Supervising Deputy Attorney General
3  MICHAEL YI
   Deputy Attorney General
4  State Bar No. 217174
   300 So. Spring Street, Suite 1702
5  Los Angeles, CA 90013
     Telephone:  (213) 269-6483
6    Facsimile:  (916) 731-2126
     E-mail: Michael.Yi@doj.ca.gov
7  *Attorneys for Complainant*

8

9                         **BEFORE THE**
                   **DEPARTMENT OF CONSUMER AFFAIRS**
10   **FOR THE BUREAU FOR PRIVATE POSTSECONDARY EDUCATION**
                      **STATE OF CALIFORNIA**
11

12

13  In the Matter of the Accusation Against:     Case No. BPPE22-023

14  **ADVANCED COLLEGE; JUSRAND LLC-**          **ACCUSATION**
    **GURPREET SINGH, OWNER**
15
    Main Location
16  13180 Paramount Boulevard
    South Gate, CA 90280
17
    **Institution Code: 3013171**
18
    Branch Location
19  5258 Pirrone Court
    Salida, CA 95368
20
21  School Code: 96110225

22  Branch Location
    8338 West Lane
23  Stockton, CA 95210

24  School Code: 17834722

25                                   Respondent.

26

27

28

**PARTIES**

1.     Deborah Cochrane (Complainant) brings this Accusation solely in her official capacity as the Chief of the Bureau for Private Postsecondary Education (Bureau), Department of Consumer Affairs.

2.     On July 20, 1999, the Bureau issued Approval to Operate Institution Code 3013171 to Advanced College; Jusrand LLC - Gurpreet Singh, Owner (Respondent).  The Approval to Operate expired on July 29, 2022, and has not been renewed.  The Bureau received a Renewal for Approval to Operate an Accredited Institution application on July 28, 2022.  The status of the application is currently pending.  Respondent's main location is 13180 Paramount Boulevard., South Gate, California 90280.  Respondent's branch locations are 5258 Pirrone Court, Salida, California 95368 (School Code: 96110225), and 8338 West Lane, Stockton, California 95120 (School Code: 17834722).

**JURISDICTION**

3.     This Accusation is brought before the Director of the Department of Consumer Affairs (Director) for the Bureau, under the authority of the following laws.  All section references are to the Education Code unless otherwise indicated.

4.     Business and Professions Code section 118, subdivision (b), provides that the suspension, expiration, surrender, or cancellation of a license shall not deprive the Bureau of jurisdiction to proceed with a disciplinary action during the period within which the license may be renewed, restored, reissued or reinstated.

5.     Section 94875 provides that the Bureau shall regulate private postsecondary educational institutions.

6.     Section 94877 states, in relevant part, that:

"(a) The bureau shall adopt and shall enforce regulations to implement this chapter pursuant to the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

(b) The bureau shall develop and implement an enforcement program, pursuant to Article 18 (commencing with Section 94932) to implement this chapter ... "

7.      Section 94937 states that:

"(a) As a consequence of an investigation, which may incorporate any materials obtained or produced in connection with a compliance inspection, and upon a finding that an institution has committed a violation, the bureau may place an institution on probation or may suspend or revoke an institution's approval to operate for:

(1) Obtaining an approval to operate by fraud.

(2) A material violation or repeated violations of this chapter or regulations adopted pursuant to this chapter that have resulted in harm to students.  For purposes of this paragraph, 'material violation' includes, but is not limited to, misrepresentation, fraud in the inducement of a contract, and false or misleading claims or advertising, upon which a student reasonably relied in executing an enrollment agreement and that resulted in harm to the student.

(b)  The bureau shall adopt regulations, within one year of the enactment of this chapter, governing probation and suspension of an approval to operate.

(c)  The bureau may seek reimbursement pursuant to Section 125.3 of the Business and Professions Code.

(d)  An institution shall not be required to pay the cost of investigation to more than one agency."

8.      California Code of Regulations, title 5, section 75100 provides that the Bureau may suspend, revoke or place on probation with terms and conditions an approval to operate.

## STATUTORY PROVISIONS

9.      Section 94897 states: "An institution shall not do any of the following:

(i)  In  any manner make an untrue or misleading change in, or untrue or misleading statement related to, a test score, grade or record of grades, attendance record, record indicating student completion, placement, employment, salaries, or financial information, including any of the following:

(1) A financial report filed with the bureau.

(2) Information or records relating to the student's eligibility for student financial aid at the institution.

(3) Any other record or document required by this chapter or by the bureau.

(k) Willfully falsify, destroy, or conceal any document of record while that document of record is required to be maintained by this chapter.

(m) Direct any individual to perform an act that violates this chapter, to refrain from reporting unlawful conduct to the bureau or another government agency, or to engage in any unfair act to persuade a student not to complain to the bureau or another government agency.
"

10.    Section 94898, subdivision (a), states: "An institution shall not merge classes unless all of the students have received the same amount of instruction. This subdivision does not prevent the placement of students, who are enrolled in different educational programs, in the same class if that class is part of each of the educational programs and the placement in a merged class will not impair the students' learning of the subject matter of the class."

11.    Section 94899.5, subdivision (b), states: "For those programs designed to be four months or longer, an institution shall not require more than one term or four months of advance payment of tuition at a time. When 50 percent of the program has been offered, the institution may require full payment."

12.    Section 94900 states:

"(a) An institution shall maintain records of the name, address, e-mail address, and telephone number of each student who is enrolled in an educational program in that institution.

(b) An institution shall maintain, for each student granted a degree or certificate by that institution, permanent records of all of the following:

(1) The degree or certificate granted and the date on which that degree or certificate was granted.

(2) The courses and units on which the certificate or degree was based.

(3) The grades earned by the student in each of those courses."

13.    Section 94900.5 states: "An institution shall maintain, for a period of not less than five years, at its principal place of business in this state, complete and accurate records of all of the following information:

(b) The names and addresses of the members of the institution's faculty and records of the educational qualifications of each member of the faculty.

(c) Any other records required to be maintained by this chapter, including, but not limited to, records maintained pursuant to Article 16 (commencing with Section 94928)."

14.    Section 94902, subdivision (a), states: "A student shall enroll solely by means of executing an enrollment agreement.  The enrollment agreement shall be signed by the student and by an authorized employee of the institution."

15.    Section 94905, subdivision (a), states: "During the enrollment process, an institution offering educational programs designed to lead to positions in a profession, occupation, trade, or career field requiring licensure in this state shall exercise reasonable care to determine if the student will not be eligible to obtain licensure in the profession, occupation, trade, or career field at the time of the student's graduation and shall provide all students enrolled in those programs with a written copy of the requirements for licensure established by the state, including any applicable course requirements established by the state.  If the minimum course requirements of the institution exceed the minimum requirements for state licensure, the institution shall disclose this information, including a list of those courses that are not required for state licensure.  The institution shall not execute an enrollment agreement with a student that is known to be ineligible for licensure, unless the student's stated objective is other than licensure."

16.    Section 94911 states: "An enrollment agreement shall include, at a minimum, all of the following:

(a) The name of the institution and the name of the educational program, including the total number of credit hours, clock hours, or other increment required to complete the educational program.

(c) In underlined capital letters on the same page of the enrollment agreement in which the student's signature is required, the total charges for the current period of attendance, the estimated total charges for the entire educational program, and the total charges the student is obligated to pay upon enrollment.

"

17.    Section 94919 states:

"(a) An institution that participates in the federal student financial aid programs complies with this article by complying with applicable regulations of the federal student financial aid programs under Title IV of the federal Higher Education Act of 1965.

(c) The institution shall also provide a pro rata refund of nonfederal student financial aid program moneys paid for institutional charges to students who have completed 60 percent or less of the period of attendance.

"

18.    Section 94934.5, subdivision (a), states: "An institution with an approval to operate that knows that it is being investigated by an oversight entity other than the bureau shall report that investigation, including the nature of that investigation, to the bureau within 30 days of the institution's first knowledge of the investigation. An institution with an approval to operate that is the subject of a judgment by, a regulatory action by, increased oversight or monitoring by, or a settlement with, any oversight entity other than the bureau shall report it to the bureau within 30 days. Failure to comply with this section may subject the institution to an administrative citation pursuant to Section 94936."

## REGULATORY PROVISIONS

19.    California Code of Regulations, title 5, section 71710, states: "In order to meet its mission and objectives, the educational program defined in section 94837 of the Code shall be comprised of a curriculum that includes:

(a) Those subject areas that are necessary for a student to achieve the educational objectives of the educational program in which the student is enrolled;

(b) Subject areas and courses or modules that are presented in a logically organized manner or sequence to students;

(c) Course or module materials that are designed or organized by duly qualified faculty. For each course or module, each student shall be provided with a syllabus or course outline that contains:

(1) A short, descriptive title of the educational program;

(2) A statement of educational objectives;

(3) Length of the educational program;

(4) Sequence and frequency of lessons or class sessions;

( 5) Complete citations of textbooks and other required written materials;

(6) Sequential and detailed outline of subject matter to be addressed or a list of skills to be learned and how those skills are to be measured;

(7) Instructional mode or methods.

(f)   Evaluation by duly qualified faculty of those learning outcomes."

20.    California Code of Regulations, title 5, section 71715, states:

"(a) Instruction shall be the central focus of the resources and services of the institution.

(b) The institution shall document that the instruction offered leads to the achievement of the learning objectives of each course.

( c) Direct instruction requires the physical presence of one or more students and one or more faculty members at the same location. Direct instruction includes instruction presented in a classroom, seminar, workshop, lecture, colloquium, laboratory, tutorial, or other physical learning settings consistent with the mission, purposes, and objectives of the institution.

(d) Distance education as defined in section 94834 of the Code, does not require the physical presence of students and faculty at the same location but provides for interaction between students and faculty by such means as telecommunication, correspondence, electronic and computer augmented educational services, postal service, and facsimile transmission.  In

addition to the other requirements of this chapter and the Act, an institution offering distance

education shall:

(3) Ensure that the materials and programs are current, well organized, designed by faculty

competent in distance education techniques and delivered using readily available, reliable

technology;

(4) Provide for meaningful interaction with faculty who are qualified to teach using

distance education methods;

(5) Maintain clear standards for satisfactory academic progress;

(6) Timely complete student evaluations of learning outcomes by duly qualified faculty,

which are appropriate for use with the distance education methods used, and evaluated by duly

qualified faculty.

"

21.     California Code of Regulations, title 5, section 71716, subdivision (a), states: "An

institution offering a distance educational program where the instruction is not offered in real

time shall transmit the first lesson and any materials to any student within seven days after the

institution accepts the student for admission."

22.     California Code of Regulations, title 5, section 71720, subdivision (a), states: "An

Educational Program Leading to a Degree.

(1) An institution offering an educational program that leads to a degree shall employ duly

qualified faculty sufficient in number to provide the instruction, student advisement, and learning

outcomes evaluation necessary for the institution to document its achievement of its stated

mission and objectives, and for students to achieve the specific learning objectives of each course

offered;

"

////

////

////

23. California Code of Regulations, title 5, section 71730, states:

"(a) Each institution shall have a chief executive officer, a chief operating officer and chief academic officer. One person may serve more than one function.

(c) An institution with one or more branch locations shall establish written institutional policies, consistent with subdivision (d), regarding the division and sharing of administrative responsibilities between the central administration at the main location and the administration at the branch locations.

(d) The administrative staffing at each branch location shall reflect the purposes, size, and educational operations at that location and at any satellite location for which the branch has administrative responsibilities.

(:t) The institution shall employ administrative personnel who have the expertise to ensure the achievement of the institution's mission and objectives and the operation of the educational programs.

"

24. California Code of Regulations, title 5, section 71735, subdivision (a), states: "An institution shall have sufficient facilities and necessary equipment to support the achievement of the educational objectives of all of the courses and educational programs in which students are enrolled. If an institution represents that the educational service will fit or prepare a student for employment in a particular occupation or as described in particular job titles, either of the following conditions shall be met:

(1) The equipment used for instruction or provided to the student shall be comparable in model type or features to equipment generally used in those occupations or job titles at the time the instruction is offered.

(2) The institution shall establish that the equipment used for instruction or provided to a student is not obsolete and is sufficient for instructional purposes to reasonably assure that a student acquires the necessary level of education, training, skill, and experience to obtain

employment in the field of training and to perform the tasks associated with the occupation or job title to which the educational program was represented to lead."

25.    California Code of Regulations, title 5, section 71745, subdivision (a), states: "The institution shall document that it has at all times sufficient assets and financial resources to do all of the following:

(1) Provide all of the educational programs that the institution represented it would provide.

(2) Ensure that all students admitted to its educational programs have a reasonable opportunity to complete the programs and obtain their degrees or diplomas.

(3) Maintain the minimum standards required by the Act and this chapter.

(4) Pay timely refunds as required by Article 13 of the Act.

(5) Pay all operating expenses due within 30 days.

"

26.    California Code of Regulations, title 5, section 71750, states:

"(a) Every institution shall make refunds that are no less than the refunds required under the Act and this Division.

(b) An institution may not enforce any refund policy that is not specified in the catalog as required pursuant to section 94909(a)(8)(B) of the Code, and must refund all institutional charges upon a student's withdrawal.  Withdrawal policy procedures pursuant to section 94909(a)(8)(B) of the Code shall include, at a minimum: the acceptable methods of delivery of a notice to withdraw; whether withdrawal can be accomplished by conduct, and if so, how; the position or positions to whom the notice to withdraw must be delivered; and the date that the notice to withdraw is considered effective, which shall be no later than the date received by the institution.

(c) A pro rata refund pursuant to section 94919(c) or 94920(d) or 94927 of the Code shall be no less than the total amount owed by the student for the portion of the educational program provided subtracted from the amount paid by the student, calculated as follows:

(1) The amount owed equals the daily charge for the program (total institutional charge, divided by the number of days or hours in the program), multiplied by the number of days student attended, or was scheduled to attend, prior to withdrawal.

(2) Except as provided for in subdivision (a)(3) of this section, all amounts paid by the student in excess of what is owed as calculated in subdivision (a)(l) shall be refunded.

(e) An institution shall refund any credit balance on the student's account within 45 days after the date of the student's completion of, or withdrawal from, the educational program in which the student was enrolled. For purposes of this subdivision and section 94919(d) of the Code, 'day' means calendar day.

(f) The institution shall maintain a cancellation and withdrawal log, kept current on a monthly basis, which shall include the names, addresses, telephone numbers, and dates of cancellations or withdrawal of all students who have cancelled the enrollment agreement with, or withdrawn from, the institution during the calendar year."

27. California Code of Regulations, title 5, section 71770, subdivision (a), states: "The institution shall establish specific written standards for student admissions for each educational program. These standards shall be related to the particular educational program. An institution shall not admit any student who is obviously unqualified or who does not appear to have a reasonable prospect of completing the program. In addition to any specific standards for an educational program, the admissions standards must specify as applicable that:

(1) Each student admitted to an undergraduate degree program, or a diploma program, shall possess a high school diploma or its equivalent, or otherwise successfully take and pass the relevant examination as required by section 94904 of the Code.

(2) Each student admitted into a post-baccalaureate degree program shall possess a bachelor's degree or its equivalent. If a graduate program leads to a profession or an occupation requiring state licensure and the licensing agency does not require that a member of the profession or occupation possess a Bachelor's degree or its equivalent, this subdivision does not apply."

////

////

////

28.    California Code of Regulations, title 5, section 71800, states: "In addition to the requirements of section 94911 of the Code, an institution shall provide to each student an enrollment agreement that contains at the least the following information:

(b) Period covered by the enrollment agreement.

(d) Date by which the student must exercise his or her right to cancel or withdraw, and the refund policy, including any alternative method of calculation if approved by the Bureau pursuant to section 94921 of the Code.

     "

29.    California Code of Regulations, title 5, section 71920, states:

"(a) The institution shall maintain a file for each student who enrolls in the institution whether or not the student completes the educational service.

(b)  In addition to the requirements of section 94900, the file shall contain all of the following pertinent student records:

( 4) Records of the dates of enrollment and, if applicable, withdrawal from the institution, leaves of absence, and graduation; and

( 5) In addition to the requirements of section 94900(b) of the Code, a transcript showing all of the following:

(A)   The courses or other educational programs that were completed, or were attempted but not completed, and the dates of completion or withdrawal;

(B)   Credit awarded for prior experiential learning, including the course title for which credit was awarded and the amount of credit;

(C)   Credit for courses earned at other institutions;

(D)   Credit based on any examination of academic ability or educational achievement used for admission or college placement purposes;

(E)   The name, address, website address, and telephone number of the institution.

(ADVANCED COLLEGE; JUSRAND LLC - GURPREET SINGH, OWNER) ACCUSATION

(10) A document specifying the amount of a refund, including the amount refunded for tuition and the amount for other itemized charges, the method of calculating the refund, the date the refund was made, and the name and address of the person or entity to which the refund was sent;

"

30.    California Code of Regulations, title 5, section 71930, states:

"(a) An institution shall maintain all records required by the Act and this chapter.  The records shall be maintained in this state.

(b)(1) In addition to permanently retaining a transcript as required by section 94900(b) of the Code, the institution shall maintain for a period of 5 years the pertinent student records described in Section 71920 from the student's date of completion or withdrawal

(e) All records that the institution is required to maintain by the Act or this chapter shall be made immediately available by the institution for inspection and copying during normal business hours by the Bureau and any entity authorized to conduct investigations.

"

31.    California Code of Regulations, title 5, section 74006, states:

"(a) An institution's annual fee is due within 30 days of the date on which the institution originally receives its approval to operate and each year thereafter on the anniversary of the date of the original approval.

(b) An institution shall pay its annual fee in addition to any other applicable fees.

"

32.    California Code of Regulations, title 5, section 76120, subdivision (a), states: "Each qualifying institution shall collect an assessment of zero dollars ($0) per one thousand dollars ($1,000) of institutional charges, rounded to the nearest thousand dollars, from each student in an educational program who is a California resident or is enrolled in a residency

(ADVANCED COLLEGE; JUSRAND LLC - GURPREET SINGH, OWNER) ACCUSATION

program.  For institutional charges of one thousand dollars ($1,000) or less, the assessment is zero dollars ($0)."

33.    California Code of Regulations, title 5, section 76130, states:

"(a)(l) A qualifying institution shall collect the assessment from each student in an educational program at the time it collects the first payment from or on behalf of the student at or after enrollment.  The assessment shall be collected for the entire period of enrollment, regardless of whether the student pays the institutional charges in increments.

(2) The assessment to be collected from a re-enrolling student shall be limited to any amount that is due after crediting any prior assessment amount paid by the student.  The enrollment agreement shall clearly identify any prior STRF assessment paid by the student.

(b) A qualifying institution shall complete the STRF Assessment report and remit it with the STRF assessments collected from students to be received by the Bureau no later than the last day of the month following the close of the quarter as follows:

(1) April 30 for the first quarter,

(2) July 31 for the second quarter,

(3) October 31 for the third quarter, and

(4) January 31 for the fourth quarter.

If the due date falls on a Saturday, Sunday, or State or federal holiday, the due date shall be extended to the next regular business day for the Bureau.

(c) The STRF Assessment report shall contain the following information:

( 1) Total number of students who signed enrollment agreements for educational programs during the reporting period; and

(2) Total number of students eligible for STRF who signed enrollment agreements for educational programs during the reporting period; and

(3) The total number of students who signed their enrollment agreement during the reporting period, were eligible for STRF, and who made their first payment during the reporting period; and

(ADVANCED COLLEGE; JUSRAND LLC - GURPREET SINGH, OWNER) ACCUSATION

(4) The total number of students who signed their enrollment agreement in a previous reporting period, were eligible for STRF, and who made their first payment during the current reporting period; and

(5) Total amount of institutional charges after rounding each student's institutional charges to the nearest $1,000, for all eligible STRF students whose STRF assessment was collected in the reporting period; and

(6) Current contact telephone number of the person preparing the form; and

(7) A declaration dated and signed under penalty of perjury by the person preparing the form that the form and any attachments are true and correct.

(d) In the event of a school closure, any collected assessments shall be remitted to the Bureau within seven days following the cessation of instruction.

( e) Submission of all prior reports and assessments required by this section is a condition of renewal."

## COST RECOVERY

34.    Section 94937, subdivision (c), provides that the Bureau may seek reimbursement costs of investigation and enforcement pursuant Business and Professions Code section 125.3.

35.    Business and Professions Code section 125.3 provides that the Board may request the administrative law judge to direct a licensee found to have committed a violation or violations of the licensing act to pay a sum not to exceed the reasonable costs of the investigation and enforcement of the case, with failure of the licensee to comply subjecting the license to not being renewed or reinstated.  If a case settles, recovery of investigation and enforcement costs may be included in a stipulated settlement.

## CONSUMER COMPLAINTS AGAINST RESPONDENT

36.    On January 6, 2022, the Bureau received an anonymous complaint from the Board of Vocational Nursing and Psychiatric Technicians (BVNPT) alleging that Advanced College, located at 5258 Pirrone Court, in Salida, California (Salida Campus) failed to follow admissions guidelines for Respondent's Vocational Nursing program.  The complaint stated that:

(1) complainant was dropped from the program for being unable to pass the class; (2) the school enrolled students into the program who did not pass the entrance exam; and (3) school employees took the entrance exam for students that could not pass.  The complaint also stated that the school committed fraud by not allowing students to complete the program.  The Bureau received prior complaints against the school alleging that the school failed to: (1) provide the supplies needed for programs; (2) disclose admissions requirements; and (3) provide timely enrollment refunds.

37.    The Bureau also received complaints against Advanced College located 13180 Paramount Boulevard in South Gate, California (Main Campus), and 8338 West Lane in Stockton, California (Stockton Campus), alleging that the schools: (1) failed to properly teach their students and disclose the loss of financial aid; (2) enrolled students without providing the required education; and (3) falsified records.

38.    On December 22, 2021, the Bureau received notice from the United States Department of Education (DOE) of the DOE's  denial of Respondent's application to continue participating in the federal student financial assistance programs.  The DOE provided Respondent with several reasons for the denial, including Respondent's failure to pay timely refunds to students, submission of false information during the DOE's investigation, failure to meet standards of financial responsibility, and failure to demonstrate administrative capability.

**BUREAU INVESTIGATION OF RESPONDENT**

39.    On January 6, 2022, a Bureau Investigator ("Bureau Investigator") and a BVNPT Nurse Education Consultant visited the Salida Campus.  The Bureau Investigator requested specific documents during the visit, including the school's current student roster, school catalog, School Performance Fact Sheets and backup data, financial report, and faculty list.  The Bureau Investigator reviewed the limited documents provided by school employees and interviewed school employees.  The Bureau Investigator also reviewed and obtained copies of student files for students enrolled at the Salida Campus, Main Campus, and Stockton Campus.  Respondent failed to provide student rosters for current or former students, a complete school catalog, complete student files for several students, the School Performance Fact Sheet backup data, a student withdrawal/drop log from 2019 to the present, a current financial report, or faculty list.

(ADVANCED COLLEGE; JUSRAND LLC - GURPREET SINGH, OWNER) ACCUSATION

40.     After the Salida Campus visit, the BVNPT Nurse Education Consultant provided a copy of her report to the Bureau Investigator for the Salida Campus and Stockton Campus.  The reports cited the schools for BVNPT violations, including: (1) the failure to use the admissions criteria submitted to BVNPT to admit students to their Vocational Nursing programs; (2) the admission of students into the Vocational Nursing program with scores that did not meet the required standard and misrepresentation of the students' ability to benefit from the program to BVNPT; (3) the failure to notify BVNPT of changes to staff and faculty related to the Vocational Nursing program; and (4) the failure to maintain the required test (or program) passage rates.

41.     The Bureau Investigator continued to investigate and obtain documents from Respondent.  The Bureau Investigator reviewed additional student files, interviewed current and former employees, interviewed current and former students, and interviewed representatives from BVNPT.

### THE BUREAU'S EMERGENCY DECISION

42.     On December 8, 2022, the Bureau issued a Notice and Emergency Decision to Respondent, pursuant to section 94938, California Code of Regulations, title 5, section 75150, and Government Code section 11460.10, et seq.  The Notice and Emergency Decision informed Respondent that effective at the close of business on December 19, 2022, Respondent  was required to cease enrollment of any new students in all Institutional programs, cease all instruction in all Institutional programs, and cease the collection of tuition and fees for all Institutional programs.  Respondent did not request to be heard before the Director regarding the allegations in the Emergency Decision.

////
////
////
////
////
////
////

# FIRST CAUSE FOR DISCIPLINE

## (Prohibited Business Practices)

43.   Respondent is subject to disciplinary action under section 94937, for violating section 94897, subdivisions (j), (k), and (m), as follows:

44.   The student file for S. C.[1] (Salida Campus) included three different Enrollment Agreements.  Two of the Enrollment Agreements did not accurately state the number of course hours, and the date S. C. signed the Enrollment Agreements.

45.   Respondent falsified admissions test results for students enrolled in the Vocational Nursing program that were unable to meet the admissions requirements.

46.   The R2T4[2] form for A. C. (Stockton Campus) contained false information.  The date A.C. signed the R2T4 form predated the date of creation of the form.  The form included a statement that A. C. was notified of a post-withdrawal disbursement on September 11, 2021, but the form was not created until December 6, 2021.

47.   Respondent provided an Enrollment Agreement dated December 17, 2020, that included Student Tuition Recovery Fund (STRF) fees that did not go into effect for that student until February 8, 2021, and had a document revision date of February 25, 2021.  Respondent falsified the date that the document was signed, and represented that the document was created and signed on December 17, 2020, when it was created and signed on or after February 25, 2021.

48.   Payment ledgers for A. R. (Stockton Campus), J.M. (Stockton Campus), E. A. (Stockton Campus), A. T. (Stockton Campus), L. Y. C. (Stockton Campus), L. P. (Stockton Campus), and R. G. (Stockton Campus) reflected a STRF charge for $17.50 that was not paid by the student, and was not itemized on their Enrollment Agreements.

49.   Respondent admitted students without verifying that the students were qualified based on the school's admissions standards.  The student files for E. A., L. Y. C, L. P., and R. G. contained a letter dated February 16, 2021, stating that they had been admitted to the program

---

[1] Individuals' initials are used to protect their identities.

[2] R2T4 refers to the calculation required when a recipient of Title IV aid withdraws from an institution during a payment period/period of enrollment in which the recipient began attendance.

1  and had met all nursing admissions requirements prior to passing the HESI (Health Education

2  Systems, Inc.) exam, which they took February 19, 2021.

3      50.    Respondent admitted a student without verifying that the student was qualified based

4  on the school's admissions standards.  The student file for S. H. (Salida Campus) contained a

5  letter dated January 16, 2019, stating that S. H. had been admitted to the Vocational Nursing

6  program, and had met all admissions requirements, including passing a HESI exam.  The student

7  file did not have documentation that the student completed a HESI exam, and the required

8  admissions policy was for an ATI TEAS (Test of Essential Academic Skills) exam.  The student

9  file did not contain a copy of an ATI TEAS test.

10      51.    The Enrollment Agreement for V. G. (Salida Campus) stated that the Vocational

11  Nursing program was 62 instructional weeks.  However, the program start, and scheduled

12  completion date was for only 30 weeks.  V. G.'s student file contained a payment ledger that did

13  not accurately reflect the charges based on the Enrollment Agreement.  The payment ledger

14  included a STRF fee of $4.00, while the Enrollment Agreement identified a STRF fee of $17.50.

15  The payment ledger identified a certification fee of $7.81, while the Enrollment Agreement

16  represented the fee as $500.00.  There were several other fees charged on the payment ledger that

17  were not accurately reflected on the Enrollment Agreement.

18      52.    Respondent made an untrue statement on an Enrollment Agreement for S. C.

19  regarding the total credits charged for, and the associated tuition fees for that Enrollment

20  Agreement.  Respondent made an untrue statement related to the charges on S. C.'s payment

21  ledger by charging for, but not providing, uniforms and a background check.

22      53.    Respondent made misleading statements regarding attendance records.  Respondent

23  provided 60 minutes of credit for 15 minutes of participation in an educational program.

24      54.    Respondent made a false or misleading statement on a record of attendance.  The

25  student file for D. V. (Stockton Campus) contained leave of absence paperwork created on

26  March 16, 2022, which is the date that Respondent provided the file to the Bureau Investigator.

27  The paperwork stated that D. V. was on a leave of absence from October 3, 2021, until March

28  21, 2022, which was inconsistent with the information provided by D. V.  Respondent charged

(ADVANCED COLLEGE; JUSRAND LLC - GURPREET SINGH, OWNER) ACCUSATION

D. V. tuition fees on October 4, 2021, for an entire term, although the paperwork indicated that she had taken a leave of absence.

55.     Respondent made a misleading and false change in a test score to admit A. R. into the Vocational Nursing program.  Respondent also made a false statement regarding fees charged to A. R. for services and supplies that were not provided, including a background check, uniforms, books, and supplies.

56.     Respondent directed an employee to make false statements on annual reports to its accreditor regarding placement and graduation rates.  Respondent also falsified a record of completion for a former student.

57.     Respondent made a misleading and false change in a test score to admit J.M. into the Vocational Nursing program.  Respondent also made a false statement regarding fees charged to J. M. for a background check, uniforms, books, and supplies, which were not provided.  Respondent made false statements regarding an attendance record showing that J. M. attended the full course period, but did not provide educational services for the entire scheduled class time.

58.     Respondent admitted C.H. (Salida Campus) without verifying that the student met the admissions standards.  C. H. did not take Respondent's required admissions test.

59.     Respondent instructed students to refrain from reporting unlawful behavior and providing complaints to the Bureau and other government agencies.

60.     On March 30, 2022, Respondent's Chief Operating Officer, J.M., provided statements to the Bureau Investigator that test scores were fraudulently altered by school staff.  On April 5, 2022, Respondent's Director of Nursing, K. F., provided an email from HESI regarding admissions tests taken fraudulently at the school.  Respondent falsified test scores for students to admit them into educational programs.

61.     Respondent made a false statement regarding collection of tuition.  Respondent provided a statement to students on January 27, 2022, stating payments for tuition charges incurred after December 31, 2021, were not required.  Respondent subsequently demanded payments before providing a diploma to Main Campus graduates M. Z., B. P., and L. J.

62. Respondent made false statements regarding a record of attendance by failing to ensure that all students completed their clinical rotations. Respondent provided transcripts and diplomas to students reflecting that they completed all required hours and components of an educational program, when in fact they did not.

63. Respondent directed an employee to falsify documents that were provided to the Bureau during the January 6, 2022 onsite investigation. Respondent directed the employee to refrain from speaking to, and reporting unlawful behavior and providing complaints to the Bureau and other government agencies. Complainant incorporates paragraphs 36-42, as though fully stated here.

## SECOND CAUSE FOR DISCIPLINE

### (Notice of Investigation of Institution)

64. Respondent is subject to disciplinary action under section 94937, for violating section 94934.5, subdivision (a), as follows: Respondent failed to notify the Bureau of the Show Cause Order taken by the Council on Occupation Education, effective September 16, 2021. Complainant incorporates paragraphs 36-42, as though fully stated here.

## TIDRD CAUSE FOR DISCIPLINE

### (Financial Resources)

65. Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 71745, subdivision (a), as follows: Respondent failed to provide documentation of sufficient assets to provide all of the educational programs offered, failed to ensure that all admitted students had an opportunity to complete their programs, failed to maintain the standards set forth by the Bureau's laws and regulations, failed to pay timely refunds, and failed to document the ability to pay all operating expenses.

66. Respondent provided bank statements and operational expense reports demonstrating that Respondent would become insolvent as early as June 2022. Respondent provided active student lists showing that students were not scheduled to complete their educational program until April 2023. Current and former employees of Respondent that stated they were not paid timely, were not provided with necessary educational materials, and received phone calls from

1 vendors regarding past due payments for required educational materials.  Student files also

2 revealed that Respondent failed to provide refunds to students, or to the federal government

3 when due, or at all.  The U.S. Department of Education also provided documents to the Bureau

4 demonstrating that the school failed to meet its fiduciary responsibility.

5  Complainant incorporates paragraphs 36-42, as though fully stated here.

6 **<u>FOURTH CAUSE FOR DISCIPLINE</u>**

7 **(Merging Classes, Converting Method of Delivery, Changing Locations)**

8  67. Respondent is subject to disciplinary action under section 94937, for violating

9 section 94898, subdivision (a), as follows: on April 11, 2022, D. L., a former Vocational Nursing

10 Instructor at the Main Campus informed the Bureau Investigator that the school merged the

11 Medical Assisting program courses with the Surgical Technology program courses due to a lack

12 of instructors.  The school merged two or more classes where all students have not received the

13 same amount of instruction, and were not enrolled in the same courses.

14  Complainant incorporates paragraphs 36-42, as though fully stated here.

15 **<u>FIFTH CAUSE FOR DISCIPLINE</u>**

16 **(Educational Program, Instruction, and Faculty)**

17  68. Respondent is subject to disciplinary action under section 94937, for violating

18 California Code of Regulations, title 5, section 71710, subdivisions (a), (b), (c), and (f),

19 California Code of Regulations, title 5, section 71715, subdivisions (a), (b), (c), (d), (d)(3),

20 (d)(4), (d)(5), and (d)(6), and California Code of Regulations, title 5, section 71720, subdivision

21 (a)(l), as follows:

22  69. Respondent failed to offer an educational program that included the areas necessary

23 for B. P. to achieve the educational objectives of the student's program.  Respondent failed to

24 provide a laboratory environment for the required laboratory component of the course.

25 Respondent failed to provide B. P. with the required variety of specialties in the externship

26 component of the educational program.  Respondent failed to provide the courses organized in a

27 logical manner to students.  Respondent did not provide the required educational courses to

28

1  prepare B. P. for the experience of working at an externship site as part of the educational

2  program.

3       70.     Respondent failed to present an educational program in a logically organized

4  sequence.  Respondent admitted D. V. in the middle of a term, and did not provide the course in

5  the required sequence.  Respondent also failed to provide course materials designed by qualified

6  faculty, including a course syllabus.

7       71.     Respondent failed to provide an educational program (Vocational Nursing) that

8  included evaluation by duly qualified faculty of the learning outcomes for each course or

9  module.  A. R., J.M., M. Z, B. P., and L. J. were not provided with an instructor for the distance

10  education courses provided by the school.

11      72.     Respondent failed to have instruction as the central focus of the services and

12  resources of the institution.  Respondent failed to employ sufficient duly qualified faculty to

13  provide instruction, and to ensure that the educational program included meaningful interactions

14  between faculty and students, failed to provide the required materials for the program, and failed

15  to ensure that learning outcomes were evaluated by duly qualified faculty.  Students participating

16  in distance education were not provided with meaningful interaction with qualified faculty.

17      73.     Respondent failed to have instruction as the central focus of the services and

18  resources of the institution.  Former employees provided statements that the school failed to

19  provide instruction for distance education programs, and failed to provide the necessary supplies

20  and equipment to instructors and students to achieve the educational objectives of the programs.

21  Current and former students provided statements that instruction was not provided while they

22  attended the school.

23      74.     Respondent failed to document instruction to achieve the learning objectives of the

24  course.  Students completed the Vocational Nursing course, but did not pass the NCLEX

25  (National Council Licensure Examination), a stated learning objective of the course.  Respondent

26  only had 34% of their graduates attempt to take the NCLEX, and only 14% of the entire eligible

27  cohort population passed the exam.

28

75. Respondent failed to have instructors present when the students were enrolled, and attending courses provided by direct instruction.

76. Respondent failed to provide instruction in its distance education offerings. The distance education did not provide for interaction between students and faculty. Students were deprived of meaningful interaction with qualified faculty.

77. Respondent failed to maintain clear standards for satisfactory academic progress. Several students failed to maintain academic progress and the school did not follow its published policy regarding academic progress. A. R., J. M., and A. T. failed their first course and should not have been permitted to continue based on Respondent's 2021 School Catalog, which required that the student "earn and maintain a 'C' grade in each term according to their current enrolled course."

78. Respondent failed to ensure that learning outcomes were evaluated by duly qualified faculty.

79. Respondent failed to employ duly qualified faculty to provide instruction, student advisement, and learning outcome evaluation for D. V.'s degree program.

Complainant incorporates paragraphs 36-42, as though fully stated here.

## SIXTH CAUSE FOR DISCIPLINE

### (Distance Educational Programs - Specific Provisions for Instruction Not in Real Time)

80. Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 71716, subdivision (a), as follows: Respondent failed to transmit all materials to students within seven days after accepting the student for admission. Respondent failed to provide textbooks and educational materials necessary to participate in the educational program within seven days of the start of a term.

## SEVENTH CAUSE FOR DISCIPLINE

### (Facilities and Equipment)

81. Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 71735, subdivision (a), as follows: Respondent

failed to have sufficient equipment for enrolled students to achieve the educational objectives of several educational programs.

## EIGHTH CAUSE FOR DISCIPLINE

### (Professions Requiring Licensure, Internships, and
### Admissions Standards and Transferred Credits Policy)

82.     Respondent is subject to disciplinary action under section 94937, for violating section 94905, subdivision (a), and California Code of Regulations, title 5, section 71770, subdivision (a), as follows:

83.     Respondent did not exercise reasonable care to ensure that a student enrolled in an educational program that leads to a profession requiring licensure would be eligible to obtain licensure in the state, and did not follow their admissions policy to ensure that the student had an ability to benefit from the program.

84.     Respondent failed to have a written admissions policy that related to the particular educational program.  Respondent provided a School Catalog, and made statements that Respondent did not include a background check as a part of the admissions process for the Surgical Technology program, although a clean background check was required to complete the externship portion of the educational  program.

85.     The student file for P. W. (Stockton Campus) contained documentation reflecting a score of 41.3% on the ATI TEAS test.  The required passing score is 55%.  The school admitted unqualified students based on the school's admissions standards.  The student files for E. A., L. Y. C, L. P., and R. G. contained a letter dated February 16, 2021 stating that they had been admitted to the program and had met all nursing admissions requirements prior to the passing HESI exam, taken on February 19, 2021.

86.     The student file for S. H. contained a letter dated January 16, 2019 stating that S. H. had been admitted to the program and had met all nursing admissions requirements, including passing a HESI exam.  S. H.'s student file did not contain documentation that S. H. completed a HESI exam, and the admissions policy required an ATI TEAS exam, not a HESI exam.  S. H.'s

1  student file did not contain a copy of an ATI TEAS test.  The student file for P. P. (Salida

2  Campus) contained a HESI exam score, and but no documentation of an ATI TEAS exam.

3        87.    Respondent's admission policy required a score of 25 or more on a Wonderlic

4  Scholastic Level Exam (SLE), and 55 or more on an ATI TEAS exam.  The student file for C. A.

5  (Stockton Campus) contained a copy of an ATI test with a score of 98%, with a testing time of

6  57 minutes.  The ATI test score was questionable, based on other tests having taken 3 or more

7  hours, and not scoring as high.  Additionally, C. A. scored 25 out of 50 on the Wonderlic SLE.

8  When asked for testing details, staff responded that ATI did not have a login for C. A.  But the

9  student file contained a letter stating that C. A. had been admitted to the program, and had met

10  all nursing admissions requirements, including passing an ATI TEAS exam.

11        88.    The student file for B. M. (Main Campus) contained a document stating that B. M.'s

12  school district was closed, and B. M. was unable to obtain a transcript reflecting high school

13  completion.  No additional documentation was provided in lieu of a high school transcript.

14  Respondent did not ensure that B. M. had a reasonable prospect of completing the program.

15  **NINTH CAUSE FOR DISCIPLINE**

16  **(Administration)**

17        89.    Respondent is subject to disciplinary action under section 94937, for violating

18  California Code of Regulations, title 5, section 71730, subdivisions (a), (c), (d), and (f), as

19  follows:

20        90.    Respondent failed to employ a Chief Academic Office and a Chief Executive

21  Officer.  Respondent failed to employ administrative personnel with expertise to achieve

22  Respondent's mission and objectives, and the operations of the educational programs.

23        91.    Respondent failed to have written policies regarding the division and sharing of

24  administrative responsibilities among its branches.

25        92.    Respondent failed to have administrative staff at a branch location reflecting the

26  purpose, size, and educational objectives of the school.  The documents provided from the Salida

27  Campus, Stockton Campus and Main Campus were full of discrepancies, missing information,

28

and missing documents.  Respondent provided several versions of the same document with different information, demonstrating a complete lack of administration at the branch level.

93.    Respondent failed to timely provide required paperwork to BVNPT for students to take their licensing exam upon completion of their educational program.  Respondent failed to maintain accurate records of students who completed an educational program.  Respondent did not have the capacity to meet the administrative needs of its student population related to admissions, financial ledgers, educational resources, and educational materials.

## **TENTH CAUSE FOR DISCIPLINE**

### **(Collection of Tuition, Institution Participating in Federal Student Financial Aid Programs, and Withdrawals and Refunds)**

94.    Respondent is subject to disciplinary action under section 94937, for violating section 94899.5, subdivision (b), section 94919, subdivisions (a) and (c), and California Code of Regulations, title 5, section 71750, subdivisions (a), (b), (c)(l), (c)(2), (e), and (f), as follows:

95.    The student files for A. R., J.M., E. A., A. T., L. Y. C., L. P., R. G., and C.H. contained a payment ledger indicating that the student was required to pay for more than 4 months of tuition upon enrollment.  The tuition charges noted on the payment ledger covered in excess of four months of the clock hour program.

96.    Respondent provided several student files for students who had been dropped, or withdrawn from their programs, which showed that Respondent failed to accurately calculate the amount of entitled Title IV funding.  Respondent failed to provide a return of Title IV funds to the federal government within 45 days of a student's last day of attendance.  Respondent also failed to return Title IV funds for dropped or withdrawn students.  A.G., a former Financial Aid Advisor for Respondent, provided statements that Respondent habitually missed required deadlines for overpayment returns to students, refunds owed to the federal government for Title IV refunds, and the application of funds to students' accounts while attending the school.

97.    The student files for S. C. and A. C. showed that Respondent failed to follow federal regulations requiring Respondent to complete the R2T4 within 45 days of the student's last date

1  of attendance.  Respondent also failed to calculate and provide a pro rata refund of non-title IV

2  funds for the student.

3        98.       Respondent provided student files for dropped and withdrawn students which

4  showed that Respondent failed to calculate a refund based on the state refund requirements.

5        99.       Student files for dropped and withdrawn students showed that Respondent failed to

6  comply with the refund policy in the School Catalog.

7        100.       Respondent provided a refund calculation worksheet for T. H. (Stockton Campus)

8  that did not accurately reflect the amount of money due to be refunded.  Based on the Enrollment

9  Agreement and date of withdrawal, T. H. was entitled to a refund of $1,162.26, but was refunded

10  $1,052.26.  Respondent fixed the mistake in the calculations, changing the number for

11  Kit/Books/Supplies to $308 rather than $398, but did not correct the error in the final total of the

12  refund, as reflected on the final line of the paper, and the check that was included with the form.

13  Respondent failed to refund a credit balance within 45 days of the date of T. H.'s withdrawal

14  from the school.  The student file contained a status change form stating that T. H.'s last day of

15  attendance was October 21, 2021.  The refund calculation was not completed until February 8,

16  2022.

17        101.       Respondent failed to maintain accurate records of the dates that students dropped or

18  withdrew from their programs, updated on a monthly basis.

19                       **ELEVENTH CAUSE FOR DISCIPLINE**

20               **(Required Student Records, General Enrollment Requirements,**

21        **Minimum Requirements for Enrollment Agreements, Enrollment Agreement,**

22            **Student Records, and Amount of STRF Assessment** )

23        102.       Respondent is subject to disciplinary action under section 94937, for violating

24  section 94900, subdivisions (a), (b)(l), (b)(2), (b)(3), section 94902, subdivision (a), 94911,

25  subdivisions (a) and (c), California Code of Regulations, title 5, section 71800, subdivisions (b)

26  and (d), California Code of Regulations, title 5, section 71920, subdivisions (a), (b)(4), (b)(5)(A-

27  E), and (b)(lO), and California Code of Regulations, title 5, section 76120, subdivision (a), as

28  follows:

103.   Respondent failed to maintain required student records including the name, address, email address and telephone number for students enrolled in an educational program.

104.   Respondent did not maintain transcripts for students who had dropped, withdrawn, or completed their program.

105.   Respondent provided two Enrollment Agreements for S. C. that did not include a signature from an authorized employee of the institution.  The Enrollment Agreement for P. W. contained signatures from the student and school dated September 13, 2018, after P. W.'s program began on August 13, 2018.

106.   Respondent did not enroll students after executing an Enrollment Agreement.  The Enrollment Agreement for S. H. contained signatures from the student and school dated April 17, 2019, after S. H.'s program began on March 25, 2019.  The Enrollment Agreement for C. A. contained signatures from the student and school dated September 13, 2018, after C. A's program began on August 13, 2018.  The Enrollment Agreement for Q. B. (Stockton Campus) also contained an Enrollment Agreement that was signed after Q. B.'s program began.

107.   The student file for S. C. did not contain an Enrollment Agreement that identified the total number of enrolled credits.  S. C.'s transfer credits were credited, but not accounted for on the Enrollment Agreement, or in the cost of tuition on the Enrollment Agreement.  The student file for P. P. contained an Enrollment Agreement that did not accurately reflect the length of the educational program.  P. P.'s Enrollment Agreement listed the accepted transfer credits, but did not reflect the total clock hours for the enrolled program.

108.   Respondent failed to accurately identify the charges for a period of attendance on students' Enrollment Agreements.

109.   Respondent failed to identify the period covered by Enrollment Agreements.

110.   Respondent failed to identify the date by which the student must exercise their right to cancel in several Enrollment Agreements.

111.   Respondent failed to maintain records of the dates of enrollment and/or withdrawal from the school, including leave of absences and graduation dates.

112.  Respondent failed to maintain student transcripts showing the courses that were completed, or attempted and not completed.

113.  Respondent failed to maintain records specifying the amount of a refund, and the method of calculating that refund.

114.  Respondent failed to charge the required STR.F' fee on the Enrollment Agreement.

## TWELFTH CAUSE FOR DISCIPLINE

### (Required Institutional Records)

115.  Respondent is subject to disciplinary action under section 94937, for violating section 94900.5, subdivisions (b) and (c), as follows: Respondent failed to maintain records of the names and addresses of the members of Respondent's faculty.  Respondent also failed to maintain required records including a withdrawal log, financial records, the School Catalog, and records pertaining to the SPFS.

## THIRTEENTH CAUSE FOR DISCIPLINE

### (Maintenance of Records)

116.  Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 71930, subdivisions (a), (b)(l) and (e), as follows:

117.  Respondent failed to maintain all of the records required by the Bureau.  Respondent failed to provide several required documents that Respondent is required to maintain during the onsite investigation.  Respondent also failed to respond to the Bureau's request for required records.  Respondent failed to maintain student files for enrolled students.  The student files provided by Respondent failed to contain all of the required records, including transcripts, attendance records, withdrawal records, and program completion records.

118.  The student files for P. T. (Main Campus), V. G., J. A. (Stockton Campus), Q. B., B. M., and C.H. did not contain a transcript showing the courses completed, or attempted and not completed.

119.  Respondent failed to immediately provide records required to be maintained by Respondent upon the Bureau's request during the onsite investigation.

**FOURTEENTH CAUSE FOR DISCIPLINE**

**(Collection and Submission of STRF Assessments)**

120.   Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 76130, subdivisions (a)-(e), for failing to submit STRF invoices for the first, second, and third quarters of 2022.

**FIFTEENTH CAUSE FOR DISCIPLINE**

**(Annual Fees)**

121.   Respondent is subject to disciplinary action under section 94937, for violating California Code of Regulations, title 5, section 74006, subdivisions (a) and (b), for failing to submit the annual fee and late fee invoices for calendar year 2022.

**PRAYER**

WHEREFORE, Complainant requests that a hearing be held on the matters alleged in this Accusation, and that following the hearing, the Director of the Department of Consumer Affairs issue a decision:

1.   Revoking or suspending Approval to Operate Institution Code 3013171, issued to Advanced College; Jusrand LLC - Gurpreet Singh, Owner;

2.   Ordering Respondent to pay the Bureau for Private Postsecondary Education the reasonable costs of the investigation and enforcement of this case, pursuant to Business and Professions Code section 125.3; and,

3.   Taking such other and further action as deemed necessary and proper.

DATED:   **12/19/22**

"Original Signature On file"

**DEBORAH COCHRANE**
Chief
Bureau for Private Postsecondary Education
Department of Consumer Affairs
State of California
*Complainant*

LA2022604242
65621473.docx